XAVIER BECERRA
Attorney General of California
SARAH E. MORRISON, State Bar No. 143459
TIMOTHY E. SULLIVAN, State Bar No. 197054
Supervising Deputy Attorneys General
ANTHONY A. AUSTIN, State Bar No. 280826
HEATHER C. LESLIE, State Bar No. 305095
DENNIS A. RAGEN, State Bar No. 106468
OLIVIA W. KARLIN, State Bar No. 154032
Deputy Attorneys General
300 South Spring Street
Los Angeles, CA 90013
Phone: (213) 269-6333
Fax: (213) 897-2802
E-mail: Olivia.Karlin@doj.ca.gov
*Attorneys for Plaintiffs*
*California Department of Toxic Substances Control*
*and the Toxic Substances Control Account*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL and the TOXIC SUBSTANCES CONTROL ACCOUNT,<br><br>Plaintiffs,<br><br>v.<br><br>NL INDUSTRIES, INC., a New Jersey corporation; JX NIPPON MINING & METALS CORPORATION, a Japanese corporation; GOULD ELECTRONICS INC., an Arizona corporation; KINSBURSKY BROS. SUPPLY, INC., a California corporation; TROJAN BATTERY COMPANY, LLC, a Delaware limited liability company; RAMCAR BATTERIES INC., a California corporation; CLARIOS, LLC, a Wisconsin limited liability company; QUEMETCO, INC., a Delaware corporation; INTERNATIONAL METALS EKCO, LTD., a California corporation; and BLOUNT, INC., a Delaware corporation,<br><br>Defendants. | CASE NO.<br><br>COMPLAINT FOR RECOVERY OF RESPONSE COSTS; DECLARATORY RELIEF; and SUPPLEMENTAL STATE LAW CLAIMS |

1

Complaint

1       Plaintiffs, the California Department of Toxic Substances Control ("DTSC")

2  and the Toxic Substances Control Account (collectively referred herein as,

3  "Plaintiffs"), allege as follows:

4                           **INTRODUCTION**

5       1.     For nearly a century, various companies, including Defendants,

6  operated, owned, and/or sent hazardous waste to a metals smelter in southeast Los

7  Angeles County that spewed dangerous heavy metals and other toxins into the air,

8  onto the ground, and into the water. The releases of these heavy metals and other

9  toxins caused widespread contamination and harm to thousands of nearby residents,

10  many of whom are part of a population group that has suffered historically

11  disproportionate impacts from economic, environmental, and racial injustice. In this

12  action, Plaintiffs seek to require Defendants to take action to remedy this

13  contamination and harm. The smelter property, located in Vernon, California, was

14  most recently owned and operated by Exide Technologies, LLC ("Exide"), but, as a

15  result of Exide's most recent bankruptcy, has been transferred to a vastly

16  underfunded response trust with only enough funds to conduct limited closure

17  activities, leaving most of the dangerous contamination at the facility unremediated.

18  Plaintiffs are asking the Court to require Defendants to reimburse Plaintiffs' costs

19  related to the investigation and cleanup of this widespread contamination. Plaintiffs

20  also seek to have the Court require Defendants to complete all additional

21  investigation and cleanup work to address the contamination.

22       2.     During its nearly 100 years of operation, the smelter released

23  thousands of pounds of lead and other pollutants into the environment. These

24  releases not only contaminated the smelter property itself, but also thousands of

25  surrounding residential properties, including homes, schools, parks, and child care

26  facilities. The releases also contaminated parkways, commercial and industrial

27  properties, and groundwater. The releases have exposed thousands of residents,

28  including children, and workers to serious health hazards from lead exposure.

            Complaint

3.      Health impacts from the exposure to the pollution can be severe. Lead is a potent neurotoxin and is unsafe at any level. It accumulates in the body and can damage all organs, including the brain. Children and pregnant women are particularly vulnerable. Other contaminants released from the smelter include arsenic and mercury. Arsenic is a known human carcinogen that can cause cancer of the liver, bladder, and lungs. Mercury can cause brain damage, mental impairment, and seizures.

4.      Exide limited, delayed, and avoided work needed to fully investigate and clean up the contamination caused by the smelter's operations. In response, given the risk of harm to residents living on the nearby contaminated properties, DTSC (with support from the California Legislature) began cleaning up the thousands of contaminated residential properties—the largest residential cleanup project of its kind in California. In this action, Plaintiffs seek reimbursement for that effort (and other costs) and seek action by Defendants to complete all additional investigation and cleanup work needed.

## STATEMENT OF THE ACTION

5.      This is a civil action against NL Industries, Inc.; JX Nippon Mining & Metals Corporation; Gould Electronics Inc.; Kinsbursky Bros. Supply, Inc.; Trojan Battery Company, LLC; Ramcar Batteries Inc.; Clarios, LLC; Quemetco, Inc.; International Metals Ekco, Ltd.; and Blount, Inc. (collectively referred to herein as "Defendants") under section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), for the recovery of unreimbursed response costs that Plaintiffs have incurred, and interest on such response costs, in connection with releases and/or threatened releases of hazardous substances, including, but not limited to, lead, aluminum, antimony, arsenic, cadmium, cobalt, mercury, selenium, thallium, zinc, sulfuric acid, chlorinated Volatile Organic Compounds ("VOCs") including trichloroethylene ("TCE"), carbon tetrachloride and tetrachloroethylene, aromatic

Complaint

VOCs, including benzene, semi-VOCs including naphthalene and polycyclic aromatic hydrocarbons ("PAHs"), dioxins and/or furans (collectively, "Contaminants of Concern"), at and from the former secondary smelter located at 2700 and 2717 South Indiana Street, 3900 East 26th Street, and 3841 and 3901 Bandini Boulevard in Vernon, California, 90058, identified by Assessor's Parcel Numbers 5243-021-024, 5243-022-007, 5243-022-009, 5243-022-010, and 5192-030-009 ("the Vernon Plant").

6.     The Vernon Plant, and the horizontal and vertical extent of the contamination from the Vernon Plant, including any area where any hazardous substance from the Vernon Plant has come to be located, is referred to herein as "the Site."

7.     Plaintiffs further make a claim for declaratory relief, under 28 U.S.C. § 2201 and section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), for a declaratory judgment that each Defendant is jointly and severally liable to Plaintiffs for the response costs DTSC has incurred and for any further response costs DTSC incurs in the future as a result of any release and/or threatened release of a hazardous substance at the Site.

8.     In the alternative to the CERCLA section 107(a) claim, and only to the extent any portion of Plaintiffs' response costs are not recovered under that claim, Plaintiffs also make a supplemental state law claim against Defendants under section 25360 of the Carpenter-Presley-Tanner Hazardous Substance Account Act ("HSAA"), California Health and Safety Code section 25300 *et seq*., for the recovery of costs that Plaintiffs have incurred in carrying out or overseeing a response or corrective action as a result of any release and/or threatened release of any hazardous substance, including, but not limited to, any Contaminant of Concern at the Site, and interest on such costs.

9.     Plaintiffs also seek preliminary and permanent injunctions under sections 25358.3(a), (e), and (g) of the HSAA, requiring Defendants to take actions

Complaint

necessary to abate the release and/or threatened release of hazardous substances at the Site.

10. Plaintiffs also seek an order under California Civil Code sections 3479, 3480, and 3491, and California Health and Safety Code sections 58009 and 58010, requiring Defendant NL Industries, Inc. ("NL Industries") to abate the public nuisance that NL Industries and its predecessor entities, Morris P. Kirk & Son, Inc. and Morris P. Kirk & Son, a partnership (together, "Morris P. Kirk") created and/or contributed to at the Site. Specifically, NL Industries and/or Morris P. Kirk have engaged in activities that released hazardous substances, including, but not limited to, Contaminants of Concern from the Vernon Plant into the environment. NL Industries and/or Morris P. Kirk's activities contaminated the soil and groundwater at the Site, including on, around, and beneath the Vernon Plant. This contamination is injurious to health and substantially interferes with the comfortable enjoyment of life and unlawfully prevents the customary use of residential and commercial, or industrial properties surrounding the Vernon Plant that are included within the Site. The contamination caused by NL Industries and/or Morris P. Kirk's activities affects a considerable number of persons in the communities where the Site is located. NL Industries and/or Morris P. Kirk's activities created or substantially contributed to a public nuisance at the Site, which has created a threat to the environment and to the health and safety of the public.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and section 113(b) of CERCLA, 42 U.S.C. § 9613(b). The Court also has supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367, because the state law claims form part of the same case or controversy as Plaintiffs' federal law claims in that the state and federal claims arise from common facts relating to the release of hazardous substances and the cleanup of contamination at the Site.

Complaint

12.   Venue is proper in this district under 28 U.S.C. § 1391(b) and section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the releases and/or threatened releases of hazardous substances into the environment that are at issue occurred in this judicial district.

### PLAINTIFFS

13.   DTSC is a public agency of the State of California, organized and existing under California Health and Safety Code section 58000 *et seq.* DTSC has the authority to protect California's people and environment from harmful effects of toxic substances by restoring contaminated resources, enforcing hazardous waste laws, reducing hazardous waste generation, and encouraging the manufacture of chemically safer products. *See, e.g.*, Cal. Health & Safety Code §§ 25100 *et seq.*, 25300 *et seq.*, 58000 *et seq.* DTSC has authority under state law to determine whether there has been a release and/or threatened release of a hazardous substance into the environment and to respond to releases and/or threatened releases of a hazardous substance into the environment. DTSC has authority to commence and maintain actions to require responsible parties to abate releases and/or threatened releases of hazardous substances and to enjoin imminent or substantial endangerment to the public health or welfare or to the environment. DTSC has authority under California Health and Safety Code section 58009 to commence and maintain actions and proceedings to enjoin and abate public nuisances.

14.   The Toxic Substances Control Account is an account within the State of California General Fund. California Health and Safety Code section 25173.6 establishes the account and the director of DTSC administers the account. Under California Health and Safety Code section 25361(a), the account shall be a party in any action for recovery of response costs or expenditures under Chapter 6.8 of Division 20 of the California Health and Safety Code incurred from the account.

///

///

**DEFENDANTS**

**Owner/Operator Defendants**

15. **NL Industries.** Defendant NL Industries, formerly known as National Lead Company, is a New Jersey corporation, with its headquarters in Dallas, Texas. NL Industries is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

16. In or prior to 1973, NL Industries became an operator of the Vernon Plant, and in 1974 became an owner of the Vernon Plant. NL Industries also is the successor to the CERCLA liabilities of Morris P. Kirk, with respect to operations at the Vernon Plant. Morris P. Kirk owned the Vernon Plant from approximately 1925 to 1974 and operated the Vernon Plant from approximately 1925 to 1973. NL Industries sold the Vernon Plant to Gould Inc. on or about January 31, 1979.

17. **JX Nippon Mining & Metals Corporation**. Defendant JX Nippon Mining & Metals Corporation ("JX Nippon") is a Japanese corporation with its headquarters in Tokyo, Japan. JX Nippon is a "person" within the meaning of section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

18. JX Nippon is the successor to the CERCLA liabilities of Gould Inc., with respect to operations at the Vernon Plant. Gould Inc. owned and/or operated the Vernon Plant from approximately 1979 to 1984. JX Nippon's liability as a successor is explained in more detail below.

19. **Gould Electronics Inc**. Defendant Gould Electronics Inc. is an Arizona corporation registered to do business in California. It was formerly known by the names Nimtec Inc. and Nikko Materials USA, Inc. Gould Electronics Inc. is a "person" within the meaning of section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

20. Gould Electronics Inc. is the successor to the CERCLA liabilities of Gould Inc., with respect to operations at the Vernon Plant, in the alternative and to

Complaint

the extent that JX Nippon is not the successor to those liabilities, as explained below.

**Arranger/Transporter Defendants**

21.     **Kinsbursky Bros. Supply Inc.** Defendant Kinsbursky Bros. Supply, Inc. ("Kinsbursky") is a California corporation. Kinsbursky is a "person" within the meaning of section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

22.     Kinsbursky arranged for disposal or treatment of hazardous substances at, or arranged with a transporter for transport for disposal or treatment, of hazardous substances to, the Vernon Plant as described in section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

23.     Kinsbursky accepted a hazardous substance for transport to the Vernon Plant as described in section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4).

24.     **Trojan Battery Company, LLC.** Defendant Trojan Battery, LLC ("Trojan"), formerly Trojan Battery Company, is a Delaware limited liability company registered to do business in California. Trojan is a "person" within the meaning of section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

25.     Trojan arranged for disposal or treatment of hazardous substances at, or arranged with a transporter for transport for disposal or treatment, of hazardous substances to, the Vernon Plant as described in section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

26.     **Ramcar Batteries Inc.** Defendant Ramcar Batteries Inc. ("Ramcar") is a California corporation. Ramcar is a "person" within the meaning of section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

27.     Ramcar arranged for disposal or treatment of hazardous substances at, or arranged with a transporter for transport for disposal or treatment, of hazardous substances to, the Vernon Plant as described in section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

///

28.    **Clarios, LLC.** Defendant Clarios, LLC, is a Wisconsin limited liability company registered to do business in California. Clarios, LLC, is a "person" within the meaning of section 101(21) of CERCLA, 42 U.S.C. § 9601(21). Clarios, LLC, is the continuation of and successor to Johnson Controls Battery Group, LLC, a limited liability company converted by operation of law from Johnson Controls Battery Group, Inc. ("Johnson Controls"). Clarios, LLC, and its predecessor entity Johnson Controls are collectively referred to herein as "Clarios."

29.    Clarios arranged for disposal or treatment of hazardous substances at, or arranged with a transporter for transport for disposal or treatment, of hazardous substances to, the Vernon Plant as described in section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

30.    Clarios accepted a hazardous substance for transport to the Vernon Plant as described in section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4).

31.    **Quemetco, Inc.** Defendant Quemetco, Inc. ("Quemetco") is a Delaware corporation registered to do business in California. Quemetco is a "person" within the meaning of section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

32.    Quemetco arranged for disposal or treatment of hazardous substances at, or arranged with a transporter for transport for disposal or treatment, of hazardous substances to, the Vernon Plant as described in section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

33.    Quemetco accepted hazardous substances for transport to the Vernon Plant as described in section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4).

34.    **International Metals Ekco Ltd.** Defendant International Metals Ekco Ltd. ("Ekco"), doing business as Ekco Metals, is a California corporation. Ekco is a "person" within the meaning of section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

Complaint

35.    Ekco arranged for disposal or treatment of hazardous substances at, or arranged with a transporter for transport for disposal of hazardous substances to, the Vernon Plant as described in section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

36.    Ekco accepted a hazardous substance for transport to the Vernon Plant as described in section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4).

37.    **Blount, Inc.** Defendant Blount, Inc. ("Blount") is a Delaware corporation registered to do business in California. Blount is a "person" within the meaning of section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

38.    Blount arranged for disposal or treatment of hazardous substances at, or arranged with a transporter for transport for disposal or treatment, of hazardous substances to, the Vernon Plant as described in section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

39.    Defendants Kinsbursky, Trojan, Ramcar, Clarios, Quemetco, Ekco and Blount are referred to collectively herein as the "Arranger Defendants."

40.    Defendants Clarios, Ekco, Kinsbursky, and Quemetco are referred to collectively herein as the "Transporter Defendants."

## GENERAL ALLEGATIONS

### The Site

41.    The Vernon Plant is a former secondary smelter that treated and stored hazardous waste in the City of Vernon. It operated from approximately 1925 to 2015. There are over 10,000 sensitive land use properties (residences, schools, daycare centers, child care facilities, and parks) and many commercial and industrial properties in close proximity to the Vernon Plant.

42.    The Vernon Plant was used primarily for secondary lead smelting. Secondary lead smelting extracts lead and other materials from secondary sources, including spent (used) lead-acid batteries and other lead-bearing materials. At various times, batteries and other secondary sources were received at the Vernon

Complaint

Plant. Batteries were crushed by a hammer mill into three main component parts: acid, plastic, and lead. Acid was treated, stored, disposed of, and/or released into the environment. Lead was melted in large furnaces, then placed into molds to cool and create ingots.  Significant amounts of lead and other Contaminants of Concern were disposed of and/or released at, around, and beneath the Vernon Plant.

43.     The Uniform Hazardous Waste Manifest ("Manifest") is the shipping document that must accompany hazardous waste shipments under the Hazardous Waste Control Law, California Health and Safety Code section 25100 *et seq*., and travels with hazardous waste from the point of generation, through transportation, to the final treatment, storage, and disposal facility ("TSDF"). The Vernon Plant was a TSDF. Since the 1980s, Manifests were used to document shipments of hazardous waste that were sent to the Vernon Plant.

44.     Each of the Arranger Defendants has been identified on Manifests, which documented shipments containing hazardous substances to the Vernon Plant between 1988 to 2015, as a generator of hazardous waste that arranged for disposal or treatment of hazardous substances at the Vernon Plant or arranged with a transporter for disposal or treatment of hazardous substances at the Vernon Plant.

45.     Each of the Transporter Defendants has been identified on Manifests, which documented shipments containing hazardous substances to the Vernon Plant between 1988 to 2015, as a transporter that accepted hazardous substances for transport to the Vernon Plant for disposal or treatment.

46.     The Transporter Defendants are also identified on Manifests as the generator of hazardous substances. The Transporter Defendants arranged for the disposal or treatment of hazardous substances at the Vernon Plant.

47.     The Transporter Defendants transported hazardous substances to the Vernon Plant. The Transporter Defendants selected or actively participated in the selection of the Vernon Plant as the TSDF for disposal or treatment of hazardous substances.

Complaint

48.     At its peak operation, the Vernon Plant received up to approximately 40,000 lead-acid batteries per day. The lead extracted from these batteries was smelted at the Vernon Plant. During the Vernon Plant's operations, hazardous substances, including but not limited to, Contaminants of Concern, were generated, treated, disposed of, and released. As a result, surrounding properties and groundwater were contaminated with lead and other Contaminants of Concern.

49.     Over more than nine decades of operation, the Vernon Plant released millions of pounds of lead and other Contaminants of Concern into the environment, which contaminated the surrounding properties, including the soil, vegetation, homes, residential yards, and residential home rooftops in the surrounding neighborhoods. These releases, and other releases and/or disposals of hazardous substances at and from the Vernon Plant resulted in hazardous substance contamination extending at least 1.7 miles from the Vernon Plant, affecting residential, commercial and industrial areas in the surrounding communities of Vernon, Bell, Boyle Heights, Commerce, Maywood, East Los Angeles, and Huntington Park, California. Thousands of residents, including children, currently live in the affected communities, and continue to be exposed to the contamination and face serious chronic health hazards.

50.     Releases and/or disposals of hazardous substances from the Vernon Plant also resulted in contamination of soil and groundwater at and surrounding the Vernon Plant. Prior to 1982, processing waste containing hazardous substances was stored at the Vernon Plant in an unpaved earthen acid dump pit. The hazardous substances in the pit, including acid, lead, and/or other metal waste, contaminated the groundwater below the Vernon Plant. Prior to 1973, hazardous substances, including furnace slag and/or dross from aluminum and zinc operations and from secondary lead smelting were dumped into a separate earthen pit at the Vernon Plant that was 20 feet deep and 50 feet across. Spent acid that could not be processed in the acid tank due to overcapacity was dumped into both earthen pits.

Complaint

51.     From at least the late 1940s through at least the early 1980s, spills of sulfuric acid from used lead batteries onto bare soil occurred at the Vernon Plant. Other spills occurred at the Vernon Plant, including a spill of molten lead in the early 1950s that contaminated the soil beneath the Vernon Plant to a depth of approximately 35 feet.

52.     In the areas where lead refining operations were carried out from 1974 to 1982, pockets of lead fused to sand were detected in soil to a depth of 20 feet, indicating that lead was released and/or disposed of during operations at the Vernon Plant.

53.     Prior to 1978, TCE was used in the metal extrusion process, and TCE was released to, and/or disposed of in, the groundwater underlying the Vernon Plant. That groundwater contamination has migrated to the south and southeast.

54.     Prior to 1981, zinc compounds were used in zinc alloy operations at the Vernon Plant, and zinc was released to, and/or disposed of in, the soil and groundwater.

55.     Releases and/or disposals of hazardous substances also occurred from several openings and/or breaches in the Vernon Plant's industrial buildings in or prior to 2014, and from contaminated wastewater used in plant operations released into storm drains in or prior to 2013. Spills of battery acid were washed down with water and the water runoff collected in depressions on the concrete floor.

**Health Effects of Lead and Other Hazardous Substances**

56.     Hazardous substances, including Contaminants of Concern, released or threatened to be released at and from the Vernon Plant are known to have negative impacts on human health.

57.     Exposure to metals and other hazardous substances can occur through inhalation, ingestion, and dermal contact, although most exposure occurs through ingestion or inhalation. Residents and workers, including construction workers, may ingest, inhale, or have dermal contact with dust and soils containing elevated

Complaint

concentrations of lead, including bare soil and dust and soil that is manually distributed or otherwise dispersed.

58.    Lead is a heavy metal and a strong poison. Lead is a cumulative toxicant that affects multiple organ systems within the body. There can be long-term health effects resulting from exposure to even low levels of lead. Lead can enter through cuts in the skin or through mucous membranes. Lead in the body is distributed to the brain, liver, kidney, and bones. It is stored in the teeth and bones where it accumulates over time. Lead in bones is released into the blood during pregnancy and becomes a source of exposure to the developing fetus.

59.    Lead can damage all of the body systems, including the heart, bones, kidneys, teeth, intestines, reproductive organs, and the nervous and immune systems. Children and pregnant women are particularly vulnerable. Lead poisoning in children can severely affect mental and physical development. At very high levels, lead poisoning can be fatal.

60.    Signs and symptoms of chronic lead poisoning in children include slowed body growth, reduced I.Q., loss of appetite and weight loss, constipation, irritability, general fatigue, anemia, hearing loss and reduction in other senses, and neurological weaknesses.

61.    Signs and symptoms of chronic lead poisoning in adults include joint and muscle pain, constipation, anemia, memory loss and decline in mental functions, headaches, hallucinations, difficulty sleeping, mood disorders, loss of pregnancy or preterm birth, and low fertility.

62.    Arsenic is a known human carcinogen. Chronic, long-term exposure to inorganic arsenic causes cancer of the liver, bladder, and lungs. Inhaling high levels of inorganic arsenic even for brief periods of time or at lower levels can irritate the throat and lungs. It can damage blood vessels, have adverse effects on the heart (abnormal heart rhythm), and cause peripheral neuropathy characterized by numbness of hands and feet ("pins and needles" sensation), kidney damage, and

Complaint

anemia (decreased production of red and white blood cells). Long-term exposure to arsenic can cause a darkening of the skin and the appearance of small "corns" or "warts" on the palms, soles, and torso. Acute high-dose exposures or chronic lower-dose exposures can lead to nausea, vomiting and diarrhea, and irritation of the gastrointestinal tract.

63.     Mercury can damage the brain, kidneys, and a developing fetus. It can cause irritability, tremors, changes in vision or hearing, and memory problems. Exposure to high levels of mercury for even short periods can cause lung damage, nausea, vomiting, diarrhea, increases in blood pressure or heart rate, skin rashes, and eye irritation. In the developing fetus, it can cause brain damage, mental retardation, incoordination, blindness, and seizures.

64.     TCE is a known human carcinogen. Acute short-term and chronic long-term inhalation exposure to high concentrations of TCE can cause dizziness, headaches, confusion, euphoria, facial numbness, weakness, unconsciousness, and even death. It can cause cardiac heart malformations in the developing fetus and liver and kidney damage, as well as adversely affect the immune system. It is classified as a carcinogen because it causes kidney cancer and it may cause liver cancer.

**Regulation of the Vernon Plant**

65.     The Hazardous Waste Control Law ("HWCL"), California Health and Safety Code section 25100 *et seq.*, is the State of California's comprehensive— "cradle to grave"—statutory and regulatory framework for the generation, handling, treatment, transportation, and disposal of hazardous wastes. The HWCL is the California analog of the federal Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.* ("RCRA"). Pursuant to both state and federal law, DTSC administers the HWCL in lieu of RCRA in California. Federal law prohibits California from imposing any requirements less stringent than those authorized

Complaint

under RCRA. 42 U.S.C. § 6929. The HWCL has stricter requirements for regulating hazardous waste than RCRA.

66.     In the early 1980s, DTSC's predecessor agency, the Department of Health Services, issued an interim status document to Gould Inc. under the HWCL, stating that the Vernon Plant was authorized to operate under interim status authorization.

67.     In October 1990, DTSC completed a RCRA Facility Assessment ("RFA"), which identified solid waste management units ("SWMUs") and areas of concern ("AOCs") at and from which there may have been releases of hazardous waste. Based on this RFA, DTSC determined that further investigation was needed to ascertain the nature and extent of contamination in the identified SWMUs and AOCs.

68.     From 2000 to October 2020, Exide owned and/or operated the Vernon Plant.

69.     In 2002, DTSC issued a corrective action consent order ("CACO"), Docket No. P3-01/02-010, to Exide. Under the 2002 CACO, DTSC required Exide to control or abate immediate threats to human health and/or the environment, perform investigations of hazardous waste released at and from the Vernon Plant, and undertake corrective action to address the release of hazardous waste.

70.     On or about August 21, 2013, DTSC approved the Emergency Response Interim Measures Workplan, Stormwater Management System, which was prepared in response to the CACO, that addressed the removal or abandonment of the existing stormwater system.

71.     On or about August 2014, Exide conducted an emergency soil removal and restoration at two residential properties.

72.     On or about November 7, 2014, DTSC approved an Interim Measures Work Plan, which was prepared by Exide, for the cleanup of contaminated properties in areas surrounding the Vernon Plant. The areas covered by the 2014

Complaint

Interim Measures Work Plan are referred to as the Northern and Southern Assessment Areas and encompass dozens of residential properties, schools, and parks.

73.   In November 2014, DTSC and Exide entered into Stipulation and Order, HWCA No. 2014-6489 ("2014 Stipulation and Order"). Under the 2014 Stipulation and Order, Exide was required to, among other things, (1) provide financial assurance for Exide's closure/post-closure plan; and (2) undertake extensive onsite corrective action at the Vernon Plant and off-site corrective action at residential and industrial areas surrounding the Vernon Plant. As part of the 2014 Stipulation and Order, Exide was required to perform interim measures for residential off-site corrective action in accordance with the 2014 Interim Measures Work Plan. Exide filed a bankruptcy petition on May 19, 2020, and the implementation of these measures, and of the off-site corrective action, has not been completed.

74.   Pursuant to the 2002 CACO and the 2014 Stipulation and Order, and in accordance with the 2014 Interim Measures Work Plan, Exide excavated contaminated soil from 186 residential properties in the Northern and Southern Assessment Areas starting in November 2014.

75.   On December 8, 2016, DTSC approved Exide's final Closure Plan. The Closure Plan addresses potential impacts from hazardous waste management units at the Vernon Plant. In December 2016, DTSC certified the Final Environmental Impact Report for the Closure Plan completed under the California Environmental Quality Act ("CEQA").

76.   On October 5, 2017, DTSC conditionally approved Exide's Closure Implementation Plan for the Vernon Plant, which governs the first phase of the facility closure activities—inventory removal; unit decontamination and removal; soil and soil gas sampling; and decontamination and deconstruction of buildings

Complaint

containing former interim status hazardous waste management units. The final Closure Implementation Plan was issued on October 19, 2017.

77.    Exide began formal closure of the Vernon Plant, subject to DTSC oversight and in accordance with the HWCL and its implementing regulations, Cal. Code of Regulations, Title 22, Div. 4.5 ("Title 22").

78.    Exide filed a bankruptcy petition on May 19, 2020, and its assets have been liquidated. On October 26, 2020, Exide transferred title to the Vernon Plant to the trustee for the Exide Vernon Environmental Response Trust, a trust created pursuant to Exide's Fourth Amended Bankruptcy Plan. The trustee is required to continue to implement closure activities and corrective action at the Vernon Plant, but the trustee has insufficient resources to complete these actions. DTSC has incurred and will continue to incur response costs related to its oversight and enforcement of these corrective action and closure activities.

**Site Cleanup and Enforcement Activities**

79.    Releases and/or disposals from the Vernon Plant's operations contaminated the sensitive land use properties surrounding the Vernon Plant with hazardous substances. DTSC has taken continuous action in response to the contamination at sensitive land use properties within the Site, including sampling and cleanup actions. DTSC's actions in the residential areas surrounding the Vernon Plant involve one of the largest and most complex response actions in DTSC's history.

80.    Sampling results showed that concentrations of lead in soil at some sensitive land use properties surrounding the Vernon Plant were as high as 45,600 milligrams per kilogram (mg/kg), which is over 500 times the residential California Human Health Screening Levels for lead in soil of 80 mg/kg.

81.    On November 12, 2015, pursuant to section 25358.5 of the HSAA, DTSC issued an "Imminent and Substantial Endangerment (ISE) Determination" for the contamination surrounding the Vernon Plant ("2015 ISE Determination").

Complaint

The 2015 ISE Determination included findings that releases of lead from the Vernon Plant contributed to the elevated lead concentration levels in the soil at residential properties surrounding the Vernon Plant. The 2015 ISE Determination was based on soil samples collected from more than 330 nearby residential properties, schools, and parks.

82.     On November 18, 2015, DTSC released the Offsite Interim Remedial Measures Work Plan, for the cleanup of approximately 50 contaminated properties in the area surrounding the Vernon Plant.

83.     Under the 2015 ISE Determination, and in accordance with the Offsite Interim Remedial Measures Work Plan, DTSC (through its contractor) performed cleanups at 50 sensitive land use properties from late 2015 through mid 2016.

84.     On February 28, 2017, DTSC released the final Time-Critical Removal Action Implementation Plan ("TCRA Implementation Plan"). The TCRA Implementation Plan set out procedures for implementing time-critical removal actions within a portion of the Site commonly referred to as the Preliminary Investigation Area (the area within a 1.7-mile radius of the Vernon Plant).

85.     Commencing on February 28, 2017, DTSC conducted cleanups at 26 sensitive land use properties within the Preliminary Investigation Area of the Site pursuant to the TCRA Implementation Plan and completed an action memorandum for each property. DTSC performed cleanups at targeted properties within the Preliminary Investigation Area of the Site with elevated soil lead levels and high risks of exposure to sensitive populations. Letters of completion were issued in May 2019.

86.     On July 17, 2017, DTSC issued the Final Removal Action Plan for Offsite Properties within the Preliminary Investigation Area ("the Cleanup Plan"). The Cleanup Plan directs the cleanup of lead-contaminated soil at additional sensitive land use properties within the Preliminary Investigation Area of the Site. DTSC also certified the Final Environmental Impact Report for the Cleanup Plan

Complaint

under CEQA. Under the Cleanup Plan, DTSC has cleaned up and is continuing to clean up lead-contaminated soil at residential properties within the Preliminary Investigation Area of the Site, reducing the risk posed by lead in soils. The fieldwork under the Cleanup Plan began on May 1, 2018, and is ongoing. As of November 27, 2020, DTSC has cleaned up or overseen the cleanup of lead-contaminated soil at approximately 2,136 properties or parcels within the Site.

87.    On March 9, 2018, DTSC finalized and released the Amended Final Offsite Remedial Measures Work Plan ("Amended Offsite Remedial Measures Work Plan"). On March 27, 2018, DTSC released a final Amended Time-Critical Removal Action Implementation Plan ("Amended TCRA Implementation Plan"), which set out procedures for implementing further time-critical removal actions within the Preliminary Investigation Area.

88.    In 2018, DTSC conducted the cleanup of lead-contaminated soil at 12 additional sensitive land use properties. DTSC performed this interim cleanup work pursuant to the Amended TCRA Implementation Plan and Amended Offsite Remedial Measures Work Plan and completed an action memorandum for each property.

89.    To date, DTSC has conducted soil sampling of over 8,500 parcels within the Preliminary Investigation Area of the Site. DTSC is continuing to conduct soil sampling.

90.    In addition, DTSC has sampled parkways (defined as an unpaved area approximately 5 feet wide by 5 to 40 feet long located in front of some sensitive land use properties) within the Preliminary Assessment Area of the Site. The sampling of parkways was conducted under DTSC's Assessment Workplan for Sampling and Analysis of Parkways in the Vicinity of the Exide Technologies Facility, issued by DTSC on June 10, 2019.

91.    On October 12, 2020, pursuant to sections 25355.5(b)(3), 25358.3, 58009, and 58010 of the California Health and Safety Code, DTSC issued an

Complaint

"Imminent and Substantial Endangerment (ISE) Determination" for the contamination at the Vernon Plant and in the surrounding area ("2020 ISE Determination"). The 2020 ISE Determination expanded on the 2015 ISE Determination, which addressed the residential area around the Vernon Plant. The 2020 ISE Determination included findings that releases of lead and other Contaminants of Concern from the Vernon Plant contributed to the elevated concentrations of lead and other Contaminants of Concern in the soil at the Vernon Plant and in surrounding areas including commercial, industrial, and residential areas. The 2020 ISE Determination was based on, among other things, thousands of soil and dust samples collected at the Vernon Plant and in the surrounding areas.

92.    Plaintiffs have incurred response costs to take this response action at the Site, and are continuing to take response actions and incur response costs, as a result of the releases and/or threatened releases of hazardous substances from the Vernon Plant.

93.    Plaintiffs' unreimbursed response costs related to the Site from 2015 through June 2020 total $136,518,770.05, exclusive of interest and enforcement costs.

94.    Plaintiffs have incurred and expect to continue to incur additional response costs caused by the release and/or threatened release of hazardous substances at and from the Vernon Plant and the Site.

**History of Owners and Operators of the Vernon Plant and Their Successors**

95.    The Vernon Plant began operating in approximately 1925. From at least 1925 to 1927, Morris P. Kirk & Son, a partnership, operated the Vernon Plant. Morris P. Kirk & Son, Inc. operated the Vernon Plant between approximately 1927 and 1973, and owned the Vernon Plant between at least 1940 and 1974. Morris P. Kirk & Son, Inc. is the successor entity to Morris P. Kirk & Son, a partnership.

///

Complaint

96.     NL Industries is the successor entity to Morris P. Kirk & Son, Inc. In 1971, NL Industries purchased all outstanding shares of Morris P. Kirk & Son, Inc., making Morris P. Kirk & Son, Inc. a wholly-owned subsidiary of NL Industries. NL Industries dissolved Morris P. Kirk & Son, Inc. in 1979.

97.     In or prior to 1973, NL Industries became an operator of the Vernon Plant, and in 1974 became an owner of the Vernon Plant. NL Industries sold the Vernon Plant to Gould Inc. on or about January 31, 1979.

98.     Gould Inc. owned and/or operated the Vernon Plant from approximately 1979 to 1984.

99.     In 1983, Gould Inc. transferred its battery business, including the Vernon Plant, to GNB Batteries Inc. ("GNB Batteries"), a wholly-owned subsidiary it created for the purpose of later selling the battery business. As part of that transaction, Gould Inc. created an agreement with GNB Batteries in which it sought to transfer its liabilities related to its battery business to GNB Batteries.

100.    In 1984, Gould Inc. sold GNB Batteries to GNB Acquisition Corp. GNB Acquisition Corp. then merged into GNB Batteries. The merged company later changed its name to GNB, Inc. ("GNB").

101.    GNB owned and operated the Vernon Plant from 1984 until 2000, when GNB merged with Exide Corporation. Exide Corporation later became Exide Technologies, LLC.

102.    From 2000 to October 2020, Exide owned and operated the Vernon Plant.

103.    Under CERCLA section 107(e)(1), 42 U.S.C. § 9607(e)(1), Gould Inc.'s transfer of its battery business and purported transfer of liabilities to GNB Batteries and its subsequent sale of that subsidiary to GNB Acquisition Corp. did not absolve Gould Inc. of liability under CERCLA section 107(a), 42 U.S.C. § 9607(a). Gould Inc.'s CERCLA section 107(a) liability with respect to the Vernon

Complaint

Plant, therefore, remained with Gould Inc. after the sale of the battery business to GNB Batteries.

104.   In 1988, Nippon Mining U.S., Inc., a wholly-owned subsidiary of Nippon Mining Co. Ltd., acquired all of the stock of Gould Inc.

105.   In 1993, Nippon Mining Co., Ltd. merged with Kyodo Oil Co., Ltd. to form a company called Nikko Kyodo Co. Ltd. Later in 1993, Nikko Kyodo Co. Ltd. changed its name to Japan Energy Corporation. As a result, Gould Inc. was wholly owned by Japan Energy Corporation's wholly-owned subsidiary Nippon Mining U.S., Inc.

106.   In October 1993, Gould Electronics Inc. (hereinafter "Gould Electronics Inc. (Ohio)") filed articles of incorporation in Ohio. Michael C. Veysey signed the articles of incorporation.

107.   During or before January 1994, Gould Electronics Inc. (Ohio) was a subsidiary of Japan Energy Corporation.

108.   In 1994, Japan Energy Corporation took steps to liquidate its subsidiaries Gould Inc. and Nippon Mining U.S., Inc. and to redistribute their assets to other subsidiaries to carry on the same businesses. As part of this redistribution of assets, in 1994 Gould Electronics Inc. (Ohio) (also a subsidiary of Japan Energy Corporation) received assets and liabilities of Gould Inc. and Nippon Mining U.S., Inc. through a January 1994 Purchase Agreement ("1994 Agreement").

109.   The 1994 Agreement was signed for Gould Inc. by Yasayuki Shimizu (its Senior Vice President and Chief Financial Officer), for Nippon Mining U.S. Inc. by Michael C. Veysey (its Vice President and Secretary), and for Gould Electronics Inc. (Ohio) by C. David Ferguson (its President and Chief Executive Officer).

110.   As of April 1993 Michael C. Veysey was Senior Vice President, General Counsel, Secretary, and a member of the Board of Directors of Gould Inc. As of January 1994, Mr. Veysey was Gould Electronics Inc. (Ohio)'s Secretary,

Complaint

and on or before April 1994 he was also Senior Vice President, General Counsel, and a member of the Board of Directors. As of April 1993 Yasuyuki Shimizu was Gould Inc.'s Senior Vice President, Chief Financial Officer, and a member of the Board of Directors. As of January 1994 Mr. Shimizu was Gould Electronics Inc. (Ohio)'s Senior Vice President, and as of April 1994 was also its Chief Financial Officer, and a member of the Board of Directors. Plaintiffs are informed and believe and on that basis allege that at that time Mr. Shimizu was also a Director of Japan Energy Corporation. As of April 1993 Thomas N. Rich was Vice President – Corporate Controller of Gould Inc. As of April 1994 Mr. Rich was Gould Electronics Inc. (Ohio)'s Vice President – Corporate Controller. As of April 1993 C. David Ferguson was President and Chief Executive Officer and a member of the Board of Directors of Gould Inc. As of April 1994 Mr. Ferguson was Gould Electronics Inc. (Ohio)'s President and Chief Executive Officer and a member of the Board of Directors. Many other individuals who held officer and director positions with Gould Inc. in April 1993 held the same position with Gould Electronics Inc. (Ohio) in April 1994.

111. Through the 1994 Agreement, Gould Inc. and Nippon Mining U.S., Inc. transferred to Gould Electronics Inc. (Ohio) their assets, including, among other things, their real property, leases, inventory, customer contracts, contractual rights, accounts receivable, intellectual property, licenses and permits, records, claims, and goodwill. Also through that agreement, Gould Inc. and Nippon Mining U.S., Inc. transferred to Gould Electronics Inc. (Ohio) their liabilities, including all liabilities of any nature whatsoever (other than specified exclusions).

112. Gould Inc. dissolved in or about February 1994. Thereafter, Gould Electronics Inc. (Ohio) carried on aspects of the Gould Inc. business connected to the assets transferred to it.

113. When Japan Energy Corporation caused Gould Inc. to liquidate in 1994, Gould Inc. was a defendant in cases alleging that Gould Inc. was liable under

Complaint

CERCLA due to releases of hazardous substances from operation of its former battery business that occurred prior to 1983, including but not limited to, lawsuits initiated by Bay Corrugated Container, Inc., against Gould Inc. in the U.S. District Court for the Eastern District of Michigan (*Bay Corrugated Container, Inc. v. Gould Inc.*, Case No. 2:91-cv-70170) and by Chemtech Industries against Gould Inc, in the U.S. District Court for the Northern District of Georgia (*Chemtech Indus. v. Gould Inc.*, Case No. 1:91cv2130).

114.    At the time Japan Energy Corporation caused Gould Inc. to liquidate, there existed a unity of interest between the two entities such that the separate personalities of the corporations no longer existed. Gould Inc. was wholly owned by Nippon Mining U.S., Inc., and Nippon Mining U.S., Inc. was wholly owned by Japan Energy Corporation until Japan Energy Corporation caused both subsidiaries to liquidate. Plaintiffs are informed and believe and thereon allege that, upon liquidation of Gould Inc., Japan Energy Corporation collected hundreds of millions of dollars of cash assets from Gould Inc., including value derived from activities that resulted in environmental contamination. Plaintiffs are informed and believe and thereon allege that this liquidation left Gould Inc. undercapitalized in that it retained its CERCLA liabilities but no longer retained assets sufficient to satisfy those liabilities. The Chairman of the Board of Directors of Gould Inc., Yukio Kasahara, was also Chairman of Japan Energy Corporation. Plaintiffs are informed and believe and thereon allege that various other of Gould Inc.'s officers or directors were also officers or directors of Japan Energy Corporation. Plaintiffs are informed and believe and thereon allege that Japan Energy Corporation used Gould Inc. as a mere instrumentality for a single venture of Japan Energy Corporation.

115.    Because Gould Inc. is a dissolved corporation, it no longer has assets to satisfy a judgment against it under CERCLA section 107(a). As a result the public may bear the financial cost of the response actions DTSC has performed and

will perform at the Site due to releases of hazardous substances for which Gould Inc. is legally responsible.

116.   Treating Gould Inc. and Japan Energy Corporation as separate entities for the purposes of liability under CERCLA section 107(a) with respect to operations at the Vernon Plant would result in injustice. The intent of Congress in enacting CERCLA in 1980 was to ensure that those responsible for environmental contamination, and not the public, bore the cost of remedying the conditions they created. *City of Emeryville v. Robinson*, 621 F.3d 1251, 1264 (9th Cir. 2010). Treating Japan Energy Corporation and its successors as separate entities from Gould Inc. would circumvent congressional intent.

117.   Based on the foregoing, Japan Energy Corporation was the alter ego of Gould Inc., and therefore Japan Energy Corporation was liable under CERCLA section 107(a) with respect to operations at the Vernon Plant to the same extent as was Gould Inc.

118.   In January 1998, Japan Energy Corporation caused Gould Electronics Inc. (Ohio) and American Microsystems Holding Corporation, two of its subsidiaries, to merge, with the resulting Ohio corporation taking the name GA-TEK Inc. The certificate of merger was signed for Gould Electronics Inc. (Ohio) by Michael C. Veysey, who was then its Senior Vice President, General Counsel, and Secretary.

119.   In April 2001, GA-TEK Inc., filed amended articles of incorporation, signed by Michael C. Veysey, its Vice President, with the Ohio Secretary of State changing the name of the company back to "Gould Electronics Inc.," referred to herein as Gould Electronics Inc. (Ohio).

120.   In April 2003, Japan Energy Corporation changed its name to Japan Energy Electronic Materials, Inc. In October 2003 Japan Energy Electronic Materials, Inc. merged with Nippon Mining Holdings, Inc., and then dissolved.

///

121.   In 2010, Nippon Mining Holdings, Inc. and Nippon Mining & Metals Co., Ltd., merged and formed JX Nippon.

122.   In a September 2003 "Asset Purchase Agreement," Gould Electronics Inc. (Ohio) transferred its assets and liabilities to Nikko Materials USA, Inc., an Arizona corporation originally incorporated in 1990 as Nimtec Inc. Through that agreement, Gould Electronics Inc. (Ohio) transferred to Nikko Materials USA, Inc. its assets, including, among other things, its real property, leases, vehicles, inventory, contractual rights, accounts receivable, intellectual property, licenses and permits, records, claims, and goodwill. Also through that agreement, Gould Electronics Inc. (Ohio) transferred to Nikko Materials USA, Inc. its liabilities, including all liabilities of any nature whatsoever (other than specified exclusions) and specifically transferred to Nikko Materials USA, Inc. its environmental liability under CERCLA.

123.   At the time it entered into the September 2003 Asset Purchase Agreement, Nikko Materials USA, Inc. was a wholly-owned subsidiary of Japan Energy Electronic Materials, Inc. (formerly known as Japan Energy Corporation).

124.   The September 2003 Asset Purchase Agreement was signed on behalf of Gould Electronics Inc. (Ohio) by Thomas N. Rich, its Vice President – Finance, Secretary, and Treasurer, and on behalf of Nikko Materials USA, Inc. by Isao Yamanashi, its Chairman. Mr. Yamanashi was at that time also Chairman of the Board of Gould Electronics Inc. (Ohio) and an Associate Corporate Officer of Japan Energy Corporation. In October 2003 Mr. Rich became Chief Financial Officer, Secretary, and a member of the Board of Directors of Nikko Materials USA, Inc.

125.   In October 2003, Gould Electronics Inc. (Ohio) filed a certificate of dissolution with the Ohio Secretary of State, effective December 2003. Thereafter, Nikko Materials USA, Inc. carried on aspects of the Gould Electronics Inc. (Ohio) business connected to the assets transferred to it.

Complaint

126.   In the alternative and to the extent that Japan Energy Corporation was not the alter ego of Gould Inc., as a result of the transactions resulting from the 1994 Agreement, Gould Electronics Inc. (Ohio) was a mere continuation of Gould Inc. and/or was party to a de facto merger with Gould Inc., and thereby assumed the CERCLA liabilities of Gould Inc. with respect to operations at the Vernon Plant.

127.   Because Gould Electronics Inc. (Ohio) is a dissolved corporation, it no longer has assets to satisfy a judgment against it under CERCLA section 107(a). As a result the public may bear the financial cost of the response actions DTSC has performed and will perform at the Site due to releases of hazardous substances for which Gould Electronics Inc. (Ohio), as successor to Gould Inc., is legally responsible.

128.   Through the September 2003 Asset Purchase Agreement, Nikko Materials USA, Inc. expressly and/or impliedly assumed Gould Electronics Inc. (Ohio)'s environmental liability under CERCLA. Further, as a result of the transactions resulting from the September 2003 Asset Purchase Agreement, Nikko Materials USA, Inc. was a mere continuation of Gould Electronics Inc. (Ohio) and/or was party to a de facto merger with Gould Electronics Inc. (Ohio), and thereby assumed the CERCLA liabilities of Gould Electronics Inc. (Ohio) with respect to operations of the Vernon Plant.

129.   In February 2006, Nikko Materials USA, Inc. changed its name to Gould Electronics Inc., the defendant Arizona corporation.

## FIRST CLAIM FOR RELIEF

(Claim for Recovery of Response Costs

Pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a))

Against All Defendants

130.   Plaintiffs re-allege and incorporate by reference the allegations of the preceding paragraphs 1 through 129 as though fully set forth herein.

Complaint

131.   Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides that the owner and/or operator of a facility, any person who arranged for disposal or treatment of hazardous substances to a facility, or any person who accepted any hazardous substances for transport to disposal or treatment facilities, from which there is a release, or a threatened release which causes the incurrence of response costs, shall be liable for all costs of removal or remedial action incurred by a State not inconsistent with the National Oil and Hazardous Substances Pollution Contingency Plan ("National Contingency Plan"), 40 C.F.R. Part 300.

132.   The Site, including the Vernon Plant and the horizontal and vertical extent of the hazardous substances contamination, including any area where any hazardous substance from the Vernon Plant has come to be located, is a "facility" within the meaning of section 101(9) of CERCLA, 42 U.S.C. § 9601(9). The hazardous substances that have been released from the Vernon Plant have contaminated the Site.

133.   Each Defendant is a "person" within the meaning of section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

134.   NL Industries was the owner and/or operator of the Vernon Plant at the time of disposal of hazardous substances at and from the Vernon Plant under section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), which contaminated the Site. Disposals of hazardous substances at and from the Vernon Plant, which contaminated the Site, occurred during NL Industries' and/or Morris P. Kirk's ownership and/or operation of the Vernon Plant.

135.   Gould Inc. was the owner and/or operator of the Vernon Plant at the time of disposal of hazardous substances at and from the Vernon Plant under section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), which contaminated the Site. JX Nippon is the successor to the CERCLA liabilities of Gould Inc., with respect to operations at the Vernon Plant. Gould Electronics Inc. is the successor to the CERCLA liabilities of Gould Inc. with respect to operations at the Vernon

Complaint

Plant, in the alternative and to the extent that JX Nippon is not the successor to those liabilities.

136.   The Arranger Defendants each arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances at the Vernon Plant, from which hazardous substances were released. The Arranger Defendants are each liable to DTSC for response costs DTSC incurred as a result of releases or threatened releases at the Site, pursuant to section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

137.   The Transporter Defendants each accepted hazardous substances for transport to the Vernon Plant, a disposal or treatment facility, from which hazardous substances were released. Each of the Transporter Defendants selected or actively participated in the selection of the Vernon Plant as the TSDF for disposal or treatment. Each of the Transporter Defendants is liable to DTSC for response costs DTSC incurred as a result of releases or threatened releases at the Site, pursuant to section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4).

138.   Contaminants of Concern released and/or threatened to be released at the Site are "hazardous substances" as defined in section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

139.   There has been a release and/or threatened release of hazardous substances from the Vernon Plant into the environment, within the meaning of sections 101(8) and 101(22) of CERCLA, 42 U.S.C. §§ 9601(8) and 9601(22).

140.   Plaintiffs are a "State" for purposes of recovery of response costs under section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

141.   Plaintiffs have incurred response costs not inconsistent with the National Contingency Plan, 40 C.F.R. Part 300, as the result of the release and/or threatened release of hazardous substances at the Site within the meaning of section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

///

Complaint

142.   Each Defendant is jointly and severally liable, without regard to fault, pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for Plaintiffs' response costs incurred as a result of the release and/or threatened release of hazardous substances at the Site.

143.   Pursuant to section 107(a) of CERCLA, Defendants are also liable for interest accrued on Plaintiffs' response costs.

**SECOND CLAIM FOR RELIEF**

(Claim for Declaratory Relief Pursuant to

Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2))

Against All Defendants

144.   Plaintiffs re-allege and incorporate by reference the allegations of the preceding paragraphs 1 through 143 as though fully set forth herein.

145.   Under section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Plaintiffs are entitled to a declaratory judgment that each Defendant is jointly and severally liable to Plaintiffs for any response costs DTSC has incurred and for any further response costs DTSC incurs in the future as a result of any release and/or threatened release of hazardous substances at the Site.

**THIRD CLAIM FOR RELIEF**

(Claim for Recovery of Costs Pursuant to the HSAA,

California Health and Safety Code section 25360)

Against All Defendants

146.   Plaintiffs re-allege and incorporate by reference the allegations of the preceding paragraphs 1 through 145 as though fully set forth herein.

147.   Pursuant to section 25360 of the California Health and Safety Code, Plaintiffs may bring an action against responsible parties in order to recover all costs DTSC has incurred in carrying out or overseeing a response or corrective action as a result of any release or threatened release of a hazardous substance at the Site.

Complaint

148.   Contaminants of Concern released and/or threatened to be released at the Site are "hazardous substances" as defined by section 25316 of the California Health and Safety Code.

149.   The release and/or threatened release of hazardous substances has occurred at the Site, as defined by California Health and Safety Code section 25320.

150.   Plaintiffs have incurred response costs in carrying out or overseeing response actions addressing the releases and/or threatened releases of hazardous substances at the Site, as defined in California Health and Safety Code section 25323.

151.   Defendants are liable persons as defined in section 25319 of the California Health and Safety Code.

152.   To the extent any portion of Plaintiffs' response costs are not recovered pursuant to the First Claim for Relief, Defendants are liable to Plaintiffs under section 25360 of the California Health and Safety Code for such costs incurred by Plaintiffs.

153.   Under sections 25360 and 25360.1 of the California Health and Safety Code, Defendants are liable to Plaintiffs for interest at the rate provided by law on any costs that may be recovered under the HSAA.

**FOURTH CLAIM FOR RELIEF**

(Claim for Abatement of Release or Threatened Release

Pursuant to the HSAA, California Health and Safety Code section 25358.3)

Against All Defendants

154.   Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 153 as though fully set forth herein.

155.   California Health and Safety Code section 25358.3(a) provides that:

///

///

Complaint

(a) Whenever the director determines that there may be an imminent or substantial endangerment to the public health or welfare or to the environment, because of a release or a threatened release of a hazardous substance, the director may do any of the following:

* * *

(3) Request the Attorney General to secure such relief as may be necessary from the responsible party or parties to abate the danger or threat. …Upon a showing by the department that a release or threatened release of a hazardous substance has occurred or is occurring, and that there may be an imminent or substantial endangerment to the public health and safety or to the environment, the court may grant a temporary restraining order or a preliminary or permanent injunction pursuant to subdivision (e).

156. California Health and Safety Code section 25358.3(e) provides, in relevant part:

Whenever there is a release or threatened release of a hazardous substance, the director may request the Attorney General to secure such relief as may be necessary from the responsible party or parties to abate the release or threatened release. … Upon a showing by the department that a release or threatened release of a hazardous substance has occurred or is occurring, and that there may be an imminent or substantial endangerment to the public health and safety or to the environment, the court may grant a temporary restraining order or a preliminary or permanent injunction.

157. California Health and Safety Code section 25358.3(g) provides that:

It shall not be necessary to allege or prove at any stage of the proceeding that irreparable damage will occur should the temporary restraining order or the preliminary or permanent injunction not be issued, or that the remedy at law is inadequate; and the temporary restraining order or the preliminary or permanent injunction shall issue without those allegations and without that proof.

Complaint

158.   DTSC's Director has determined that there may be an imminent or substantial endangerment to the environment or to the public health or welfare, because of the release or threatened release of hazardous substances, including but not limited to, Contaminants of Concern, at the Site.

159.   In accordance with California Health and Safety Code section 25358.3(a) and (e), DTSC has requested that the Attorney General secure relief from each Defendant necessary to abate the danger or threat to the public and safety and to the environment from the Site.

160.   Defendants are responsible parties within the meaning of California Health and Safety Code section 25358.3.

161.   Pursuant to California Health and Safety Code Sections 25358.3(a), (e), and (g), DTSC is entitled to such relief as may be necessary from Defendants to abate the danger or threat, including preliminary and permanent injunctive relief to require Defendants to take actions necessary to abate the release and/or threatened release of hazardous substances at the Site causing an imminent or substantial endangerment to the public health and safety or to the environment.

## FIFTH CLAIM FOR RELIEF

(Claim for Abatement of a Public Nuisance, California Civil Code sections 3479, 3480 and 3491, California Health and Safety Code sections 58009 and 58010)

Against Defendant NL Industries Only

162.   Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 129 as though fully set forth herein.

163.   Under California Civil Code section 3479, a "nuisance" is "anything which is injurious to health . . . or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. . . ."

164.   Under California Civil Code section 3480, "a public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons although the extent of the annoyance or damage

Complaint

1   inflicted upon individuals may be unequal."

2       165.   Pursuant to California Health and Safety Code section 58009, DTSC

3   may commence and maintain all proper and necessary actions and proceedings to

4   enjoin and abate nuisances related to matters within its jurisdiction that are

5   dangerous to health.

6       166.   Pursuant to California Health and Safety Code section 58010, DTSC

7   may abate public nuisances related to matters within its jurisdiction.

8       167.   NL Industries and/or Morris P. Kirk engaged in conduct that is

9   injurious to public health and that interferes with the comfortable enjoyment of life

10  and property of a considerable number of persons.

11      168.   NL Industries and/or Morris P. Kirk's business operations at the

12  Vernon Plant involved dismantling spent batteries, extracting lead and plastic from

13  the dismantling of these batteries, and then disposing of lead waste and spent

14  sulfuric acid, in part by means of air emissions of these hazardous solid and liquid

15  wastes. NL Industries and/or Morris P. Kirk's operations also included processing

16  lead scrap and waste. NL Industries and /or Morris P. Kirk's release of

17  Contaminants of Concern and other hazardous substances from the Vernon Plant,

18  including the release of lead waste by air emissions, and the release of TCE and

19  spent sulfuric acid on and into the soil, contaminated the soil and groundwater at

20  and beneath the Site, including at thousands of privately and publicly owned

21  properties in residential, commercial, and industrial areas surrounding the Vernon

22  Plant.

23      169.   NL Industries and/or Morris P. Kirk's business operations resulted in

24  release of hazardous substances, including but not limited to, Contaminants of

25  Concern, onto or into the soil and/or groundwater at the Site. NL Industries and/or

26  Morris P. Kirk's release of hazardous substances is a direct and proximate

27  contributing cause of conditions that are injurious to human health.

28  ///

Complaint

170.   The presence of hazardous substances including, but not limited to, Contaminants of Concern in the soil at the Site caused by NL Industries and/or Morris P. Kirk's operations at the Vernon Plant exceed state regulatory levels that are intended to protect public health.

171.   The presence of, and exposure to, hazardous substances, including, but not limited to, the Contaminants of Concern, in the soil at the Site may have long-term health impacts on residents and workers. With respect to lead, which has been detected in the soil at 500 times the California Human Health Screening Levels for residential soil, exposure could cause damage to all of the body systems or death.

172.   Hazardous substances, including, but not limited to, antimony, arsenic, barium, beryllium, cadmium, cobalt, lead, mercury, nickel, selenium, sulfate, vanadium, zinc, and the VOCs naphthalene, TCE, and carbon tetrachloride, are present in groundwater at the Site at concentrations that exceed the regulatory standards in Title 22, Chapter 15, § 64431 of the California Code of Regulations, the Maximum Contaminant Levels in Drinking Water ("MCLs"), either primary or secondary. Chronic, long-term exposure to hazardous substances such as lead, arsenic, mercury, and/or TCE, interferes with the comfortable enjoyment of life because such exposure could cause negative health impacts including cancer.

173.   The presence of, and exposure to, hazardous substances, including, but not limited to, the Contaminants of Concern, contaminated the groundwater at levels exceeding the MCLs, and creates a threat to public health, safety, and well-being by contaminating water sources that have been designated beneficial for municipal, industrial, and agricultural uses, which could include future drinking water uses. These conditions threaten to continue unless contamination is abated.

174.   The presence of hazardous substances, including, but not limited to, Contaminants of Concern, in the soil and/or groundwater at the Site caused by NL Industries and/or Morris P. Kirk's operations at the Vernon Plant interferes with the

Complaint

comfortable enjoyment of life or property so as to cause a nuisance pursuant to California Civil Code section 3479.

175.   The presence of hazardous substances in the soil and/or groundwater at the Site at concentrations higher than levels developed pursuant to Health and Safety Code Section 57008 and caused by NL Industries and/or Morris P. Kirk's operations at the Vernon Plant is a public nuisance which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal, pursuant to California Civil Code section 3480.

176.   NL Industries and/or Morris P. Kirk's conduct created the unreasonable interference with a right common to the general public. NL Industries and/or Morris P. Kirk's conduct created a significant interference with the public health, public safety, public peace, public comfort, and/or public convenience.

177.   NL Industries and/or Morris P. Kirk's conduct creating an interference with a public right is intentional and unreasonable. In the alternative, NL Industries and/or Morris P. Kirk's conduct is unintentional but is negligent or reckless, and/or is caused by an abnormally dangerous activity.

178.   NL Industries and/or Morris P. Kirk's business operations caused the unreasonable interference with a public right.  NL Industries is therefore liable, on behalf of itself and/or as the successor to Morris P. Kirk, under California Civil Code sections 3479, 3480, and 3491, for creating and/or substantially contributing to a public nuisance.

179.   The threat to the public health and safety posed by the nuisance at the Site will continue unless NL Industries is ordered to abate the nuisance. NL Industries must therefore abate the public nuisance caused by its release of hazardous substances at the Site.

///

///

Complaint

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.    For a judgment that Defendants are jointly and severally liable to Plaintiffs under section 107(a) of CERCLA, 42 U.S.C. § 9607(a) for all unreimbursed response costs incurred by Plaintiffs responding to releases and/or threatened releases of hazardous substances at the Site, in an amount to be proven at trial, but at least $136,518,770.05, including attorneys' fees and other enforcement costs;

2.    For interest to be paid to Plaintiffs on the above sums as provided under section 107(a) of CERCLA, 42 U.S.C. § 9607(a);

3.    For a declaratory judgment, pursuant to 28 U.S.C. § 2201 and section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), that each Defendant is jointly and severally liable without regard to fault to Plaintiffs for all future response costs incurred by Plaintiffs responding to the release and/or threatened release of hazardous substances at the Site;

4.    In the alternative to the CERCLA section 107(a) claim and only to the extent a portion of Plaintiffs' response costs are not recovered pursuant to that claim, for a judgment that each Defendant is liable to Plaintiffs under section 25360 of the HSAA, for response costs incurred by Plaintiffs responding to the release and/or threatened release of hazardous substances at the Site, in an amount to be proven at trial, but at least $136,518,770.05, including interest pursuant to California Health and Safety Code section 25360.1;

5.    For preliminary and/or permanent injunctions pursuant to California Health and Safety Code section 25358.3 requiring Defendants to abate the release or threatened release of hazardous substances at the Site;

6.    For an order enjoining Defendant NL Industries to abate the public nuisance at the Site;

7.    For costs of this suit; and

Complaint

1    8.    For all other relief the Court deems just and appropriate.

2

3   Dated: December 14, 2020                Respectfully submitted,

4                                           XAVIER BECERRA
                                            Attorney General of California
5                                           SARAH E. MORRISON
                                            TIMOTHY E. SULLIVAN
6                                           Supervising Deputy Attorneys General

7
                                             /s/ OLIVIA W. KARLIN
8                                           OLIVIA W. KARLIN
                                            ANTHONY A. AUSTIN
9                                           HEATHER C. LESLIE
                                            DENNIS A. RAGEN
10
                                            Deputy Attorneys General
11                                          *Attorneys for Plaintiffs*
                                            *California Department of Toxic*
12                                          *Substances Control and the Toxic*
                                            *Substances Control Account*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint