Joel L. Herz, Esq. (Admitted Pro Hac Vice)
joel@joelherz.com
LAW OFFICES OF JOEL L. HERZ
3573 East Sunrise Drive, Suite 215
Tucson, AZ 85718
(520) 529-8080 (telephone)
(520)529-8077 (facsimile)

Kenneth A. Ehrlich (Bar #150570)
kehrlich@elkinskalt.com
ELKINS KALT WEINTRAUB REUBEN
GARTSIDE LLP
10345 W. Olympic Blvd
Los Angeles, CA  90064
(310) 746-4412 (telephone)
(310) 746-4499 (facsimile)

Attorneys for Defendant NL Industries, Inc.

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL, et al. | Case No. 2:20-cv-11293-SVW-JPR |
| Plaintiffs, | **DEFENDANT NL INDUSTRIES, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| NL INDUSTRIES, INC., et al. | |
| Defendants. | Date:   June 28, 2021 |
| | Time:  1:30 p.m. |
| | Place:  First Street Courthouse |
| | 350 W. 1st Street |
| | Los Angeles, CA 90012 |
| | Courtroom 10A, 10th Floor |
| | Before:  Hon. Stephen V. Wilson |
| | Complaint Filed:  December 14, 2020 |
| | Trial Date:  None Set |

i

NL INDUSTRIES, INC'S NOTICE OF MOTION AND MOTION          CASE NO. 2:20-CV-11293-SVR-JPR
TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iii

MEMORANDUM OF POINTS AND AUTHORITIES .......................................1

I.      INTRODUCTION ................................................................1

II.     SUMMARY OF ARGUMENTS ...................................................4

III.    FACTUAL BACKGROUND ......................................................5

IV.     DOCUMENTS CONSIDERED ON A MOTION TO DISMISS.................8

V.      ARGUMENT ....................................................................8

        POINT I – DTSC'S CERCLA CLAIMS (COUNT 1 AND II) ..................  8
        AGAINST NL WITH REGARD TO THE OFF-SITE SOILS
        IMPACTED BY ALLEGED AIR EMISSIONS ARE BARRED
        BY *PAKOOTAS v. TECK COMINCO METALS, LTD.*

        POINT II – DTSC'S FIRST AND SECOND CLAIMS FOR ..................... 13
        RELIEF MUST BE DISMISSED BECAUSE CERCLA IS NOT
        RETROACTIVE.  APPLYING CERCLA RETROACTIVELY
        TO NL UNDER THESE CIRCUMSTANCES IS
        UNCONSITUTIONAL

        POINT III – DTSC'S THIRD AND FOURTH CLAIMS FOR .................18
        RELIEF MUST BE DISMISSED BECAUSE THE HSAA IS NOT
        RETROACTIVE

        POINT IV - ALL OF DTSC'S CLAIMS THAT NL MUST  .................... 19
        ABATE LEAD IN SOILS, INCLUDING DTSC'S FIFTH
        CLAIM FOR RELIEF (NUISANCE), MUST BE DISMISSED
        BECAUSE NL HAS ALREADY PAID TO REMOVE THE
        LEAD IN SOILS, AND A BINDING COURT ORDER
        PROHIBITS THE VERY LAWSUIT THAT DTSC HAS
        FILED AGAINST NL

CONCLUSION......................................................................25

ii

NL INDUSTRIES, INC'S NOTICE OF MOTION AND MOTION          CASE NO. 2:20-CV-11293-SVR-JPR
TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Anderson Bros., Inc. v. St. Paul Fire & Marine Insurance Co.*, 729 F.3d 923 (9th Cir. 2013) ................................................... 13

*Atlantic Richfield Co. v. Christian*, 590 U.S. ____, 140 S. Ct. 1335, 206 L. Ed. 2d 516 (2020) ......................................... 13

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ................................. 17

*Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863 (9th Cir. 2001) ....... 10, 11

*Center for Community Action & Environmental Justice v. BNSF Railway Co.*, 764 F.3d 1019 (9th Cir. 2014) ................................... 11

*Chubb Custom Insurance Company v. Space Systems/Loral*, No. C 09-4485 JF (PVT), 2010 WL 689940 (N.D. Cal. Feb. 23, 2010) .......................... 18

*County of Sierra v. Butler*, 136 Cal. 547 (1902) ................................... 24

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) ............... 8

*E. Enters. v. Apfel*, 524 U.S. 498 (1998) ............................... 14, 15, 16, 17

*In re Marriage of Reuling*, 23 Cal. App. 4th 1428 (1994) ........................ 19

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) ...................... 13, 14, 16

*Lerner v. L.A. City Bd. of Educ.*, 59 Cal. 2d 382, 29 Cal. Rptr. 657 (1963) ....................................................................... 24

*Pakootas v. Teck Cominco Metals, Ltd.*, 830 F.3d 975 (9th Cir. 2016) ........... passim

*People ex rel. Bryant v. Holladay*, 93 Cal. 241, 29 P. 54 (1892) .............. 23

*People ex rel. Ryan v. San Diego*, 71 Cal. App. 421 (App. 1925) .............. 24

*S. Coast Air Quality Mgmt. Dist. v. Exide Techs. (In re Exide Techs.),*
   613 B.R. 79 (D. Del. 2020 .................................................................. 6

*Steinle v. City of S.F.*, 919 F.3d 1154 (9th Cir. 2019) ................................ 8

*United Alloys, Inc. v. Baker*, 797 F. Supp. 2d 974 (C.D. Cal. 2011) ...................... 18

*United States ex rel. Modglin v. Djo Global Inc.*, 114 F. Supp. 3d 993
   (C.D. Cal. 2015).............................................................................. 8

*United States v. DJO Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017) ...................... 8

*Vartelas v. Holder*, 566 U.S. 257 (2012)............................................ 15, 16

## **REGULATIONS**

17 CCR § 35036 ...................................................................... 2

40 C.F.R. 745,65(c) ................................................................. 2

## **STATUTES AND RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................. 1

Federal Rule of Evidence 201 ........................................................ 8

Resource Conservation and Recovery Act ("RCRA"). 42 U.S.C. § 9601(29);
   42 U.S.C. § 6903(3)........................................................... 10

## NOTICE OF MOTION AND MOTION

TO PLAINTIFF AND TO ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on **June 28, 2021 at 1:30 p.m.** in the courtroom of the Honorable Stephen V. Wilson, located in Courtroom 10A on the 10th Floor of the First Street Courthouse, 350 W. 1st Street, Los Angeles, California 90012, Defendant NL Industries, Inc. ("NL") will and hereby does move (1) to dismiss Plaintiff California Department of Toxic Substances Control and the Toxic Substances Control Account's ("DTSC" or "California") Complaint, including the First through Fifth Claims for Relief pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and (2) to obtain other relief as is just and equitable.  As set forth in the accompanying Memorandum, Plaintiff's claims fail to state a valid claim upon which relief can be granted.

This Motion is based on the Memorandum of Points and Authorities, the concurrently filed Declaration of John Powers, and the accompanying Request for Judicial Notice, and on such oral argument and evidence that may be represented at the hearing.

PLEASE TAKE FURTHER NOTICE that pursuant to L.R. 7-9, an opposition, if any, shall be served at least twenty-one (21) days before the motion hearing date.

This Motion is made following the conference of counsel pursuant to L.R. 7-3.  On January 28, 2021, counsel for Plaintiff and I, Joel L. Herz, conducted a conference via telephone pursuant to Local Rule 7-3 to discuss the substance of NL's contemplated Motion to Dismiss Complaint.  On April 14, 2021, a second conference was conducted via telephone.  The conferences did not resolve this motion as Plaintiff's counsel disagreed with the arguments presented.

NL INDUSTRIES, INC'S NOTICE OF MOTION AND MOTION
TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

CASE NO. 2:20-CV-11293-SVR-JPR

DATED:       April 22, 2021

LAW OFFICES OF JOEL L. HERZ          ELKINS KALT WEINTRAUB
                                     RUEBEN GARTSIDE LLP

/s/ Joel L. Herz                     /s/ Kenneth A. Ehrlich

Counsel for NL Industries, Inc.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendant NL Industries, Inc. ("NL") submits this Memorandum of Law in Support of its Motion to Dismiss Plaintiff California Department of Toxic Substances Control and the Toxic Substances Control Account's ("DTSC" or "California") Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

# I.   INTRODUCTION

In a March 11, 2015 Non-Prosecution Agreement with the United States Attorney's Office, Exide Technologies ("Exide") admitted to two decades' worth of felonious conduct by illegally storing and allowing hazardous waste to leak at its lead smelter in Vernon, California (the "Exide Site"), **"a significant number of times over the past two decades".**  *See* March 11, 2015 Non-Prosecution Agreement (emphasis added), a copy of which is attached as Exhibit A to the Declaration of John Powers ("Powers Declaration") filed herewith, and is also available at https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/03/Exide-U-S-Attorney-s-Office-Non-Prosecution-Agreement.pdf.

Exide befouled the Exide Site for more than 15 years, with the implicit blessing of DTSC.

After public outcry of DTSC's gross mismanagement of the Exide Site, DTSC attempted to force Exide into a "toothbrush style" cleanup.  DTSC required Exide to encase a humongous lead smelter building in an expensive air pressurized tent, "toothbrush clean" the Exide Site, and then remove buildings[1].  Indeed, even DTSC admits that "[d]econstruction of buildings is above and beyond typical RCRA closure requirements."  *See* November 2015 Exide Closure Plan at page 11-1, attached to Powers Declaration as Exhibit B and is available at

---

[1] The main lead smelter that DTSC was requiring Exide to remove was not even on the Exide Site at the time NL sold the property.  NL had nothing to do with Exide's lead smelter.

https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/03/CLOSURE-PLAN-MAIN-TEXT.pdf.

DTSC also demanded that Exide remediate offsite residential yards and gardens located in multiple cities outside of Vernon that the Exide Site did not remotely impact.  DTSC demanded that Exide clean the offsite residential yards located in the cities of Bell, Huntington Park, Maywood, Commerce, Los Angeles and in unincorporated areas of Los Angeles County located up to 1.7 miles away from the Exide facility to an **80 part per million** lead soil standard, when the United States Environmental Protection Agency ("EPA") and Center for Disease Control and Prevention ("CDC") standard for lead in bare soil is **only 400 parts per million** in children's play areas, and 1,200 parts per million in other areas.  *See* 40 C.F.R. 745.65(c)  (stating: "**(c)** *Soil-lead hazard.* A soil-lead hazard is bare soil on residential real property or on the property of a child-occupied facility that contains total lead equal to or exceeding **400 parts per million** ($\mu g/g$) in a play area or average of **1,200 parts per million** of bare soil in the rest of the yard based on soil samples.")[2].

The standard set by EPA, is the same as California's own "lead contaminated soil" regulation, which states:

> "Lead-contaminated soil" means bare soil that contains an amount of lead equal to, or in excess of, four hundred parts per million (**400 ppm**) **in children's play areas and one thousand parts per million (1000 ppm) in all other areas**.

*See* 17 CCR § 35036 (emphasis added).

---

[2]  It should not escape this Court that "Natural levels of lead in soil range between 50 parts per million (ppm) and 400 ppm."  *See* EPA Article "Lead at Superfund Sites: Human Health", a copy of which is attached to the Powers Declaration as Exhibit C and is available at https://www.epa.gov/superfund/lead-superfund-sites-human-health.

Indeed, DTSC's *own* September 29, 2015 Report entitled *Preliminary Estimate of the Geographical Boundary of Emissions from the Former Exide Technologies Facility*, concluded that soil lead background in the cleanup area (described in the report as "th[e] level represent[ing] the amount of lead in soil that cannot be attributed to a specific source") is between 165-250 parts per million. *See* September 29, 2015 Report titled *Preliminary Estimate of the Geographical Boundary of Emissions from the Former Exide Technologies Facility at p. 6, p. 24, Table 1*, attached to the Powers Declaration as Exhibit D.

Exide should not have been required to remediate soil in multiple cities outside Vernon to a level that is two to three times lower than background. Neither should anyone else. No one should have to remediate soil in a Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") cleanup to a level lower than EPA's standards.

Not surprisingly, as a result of DTSC's overreaching, DTSC forced Exide into bankruptcy, and Exide is now totally out of business. Exide has now been liquidated -- and at least **$29,070,513.45** has been placed in a trust by Exide to remediate the Exide Site. Not content with that money, DTSC has sued NL and others to pay for its own mismanagement of the Exide Site during the more than 40 years after the property was sold by NL in January of 1979. NL had nothing to do with DTSC's gross negligence and mismanagement. NL had nothing to do with the lead smelter building that is now being demolished under a negative pressure tent. It was built **AFTER** NL sold the property.

Importantly, DTSC is suing NL to cleanup offsite residential houses that it claims were impacted by Exide's lead smelter – a building that NL never built nor owned nor operated. Regardless, the lead issue in residential yards revolves almost exclusively around: a) exterior lead paint that was not properly maintained by homeowners; b) emissions from leaded gasoline in Los Angeles; and c) other sources

of lead, such as LA smog over many years, having nothing to do with NL. DTSC's own data appears to show that poorly-maintained lead paint is a primary source of lead issues in the residential yards[3]. As discussed in more detail below, NL has already paid to remediate the alleged lead paint and lead dust nuisance in the County of Los Angeles. The lead nuisance claim against NL is barred by a prior settlement and court order.

For the reasons set forth below, regardless of Exide's conduct, and the gross mismanagement by the DTSC, NL can have no liability under any of the claims that have been asserted by DTSC.

## II.                    <u>SUMMARY OF ARGUMENTS</u>

o     DTSC's CERCLA claim alleging that NL is responsible for offsite contamination from air emissions, is barred by the controlling Ninth Circuit decision in *Pakootas v. Teck Cominco Metals, Ltd.*, 830 F.3d 975 (9th Cir. 2016).

o     CERCLA, if retroactive, cannot be applied retroactively to NL in these circumstances, as it would result in an unlawful taking and due process violation of NL's constitutional rights.

o     DTSC's claims under the Carpenter-Presly-Tanner Hazardous Substances Account Act ("HSAA") cannot apply to NL, because NL had nothing to do with the Exide Site after January 1, 1982 -- the effective period of the HSAA.

---

[3] A true and correct copy of the Exide sampling data for soil lead and paint chips is available on DTSC's public website at the following location: https://dtsc.ca.gov/wp-content/uploads/sites/31/2020/06/2020-05-31_DTSC-PIA-Sampling-Data-Tables.xlsx (last visited March 4, 2021). A full copy of this document is on file with NL's Counsel and is available upon request. DTSC's spreadsheet includes 27,381 unique records (each record representing one unique paint chip sample) that shows the presence of lead in paint chip samples taken from buildings in the residential cleanup area. Attached to the Powers Declaration as Exhibit E are the first five pages from a 301-page PDF printout of the DTSC's publicly available lead paint chip testing records that has been filtered to show the paint chip samples containing lead. A full copy of the 301-page PDF printout is in counsel's possession and is available upon request.

4

NL INDUSTRIES, INC'S NOTICE OF MOTION AND MOTION                    CASE NO. 2:20-CV-11293-SVR-JPR
TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

     o     DTSC's attempt to sue NL for offsite lead in soils is barred by a prior Court Order that the State of California agreed to with NL -- in accepting over $350 million from NL and others.

### III.   FACTUAL BACKGROUND (As Established by the Complaint and Properly Considered Facts Drawn from Discrete Documents in the Public Domain and/or Referenced in the Complaint)

According to DTSC, the Exide Site is located in the City of Vernon, on approximately 24 acres of land. *See* June 2006 DTSC Fact Sheet, a copy of which is attached to the Powers Declaration as Exhibit F and is available at https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/03/Exide_FS_dPermit.pdf. The parcel is zoned for heavy Industrial (Zone M-2) and other parcels in the vicinity are zoned either Manufacturing or Commercial. *Id*. **There is no residential zoning within a quarter mile radius of the site**. *Id*.

When Vernon was incorporated in 1905, it was "designed exclusively for businesses." *See* 2020 Vernon Chamber of Commerce available at https://www.vernonchamber.org/about-vernon/. The motto on the City seal is "Exclusively Industrial." *Id*. It remains today an industrial city. *Id*.

DTSC alleges that the property was first used for industrial purposes in 1925. *See* DTSC Complaint at ¶ 16.

DTSC alleges that NL became the owner of the property in 1974. *See id.*

DTSC alleges that NL sold the property on **January 31, 1979**. *See id.*

While DTSC alleges that NL is responsible for the activities of a prior owner, Morris Kirk, DTSC also alleges that NL owned the property for less than six years. *See id.*

During the early 1980s, the facility was the subject of a major modernization and reconstruction that resulted in the current site configuration. *See* Exide Closure Plan modified by DTSC on December 8, 2016 at page i, a copy of which is attached

to the Powers Declaration as Exhibit G and is available at https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/03/Exide_ClosurePlan_Exec-Summary.pdf.

The lead smelter building now existing on the Exide Site, now being cleaned up under a negative pressure tent, was not even built at the time NL sold the property, and NL had nothing to do with that lead smelter building.  *See* Exhibit G to Powers Declaration, Exide Closure Plan at page iii.

In **September 2000**, Exide acquired the facility. *See* Exhibit G to Powers Declaration, Exide Closure Plan at page i.

On **February 25, 2002**, DTSC and Exide entered into a Corrective Action Consent Order (CACO) that required Exide to prepare and implement a work plan for investigation of the entire facility.  *See* Corrective Action Consent Order ("CACO") attached to Powers Declaration as Exhibit H, available at https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/03/Exide_ENF_coraction_hwm_031203.pdf.

On **April 15, 2002**, Exide filed its **first bankruptcy** under Chapter 11. *See* http://www.deb.uscourts.gov/sites/default/files/opinions/judge-kevin-j.carey/exide.pdf.

In a **June 2006 "Fact Sheet"** (Exhibit F to Powers Declaration), DTSC stated that it had "conducted a detailed review of the Exide Technologies Part B Permit application and has determined that it complies with all applicable regulatory standards and requirements."

As discussed by DTSC in the **June 2006 "Fact Sheet",** the Exide Site is not a new source and "**all other emissions were determined to be less than significant**". The "**impacts of the facility on all other environmental resources were also determined to be less than significant."**

On **June 10, 2013**, Exide filed its **second voluntary bankruptcy** under Chapter 11.  *S. Coast Air Quality Mgmt. Dist. v. Exide Techs. (In re Exide Techs.),*

613 B.R. 79, 82 (D. Del. 2020).

In **March 2014**, Exide stopped operations. *See* Exhibit G to Powers Declaration, Exide Closure Plan at page i.

On **March 11, 2015**, during the Chapter 11 cases, Exide and the United States Attorney for the Central District of California entered into a Non-Prosecution Agreement. *See* Exhibit A to Powers Declaration.

In the Non-Prosecution Agreement, Exide admitted to having committed felony environmental violations at the Exide Site over the previous two decades and agreed to permanently close the Exide Site. *Id*.

Exide admitted to "knowingly storing corrosive and lead-contaminated hazardous waste inside leaking van trailers ... parked at the [Exide] Facility." *Id*.

Pursuant to the Non-Prosecution Agreement, the parties estimated that the direct costs of Exide's compliance (i.e., the closure and remediation efforts) would be between approximately $108 and $133 million. *Id*.

On **April 7, 2015**, Exide provided notice of its intent to permanently close the facility. *See* Exhibit G to Powers Declaration, Exide Closure Plan at page i.

On **May 19, 2020**, Exide filed its **third Chapter 11 bankruptcy and DTSC forced Exide to liquidate its assets**. *See* Docket 1, Petition for Non-Individuals Filing for Bankruptcy, Case No. 20-1157-CSS, filed May 19, 2020, United States Bankruptcy Court for the District of Delaware. As a result of the bankruptcy, Exide placed at least **$29,070,513.45** in an environmental trust to remediate the Exide Site. *See* DTSC November 25, 2020 Letter to EPA showing that $29,070,513.45 was in Vernon Environmental Trust on October 23, 2020 attached to the Powers Declaration as Exhibit I and available at DTSC's Website at https://www.envirostor.dtsc.ca.gov/public/hwmp_community_involvement/4630262076/2020-11-25_DTSC_LTR%20to%20EPA_120DayBudget%20Final%20Complete.pdf

7

NL INDUSTRIES, INC'S NOTICE OF MOTION AND MOTION   CASE NO. 2:20-CV-11293-SVR-JPR
TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

## IV.   DOCUMENTS CONSIDERED ON A MOTION TO DISMISS

It is well-established that the Court, in adjudicating this Motion, may consider all well-pleaded facts alleged in the Complaint, documents incorporated within the Complaint by reference, any document on which the Complaint heavily relies, and facts of which judicial notice may be taken under Federal Rule of Evidence 201.   *See e.g. Steinle v. City of S.F.*, 919 F.3d 1154, 1162-63 (9th Cir. 2019) ("This doctrine permits a court to consider a document 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'")

Courts routinely take judicial notice on Motions to Dismiss of documents on official government websites.  *United States ex rel. Modglin v. Djo Global Inc.*, 114 F. Supp. 3d 993, 1003 n.43 & 1008 (C.D. Cal. 2015) ("The court takes judicial notice of this fact based on an official document available on the CMS website. . . . Under Rule 201, the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies."), *aff'd sub nom. United States v. DJO Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010) (taking judicial notice of information on the websites of two school districts because they were government entities); *see also* NL Industries Request for Judicial Notice filed herewith.

### ARGUMENT

### POINT I

### DTSC'S CERCLA CLAIMS (COUNT I AND II) AGAINST NL WITH REGARD TO THE OFF-SITE SOILS IMPACTED BY ALLEGED AIR EMISSIONS ARE BARRED BY *PAKOOTAS V. TECK COMINCO METALS*

DTSC claims that NL has liability under CERCLA for alleged air emissions of lead that came from the Exide Site in Vernon and allegedly settled into residential

yards in Bell, Huntington Park, Maywood, Commerce and Los Angeles.  The Ninth Circuit in *Pakootas v. Teck Cominco Metals, Ltd.*, 830 F.3d 975 (9th Cir. 2016), held that air emission of hazardous substances is not a "disposal" under CERCLA. Disposal is a requirement under CERCLA.  *See* CERCLA § 107(b - d).  DTSC's claim under CERCLA, that NL be required to pay for the cleanup of offsite yards and soil, is predicated on air emissions.  It must be dismissed.

The Ninth Circuit explained that "disposal"—as opposed to release—of hazardous substances does not include an "aerial deposition" or "emission". *Pakootas*, 830 F.3d at 983-984.

More specifically, the Ninth Circuit held that the owner of a smelter was not liable as a person who "arranged for disposal" of hazardous substances when it emitted those compounds into the air and the substances were deposited onto land and water downwind.  Overturning the district court's decision, the Court excluded from the CERCLA definition of "disposal" the emission of hazardous substances into the air that are then deposited elsewhere. The Ninth Circuit relied heavily on the reasoning and analysis from two previous Ninth Circuit decisions to determine that the term "disposal" as construed under CERCLA did not include the passive depositing of compounds onto land or water through emission into the air. The Ninth Circuit's holding follows Ninth Circuit precedent that passive migration does not constitute disposal under CERCLA.

In *Pakootas v. Teck Cominco Metals, Ltd.*, the Defendant Teck Cominco Metals, Ltd's ("Teck") owned a smelter located ten miles north of the United States – Canada border in British Columbia. The smelter had operated there for almost 100 years. The Plaintiff in *Pakootas*, like DTSC here, alleged that hazardous substances were "discharged into the atmosphere by the [Teck smelter and] travelled through the air into the United States resulting in the deposition of airborne hazardous substances" onto the site. Teck moved to strike these claims. The trial court denied

Teck's motion and denied a subsequent request for reconsideration reasoning that "the actionable CERCLA 'disposal' in this case occurred when the hazardous substances emitted by Teck entered the land or water at the site, not when the substances were initially released into the air." On interlocutory appeal, the Ninth Circuit reversed.

As is the case here, the question before the Ninth Circuit was "whether aerial emissions leading to disposal of hazardous substances 'into or on any land or water' are actionable under CERCLA." The question arose in the context of CERCLA arranger liability, and whether the defendant "arranged for *disposal*" within the meaning of CERCLA § 107(a) when hazardous substances passively travelled through the air and were then deposited on the land and in water. The Ninth Circuit's analysis focuses on CERCLA's definition of "disposal." CERCLA does not set forth its own definition of "disposal." Rather, it cross-references the definition of "disposal" found in the Resource Conservation and Recovery Act ("RCRA"). 42 U.S.C. § 9601(29); 42 U.S.C. § 6903(3). RCRA defines "disposal" as "the discharge, deposit, injunction, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that [such waste] may enter the environment or be emitted into the air or discharged into any waters[.]" 42 U.S.C. § 6903(3). This RCRA definition and its use of the term "deposit" was a central issue because Plaintiffs in *Pakootas*, identical to the DTSC here, wanted the Ninth Circuit to construe "deposit" to broadly include the passive transport of air emissions.  The Ninth Circuit ultimately rejected this broader interpretation of what it means to "dispose" by way of "deposit" relying on two earlier Ninth Circuit cases.

In *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863 (9th Cir. 2001), the Ninth Circuit, *en banc*, interpreted the terms "deposit" and "disposal" as they applied to former owner/operator liabilities under CERCLA and held that the term "deposit" "is akin to 'putting down' or placement" by someone and that "nothing in

the context of the statute or the term 'disposal' suggests that Congress meant to include chemical or geologic processes or passive migration." *Carson Harbor,* 270 F.3d at 879 & n.7.  Where Congress had intended to include passive activity, it employed specific terminology, such as "leaching." Accordingly, *Carson Harbor* rejected the notion that "deposit" included the gradual or passive spread of contaminants without human intervention.

The Ninth Circuit also followed *Center for Community Action & Environmental Justice v. BNSF Railway Co.,* 764 F.3d 1019 (9th Cir. 2014) in interpreting "disposal" under RCRA, which held that emitting diesel particulate matter into the air and allowing it to be "transported by wind and air currents onto the land and water" did not constitute "disposal" of waste within the meaning of the RCRA. The Ninth Circuit analyzed the statutory text and Congressional intent of RCRA and determined that waste must *first* be placed onto the land or water and *thereafter* be emitted into the air to constitute disposal. *Center for Community Action & Environmental Justice,* 764 F.3d at 1024-25.

Despite claims by the *Pakootas* Plaintiffs, that the term "disposal" could be interpreted more broadly, the Ninth Court ultimately concluded that it was bound by the *en banc* decision in *Carson Harbor*, and found no compelling reason to depart from the persuasive reasoning in *Center for Community Action & Environmental Justice,* that a hazardous substance first emitted into the air was not a "disposal" under RCRA's definition. Therefore, the Ninth Circuit reversed the lower court and concluded that Plaintiffs could not maintain a cause of action for arranger liability based upon Teck's aerial emissions from its smelter.

Here, DTSC alleges that there were "releases" of lead particulate from the Vernon Plant that traveled 1.7 miles into a number of different cities and unincorporated areas outside Vernon.  *See* DTSC Complaint at ¶ 47.  DTSC's CERCLA claim does not explicitly explain how the lead supposedly traveled off the

NL INDUSTRIES, INC'S NOTICE OF MOTION AND MOTION
TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

CASE NO. 2:20-CV-11293-SVR-JPR

Exide Site for approximately 1.7 miles.  However, in its nuisance claim, DTSC admits that the lead allegedly traveled by air.  *See* DTSC Complaint at ¶¶ 168 and 169.  DTSC's Complaint does not allege how any lead might have traveled up to 1.7 miles -- other than through air emissions.  But any mystery as to how DTSC claims that lead from Exide's Plant traveled to residential properties in different cities up to 1.7 miles from Exide's Plant was resolved by DTSC in its July 17, 2017 Removal Action Plan (Cleanup Plan)("RAPCP"):



*See* RAPCP at page 2-19, figure 6 attached to the Powers Declaration as Exhibit J and is available on DTSC's Website at https://www.envirostor.dtsc.ca.gov/public/community_involvement/1385548233/FINAL_Removal_Action_Plan-Cleanup_Plan_17Jul2017.pdf. (emphasis added)

       As noted above, no residential zoning exists in Vernon or within ¼ mile – 1320 feet of the Exide Plant.  *See* June 2006 DTSC Fact Sheet attached as Exhibit F to the Powers Declaration, and available at https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/03/Exide_FS_dPermit.pdf.  The only plausible explanation for disposal off the Exide Site that would require offsite residential remediation up to 1.7 miles away is air transmission.  Under the plausibility standard set forth by the Supreme Court in *Iqbal* and *Twombly*, DTSC has not remotely set forth a plausible basis for its claim that NL is responsible for the remediation of "10,000 sensitive land use properties (residences, schools, daycare centers, child care facilities and parks)" in multiple cities that DTSC contends need to be remediated.

12

NL INDUSTRIES, INC'S NOTICE OF MOTION AND MOTION                                    CASE NO. 2:20-CV-11293-SVR-JPR
TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

*See* DTSC Complaint at ¶¶ 41, 81-93.  All claims that NL is responsible for any off-site contamination should be dismissed.

## POINT II

## DTSC'S FIRST AND SECOND CLAIMS FOR RELIEF MUST BE DISMISSED BECAUSE CERCLA IS NOT RETROACTIVE.  APPLYING CERCLA RETROACTIVELY TO NL UNDER THESE CIRCUMSTANCES IS UNCONSTITUTIONAL

NL recognizes that numerous Circuit Courts of Appeal and District Courts have found CERCLA to be retroactive, and that such construction does not violate the Constitution.  NL respectfully submits that these cases were decided either: a) prior to the *Landgraf, Apfel,* and *Vartelas* trilogy discussed below; b) did not consider applying CERCLA to events between more than 40 and 95 years ago; or c) are wrongly decided.  Neither the Supreme Court nor the Ninth Circuit have directly decided the issue of CERCLA's retroactivity.  Both Courts have *dicta* to the effect that CERCLA is retroactive, but such statements are just that – *dicta*.  *Atlantic Richfield Co. v. Christian*, 590 U.S. ____, 140 S. Ct. 1335, 206 L. Ed. 2d 516 (2020); *Anderson Bros., Inc. v. St. Paul Fire & Marine Insurance Co.*, 729 F.3d 923, 926 (9th Cir. 2013).  Fully analyzing the issues, the Supreme Court and the Ninth Circuit would find against retroactive application of CERCLA against NL in these circumstances in light of the *Landgraf, Apfel,* and *Vartelas* trilogy.  So too should this Court.

CERCLA should not be retroactively applied here because it was not enacted, and did not become effective, until December 11, 1980 – over 11 months after NL sold the property.  The Supreme Court has counseled that statutes cannot be applied retroactively absent **"clear congressional intent favoring such a result."**  *Landgraf v. USI Film Prods.,* 511 U.S. 244, 280 (1994)(emphasis added). There is no such clear congressional direction in CERCLA.

More so, even if there was, DTSC is demanding NL pay no less than **$136 million** in alleged cleanup costs.  *See* Complaint at ¶ 93.   Due to the misfeasance of DTSC, the California State Auditor has concluded that cleanup costs could reach **$650 million**.   *See* California State Auditor Report, October 2020, "California Department of Toxic Substances Control: The State's Poor Management of the Exide Cleanup Project Has Left Californians at Continued Risk of Lead Poisoning" attached to the Powers Declaration as Exhibit K and available at https://www.auditor.ca.gov/pdfs/reports/2020-107.pdf.

As applied here, forcing NL to pay $136 million (or more), for conduct which allegedly occurred before January 31, 1979 and allegedly many years prior, and prior to the enactment of CERCLA, would result in an unlawful taking and due process violation under the United States Constitution.

In 1994, in *Landgraf,* the Supreme Court held that the presumption against retroactive legislation is "deeply rooted in this Court's jurisprudence," and can only be overcome where Congress expresses a clear intent to do so.  *Landgraf,* 511 U.S. at 265.   The Supreme Court observed that **"the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place,"** (*id.* at 265) **to avoid the "unfairness of imposing new burdens on persons after the fact"** (*id.* at 270) (emphasis added). The Supreme Court added that if a new statute would "impair rights a party possessed when he acted, **increase a party's liability for past conduct**, **or impose new duties with respect to transactions already completed,"** then courts should not give retroactive effect to the statute without **"clear congressional intent favoring such a result**." *Id.* at 280 (emphasis added).  In stating these principles, the Supreme Court held that the Civil Rights Act of 1991 is not retroactive.

Four years later in 1998, in *E. Enters. v. Apfel*, 524 U.S. 498 (1998), the Supreme Court stated that "in accordance with 'fundamental notions of justice' that

have been recognized throughout history," "[r]etroactivity is generally disfavored in the law." *Apfel*, 524 U.S. at 532 (plurality) (holding unconstitutional an effort to "reach[] back 30 to 50 years to impose liability ... based on [a] company's activities between 1946 and 1965"); *see also id.* at 549 (Kennedy, J., concurring) ("due process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity").

The Supreme Court stated that even a legislative effort to allocate economic responsibility for a societal problem can be "unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." *Apfel*, 524 U.S. at 528-29 (plurality).   In re-stating these principles, the Supreme Court held that the Coal Act could not be applied retroactively because it:

> substantially interferes with Eastern's reasonable investment-backed expectations. It operates retroactively, **reaching back 30 to 50 years** to impose liability based on Eastern's **activities between 1946 and 1965**. Retroactive legislation is generally disfavored. It presents problems of unfairness because it can deprive citizens of legitimate expectations and upset settled transactions. *General Motors Corp*. v. *Romein*, 503 U.S. 181, 191. The distance into the past that the Coal Act reaches back to impose liability on Eastern and the magnitude of that liability raise substantial fairness questions.

*Apfel*, 524 U.S. at 501-02 (plurality) (emphasis added.)

Fourteen years after *Apfel*, in 2012, in *Vartelas v. Holder*, 566 U.S. 257 (2012), the Supreme Court further invoked the principle against retroactive legislation:

The presumption against retroactive legislation, the Court recalled in *Landgraf,* "embodies a legal doctrine centuries older than our Republic." ... Several provisions of the Constitution, the Court noted, embrace the doctrine, among them, the *Ex Post Facto* Clause, the Contract Clause, and the Fifth Amendment's Due Process Clause. Numerous decisions of this Court repeat the classic formulation Justice Story penned for determining when retrospective application of a law would collide with the doctrine. It would do so, Story stated, when such application would "tak[e] away or impai[r] vested rights acquired under existing laws, **or creat[e] a new obligation, impos[e] a new duty, or attac[h] a new disability, in respect to transactions or considerations already past**."

*Vartelas v. Holder*, 566 U.S. at 265-66 (emphasis added; citations omitted).

The Supreme Court in *Vartelas* added:

But "[e]ven when the conduct in question is morally reprehensible or illegal," the Court added, "a degree of unfairness is inherent whenever the law imposes additional burdens based on conduct that occurred in the past." And in *Hughes Aircraft,* the Court found that Congress' 1986 removal of a defense to a *qui tam* action did not apply to pre–1986 conduct in light of the presumption against retroactivity. As in *Landgraf,* the relevant conduct (submitting a false claim) had been unlawful for decades.

*Vartelas v. Holder*, 566 U.S. at 273 (citations omitted).

The trilogy of *Landgraf, Apfel,* and *Vartelas,* make clear that CERCLA cannot be applied retroactively in this case against NL.

Here, NL's alleged predecessor, Morris Kirk, allegedly opened the property in 1925 in the City of Vernon, which had no residents, and which billed itself as

"exclusively industrial".  NL allegedly took over the property in 1974 and had no inkling that CERCLA would be enacted or that NL would have retroactive liability for events that occurred almost 100 years ago.  NL sold the property in 1979 - before CERCLA was enacted.

DTSC does not allege any activity by NL at the Exide Site after the enactment of CERCLA.  DTSC is looking to use CERCLA to reach back not just "30 to 50 years," which the Supreme Court found was too long in *Apfel*, but nearly a century, "to impose liability … based on … activities" allegedly starting in 1925.  *Apfel*, 524 U.S. at 532.

Forcing NL to shoulder the enormous burden of remedying a property that it has had nothing to do with since 1979, at a cost of over $136 million, based on alleged conduct that pre-dated this litigation by more than 40 years (and up to 95 years ago) and all of which pre-dated CERCLA, is exactly the kind of "severe, disproportionate, and extremely retroactive burden" that the Constitution prohibits. *Apfel*, 524 U.S. at 538; *see also id.* at 549 (Kennedy, J., concurring). "Elementary notions of fairness … dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996).  Here, NL had neither.

The Supreme Court in *Apfel*, 524 U.S. at 500, stated that Congress may impose retroactive liability to some degree, particularly where it is "'**confined to short and limited periods** required by the practicalities of producing national legislation,'".  It did not say that there could be a retroactive lookback of 95 years. CERCLA cannot be applied retroactively to NL in this case.

**POINT III**

**DTSC'S THIRD AND FOURTH CLAIMS FOR RELIEF MUST BE DISMISSED BECAUSE THE HSAA IS NOT RETROACTIVE**

Counts III and IV of DTSC's Complaint rely entirely upon the Carpenter-Presly-Tanner Hazardous Substances Account Act ("HSAA"). Section 25366 of the HSAA provides that it only applies to acts **after January 1, 1982**, as follows:

(a) **This chapter shall not be construed as imposing any new liability associated with acts that occurred on or before <u>January 1, 1982</u>, if the acts were not in violation of existing state or federal laws at the time they occurred.**

(emphasis added).

DTSC alleges that NL sold the property that is the subject of its Complaint effective **<u>January 1, 1979</u>**. *See* DTSC Complaint at ¶ 97. This was three years before the **<u>January 1, 1982</u>** effective date of the HSAA. At no place in the Complaint does DTSC allege that NL did anything after January 1, 1979. Nor does DTSC allege that any alleged acts of NL were in violation of existing state or federal law at the time NL undertook such acts.

The HSAA is not retroactive and exempts all legal acts before January 1, 1982. *See e.g.*, *Chubb Custom Insurance Company v. Space Systems/Loral*, No. C 09-4485 JF (PVT), 2010 WL 689940, at *8 (N.D. Cal. Feb. 23, 2010) ("Although Chevron offers several grounds for dismissal of this claim, the first is unopposed by Chubb and is dispositive: the California Health and Safety Code does not impose retroactive liability and exempts all acts that occurred before January 1, 1982."); *United Alloys, Inc. v. Baker*, 797 F. Supp. 2d 974, 1005 (C.D. Cal. 2011) ("However, HSAA does not impose liability for acts that occurred prior to January 1, 1982, if those acts did not violate existing federal laws at the time they occurred. Cal. Health & Saf. Code § 25366(a).")

Here, DTSC has not alleged any facts as to NL that would trigger a claim under HSAA.  DTSC does not allege that any of NL's alleged acts were "in violation of existing state or federal laws at the time they occurred".

Attempting to apply the HSAA retroactively to NL would also be in violation of California Code and the California Constitution.   Indeed, Section 3 of the California Civil Code includes a specific codification against retroactivity, as follows: "No part of this Code is retroactive, unless expressly so declared." Moreover, the presumption against retroactivity applies with particular force to laws creating new obligations, imposing new duties, or exacting new penalties because of past transactions.  *In re Marriage of Reuling,* 23 Cal. App. 4th 1428, 1439 (1994).

DTSC's Third and Fourth Claims for Relief must be dismissed with prejudice.

## POINT IV

### ALL OF DTSC'S CLAIMS THAT NL MUST ABATE LEAD IN SOILS, INCLUDING DTSC'S FIFTH CLAIM FOR RELIEF (NUISANCE), MUST BE DISMISSED BECAUSE NL HAS ALREADY PAID TO REMOVE THE LEAD IN SOILS, AND A BINDING COURT ORDER PROHIBITS THE VERY LAWSUIT THAT DTSC HAS FILED AGAINST NL

In its Complaint, DTSC alleges that NL must pay for the cleanup of lead in residential soils and lead dust from the Exide Site.  In particular, DTSC's Count V alleges that NL is required to abate a public nuisance allegedly caused by air emissions of lead from the Exide Site that are now allegedly in the soil within the County of Los Angeles.  *See* Complaint at ¶¶ 162 – 179.  NL has already paid for that cleanup, and has received a Court Order barring any successive nuisance lawsuit for that lead in soils.

More specifically, in 2000, NL was sued by the State of California in *The People of the State of California, Plaintiff, v. Atlantic Richfield Company, et al., Defendants,* Case No. 1-00-CV-788657, Superior Court of the State of California,

in and for the County of Santa Clara, to abate a public nuisance for lead in soils throughout the State of California, including Los Angeles County, where the Exide Site is located.  After years of litigation, the State of California settled on a Fourth Amended Complaint filed March 16, 2011 which alleged as follows:

> 3. In response to this public health crisis, County Counsel and City Attorneys from throughout the State of California ("the Prosecuting Entities") have brought this action on behalf of the People of the State of California to remedy the devastation caused by **Lead poisoning**, a clear and present danger to the health and well-being of people throughout the State of California, particularly millions of children. This Fourth Amended Complaint **sets forth a public nuisance claim seeking an order requiring abatement of all Lead from private and public** homes, buildings, and **property in the Prosecuting Entities' jurisdictions**.  The Prosecuting Entities bring this claim to protect the public health as statutorily appointed representatives of the People of the State of California pursuant to California Code of Civil Procedure section 731.

*See* Fourth Amended Complaint in *The People of the State of California, Plaintiff, v. Atlantic Richfield Company, et al., Defendants,* Case No. 1-00-CV-788657, Superior Court of the State of California, in and for the County of Santa Clara, attached to the Powers Declaration as Exhibit L.

After almost 20 years of litigation, in a July 2019 Joint Motion for Dismissal With Prejudice, the State of California agreed that NL would not be sued again for lead dust and stipulated as follows:

> For purposes of clarity, the parties stipulate that this judgment of dismissal **resolves Defendants' past, present, and future liability**

20

NL INDUSTRIES, INC'S NOTICE OF MOTION AND MOTION                    CASE NO. 2:20-CV-11293-SVR-JPR
TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

**for** public nuisance arising from lead paint, lead pigment, **or lead dust in the Prosecuting Jurisdictions**.

*See* July 2019 Joint Motion for Dismissal With Prejudice and Order and Judgment, attached to the Powers Declaration as Exhibit M (emphasis added).  California defines lead dust to include "dust that contains an amount of lead equal to, or in excess of: (a) forty micrograms per square foot ($40mg/ft^2$) for interior floor surfaces; or (b) two hundred and fifty micrograms per square foot ($250mg/ft^2$) for interior horizontal surfaces; or (c) four hundred micrograms per square foot ($400mg/ft^2$) for exterior floor and exterior horizontal surfaces." Cal. Code Regs., tit. 17, § 35035.

Indeed, in the Order dismissing the case, Judge Thomas E. Kuhnle, ordered:

5. This dismissal constitutes a final judgment on the merits and **bars subsequent litigation of all issues which were or could have been raised, including but not limited to any successive action for public nuisance**, as set forth in the Agreement and **Full and Complete Release**.

*See* July 2019 Joint Motion for Dismissal With Prejudice and Order and Judgment, attached to the Powers Declaration as Exhibit M (emphasis added).

In the Order dismissing the case, Judge Thomas E. Kuhnle, found that each Prosecuting Jurisdiction was duly authorized to bring the action, the People of the State of California were effectively represented, and each Prosecuting Jurisdiction approved the settlement, as follows:

1.   The Court finds that each County Counsel or City Attorney of each Prosecuting Jurisdiction was duly authorized under Section 731 of the Code of Civil Procedure to bring this public nuisance action on behalf of the People of the State of California, each County Counsel and City Attorney adequately and effectively represented the People, the Prosecuting Jurisdictions and the public in litigating this action

zealously, and each Prosecuting Jurisdiction has approved the Agreement and Full and Complete Release, attached as Exhibit A, in accordance with its required procedures.

*See* July 2019 Joint Motion for Dismissal With Prejudice and Order and Judgment, attached to the Powers Declaration as Exhibit M.  Section 731 of the California Code of Civil Procedure is the statute that allows for nuisance claims to be brought under California Code Section 3479.  This is the very same section that DTSC is now again suing NL under.

The very complaints that DTSC is now making not only could have been raised in the prior litigation -- they were raised.  In the prior case, the County of Los Angeles, on behalf of the People of the State of California, demanded that NL cleanup lead from "**property in the Prosecuting Entities' jurisdictions**."  *See* Fourth Amended Complaint in *The People of the State of California, Plaintiff, v. Atlantic Richfield Company, et al., Defendants,* Case No. 1-00-CV-788657, Superior Court of the State of California, in and for the County of Santa Clara, attached to the Powers Declaration as Exhibit L.  The property that DTSC, a department of the State of California, is seeking NL clean up again is all located within the County of Los Angeles – one of the "prosecuting entities".

The DTSC's Complaint, including Count 5, does exactly what the State of California agreed not to do -- when it accepted over $305 million from NL and others and agreed not to file successive lawsuits seeking to have NL abate lead in residential soils.  The Order dismissing that case barred any successive public nuisance claims. DTSC is now claiming that the very same yards need to be cleaned up with yet more money from NL.  NL should not be required to pay to abate the same alleged nuisance twice.  The claims are barred by the Court's Order.

DTSC can be expected to argue that it is not bound by the agreement of the People of the State of California, and the County of Los Angeles within which the

Exide Site is located.  DTSC would be incorrect.

California courts have long maintained the State is bound by settlements entered into by its political subdivisions.

For example, in *People ex rel. Bryant v. Holladay*, 93 Cal. 241 (1892), the California Supreme Court held that when a county had the authority to sue to enforce public rights, the State of California would be subsequently bound by the results of that litigation, as follows:

> **We entertain no doubt that** the city and county of San Francisco has the authority to maintain an action for the purpose of preserving the rights of the general public to the use of squares, or land claimed as such, within its limits, and that in such action it is authorized to put in issue the alleged rights of the people to such easement, and that **the state itself is bound by the result of such litigation**, if the same is not collusive.

*People ex rel. Bryant v. Holladay*, 93 Cal. at 249 (emphasis added).

The California Supreme Court added that "the public would be bound by the final judgment therein if the action was conducted in good faith on the part of the city" and stated:

> The rule that the **citizen shall not be twice vexed for the same cause of action is as binding upon the state as upon other litigants**; and the legislature, in conferring upon the city power to maintain and defend in the courts the rights of the state to streets and squares within its limits, must be presumed to have done so with reference to this well known maxim, and to have intended that the state should be bound by the result of such litigation.

*People ex rel. Bryant v. Holladay*, 93 Cal. at 249 – 250 (emphasis added).

Following *Holladay*, the California Supreme Court in *County of Sierra v. Butler*, 136 Cal. 547, 551 (1902) confirmed the very principle that one department of a state is bound by the litigation or settlement of another department, as follows:

> "If it should be said that the action should have been by the authority of the state, through the attorney-general, the answer is, as in *People* v. *Holladay,* that in the action by the county **the rights of the people are put in issue, and the state would be bound by the result of the litigation**, if not collusive.") (emphasis added)

*County of Sierra v. Butler*, 136 Cal. at 551 (1902) (emphasis added).

The same must hold true here. NL was sued in the name of the People of the State of California by counties and cities in California, including the County of Los Angeles, to abate lead in soils and lead dust within the County of Los Angeles. A different branch of the State of California is seeking to have NL abate lead in soils and lead dust within the County of Los Angeles yet again. The State is bound by the first order barring all successive lawsuits to abate lead and cleanup lead dust. *See also People ex rel. Ryan v. San Diego*, 71 Cal. App. 421, 432-33 (1925) ("In each of these cases the state had conferred upon the municipality, or officer, jurisdiction over the subject matter of the controversy, and for that reason our courts have held that in any litigation involving such subject matter, the municipality, or officer, represented the state, and that the latter is bound by any judgment rendered against its representative."); *Lerner* v. *L.A. City Bd. of Educ.*, 59 Cal. 2d 382, 398 (1963) ("[T]he agents of the same government are in privity with each other, since they represent not their own rights but the right of the government.").

The claims made in DTSC's Complaint, including those made in the Fifth Claim for Relief, are barred by prior Court order. They cannot survive.

## **CONCLUSION**

For the reasons set forth herein, NL requests this Court dismiss DTSC's Complaint with prejudice. To the extent that any answer to the Complaint is required by NL, NL denies all claims via a general denial.

Date: April 22, 2021                    Respectfully submitted,


                                        /s/ Joel L. Herz
                                        LAW OFFICES OF JOEL L. HERZ
                                        3573 East Sunrise Drive, Suite 215
                                        Tucson, AZ  85718
                                        (520) 529-8080
                                        (520) 529-8077 (facsimile)
                                        Email:  joel@joelherz.com
                                        Admitted Pro Hac Vice

                                        Kenneth A. Ehrlich (Bar #150570)
                                        ELKINS KALT WEINTRAUB REUBEN
                                        GARTSIDE LLP
                                        10345 W. Olympic Blvd
                                        Los Angeles, CA  90064
                                        (310) 746-4412
                                        (310) 746-4499 (facsimile)
                                        KEhrlich@elkinskalt.com
                                        Counsel for NL Industries, Inc.

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that on April 22, 2021, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF system, which will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

By:  /s/ Joel L. Herz

NL INDUSTRIES, INC'S NOTICE OF MOTION AND MOTION    CASE NO. 2:20-CV-11293-SVR-JPR
TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES