David C. Allen (SBN 190479)
david.allen@btlaw.com
Joel R. Meyer (SBN 247620)
joel.meyer@btlaw.com
Joseph M. Wahl (SBN 281920)
joseph.wahl@btlaw.com
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, California  90067
Telephone: (310) 284-3880
Facsimile:  (310) 284-3894

Attorneys for Defendant
GOULD ELECTRONICS INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL and the TOXIC SUBSTANCES CONTROL ACCOUNT,<br><br>Plaintiff,<br><br>v.<br><br>NL INDUSTRIES, INC., a New Jersey corporation; JX NIPPON MINING & METALS CORPORATION, a Japanese corporation; GOULD ELECTRONICS INC., an Arizona corporation; KINSBURSKY BRO. SUPPLY, INC., a California corporation; TROJAN BATTERY COMPANY, LLC, a Delaware limited liability company; RAMCAR BATTERIES INC., a California corporation; CLARIOS, LLC, a Wisconsin limited liability company; QUEMETCO INC., a Delaware corporation; INTERNATIONAL METALS EKCO, LTD., a California corporation; and BLOUNT, INC., a Delaware corporation,<br><br>Defendants. | Case No.  2:20-cv-11293 SVW (JPRx)<br><br>**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS**<br><br>Judge: Hon. Stephen V. Wilson<br>Courtroom: 10A<br><br>**Complaint Filed:  December 14, 2020**<br>**Trial Date:  None Set** |

**ANSWER**

Defendant Gould Electronics Inc. ("GEI"), by undersigned counsel, answers Plaintiffs' Complaint as follows.  As permitted by Fed. R. Civ. P. 8(b) (3), GEI generally denies all allegations in the Complaint except those specifically admitted here.

INTRODUCTION

1.      In response to Paragraph 1 of the Complaint, GEI admits that the smelter property located in Vernon, California ("Vernon Plant") was most recently owned and operated by Exide Technologies, LLC ("Exide") and, due to Exide's bankruptcy, the Vernon Plant has been transferred to an environmental response trust.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 1 and, on that basis, denies those allegations.

2.      GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 2 and, on that basis, denies those allegations.

3.      GEI admits that, based upon the length of exposure and dose, lead is a neurotoxin that can accumulate in the body and can damage organs.  GEI admits that children may be particularly vulnerable to the effects of lead.  GEI admits that some government agencies have determined that, based on the length of exposure and dose, arsenic is a known human carcinogen, and that government agencies have determined that mercury can cause brain damage, mental impairment, and seizures depending on dose and exposure.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 3 and, on that basis, denies those allegations.

4.      GEI admits that the California Department of Toxic Substances Control ("DTSC") has conducted certain environmental investigation and excavation actions at certain properties within 1.7 miles of the Vernon Plant.  GEI

lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 4 and, on that basis, denies those allegations.

STATEMENT OF THE ACTION

5.     Paragraph 5 purports to define "Vernon Plant."  GEI lacks knowledge or information sufficient to form a belief about the truth of the definition of "Vernon Plant", particularly whether the parcels of land that make up Plaintiffs' definition of the "Vernon Plant" changed over the course of the approximately 95 years the smelter was in operation and, on that basis, denies the truth of that allegation.  The term "Vernon Plant" as used by GEI in this pleading refers to Plaintiffs' defined term "Vernon Plant," but use of the term "Vernon Plant" herein does not admit any allegation or definition regarding that term or Plaintiffs' characterizations regarding the extent of contamination attributable to the Vernon Plant.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 5 and, on that basis, denies those allegations.

6.     Paragraph 6 purports to define the "Site," the definition of which is a conclusion of law that need not be admitted or denied at this stage.  The term "Site" as used by GEI in this pleading refers to Plaintiffs' defined term "Site," but use of the term "Site" herein does not admit any allegation or definition regarding the term "Site" or Plaintiffs' characterizations regarding the extent of contamination attributable to the Vernon Plant.  GEI denies Plaintiffs' allegations regarding the extent of contamination attributable to the Vernon Plant.

7.     Paragraph 7 consists of Plaintiffs' characterization of their own lawsuit, which need not be admitted or denied.

8.     Paragraph 8 consists of Plaintiffs' characterization of their own lawsuit, which need not be admitted or denied.

9.     Paragraph 9 consists of Plaintiffs' characterization of their own lawsuit, which need not be admitted or denied.

10.     The first sentence of Paragraph 10 contains Plaintiffs' characterization of their own lawsuit, which need not be admitted or denied.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 5 and, on that basis, denies those allegations.

JURISDICTION AND VENUE

11.     Paragraph 11 contains conclusions of law that need not be admitted or denied at this stage.

12.     Paragraph 12 contains conclusions of law that need not be admitted or denied at this stage.

PLAINTIFFS

13.     Paragraph 13 contains conclusions of law regarding DTSC's legal status, authority and jurisdiction that need not be admitted or denied at this stage.

14.     Paragraph 14 contains conclusions of law regarding the Toxic Substances Control Account's legal status that need not be admitted or denied at this stage.

DEFENDANTS

Owner/Operator Defendants

15.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 15 regarding the citizenship of NL Industries and, on that basis, denies, those allegations.  Paragraph 15 also contains conclusions of law regarding the legal status of NL Industries that need not be admitted or denied at this stage.

16.     GEI admits that NL Industries sold the Vernon Plant to Gould Inc. on or about January 31, 1979.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 16 and, on that basis, denies those allegations.

17.     In response to Paragraph 17, GEI admits that JX Nippon Mining & Metals Corporation is a Japanese corporation with its headquarters in Tokyo, Japan.

The remainder of Paragraph 17 contains conclusions of law regarding the legal status of JX Nippon Mining & Metals Corporation that need not be admitted or denied at this stage.

18.     In response to Paragraph 18, GEI admits that Gould Inc. operated the Vernon Plant from January 31, 1979 through December 1982. GEI denies the remaining allegations in Paragraph 18.

19.     GEI admits the truth of the first and second sentences of Paragraph 19. The last sentence of Paragraph 19 contains conclusions of law regarding the legal status of Gould Electronics Inc. that need not be admitted or denied at this stage.

20.     Paragraph 20 contains conclusions of law regarding successor liability that need not be admitted or denied at this stage.

Arranger/Transporter Defendants

21.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 21 regarding the citizenship of Kinsbursky Bros. Supply, Inc. and, on that basis, denies that allegation. Paragraph 21 also contains conclusions of law regarding the legal status of Kinsbursky that need not be admitted or denied at this stage.

22.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 22 and, on that basis, denies those allegations.

23.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23 and, on that basis, denies those allegations.

24.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 24 regarding the citizenship of Trojan Battery Company, LLC. and, on that basis, denies that allegation. Paragraph 24 also contains conclusions of law regarding the legal status of Trojan that need not be admitted or denied at this stage.

25.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25 and, on that basis, denies those allegations.

26.     GEI lacks knowledge or information sufficient to form a belief about the truth of the in Paragraph 26 regarding the citizenship of Ramcar Batteries Inc. and, on that basis, denies those allegations.  Paragraph 26 also contains conclusions of law regarding the legal status of Ramcar that need not be admitted or denied at this stage.

27.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 27 and, on that basis, denies those allegations.

28.     GEI lacks knowledge or information sufficient to form a belief about the truth of the in Paragraph 28 regarding the citizenship of Clarios, LLC and, on that basis, denies those allegations.  Paragraph 28 also contains conclusions of law regarding the legal status of Clarios that need not be admitted or denied at this stage.

29.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 29 and, on that basis, denies those allegations.

30.      GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 30 and, on that basis, denies those allegations.

31.     GEI lacks knowledge or information sufficient to form a belief about the truth of the in Paragraph 31 regarding the citizenship of Quemetco, Inc. and, on that basis, denies those allegations.  Paragraph 31 also contains conclusions of law regarding the legal status of Quemetco that need not be admitted or denied at this stage.

32.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 32 and, on that basis, denies those allegations.

33.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 33 and, on that basis, denies those allegations.

34.     GEI lacks knowledge or information sufficient to form a belief about the truth of the in Paragraph 34 regarding the citizenship of Metals Ekco Ltd. and, on that basis, denies those allegations.  Paragraph 34 also contains conclusions of law regarding the legal status of Metals Ekco that need not be admitted or denied at this stage.

35.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 35 and, on that basis, denies those allegations.

36.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 36 and, on that basis, denies those allegations.

37.     GEI lacks knowledge or information sufficient to form a belief about the truth of the in Paragraph 37 regarding the citizenship of Blount, Inc. and, on that basis, denies those allegations.  Paragraph 37 also contains conclusions of law regarding the legal status of Bount, Inc. that need not be admitted or denied at this stage.

38.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 38 and, on that basis, denies those allegations.

39.     No response is required to the allegations in Paragraph 39.

40.     No response is required to the allegations in Paragraph 40.

GENERAL ALLEGATIONS

The Site

41.     GEI admits that the Vernon Plant operated as a secondary smelter in the City of Vernon.  GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations about the dates of operation of the Vernon Plant or the number and type of properties in "close proximity" to the Vernon Plant and, on that basis, those allegations are denied.  The allegation that the Vernon Plant "treated and stored" hazardous waste is a conclusion of law that need not be admitted or denied at this stage.

42.     GEI admits that at times the Vernon Plant was used for secondary lead smelting, which extracts lead and other materials from secondary sources including spent lead-acid batteries.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 42 and, on that basis, denies those allegations.

43.     Paragraph 43 alleges conclusions of law that need not be admitted or denied at this stage.  To the extent Paragraph 43 alleges factual statements against GEI, GEI lacks knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, denies those allegations.

44.     The allegations in Paragraph 44 are asserted against the "Arranger Defendants", as defined in the Complaint, and as such they are not addressed to GEI.  To the extent Paragraph 44 alleges factual statements against GEI, GEI lacks knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, denies those allegations.  The remaining allegations of Paragraph 44 are conclusions of law that need not be admitted or denied at this stage.

45.     The allegations in Paragraph 45 are asserted against the "Transporter Defendants", as defined in the Complaint, and as such they are not addressed to GEI.  To the extent Paragraph 45 alleges factual statements against GEI, GEI lacks

knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, denies those allegations.  The remaining allegations of Paragraph 45 are conclusions of law that need not be admitted or denied at this stage.

46.    The allegations in Paragraph 46 are asserted against the "Transporter Defendants", as defined in the Complaint, and as such they are not addressed to GEI.  To the extent Paragraph 46 alleges factual statements against GEI, GEI lacks knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, denies those allegations.  The remaining allegations of Paragraph 46 are conclusions of law that need not be admitted or denied at this stage.

47.    The allegations in Paragraph 47 are asserted against the "Transporter Defendants", as defined in the Complaint, and as such they are not addressed to GEI.  To the extent Paragraph 47 alleges factual statements against GEI, GEI lacks knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, denies those allegations.  The remaining allegations of Paragraph 47 are conclusions of law that need not be admitted or denied at this stage.

48.    In response to Paragraph 48, GEI admits that at times during the operation of the Vernon Plant lead was extracted from batteries.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 48 and, on that basis, denies those allegations.

49.    GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 49 and, on that basis, denies those allegations.

50.    GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 50 and, on that basis, denies those allegations.

51.     In response to Paragraph 51, GEI denies that spills occurred during the time that Gould Inc. owned the Vernon Plant.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 51 and, on that basis, denies those allegations.

52.     In response to Paragraph 52, GEI denies that lead was released from areas where lead refining was carried out during the time that Gould Inc. owned the Vernon Plant.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 52 and, on that basis, denies those allegations.

53.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 53 and, on that basis, denies those allegations.

54.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 54 and, on that basis, denies those allegations.

55.     In response to Paragraph 55, GEI denies that the allegations to the extent that they allege events that occurred during the time period Gould Inc. owned the Vernon Plant.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 55 and, on that basis, denies those allegations.

Health Effects of Lead and Other Hazardous Substances

56.     In response to Paragraph 56, GEI admits that, depending on the dose, length of exposure and other factors, hazardous substances, including the substances defined as "Contaminants of Concern" in the Complaint, can have negative impacts on human health.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 56 and, on that basis, denies those allegations.

57.     GEI admits that the theoretical exposure pathways alleged in Paragraph 57 are possible depending on circumstances.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 57 and, on that basis, denies those allegations.

58.     GEI admits that lead is classified as a heavy metal and that, depending on the dose, length of exposure and other factors, it can be toxic and can be a cumulative toxicant that can affect multiple organ systems within the body.  GEI admits that the health effects alleged in Paragraph 58 are theoretically possible depending on circumstances, including the dose, length of exposure and other factors.

59.     Depending on the dose, length of exposure and other factors, GEI admits that the health effects alleged in Paragraph 59 are theoretically possible depending on circumstances.

60.     Depending on the dose, length of exposure and other factors, GEI admits that the health effects alleged in Paragraph 60 are theoretically possible depending on circumstances.

61.     Depending on the dose, length of exposure and other factors, GEI admits that the health effects alleged in Paragraph 61 are theoretically possible depending on circumstances.

62.     Depending on the dose, length of exposure and other factors, GEI admits that the health effects alleged in Paragraph 62 are theoretically possible depending on circumstances.

63.     Depending on the dose, length of exposure and other factors, GEI admits that the health effects alleged in Paragraph 63 are theoretically possible depending on circumstances.

64.     Depending on the dose, length of exposure and other factors, GEI admits that the health effects alleged in Paragraph 64 are theoretically possible depending on circumstances.

Regulation of the Vernon Plant

65.     The allegations of Paragraph 65 are Plaintiffs' characterizations of California and federal law that need not be admitted or denied.

66.     After a reasonable investigation, GEI has been unable to confirm the allegations in Paragraph 66 and lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, on that basis denies the allegations of Paragraph 66.

67.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 67 and, on that basis, denies those allegations.

68.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 68 and, on that basis, denies those allegations.

69.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 69 and, on that basis, denies those allegations.

70.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 70 and, on that basis, denies those allegations.

71.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 71 and, on that basis, denies those allegations.

72.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 72 and, on that basis, denies those allegations.

73.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 73 and, on that basis, denies those allegations.

74.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 74 and, on that basis, denies those allegations.

75.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 75 and, on that basis, denies those allegations.

76.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 76 and, on that basis, denies those allegations.

77.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 77 and, on that basis, denies those allegations.

78.     In response to Paragraph 78, GEI admits that Exide filed for bankruptcy in 2020 and that title to the Vernon Plant has been transferred to an environmental response trust.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 78 and, on that basis, denies those allegations.

Site Cleanup and Enforcement Activities

79.     In response to Paragraph 79, GEI denies that, during the period of Gould Inc.'s ownership of the Vernon Plant, that "releases and/or disposals" contaminated sensitive land use properties surrounding the Vernon Plant with hazardous substances.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 79 and, on that basis, denies those allegations.

80.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 80 and, on that basis, denies those allegations.

81.     GEI admits the allegations in the first sentence of Paragraph 81.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 81 and, on that basis, denies those allegations.

82.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 82 and, on that basis, denies those allegations.

83.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 83 and, on that basis, denies those allegations.

84.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 84 and, on that basis, denies those allegations.

85.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 85 and, on that basis, denies those allegations.

86.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 86 and, on that basis, denies those allegations.

87.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 87 and, on that basis, denies those allegations.

88.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 88 and, on that basis, denies those allegations.

89.     GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 89 and, on that basis, denies those allegations.

90.    GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 90 and, on that basis, denies those allegations.

91.    GEI lacks information sufficient to admit or deny the allegations of Paragraph 91.

92.    In response to Paragraph 92, the terms "response costs" and "response action" are conclusions of law that need not be admitted or denied at this stage. GEI lacks knowledge or information sufficient to form a belief as to the truth of the allegation that costs were incurred by DTSC as a result of releases and/or threatened releases of hazardous substances at the Vernon Plant and, on that basis, denies those allegations.

93.    GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 93 and, on that basis, denies those allegations.

94.    GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 94 and, on that basis, denies those allegations.

History of Owners and Operators of the Vernon Plant and Their Successors

95.    GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 95 and, on that basis, denies those allegations.

96.    GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 96 and, on that basis, denies those allegations.

97.    In response to Paragraph 97, GEI admits that NL Industries sold the Vernon Plant to Gould Inc. on or about January 31, 1979.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 97 and, on that basis, denies those allegations.

98.     In response to Paragraph 98, GEI admits that Gould Inc. owned and/or operated the Vernon Plant from about January 1979 through December 1982.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 98 and, on that basis, denies those allegations.

99.     In response to Paragraph 99, GEI admits that in 1983 Gould Inc. transferred substantially all of the assets and liabilities of its battery business, including the Vernon Plant, to GNB Batteries Inc., which was a wholly-owned subsidiary created for the purpose of selling the battery business.  GEI further admits that in connection with this transaction, GNB Batteries entered into an agreement with Gould Inc. to assume substantially all of the liabilities associated with the battery business being acquired.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 99 and, on that basis, denies those allegations.

100.   In response to Paragraph 100, GEI admits that in 1984 Gould Inc. sold all of the stock of GNB Batteries to GNB Acquisition Corp., a company unrelated to Gould Inc., and that GNB Acquisition Corp. then merged with GNB Batteries. GEI admits that sometime later the merged company changed its name to GNB, Inc.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 100 and, on that basis, denies those allegations.

101.   GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 101 and, on that basis, denies those allegations.

102.   GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 102 and, on that basis, denies those allegations.

103.   The allegations of Paragraph 103 are legal conclusions that need not be admitted or denied at this stage.

104.   GEI admits the allegations in Paragraph 104.

105.   In response to Paragraph 105, GEI admits that Gould Inc. was wholly owned by Nippon Mining U.S. Inc., which was a wholly-owned subsidiary of Japan Energy Corporation.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 105 and, on that basis, denies those allegations.

106.   GEI admits the allegations in Paragraph 106.

107.   GEI admits the allegations in Paragraph 107.

108.   In response to Paragraph 108, GEI admits that in January 1994 Gould Inc., Nippon Mining U.S. Inc. and Japan Energy were parties to a transaction that, among other things, included the transfer of certain assets and liabilities of Gould Inc. and Nippon Mining U.S., Inc. to Gould Electronics Inc., an Ohio corporation and subsidiary of Japan Energy.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 108 and, on that basis, denies those allegations.

109.   GEI admits the allegations in Paragraph 109.

110.   GEI admits the allegations in the first, second, third, fourth, sixth, seventh, and eighth sentences of Paragraph 110.  GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in the fifth and ninth sentences of Paragraph 110 and, on that basis, denies those allegations.

111.   GEI admits that in January 1994 Gould Electronics Inc., an Ohio corporation, acquired certain assets and assumed certain liabilities from Gould Inc. and Nippon Mining U.S. Inc.  The agreement speaks for itself with respect to the remaining allegations in Paragraph 111.

112.   GEI admits the allegations in Paragraph 12.

113.   GEI admits that Gould Inc. was a defendant Bay Corrugated Container, Inc. v. Gould Inc., Case No. 2:91-cv-70170, and Chemtech Indus. v. Gould Inc., Case No. 1:91cv2130, and lacks knowledge or information sufficient to

form a belief about the truth of the remaining allegations in Paragraph 113 and, on that basis, denies those allegations.

114.   Paragraph 114 also contains legal conclusions that need not be admitted or denied at this stage.  GEI admits that during January 1993 Gould Inc. was a wholly-owned subsidiary of Nippon Mining U.S. Inc. and that Nippon Mining U.S. Inc. was a wholly-owned subsidiary of Japan Energy Corporation. GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 114 and, on that basis, denies those allegations.

115.   Paragraph 115 also contains legal conclusions that need not be admitted or denied at this stage.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 115 and, on that basis, denies those allegations.

116.   Paragraph 116 contains legal allegations and conclusions that need not be admitted or denied at this stage.  To the extent the allegations of Paragraph 116 are construed as factual in nature, GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 116 and, on that basis, denies those allegations.

117.   Paragraph 117 contains legal conclusions that need not be admitted or denied at this stage.  To the extent the allegations of Paragraph 117 are construed as factual in nature, GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 117 and, on that basis, denies those allegations.

118.   GEI admits that Gould Electronics Inc., an Ohio corporation and subsidiary of Japan Energy Corporation, merged with American Microsystems Holding Corporation in January 1998, that the surviving corporation was named GA-TEK Inc., and that Michael C. Veysey signed the Certificate of Merger on behalf of Gould Electronics Inc. as its Senior Vice President, General Counsel and

Secretary.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 118 and, on that basis, denies those allegations.

119.   GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 119 and, on that basis, denies those allegations.

120.   GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 120 and, on that basis, denies those allegations.

121.   GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 121 and, on that basis, denies those allegations.

122.   GEI admits that in September 2003, Nikko Materials USA, acquired certain assets and assumed certain liabilities from Gould Electronics Inc., an Ohio corporation.  The agreement speaks for itself with respect to the remaining allegations in Paragraph 122.

123.   GEI admits that in September 2003, Nikko Materials USA, Inc. was a wholly-owned subsidiary of Japan Energy Electronic Materials Inc.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 123 and, on that basis, denies those allegations.

124.   GEI admit that the referenced agreement was signed on behalf of Gould Electronics Inc. by Thomas N. Rich and on behalf of Nikko Materials USA, Inc. by Isao Yamanashi, its Chairman, and admits that at that time Mr. Yamanashi was the Chairman of the Board of Gould Electronics Inc.  GEI lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 124 and, on that basis, denies those allegations.

125.   GEI admits the allegations in Paragraph 125.

126.   Paragraph 126 contains legal conclusions that need not be admitted or denied at this stage.  To the extent the allegations of Paragraph 126 are construed as factual in nature, GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 126 and, on that basis, denies those allegations.

127.   Paragraph 127 contains legal conclusions that need not be admitted or denied at this stage.  To the extent the allegations of Paragraph 127 are construed as factual in nature, GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 127 and, on that basis, denies those allegations.

128.   Paragraph 128 contains legal conclusions that need not be admitted or denied at this stage.  To the extent the allegations of Paragraph 127 are construed as factual in nature, the referenced document speaks for itself.

129.   GEI admits the allegations in Paragraph 129.

FIRST CLAIM FOR RELIEF

130.   In response to Paragraph 130, GEI' responses to Paragraphs 1-129 are incorporated herein.

131.   Paragraph 131 purports to characterize CERCLA, which speaks for itself and need not be admitted or denied at this stage.

132.   Paragraph 132 also contains legal conclusions that need not be admitted or denied at this stage.  To the extent the allegations of Paragraph 132 are construed as factual in nature, GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 132 and, on that basis, denies those allegations.

133.   Paragraph 133 contains legal conclusions that need not be admitted or denied at this stage.

134.   Paragraph 134 also contains legal conclusions that need not be admitted or denied at this stage.  To the extent the allegations of Paragraph 132 are

construed as factual in nature, GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 132 and, on that basis, denies those allegations.

135.   GEI admits that Gould Inc. was the owner and/or operator of the Vernon Plant from January 31, 1979 through December 1982.  Paragraph 135 also contains legal conclusions that need not be admitted or denied at this stage.

136.   GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 136 and, on that basis, denies those allegations.

137.   GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 137 and, on that basis, denies those allegations.

138.   Paragraph 138 contains legal conclusions that need not be admitted or denied at this stage.

139.   Paragraph 139 contains legal conclusions that need not be admitted or denied at this stage.

140.   Paragraph 140 contains legal conclusions that need not be admitted or denied at this stage.

141.   Paragraph 141 contains legal conclusions that need not be admitted or denied at this stage.  GEI nevertheless denies that Plaintiffs have incurred response costs consistent with the National Contingency Plan.

142.   Paragraph 142 contains legal conclusions that need not be admitted or denied at this stage.  GEI nevertheless denies liability under CERCLA Section 107(a).

143.    Paragraph 143 contains legal conclusions that need not be admitted or denied at this stage.  GEI nevertheless denies liability under CERCLA Section 107(a).

1

2                      SECOND CLAIM FOR RELIEF

3          144.   In response to Paragraph 144, GEI' responses to Paragraphs 1-143 are

4    incorporated herein.

5          145.   Paragraph 145 contains legal conclusions that need not be admitted or

6    denied at this stage.  GEI nevertheless denies that Plaintiffs are entitled to a

7    declaratory judgment against GEI under CERCLA Section 113(g)(2).

8                      THIRD CLAIM FOR RELIEF

9          146.   In response to Paragraph 146, GEI' responses to Paragraphs 1-145 are

10   incorporated herein.

11         147.   Paragraph 147 purports to characterize the California Health and

12   Safety Code, which speaks for itself and need not be admitted or denied at this

13   stage.

14         148.   Paragraph 148 contains legal conclusions that need not be admitted or

15   denied at this stage.

16         149.   Paragraph 149 contains legal conclusions that need not be admitted or

17   denied at this stage.

18         150.   Paragraph 150 contains legal conclusions that need not be admitted or

19   denied at this stage.

20         151.   Paragraph 151 contains legal conclusions that need not be admitted or

21   denied at this stage.  GEI nevertheless denies liability under Cal. Health and Safety

22   Code Section 25319.

23         152.   Paragraph 152 contains legal conclusions that need not be admitted or

24   denied at this stage.  GEI nevertheless denies liability under Cal. Health and Safety

25   Code Section 25360.

26         153.   Paragraph 153 contains legal conclusions that need not be admitted or

27   denied at this stage.  GEI nevertheless denies liability under Cal. Health and Safety

28   Code Sections 25360 and 25360.1.

FOURTH CLAIM FOR RELIEF

154.    In response to Paragraph 154, GEI' responses to Paragraphs 1-153 are incorporated herein.

155.    Paragraph 155 purports to quote California Health and Safety Code Section 25358.3(a), which speaks for itself and need not be admitted or denied at this stage.

156.    Paragraph 156 purports to quote California Health and Safety Code Section 25358.3(e), which speaks for itself and need not be admitted or denied at this stage.

157.    Paragraph 157 purports to quote California Health and Safety Code Section 25358.3(g), which speaks for itself and need not be admitted or denied at this stage.

158.    GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 158 and, on that basis, denies those allegations.

159.    GEI lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 159 and, on that basis, denies those allegations.

160.    Paragraph 160 contains legal conclusions that need not be admitted or denied at this stage.   GEI nevertheless denies being a "responsible party" under Cal. Health and Safety Code Section 25358.3.

161.    Paragraph 161 contains legal conclusions that need not be admitted or denied at this stage.  GEI nevertheless denies that Plaintiffs are entitled to any relief under the California Health and Safety Code.

FIFTH CLAIM FOR RELIEF

Plaintiffs' Fifth Claim for Relief requires no response from GEI.

PRAYER FOR RELIEF

Fed. R. Civ. P. 8 does not require GEI to respond to Plaintiffs' Prayer for Relief, but GEI generally denies that Plaintiffs are entitled to the relief sought.

## AFFIRMATIVE AND OTHER DEFENSES

1.      The Complaint fails to state a claim upon which relief can be granted.

2.      The Complaint is barred in whole or in part by the doctrines of laches, estoppel, release, waiver, consent, unjust enrichment, and/or unclean hands.

3.      The claims are barred insofar as they seek to recover costs, damages and expenses other than "response costs" as that term is defined in Sections 101(23), (24) and (25) of CERCLA, 42 U.S.C. §§9601(23), (24) and (25).

4.  Plaintiffs have failed to mitigate their response costs and damages.

5.      Definition of "Site": Plaintiffs' alleged definition of the "Site" is inaccurate and unsupportable because hazardous substances released from the Vernon Plant have not come to be located in areas Plaintiffs include in the alleged definition of the "Site."  Some or all of the costs alleged in connection with investigation and excavation activities described in Plaintiffs' Complaint are therefore associated with alleged environmental contamination that is unconnected to the Vernon Plant.

6.      Federally permitted release: All or some portion of Plaintiffs' alleged response costs resulted from a federally permitted release, for which recovery cannot be sought under CERCLA Section 107.  *See* 42 U.S.C. § 9607(j).

7.      National Contingency Plan: Some or all of Plaintiffs' alleged costs of removal and remedial action, and Plaintiffs' actions in conjunction with incurring those costs, are and have been inconsistent with the "National Oil and Hazardous Substances Pollution Contingency Plan" 40 C.F.R. Part 300, *et seq.*  Among other inconsistencies, and without limitation, Plaintiffs failed to properly investigate the

alleged contamination by hazardous substances, including potential sources; to establish scientifically supportable cleanup standards for contaminants of concern, including but not limited to the cleanup standard for lead in soil; to adequately and timely evaluate site remediation options and priorities; to assess site conditions and evaluate alternatives; to properly select a remedy; and to manage remediation in a cost-effective manner. *See id.* § 9607(a)(4)(A).

8.      Superfund Recycling Equity Act: Pursuant to the Superfund Recycling Equity Act, 42, U.S.C. § 9627, GEI is not liable under section 9607(a)(2) of CERCLA, or under HSAA, with respect to any recyclable material that it provided to the Vernon Plant for recycling.

9.      Divisibility: Any GEI liability under HSAA and CERCLA must be several, rather than joint and several, because the alleged harm is divisible and must be apportioned.  HSAA has a presumption of divisibility.

10.     Disposal and treatment: GEI did not intend to arrange, and did not arrange, for "disposal" or "treatment" of hazardous substances at the Vernon Plant, and the Vernon Plant was not a "disposal or treatment facility," as those terms are defined in CERCLA.  *See* 42 U.S.C. § 9607(a).  Among other reasons, the GEI materials at issue, if any, were useful products and recyclable material.

11.     Settlement credit: Any potentially responsible party who has resolved claims by settlement is not liable for contribution under CERCLA Section 113, but such settlements reduce the potential liability of GEI and other defendants by the amount of the settlement.  *See* 42 U.S.C. § 9613(f) (2).  Such settlements include, but are not limited to, the settlements in favor of the Vernon Environmental Response Trust from the 2003 and 2020 bankruptcy proceedings filed by Exide Technologies, LLC.

12.     Battery tax:  Manufacturer battery fees remitted by GEI under California's Lead-Acid Battery Recycling Act must be "credited against amounts owed by the manufacturer to the state pursuant to a judgment or determination of

liability under [the HSAA] or any other law for removal, remediation, or other response costs relating to a release of a hazardous substance from a lead-acid battery recycling facility."  Cal. H.S.C. § 25215.56(a).

13.     Statutes of limitations: Plaintiffs' claims are barred by applicable statutes of limitations.

14.     Injunction: Among other defenses and without waiving any defense, any injunction compelling abatement on private property requires joinder of the property owner as a necessary party and, depending on the actual injunction sought, such joinder may be infeasible.

15.     GEI hereby incorporates by reference all affirmative defenses raised by any other defendant to the extent those defenses respond to allegations of the Complaint that also addresses GEI, except to the extent such defenses would shift liability to GEI.

16.     GEI hereby reserves the right to assert such additional defenses that may become available or apparent during discovery and based upon the facts developed as this matter progresses.

**WHEREFORE**, defendant Gould Electronics Inc. prays as follows:

1. That Plaintiffs take nothing by virtue of their claims and that this action be dismissed in its entirety;

2.  For costs and attorneys' fees incurred herein; and

3. For such other and further relief as the Court may deem just and proper.

## COUNTERCLAIMS

Defendant Gould Electronics Inc. counterclaims as follows against Plaintiffs California Department of Toxic Substances Control and the Toxic Substances Control Account.  This Counterclaim adopts the defined terms used in Plaintiffs' Complaint unless otherwise specified.

1

2                            JURISDICTION AND VENUE

3          1.      The Court has jurisdiction over these counterclaims under 28 U.S.C.

4   § 1331 and 42 U.S.C. § 9613(b).  The Court has supplemental jurisdiction over

5   state law claims under 28 U.S.C. § 1367 because the federal and state claims arise

6   from a common nucleus of operative facts.

7          2.      Venue is proper in this district under 28 U.S. § 1391(b) and 42 U.S.C.

8   § 9613(b) because the alleged releases and/or threatened releases occurred in this

9   district.

10                                      PARTIES

11         3.      Gould Electronics Inc. ("GEI") is a corporation duly organized under

12  the laws of the State of Arizona and is registered to do business in California.

13         4.      The California Department of Toxic Substances Control ("DTSC") is a

14  public agency of the State of California, organized and existing under Cal. Health

15  and Safety Code, § 58000 *et seq.*  DTSC is the successor to the California

16  Department of Health Services.

17         5.      The Toxic Substances Control Account is an account within the State

18  of California General Fund pursuant to Cal. Health and Safety Code, § 25173.6.

19                               GENERAL ALLEGATIONS

20         6.      DTSC's mission includes protecting California's people and

21  environment from the harmful effects of toxic substances by restoring contaminated

22  resources, and enforcing hazardous waste laws, including the Hazardous Waste

23  Control Law, Cal. Health and Safety Code ("HWCL"), § 25100 *et seq.*  DTSC

24  administers the HWCL, which has as strict, or stricter, requirements for regulating

25  hazardous waste than the federal Resource Conservation and Recovery Act

26  ("RCRA"), 42 U.S.C. § 6901 *et seq.*

27         7.      CERCLA imposes liability on several classes of persons, including

28  "any person who at the time of disposal of any hazardous substance owned or

BARNES &
THORNBURG LLP

                                           26

operated any facility at which such hazardous substances were disposed of."  42 U.S.C. § 9607(a) (2).

8.     Liability as an operator attaches when a party "manage[s], direct[s], or conduct[s] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."  *United States v. Bestfoods,* 524 U.S. 51, 66 (1998).

9.     Governmental entities are not insulated from liability as "operators" under CERCLA, including when acting under their regulatory authority.  *United States v. Shell Oil*, 294 F.3d 1045, 1053 (9th Cir. 2002); *see also FMC Corp. v. United States Dep't of Commerce,* 29 F.3d 833, 840 (3rd Cir. 1994) (en banc) ("[T]he government can be liable when it engages in regulatory activities extensive enough to make it an operator of a facility....").

10.     As a remedial statute, CERCLA is construed liberally in order to effectuate its goals.  *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001) (en banc).

DTSC's failure to satisfy its mandatory permitting responsibilities

11.     DTSC and its predecessor agency administered a hazardous waste permitting system for the Vernon Plant for more than 30 years, during which time no final hazardous waste facility permit was ever issued for the Vernon Plant.

12.     Upon information and belief, a former owner or operator of the alleged Vernon Plant filed a RCRA Part A application with the United States Environmental Protection Agency (EPA) on August 8, 1980.

13.     Upon information and belief, DTSC's predecessor agency issued an "Interim Status Document" (ISD) for the Vernon Plant nearly 40 years ago on December 12, 1981.  Alternatively, upon information and belief, an ISD for the Vernon Plant was issued on December 18, 1981.

14.     Upon information and belief, a former owner or operator of the Vernon Plant subsequently eliminated a waste pile, claimed that its smelters did not require a permit, and requested reclassification to generator status.  Upon information and belief, EPA then rescinded the facility's Treatment and Storage Facility classification by returning the 1980 RCRA Part A permit application.

15.     Upon information and belief, DTSC's predecessor agency rescinded the ISD for the Vernon Plant in 1982.

16.     Upon information and belief, DTSC's predecessor agency issued another ISD for the Vernon Plant on August 19, 1983.  Alternatively, upon information and belief, a renewed ISD was issued for the Vernon Plant sometime between 1982 and January 1, 1992.  Alternatively, upon information and belief, a renewed ISD was issued for the Vernon Plant sometime between January 1, 1992 and December 13, 1999.

17.     Upon information and belief, a former owner or operator of the Vernon Plant filed a revised RCRA Part A application for the Vernon Plant on July 5, 1985.

18.     Upon information and belief, DTSC's predecessor agency determined on September 3, 1986 that a hazardous waste facility permit was necessary for the Vernon Plant.

19.     Upon information and belief, a former owner or operator of the Vernon Plant submitted a RCRA Part B application for the Vernon Plant on November 8, 1988.  That application, including its subsequent and incorporated revisions, is referred to here as the "Permit Application."

20.     California law required DTSC to act on the November 8, 1988 hazardous waste facility permit application for the Vernon Plant on or before July 1, 1993.  Cal. Health and Safety Code, § 25200.11(a).  DTSC was required either to issue the permit, make a final denial of the application, or extend final action for

one year upon a determination that the application was complete and more time was needed for evaluation.  *Id.*

21.     Upon information and belief, as of July 1, 1993, DTSC had not issued a permit for the Vernon Plant, denied the Permit Application, or extended final action for one year.  Upon information and belief, operations continued at the Vernon Plant without action on the Permit Application from 1993 through 1999.

22.     Upon information and belief, DTSC made no further permitting determinations with respect to the Vernon Plant until December 13, 1999.

23.     Upon information and belief, DTSC approved a Class 2 Interim Status modification for the Vernon Plant on December 13, 1999 for supplemental environmental projects as a result of the settlement of an enforcement case.

24.     Upon information and belief, DTSC approved a Class 2 Interim Status modification for the Vernon Plant on June 30, 2000, regarding a wastewater treatment plant and secondary containment.

25.     Upon information and belief, DTSC approved a Class 1 Interim Status modification for the Vernon Plant on January 5, 2001, for change of ownership and operational control to Exide.  Upon information and belief, DTSC approved a Class 1 Interim Status modification for the Vernon Plant on November 16, 2001 for Exide's name change.

26.     Upon information and belief, between 1988 and 2006, the owners or operators of the Vernon Plant periodically revised the Permit Application.

27.     Upon information and belief, DTSC requested information on May 4, 1992 and the Permit Application was revised with the requested information in June 1992.

28.     Upon information and belief, the Permit Application was revised in November 1993 with an updated contingency plan, more detailed operating procedures, description of containment buildings, and furnace operation information requested by DTSC.

29.     Upon information and belief, the Permit Application was revised in February 1998 to reflect additional and expanded operations and equipment, a revised waste analysis plan, a revised closure/post-closure plan and cost estimates, and other revisions and clarifications requested by DTSC.

30.     Upon information and belief, the Permit Application was revised in November 2000 to incorporate the two approved Class 2 Interim Status modification requests in 1999 and 2000, revised permitted unit capacities, updated contingency plan, updated closure/post-closure plan and cost estimate, and a revised process description based on the Interim Status modifications.

31.     Upon information and belief, the Permit Application was revised in May 2002 to respond to comments from DTSC and to reflect the addition of new equipment.  Upon information and belief, certain pages in the May 2002 Permit Application revision were replaced in January 2006 to reflect the relocation of certain equipment.

32.     Upon information and belief, the Permit Application was revised in April 2006 to reflect additional equipment and a revised closure/post-closure cost estimate.

33.     Upon information and belief, DTSC did not submit for public review a draft permit in response to the Permit Application until July 7, 2006, nearly 18 years after the Permit Application was submitted.

34.     Upon information and belief, DTSC did not release for public comment a Health Risk Assessment and, as required by the California Environmental Quality Act, an Environmental Impact Report related to the Vernon Plant until July 7, 2006, nearly 18 years after the Permit Application was submitted to DTSC.

35.     Upon information and belief, following public comment on the draft permit, Health Risk Assessment and Environmental Impact Report, DTSC subsequently directed Exide to revise the Permit Application again.  Upon

information and belief, Exide submitted a revised Permit Application on July 23, 2010.

36.    Upon information and belief, DTSC subsequently directed Exide to revise its Permit Application again.  Upon information and belief, Exide submitted a revised Permit Application in January 2013.

37.    Upon information and belief, SB 712 passed in 2014 and required DTSC to act upon the Permit Application by December 31, 2015.  Upon information and belief, Exide withdrew the Permit Application in April 2015, more than 26 years after it was first submitted.

38.    Upon information and belief, DTSC never granted or denied the Permit Application during its pendency of more than 26 years.

39.    Upon information and belief, DTSC's failure to act on the Permit Application affected the nature, duration and extent of releases or threatened releases of hazardous substances at, from, or related to the Vernon Plant.  Upon information and belief, DTSC's failure to act on the Permit Application therefore impacted the eventual cost of investigation and excavation activities in the area DTSC alleged to be impacted by the Vernon Plant.

40.    California law mandated that any hazardous waste facility permit issued for the Vernon Plant include a requirement for "corrective action for all releases of hazardous waste or constituents from… a hazardous waste management unit at a facility engaged in hazardous waste management, regardless of the time at which waste was released at the facility."  Cal. Health and Safety Code, § 25200.10(b).  Such a corrective action provision in a hazardous waste facility permit for the Vernon Plant needed to include a requirement "that corrective action be taken beyond the facility boundary where necessary to protect human health and safety or the environment[.]"  *Id.*

41.    Upon information and belief, by failing to act on the Permit Application for more than 26 years, DTSC thwarted the requirement in California

law that would have mandated that DTSC include a corrective action requirement for the Vernon Plant as part of any permit issued in response to the Permit Application.  Upon information and belief, if DTSC had issued a lawfully constituted permit for the Vernon Plant in response to the Permit Application by July 1, 1993, such a corrective action requirement would have been in place by July 1, 1993.  *Id.*, § 25200.11(a).

42.     California law also mandated that when considering a hazardous waste facility permit where corrective action could not be completed prior to the issuance of the permit, DTSC needed to include in the permit "schedules of compliance for corrective action."  *Id.*, § 25200.10(b).

43.     Upon information and belief, the corrective action required in connection with the Vernon Plant could not have been completed between November 8, 1988 and July 1, 1993, when the Permit Application was due for DTSC action under Cal. Health and Safety Code, § 25200.11(a).

44.     Upon information and belief, in considering the November 8, 1988 Permit Application, which was due no later than July 1, 1993, DTSC was required to include in any responsive permit for the Vernon Plant "schedules of compliance for corrective action."  *Id.*, § 25200.10(b).

45.     Upon information and belief, if DTSC had fulfilled its statutory permitting obligations under California hazardous waste law in the early 1990s, an enforceable corrective action requirement for the Vernon Plant, with associated compliance schedules, would have been in place by 1993.

46.     Instead, upon information and belief, no corrective action requirement was in place for the Vernon Plant throughout the 1990s.  Rather than requiring the Vernon Plant's owners and operators to take corrective action during the 1990s, upon information and belief, DTSC allowed operations at the Vernon Plant to continue, including the environmental releases DTSC now alleges were associated with those operations.  Upon information and belief, the absence of a corrective

action requirement and associated compliance schedules in the 1990s contributed to the ultimate extent and severity of the environmental contamination DTSC now attributes to the Vernon Plant, contributing to higher response costs.

DTSC's failure to secure financial assurance for the Vernon Plant

47.   The purpose of financial assurances in the California hazardous waste laws is to assure that facility owners and operators establish funding mechanisms, such as surety bonds and trust funds, that will be available to address adverse environmental conditions arising out of facility operations, even if the owner/operator becomes insolvent, without transferring such costs to the taxpayers.

48.   Exide, with its multiple bankruptcies, is an example of why DTSC's obligation to enforce the financial assurances obligations under California law are important for the public, the customers of the facilities, and the regulated community of hazardous waste facility permitted owners or operators.

49.   Exide went through bankruptcy proceedings three times between 2002 and 2020, with the final result that the bankruptcy judge in Exide's third bankruptcy in 2020 concluded: "Exide should pay its debts, but it cannot.  There is simply no available money to do so."  *In re: Exide Holdings, Inc.*, No 20-11157, ECF No. 1004-3, at 1 (D. Del. Bankr., Oct. 19, 2020).  Had DTSC properly exercised its mandatory statutory duties, as described below, DTSC would have required Exide to establish financial assurances that would be available today to remediate the very environmental conditions at the Site upon which the Complaint is based.

50.   California law mandated that when considering a hazardous waste facilities permit where corrective action could not be completed prior to the issuance of the permit, DTSC is required to include in the permit "assurance of financial responsibility for completing the corrective action." *Id.*, § 25200.10(b).

51.   Upon information and belief, the corrective action required in the vicinity of the Vernon Plant could not have been completed between November 8,

1988 and July 1, 1993, when the Permit Application was due for DTSC action under Cal. Health and Safety Code, § 25200.11(a).

52.    Upon information and belief, in considering the November 8, 1988 Permit Application, which was due for action no later than July 1, 1993, DTSC was required to include in any permit for the Vernon Plant requirements for "assurance of financial responsibility for completing the corrective action." *Id.*, § 25200.10(b).

53.    Upon information and belief, if DTSC had fulfilled its statutory permitting obligations under California hazardous waste law in the early 1990s, an enforceable corrective action requirement for Exide, with associated financial assurances, would have been in place by 1993.

54.    California law also mandated that DTSC adopt standards and regulations specifying "financial assurances to be provided by the owner or operator of a hazardous waste facility that are necessary to respond adequately to damage claims arising out of the operation of that type of facility and to provide for the cost of closure and subsequent maintenance of the facility, including, but not limited to, the monitoring of groundwater and other aspects of the environment after closure." Cal. Health and Safety Code, § 25245(a)(1).

55.    Per the mandate of Cal. Health and Safety Code, § 25245(a)(1), DTSC promulgated 22 CCR §§ 66264.140-151, which require that owners and operators of hazardous waste facilities prepare and submit to DTSC a detailed estimate of the cost of properly closing the facility in accordance with DTSC requirements at the end of the facility's useful life, based on how much it would cost the owner or operator to hire a third party to close the facility, and then establish financial assurances equal to such costs using one of the financial mechanisms, such as a trust fund or surety bond, approved by DTSC.

56.    Per the mandate of Cal. Health and Safety Code, § 25245(a)(1), DTSC also promulgated 22 CCR § 66264.101, providing that "[t]he owner or operator [of a facility seeking a permit for the transfer, treatment, storage, or disposal of

hazardous waste] shall provide a financial assurance mechanism for corrective action to [DTSC] within 90 days of [DTSC's] approval of a corrective measures implementation workplan or a [DTSC]-approved equivalent… to allow [DTSC] access to the funds to undertake corrective measures implementation tasks if the owner or operator is unable or unwilling to undertake the required tasks."  22 CCR § 66264.101(b).

57.    Upon information and belief, DTSC did not require the owner or operator of the Vernon Plant to provide a financial assurance mechanism for either closure or corrective action during the 1980s or 1990s.  Moreover, when DTSC finally did require Exide to establish financial assurances for closure, DTSC failed in its statutory duty to require Exide to establish adequate financial assurances to fund such closure.  Upon information and belief, DTSC's failure is directly responsible for what it describes as "a vastly underfunded response trust with only enough funds to conduct limited closure activities, leaving most of the dangerous contamination at the facility unremediated."  Complaint ¶ 1.

58.    Upon information and belief, DTSC did not approve or require a corrective measures implementation work plan or an equivalent during the 1980s or 1990s.

59.    California law mandates that the interim status of a facility "shall terminate" on July 1, 1997 "unless [DTSC] certifies, on or before July 1, 1997, that the facility is in compliance with the financial assurance requirements of Article 12 (commencing with Section 25245)[.]"  Cal. Health and Safety Code, § 25205(b).  The financial assurance requirements set forth in this section are "requirements of Article 12."

60.    Upon information and belief, DTSC did not certify during the 1980s or 1990s that the Vernon Plant was in compliance with the financial assurance requirements of Article 12.

61.     Upon information and belief, the interim status of the Vernon Plant terminated on July 1, 1997 following DTSC's failure to certify that Exide was in compliance with the financial assurance requirements of Article 12.  Upon information and belief, DTSC allowed the Vernon Plant to operate unlawfully after July 1, 1997, without interim status or other proper legal authorization.  Alternatively, upon information and belief, DTSC allowed the Vernon Plant to operate pursuant to an interim status after July 1, 1997 in violation of DTSC obligations under California law.

62.     Upon information and belief, DTSC's failure in the early 1990s to enforce statutory requirements for financial assurances from the owners or operators of the Vernon Plant regarding corrective action contributed to the unavailability of funding from Exide when remediation and removal operations were finally undertaken two decades later.

DTSC's failure to compel a "phase I environmental assessment"

63.     California law mandated that DTSC require any offsite facility granted interim status under Section 25200.5 of the Health and Safety Code prior to January 1, 1992 to complete a "phase I environmental assessment" of the facility site under Section 25200.14(a)-(d) of the Health and Safety Code by July 1, 1997.  *See* Cal. Health and Safety Code, § 25200.10(f)(1).

64.     Upon information and belief, the Vernon Plant was granted interim status under Section 25200.5 prior to January 1, 1992.

65.     Upon information and belief, a "phase I environmental assessment" was conducted for the Vernon Plant dated June 9, 1986.  Upon information and belief, no further "phase I environmental assessment" was conducted for the Vernon Plant before July 1, 1997.  Upon information and belief, the June 9, 1986 "phase I environmental assessment" for the Vernon Plant was "prepared for another purpose" and was prepared before July 1, 1994, and therefore did not satisfy the requirements of Cal. Health and Safety Code, § 25200.10(f)(1).  *See* Cal. Health

and Safety Code, § 25200.14(c).  Upon information and belief, the June 9, 1986 "phase I environmental assessment" was not supplemented by any relevant updated information.

66.     Upon information and belief, DTSC did not require the owner of the Vernon Plant to complete a compliant "phase I environmental assessment" of the facility site under Section 25200.14(a)-(d) on or before July 1, 1997.  Upon information and belief, no agency completed a compliant RCRA facility or equivalent assessment for the Vernon Plant on or before July 1, 1997.  *See id.*, § 25200.10(f) (3).

67.     Upon information and belief, a compliant "phase I environmental assessment" would have identified extant and potential environmental contamination, both at the Vernon Plant and beyond its borders, if any, that was not in fact timely identified.  Upon information and belief, a timely "phase I environmental assessment" would have made possible an extra decade or more of additional prevention and environmental response at the "site" of the Vernon Plant, as that term is ultimately defined by the Court.

68.     California law also mandated that in the absence of a compliant "phase I environmental assessment" or its equivalent by July 1, 1997, the interim status of a facility "shall terminate" on July 1, 1997.

69.     Upon information and belief, the interim status of the Vernon Plant terminated on July 1, 1997 following DTSC's failure to require a "phase I environmental assessment."  Upon information and belief, DTSC allowed the Vernon Plant to operate unlawfully after July 1, 1997, without interim status or other proper legal authorization.  Alternatively, upon information and belief, DTSC allowed the Vernon Plant to operate pursuant to an interim status after July 1, 1997 in violation of DTSC obligations under California law.

DTSC's cleanup mismanagement

70.     In November 2015, DTSC made a determination that contamination in what DTSC characterized as the vicinity of the Vernon Plant may pose an imminent and substantial endangerment ("ISE") to public health, welfare, or the environment. *See* Auditor of the State of California, *Cal. Dept. of Toxic Substances Control: The State's Poor Management of the Exide Cleanup Project Has Left Californians at Continued Risk of Lead Poisoning* (October 2020) ("State Auditor Report"), Exhibit A, at 4.

71.     Because it made an ISE determination, DTSC could have elected to conduct cleanup activities itself, or hire contractors. *Id*. at 5.  Upon information and belief, DTSC chose to hire contractors.

72.     In April 2016, the state legislature passed Assembly Bill 118 ("AB 118").  AB 118 appropriated $176,600,000 from the state's General Fund to DTSC, to be used for investigation and cleanup of properties in communities surrounding the Vernon Plant.

73.     As of June 2020, DTSC has received approximately $260,000,000 from the state, primarily from the General Fund, to conduct the Vernon Plant cleanup and related activities.  *Id*. at 5.

74.     Upon information and belief, DTSC has mismanaged the investigation and cleanup, and the funds allocated for it.

75.     Upon information and belief, DTSC's cleanup costs have been significantly higher than necessary.

76.     Upon information and belief, to date DTSC's largest cleanup contracts are time-and-materials contracts, and not fixed-price contracts.  A fixed-price contract limits costs to an agreed-upon amount.  In contrast, the time-and-materials contracts entered into by DTSC allowed DTSC to be charged for the full actual cost of labor and materials, regardless of whether those costs exceeded estimates.

77.     Cleanup costs exceeded estimates.  Upon information and belief, contractors under a time-and-materials arrangement with DTSC did not utilize cost-

effective techniques, and as a result tens of millions of dollars in unnecessary costs were passed on to DTSC. *See e.g*., State Auditor Report, at 25.

78.     Upon information and belief, DTSC recognized costs were exceeding estimates, and spent an additional $5,400,000 to hire a consultant to help control the excess costs. These excess costs were a foreseeable consequence of DTSC's time-and-materials contracts.

79.     Upon information and belief, DTSC had several options other than entering into time-and-materials contracts for the cleanup.

80.     Upon information and belief, time-and-materials contracts are not the norm for public agencies.

81.     In addition to mismanaging the funds allocated to it from the General Fund to clean up several thousand properties DTSC classified as high-priority, upon information and belief DTSC currently has no timeline or plan for cleaning up the remaining properties it has designated as impacted by the Vernon Plant. This set of properties is estimated to number 4,600. *See* State Auditor Report at 17.

GEI's damages

82.     DTSC's failure to enforce and comply with California statutory law led to more widespread environmental contamination in what DTSC has characterized as the vicinity of the Vernon Plant and consequently unnecessary response costs for investigation, removal, and remedial actions. To the extent that a judgment is entered under CERCLA, HSAA, or other law subjecting GEI to liability for such unnecessary response costs and a monetary award for a share of those response costs, such a judgment constitutes monetary damages for GEI caused by DTSC's actions and omissions.

83.     DTSC's failure to enforce and comply with California statutory law led to the unavailability of funding from Exide Technologies, LLC for cleanup from the Vernon Plant's owners or operators, which required transferring most of the environmental response costs to taxpayers. To the extent that a judgment is entered

under CERCLA, HSAA, or other law subjecting GEI to liability for such unnecessary DTSC response costs and a monetary award for a share of those response costs, such a judgment constitutes monetary damages for GEI caused by DTSC's actions and omissions.

COUNTERCLAIM ONE

(Contribution under CERCLA § 113(f))

84.     GEI incorporates by reference the allegations in the Paragraphs 1 to 81, inclusive.

85.     DTSC alleges that the "site" of the Vernon Plant, as that term is ultimately defined by the Court, is a "facility" within the meaning of 42 U.S.C. § 9601(9).  If true, the "site" of the Vernon Plant, as that term is ultimately defined by the Court, is a "facility."

86.     DTSC is a "person" as defined in 42 U.S.C. § 9601(21).

87.     DTSC has been involved in cleanup efforts in connection with the Vernon Plant since at least 2015.  During that time, DTSC issued multiple remedial action plans that selected and implemented response actions at the "site" of the Vernon Plant, as that term is ultimately defined by the Court.  DTSC itself organized and executed these response actions.  These activities constitute managing, directing, and/or conducting operations at the Vernon Plant and the surrounding investigation area regarding the leakage or disposal of hazardous waste and decisions about compliance with environmental laws and regulations.

88.     DTSC is and has been an "operator" at the Vernon Plant and the surrounding investigation area at the time of disposal of hazardous substances there, as defined in 42 U.S.C. § 9607(a) (2).

89.     DTSC is a liable party in this action under 42 U.S.C. § 9607(a) (2).

90.     DTSC's mismanagement of the environmental response actions at the Vernon Plant and the surrounding investigation area has involved gross negligence and/or reckless, willful, wanton and/or intentional misconduct, such that DTSC

may be liable for costs or damages as a result of its actions under 42 U.S.C.
§ 9607(d)(2).

91.    GEI has denied liability for response costs incurred as the result of alleged releases or threatened releases of hazardous substances.  But GEI may incur such liability in this action and/or in the future.

92.    DTSC is liable to GEI for contribution under 42 U.S.C. § 9613(f) for some or all of any amounts GEI incurs or will incur as a result of any release or threatened release of hazardous substances at the "site" of the Vernon Plant, as that term is ultimately defined by the Court.

## COUNTERCLAIM TWO

### (Declaratory judgment under CERCLA § 113 (g))

93.    GEI incorporates by reference the allegations in the Paragraphs 1 to 90, inclusive.

94.    An actual and justiciable controversy exists between GEI and DTSC regarding their respective rights and obligations for response costs that GEI may incur as a result of alleged releases or threatened releases of hazardous substances at the "site" of the Vernon Plant, as that term is ultimately defined by the Court.

95.    GEI seeks declaratory judgment against DTSC under 42 U.S.C. § 9613 (g) (2).  DTSC is liable for some or all of any amounts GEI incurs or will incur as a result of any release or threatened release of hazardous substances at the "site" of the Vernon Plant, as that term is ultimately defined by the Court.

## COUNTERCLAIM THREE

### (Contribution/indemnity under HSAA § 25300)

96.    GEI incorporates by reference the allegations in the Paragraphs 1 to 93, inclusive.

97.    DTSC caused or permitted a release or threatened release of hazardous substances into, on, or about the "site" of the Vernon Plant, as that term is

ultimately defined by the Court, , as set forth in the Hazardous Substances Account Act ("HSAA"), Cal. Health and Safety Code, § 25300 *et seq*.

98.    DTSC is a "liable person" as defined in Cal. Health and Safety Code, § 25323.5.

99.    GEI has denied liability for response or corrective action costs incurred as the result of alleged releases or threatened releases of hazardous substances from the Vernon Plant.  But GEI may incur such liability in this action and/or in the future.

100.   DTSC is liable to GEI for contribution and/or indemnity under Cal. Health and Safety Code, § 25363 (d) for some or all of any amounts GEI incurs or will incur as a result of any release or threatened release of hazardous substances at the "site" of the Vernon Plant, as that term is ultimately defined by the Court.

## COUNTERCLAIM FOUR

(Negligent failure to discharge statutory and regulatory duties)

101.   GEI incorporates by reference the allegations in the Paragraphs 1 to 98, inclusive.

102.   DTSC owes a duty of care to GEI to the extent of mandatory duties imposed by California enactments that are designed to protect GEI from the risk of a particular type of injury.  "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."  Cal. Gov Code, § 815.6.

103.   DTSC breached the mandatory statutory and regulatory duties described *supra* at ¶¶ 20, 33-69.  These duties were designed to protect GEI against the particular kinds of injury described *supra*.

104.   DTSC's breaches of its mandatory statutory and regulatory duties proximately caused injury to GEI as described *supra*.  These injuries were proximately caused by DTSC's failure to discharge these mandatory duties.

105.   DTSC did not exercise reasonable care to discharge its mandatory statutory and regulatory duties.  DTSC is liable to GEI for the negligent failure to discharge its mandatory statutory and regulatory duties.

106.   GEI suffered injuries of the types described *supra*, including any monetary and/or declaratory judgment against GEI for liability in this action and for any share of environmental response costs allocated in this action.  Any DTSC recovery from GEI in this case must be diminished accordingly under the doctrine of recoupment.

107.   As this counterclaim is solely for recoupment, the presentment and other administrative requirements of the California Government Claims Act, Cal. Gov. Code § 810 *et seq*. (f/k/a California Tort Claims Act), are satisfied and/or excused.

## COUNTERCLAIM FIVE

(Grossly negligent failure to abate the presence of hazardous substances)

108.   GEI incorporates by reference the allegations in the Paragraphs 1 to 105, inclusive.

109.   DTSC is a "public entity" and/or "public agency" as defined in Cal. Health and Safety Code, § 25400 *et seq*.

110.   Per its own "commitment to the people and environment of California," DTSC is responsible for the cleanup and abatement of hazardous wastes on contaminated properties in California.  *See* dtsc.ca.gov/our-commitment. This includes properties reasonably believed to be an imminent peril to public health and safety as the result of the discharge, spill, or presence of a hazardous substance.

111.   In undertaking the abatement of such a hazard, DTSC incurs a duty to the public, including GEI, to avoid acts or omissions performed in bad faith or in a grossly negligent manner.  Cal. Health and Safety Code, § 25400(a).

112.   As described *supra*, DTSC's abatement and attempted abatement of hazardous substances at the "site" of the Vernon Plant, as that term is ultimately defined by the Court, were performed in a grossly negligent manner.

113.   As described *supra*, DTSC's gross negligence proximately caused injury to GEI, including any monetary and/or declaratory judgment against GEI for liability in this action and for any share of environmental response costs allocated in this action.  Any DTSC recovery from GEI in this case must be diminished accordingly under the doctrine of recoupment.

114.   As this counterclaim is solely for recoupment, the presentment and other administrative requirements of the California Government Claims Act, Cal. Gov. Code § 810 *et seq*. (f/k/a California Tort Claims Act), are satisfied and/or excused.

PRAYER FOR RELIEF

GEI asks the Court to enter judgment in favor of GEI, and against DTSC, as follows:

- For judgment that DTSC is jointly and severally liable under 42 U.S.C. § 9607(a) for all response costs incurred as a result of the release and/or threatened release of hazardous substances from the "site" of the Vernon Plant, as that term is ultimately defined by the Court;

- For contribution under 42 U.S.C. § 9607(f) to response costs incurred, in an amount to be determined;

- For contribution and indemnity under HSAA, Cal. Health and Safety Code § 25300 *et seq.*, to response costs incurred, in an amount to be determined;

- For the offset and recoupment of any CERCLA cost recovery judgment against GEI to the extent of damages proved against DTSC for negligence and gross negligence;

- For a declaratory judgment that DTSC is jointly and severally liable for all response costs that GEI may incur in the future as a result of the release and/or threatened release of hazardous substances from the "site" of the Vernon Plant, as that term is ultimately defined by the Court;

- For litigation expenses and costs, including reasonable attorneys' fees and expert fees, as permitted by law;

- For an award of interest at the maximum legal date on any and all damages from the earliest date permitted by law.

Dated:      April 22, 2021          **BARNES & THORNBURG LLP**


By:   /s/ *David C. Allen*
David C. Allen
Attorneys of Record for Defendant
GOULD ELECTRONICS INC.