Joel L. Herz (Admitted Pro Hac Vice)
joel@joelherz.com
LAW OFFICES OF JOEL L. HERZ
3573 East Sunrise Drive, Suite 215
Tucson, AZ 85718
(520) 529-8080 (telephone)
(520) 529-8077 (facsimile)

Kenneth A. Ehrlich (Bar #150570)
kehrlich@elkinskalt.com
ELKINS KALT WEINTRUAB REUBEN
GARTSIDE LLP
10345 W. Olympic Blvd
Los Angeles, CA  90064
(310) 746-4412 (telephone)
(310) 746-4499 (facsimile)

Attorneys for Third-Party Plaintiff NL Industries, Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL and the TOXIC SUBSTANCES CONTROL ACCOUNT,<br><br>Plaintiffs,<br><br>v.<br><br>NL INDUSTRIES, INC., a New Jersey corporation; JX NIPPON MINING & METALS CORPORATION, a Japanese corporation; GOULD ELECTRONICS INC., an Arizona corporation; KINSBURSKY BROS. SUPPLY, INC., a California corporation; TROJAN BATTERY COMPANY, LLC, a Delaware limited liability company; RAMCAR BATTERIES INC., a California | Case No.<br><br>2:20−cv−11293−SVW−JPR<br><br>**THIRD-PARTY COMPLAINT** |

1

corporation; CLARIOS, LLC, a
Wisconsin limited liability company;
QUEMETCO, INC., a Delaware
corporation; INTERNATIONAL METALS
EKCO, LTD., a California corporation; and
BLOUNT, INC., a Delaware corporation,

                Defendants.

_____

NL INDUSTRIES, INC.,

                Counterclaimant,

v.

CALIFORNIA DEPARTMENT OF TOXIC
SUBSTANCES CONTROL and the TOXIC
SUBSTANCES CONTROL ACCOUNT,

                Counterdefendants.

_____

NL INDUSTRIES, INC.,

                Third-Party Plaintiff,

v.

EXXON MOBIL CORPORATION, a New
Jersey corporation; CRESCENT REFINING
AND OIL COMPANY, a California
corporation; CONTINENTAL HOLDINGS,
INC., a Wyoming corporation; OWENS-
BROCKWAY GLASS CONTAINER, INC.,
a Delaware corporation; O-I GLASS, INC.
f/k/a OWENS-ILLINOIS, INC., a Delaware
corporation; CITY OF BELL, a California
municipality; CITY OF COMMERCE, a
California municipality; CITY OF
HUNTINGTON PARK, a California
municipality; CITY OF MAYWOOD, a

California municipality; CITY OF LOS
ANGELES, a California municipality;
COUNTY OF LOS ANGELES, a California
county; HOUSING AUTHORITY OF THE
CITY OF LOS ANGELES, a California
state-chartered public agency; BELL
COMMUNITY HOUSING AUTHORITY, a
California state-chartered public agency;
HOUSING AUTHORITY OF THE
COUNTY OF LOS ANGELES, a California
state-charged public agency; 12909
CORDARY LLC, a California limited
liability company; 20 20 08WYB02 LLC, a
Wyoming limited liability company; 2013-1
IH BORROWER LP, a Delaware limited
partnership aka INVITATION HOMES;
2015-3 IH2 BORROWER LP, a Delaware
limited partnership aka INVITATION
HOMES; 2017-1 IH BORROWER LP, a
Delaware limited partnership aka
INVITATION HOMES; 2017-2 IH
BORROWER LP, a Delaware limited
partnership aka INVITATION HOMES;
3551 SABINA LLC, a California limited
liability company; 3553 PERCY LLC, a
California limited liability company; 4-1 ST.
PROPERTIES LLC, a California limited
liability company; 525 HIGHLAND LLC, a
California limited liability company; 55
CORONA LLC, a California limited liability
company; 6317 FLORA AVE LLC, a
California limited liability company; 943
BONNIE BEACH LLC, a California limited
liability company; AHUIGIS
MANAGEMENT LLC, a California limited
liability company; AJG REALTY INC., a
California corporation; ALM UNITED LLC,
a California limited liability company;
BEACHWOOD HOLDINGS LLC, a
California limited liability company;
CHAMPERY RENTAL REO LLC, a

California limited liability company; CLELA )
INVESTORS LLC, a California limited )
liability company; DELECOR )
INVESTMENTS LLC, a California limited )
liability company; E.N.E.A. MORA )
PROPERTIES, LLC a California limited )
liability company; ELA PROPERTIES LLC, )
a California limited liability company; FS )
PROSPECT LLC, a California limited )
liability company; FG PROPERTY )
MANAGEMENT INC., a California )
corporation; NICOLAS AND SONS )
MANAGEMENT LLC, a California limited )
liability company; FOUNTAINHEAD 30 )
LP, a California limited partnership; GMN )
ENTERPRISES INC., a California )
corporation; GOLDSTAR ENTERPRISES )
INC., a California corporation; GREEN BAY )
LLC, a California limited liability company; )
GROUP XII PROPERTIES LP, a California )
limited partnership; HH PERCY LLC, a )
California limited liability company; )
HOOVER PROPERTIES LLC, a California )
limited liability company; JEM 3 )
PROPERTIES LLC, a California limited )
liability company; KLGV INVESTMENTS )
III LLC, a California limited liability )
company; KLGV INVESTMENTS, LLC, a )
California limited liability company; )
MAYWOOD PLAZA PARTNERS LLC, a )
California limited liability company; )
MENLO APARTMENT GROUP LLC, a )
California limited liability company; )
MOLINA INVESTMENT INC., a California )
corporation; MULTI-UNIT ACQUISITION )
GROUP CORP, a California corporation; )
MYWD 4 LP, a California limited )
partnership; NEW SEASON LLC, a )
California limited liability company; )
NEWSHIRE INVESTMENTS INC., a )
California corporation; PERCY )

1  ENTERPRISES LLC, a California limited )
2  liability company; PYRAMID )
   INVESTMENTS INC., a California )
3  corporation; RCK INVESTMENTS LLC, a )
   California limited liability company; )
4  SALGADO FAMILY INVESTMENTS )
5  LLC, a California limited liability company; )
   STAMCO LP, a California limited )
6  partnership; SUNRISE INVESTMENTS – )
7  SRI NO. 5 LLC, a California limited liability )
   company; THURMAN INTERIM )
8  CALIFORNIA LLC, a Delaware limited )
9  liability company; WOOD ROCK )
   PROPERTIES LLC, a California limited )
10 liability company; and YNFANTE )
11 HOLDINGS I LLC, a California limited )
   liability company, )
12                                            )
                                              )
13           Third-Party Defendants.          )

14 _____

15         Third-Party Plaintiff NL Industries, Inc. ("NL"), for its Third-Party
16 Complaint against EXXON MOBIL CORPORATION, CRESCENT REFINING
17 AND OIL COMPANY, CONTINENTAL HOLDINGS, INC., OWENS-
18 BROCKWAY GLASS CONTAINER, INC., O-I GLASS, INC. f/k/a OWENS-
19 ILLINOIS, INC., CITY OF BELL, CITY OF COMMERCE, CITY OF
20 HUNTINGTON PARK, CITY OF MAYWOOD, CITY OF LOS ANGELES,
21 COUNTY OF LOS ANGELES, HOUSING AUTHORITY OF THE CITY OF LOS
22 ANGELES, BELL COMMUNITY HOUSING AUTHORITY, HOUSING
23 AUTHORITY OF THE COUNTY OF LOS ANGELES, 12909 CORDARY LLC,
24 20 20 08WYB02 LLC, 2013-1 IH BORROWER LP aka INVITATION HOMES;
25 2015-3 IH2 BORROWER LP aka INVITATION HOMES, 2017-1 IH BORROWER
26 LP aka INVITATION HOMES, 2017-2 IH BORROWER LP aka INVITATION
27 HOMES, 3551 SABINA LLC, 3553 PERCY LLC, 4-1 ST. PROPERTIES LLC, 525

HIGHLAND LLC, 55 CORONA LLC, 6317 FLORA AVE LLC, 943 BONNIE BEACH LLC, AHUIGIS MANAGEMENT LLC, AJG REALTY INC., ALM UNITED LLC, BEACHWOOD HOLDINGS LLC, CHAMPERY RENTAL REO LLC, CLELA INVESTORS LLC, DELECOR INVESTMENTS LLC, E.N.E.A. MORA PROPERTIES, LLC, ELA PROPERTIES LLC, FS PROSPECT LLC, FG PROPERTY MANAGEMENT INC., NICOLAS AND SONS MANAGEMENT LLC, FOUNTAINHEAD 30 LP, GMN ENTERPRISES INC., GOLDSTAR ENTERPRISES INC., GREEN BAY LLC, GROUP XII PROPERTIES LP, HH PERCY LLC, HOOVER PROPERTIES LLC, JEM 3 PROPERTIES LLC, KLGV INVESTMENTS III LLC, KLGV INVESTMENTS, LLC, MAYWOOD PLAZA PARTNERS LLC, MENLO APARTMENT GROUP LLC, MOLINA INVESTMENT INC., MULTI-UNIT ACQUISITION GROUP CORP, MYWD 4 LP, NEW SEASON LLC, NEWSHIRE INVESTMENTS INC., PERCY ENTERPRISES LLC, PYRAMID INVESTMENTS INC., RCK INVESTMENTS LLC, SALGADO FAMILY INVESTMENTS LLC, STAMCO LP, SUNRISE INVESTMENTS – SRI NO. 5 LLC, THURMAN INTERIM CALIFORNIA LLC, WOOD ROCK PROPERTIES LLC, and YNFANTE HOLDINGS I LLC, (collectively the "Third-Party Defendants") alleges as follows:

## INTRODUCTION

1.      The California Department of Toxic Substances Control ("DTSC") knows that the former Exide Technologies, Inc. ("Exide") property in Vernon, California is not the reason there is or was soil lead above 80 milligrams per kilogram (mg/kg) in some portion of residential neighborhoods in Bell, Commerce, Huntington Park, Maywood, the City of Los Angeles, and unincorporated Los Angeles County.  Extensive testing and analysis by the DTSC and others already have proven, beyond any doubt, that the DTSC's 80 mg/kg cleanup level for these

neighborhoods is well below the "background"[1] lead level that would exist in these neighborhoods, even if the alleged activities at the former Exide property had never happened.  DTSC itself has admitted in its own highly detailed report that *by its own calculations*, expected background lead levels in these neighborhoods are several times *higher* than the 80 mg/kg lead cleanup criteria adopted by DTSC in its Cleanup Plan.  Accordingly, to the extent that any cleanup is actually necessary, based on the 80 mg/kg lead cleanup criteria adopted by DTSC in its Cleanup Plan, the residential properties owned by the Third-Party Defendants would likely require cleanup, even if the former Exide property had never existed, and activities

---

[1] EPA and DTSC both use the concept of "background" to differentiate those areas or chemical concentrations that have been impacted by "site" releases, and those areas or concentrations that have not.  Background can refer to "pristine or natural conditions," which is the level of a substance that would exist in a pristine untouched location, and also "anthropogenic" or "ambient concentrations", which includes contributions from non-site sources (such as "lead historically emitted from car exhaust").  *See*, *DTSC, Proven Technologies and Remediation Guidance – Remediation of Metals in Soil, Appendix B, Strategies for Establishing and Using Background Estimates for Metals in Soil* at B-3 ("the general term 'background' will be used to refer to soil that has not been affected by site-related releases"). https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/11/Appdx_B_083108.pdf; EPA, *Role of Background in CERCLA Cleanup Program*, OSWER No. 9285.6-07P, page 5 ("Background refers to constituents or locations that are not influenced by the releases from a Site, and is usually described as naturally occurring or anthropogenic").  https://www.epa.gov/sites/default/files/2015-11/documents/bkgpol_jan01.pdf.  In this Third-Party Complaint, the term "background" refers to the ambient or anthropogenic level of lead present in the neighborhoods that is not related to the former Exide property.  According to DTSC's published guidance, "DTSC does not generally require cleanup of sites to concentrations that are less than background."  *DTSC, Proven Technologies and Remediation Guidance – Remediation of Metals in Soil* at Section 5.4.2. https://dtsc.ca.gov/wp-content/uploads/sites/31/2016/01/Guidance_Remediation-Soils.pdf.  *See also, supra*, EPA, OSWER No. 9285.6-07P, page 3 ("Background information is important to risk managers because the CERCLA program, generally, does not clean up to concentrations below natural or anthropogenic background levels.")

at the former Exide property had never happened.  Additionally, the pattern of contamination within these residential neighborhoods shows that the former Exide property is not even a detectable contributing source of soil lead issues in the neighborhoods subject to the DTSC's Cleanup Plan, or on the specific properties owned by the Third-Party Defendants named in this Third-Party Complaint.

2.     If DTSC was going to pay for the neighborhood cleanup itself, this would not be any concern of NL's.  But DTSC has filed a lawsuit attempting to shift 100% of its residential investigation and cleanup costs to NL and a handful of other parties allegedly associated with the former Exide property.

3.     On June 21, 2021, DTSC filed a brief in this case indicating that if Defendants, such as NL, wished to protect themselves against an unfair allocation of costs, they must sue other responsible parties themselves.  Dkt. No. 88 p. 19 ("[Defendant's] remedy for bringing other parties it considers to be responsible into this action is to sue them itself").  Thus, in order to limit the potential imposition of grossly disproportionate liability on NL and a handful of other parties associated with the former Exide property, NL has filed this Third-Party Complaint against three categories of Third-Party Defendants: (1) current and former Industrial Operators that are closer to the residential neighborhoods than the former Exide property; (2) Public Entity Owners that own property with lead levels that may require cleanup through no fault of NL or the other parties targeted by DTSC; and (3) Corporate Investment Property Owners that own property with lead levels that require cleanup through no fault of NL or the other parties targeted by DTSC.

4.     Although DTSC characterizes the residential cleanup area as economically disadvantaged in its Complaint, this characterization does not apply to the Corporate Investment Property Owners named in this Third-Party Complaint.  The aggregate assessed value of the corporate-owned residential

investment property at issue in this Third-Party Complaint exceeds ***$120 Million***. There is no reason the Third-Party Defendant Corporate Investment Property Owners should not be paying for all investigation and cleanup costs recovered by DTSC which were incurred to address background lead issues which are the responsibility of the landowner, and to improve the condition of these valuable corporate investment assets.

5.      NL continues to investigate its claims and will seek to add additional Third-Party Defendants to its Third-Party Complaint as its investigation continues.

**Background**

6.      In July 2017, DTSC issued a Cleanup Plan requiring that thousands of residential properties be cleaned up whenever soil lead levels on the property exceeded 80 mg/kg (UCL) lead.   The Cleanup Plan is available at https://www.envirostor.dtsc.ca.gov/public/community_involvement/6100742936/Cleanup-Plan-Exec-Summary_7-6-2017_English-final.pdf (last visited August 4, 2021).

7.      To date, DTSC has claimed that it has cleaned up approximately 2,766 parcels of residential property.

8.      According to DTSC, it intends to clean up (or attempt to force NL and a handful of others to clean up) thousands more residential properties with lead levels above 80 mg/kg (UCL).

9.      On December 14, 2020, DTSC filed a Complaint against NL and a small number of other companies associated with the former Exide property.  The Complaint seeks recovery of DTSC's past cleanup costs and demands, among other things, that NL and others clean up all residential properties in the cleanup area designated by DTSC that have soil lead levels above 80 mg/kg.

10.      In Count 5 of the Complaint, DTSC alleges that "the Site" includes "thousands of residential properties" and that hazardous substances on those

properties above the DTSC's cleanup level constitute a "public nuisance." As used herein, the term "Site" shall mean the Site as defined by DTSC in its Complaint or as ultimately decided by the Court. NL does not agree, and disputes, that the Site is correctly delineated by DTSC as a single "facility" under CERCLA or otherwise.

11.    DTSC's own studies conclude that its 80 mg/kg cleanup trigger is far below the "background" level of lead that would exist in these residential neighborhoods, even if no activity ever occurred at the former Exide property. Thus, the conduct of NL and the other parties targeted by DTSC, even taken together, did not cause the need for any cleanup on the properties owned by the Third-Party Defendants, if there is or was any need. Indeed, as noted above, DTSC's own published guidance states that "DTSC does not generally require cleanup of sites to concentrations that are less than background." *DTSC, Proven Technologies and Remediation Guidance – Remediation of Metals in Soil* at Section 5.4.2. https://dtsc.ca.gov/wp-content/uploads/sites/31/2016/01/Guidance_Remediation-Soils.pdf.

12.    On September 29, 2015, DTSC issued a report titled "Preliminary Estimate of the Geographical Boundary of Emissions from the Former Exide Technologies Facility; 2700 Indiana Street, Vernon, CA 90023." ("2015 DTSC Report")[2] which, among other things, evaluated the level of "background" lead in various locations around Vernon, CA.

---

[2] Although DTSC relies upon this document as the basis for defining the extent of the cleanup area, this document is not available online. A copy can be obtained from DTSC via a Public Records Act Request.



13.     According to the introduction of the 2015 DTSC Report, one "objective of the data evaluation included estimation of urban lead levels. This level represents the amount of lead in soil that cannot be attributed to a specific source." In other words, the "urban lead level" (alternatively referred to in the report as the "urban background" level) is the anthropogenic background or "ambient" lead level that would exist in these older urban neighborhoods, and would be expected on the property owned by the Third-Party Defendants, even if no activities occurred at the former Exide property, or the lead level that would result from other specific sources in the area.[3]

14.     After analyzing several data sources, including a small set of soil samples taken by Exide at a non-representative location in Long Beach, California,[4] DTSC reached several conclusions in the 2015 DTSC Report

---

[3] Unique localized sources, like a significant amount of poorly-maintained and deteriorated lead paint in the "drip zone" of a house, or the prior application of a pesticide with significant lead content on a particular yard, would be expected to cause lead levels on certain properties to significantly exceed the neighborhood "background" lead levels.

[4] The Long Beach data set was non-representative because the housing was much newer than in the residential areas around Vernon (limiting potential contributions from leaded gasoline and poorly maintained lead paint) and because prevailing offshore winds blew clean ocean air into Long Beach as compared to the leaded-

regarding the "urban lead level" that existed in different geographic areas located between 0.25 miles to 1.7 miles away from the former Exide property (i.e., the area that DTSC now claims constitutes a single "Site" or "Facility").

15.    DTSC concluded that the background "urban lead level" could be expressed using different statistical criteria, including the 95th percentile.   Under DTSC guidance, where background levels of a metal exceed the screening level, the cleanup level is generally set at the 95% upper limit of the background concentration.   *See DTSC, Proven Technologies and Remediation Guidance – Remediation of Metals in Soil, Appendix B, Strategies for Establishing and Using Background Estimates for Metals in Soil* at B-17.   https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/11/Appdx_B_083108.pdf.

16.    With regard to the residential area North of the former Exide property (including neighborhoods in Los Angeles City and unincorporated Los Angeles County), DTSC concluded that the 95th Percentile of the "urban lead level" ranged from 367-558 mg/kg.   Five percent of the yards would be expected to have even higher "background" lead levels.

17.    With regard to the residential areas South, Southeast, and Southwest of the former Exide property (including neighborhoods in Huntington Park, Maywood, and Bell), DTSC concluded that the 95th Percentile of the "urban lead level" ranged from 366-402 mg/kg. Five percent of the yards would be expected to have even higher "background" lead levels.

18.    With regard to the residential areas Northeast and East of the former Exide property (including neighborhoods in unincorporated Los Angeles County

---

gasoline contaminated air that blew from other parts of inland Los Angeles into Vernon).  See Mitchell and Small, *Statistical Analysis of Soil Lead in Vernon, CA (April 12, 2015). Available at* https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/03/Final-Exide-Statistical-Analysis-Report_081415.pdf.

and Commerce), DTSC concluded that the 95th Percentile of the "urban lead level" was 337 mg/kg.  Five percent of the yards would be expected to have even higher "background" lead levels.

19.    In 2018, Exide's consultant Geosyntec released its own highly detailed report calculating the "urban background" lead level in the residential areas, which was similarly intended to represent the lead level that would have been present if no activity occurred at the former Exide property.  Geosyntec concluded that the "urban lead level" in the residential areas at issue was 608 mg/kg.  Certain yards would have even higher levels.

20.    Geosyntec's estimates are consistent with DTSC's findings in the 2015 DTSC Report that the expected background ("urban lead levels" or "urban background" levels) that would have existed in these neighborhoods if no activity whatsoever had occurred at the former Exide property were significantly higher than DTSC's 80 mg/kg cleanup criteria.

21.    NL believes that the true background lead levels in these neighborhoods are likely even higher than estimated by DTSC and Geosyntec.

22.    The background analyses of both DTSC and Geosyntec establish that exceedances of DTSC's 80 mg/kg lead cleanup criteria on the Third-Party Properties were entirely expected, even in the total absence of any lead contribution from the former Exide property.

23.    Geosyntec's analysis also established that there is no pattern of contamination in the residential areas that would indicate that the former Exide property is a detectable contributing source of lead on the residential properties in these neighborhoods, or on the properties owned by the Third-Party Defendants.

24.    The sources of background lead in urban soil, especially in older neighborhoods such as those where the property owned by the Third-Party

Defendants is located, are no mystery – they are well-known, well-studied, and well-documented.

25.    The primary source of soil lead in residential soils is the residue from historic leaded gasoline emissions, especially in areas near and downwind from freeways and major arterial roads.  Los Angeles had some of the highest air lead levels in America associated with historic leaded gasoline use.  Airborne gasoline lead eventually settles in soils.



26.    Another significant source of lead in urban soils in Los Angeles County was the direct application of pesticides containing lead to lawns and gardens to control crabgrass, caterpillars, grubs, and moths.  Between the 1920's and the 1960's, the *Los Angeles Times* and other publications instructed homeowners to use a pesticide known as "lead arsenate" on their lawns.  Lead

---

[5] Unless otherwise noted, illustrations in this section are taken from the Draft Residential RCRA Facility Investigation (RFI) Report prepared by Geosyntec for Exide Technologies.

arsenate or "arsenate of lead" was over 60% pure lead.  Property owners following the recommendations of the *Los Angeles Times* added pounds of lead directly to their lawns with each application, and then washed the lead into the soil for control of insects and crabgrass.  Even a single application of lead arsenate at the levels recommended by the *Los Angeles Times* would have been sufficient to raise the lead level of an entire yard above the 80 mg/kg cleanup level.


[6]

27.   Poorly-maintained exterior lead paint can also be a contributing cause of residential soil lead, especially in areas with housing constructed prior to 1950. DTSC's own testing establishes that "lead paint chips" are prevalent throughout the residential neighborhoods and property records indicate that nearly the entire residential area was constructed well before 1950.

---

[6] Los Angeles Times, Sunday Oct. 16, 1955, page 364.



28.   To the extent residential soils in these areas were impacted by industrial activities in addition to impacts from leaded gasoline emissions, poorly-maintained lead paint, and lead arsenate and other pesticides[7], there were literally hundreds of lead-generating facilities repair shops and industrial facilities inside and near the residential neighborhoods that would potentially have contributed to such impacts.

---

[7] Lead is also found in other pesticides such as glyphosate or Roundup.  *See* N. Defarge, J. Spiroux de Vendômois, G.E. Séralini, Toxicity of formulants and heavy metals in glyphosate-based herbicides and other pesticides, Toxicology Reports, Volume 5, 2018, Pages 156-163, ISSN 2214-7500, https://doi.org/10.1016/j.toxrep.2017.12.025.https://www.sciencedirect.com/science/article/pii/S221475001730149X.   Additionally, according to CALPIRG and the Environmental Working Group, samples of the popular residential fertilizer "Ironite" purchased in Los Angeles County consumer stores contained lead at levels       between       3,700       mg/kg       and       4,200       mg/kg. https://static.ewg.org/reports/1999/As-You-Sow.pdf?_ga=2.49450338.538593293.1628698671-1837387009.1628698671.



29.     All of these background lead sources would have affected the neighborhoods where the Third-Party Defendants' properties are located.  None of the ubiquitous sources of lead to residential soils discussed in the preceding paragraph have anything to do with the former Exide property. Those sources are entirely sufficient, however, to explain the presence of lead at levels well above 80 mg/kg in the soils of residential yards in these older urban neighborhoods.

**Parties**

30.     Third-Party Plaintiff NL Industries, Inc. ("NL") is a New Jersey corporation with its headquarters located in Dallas, Texas.

**Third-Party Defendant Industrial Owner/Operators**

31.     Third-Party Defendant "**EXXON MOBIL CORPORATION**" is a New Jersey Corporation with its principal place of business in Texas.

32.     Upon information and belief, **EXXON MOBIL CORPORATION**, is the corporate successor and/or successor by merger of, General Petroleum

Corporation of California ("General Petroleum") and Socony-Vacuum Oil corporation ("Socony").

33.     Upon information and belief, **EXXON MOBIL CORPORATION,** by itself and through its predecessors General Petroleum and Socony operated an extensive refinery complex in the vicinity of 2619 East 37th Street, in Vernon, California between the 1910's until today.

34.     Upon information and belief, the refinery operated by **EXXON MOBIL CORPORATION** and its predecessors was involved, among other things, in the production of leaded gasoline.  Even when manufacturing non-leaded gasoline products, refinery operations would have generated airborne lead emissions.  Potential lead emitting sources at this operation included stills, boiler houses, cooling towers, furnaces, and a paint shop.  Lead and other hazardous substances may also have been disposed to soil, groundwater, and surface waters in industrial and commercial areas within the area designated by DTSC as "the Facility."

35.     Among other things, the refining facility operated by **EXXON MOBIL CORPORATION** and its predecessors included a 125-foot tall smokestack and at least nine other smokestacks.

36.     The refining property is and was owned and operated by **EXXON MOBIL CORPORATION** and its predecessors.

37.     Upon information and belief, lead released from the **EXXON MOBIL CORPORATION** facility was deposited in the soils of residential properties within the area designated by DTSC as the Site.

38.     Upon information and belief, **EXXON MOBIL CORPORATION** disposed of hazardous substances within the Site as defined by DTSC, at the time it or its predecessors was an owner and/or operator of the refining property.

18

39.     Third-Party Defendant "**CRESCENT REFINING AND OIL COMPANY**" is a California Corporation with its principal place of business in California.

40.     According to its website, crescentoilco.com, **CRESCENT REFINING AND OIL COMPANY** has been in business since 1916.

41.     Upon information and belief, **CRESCENT REFINING AND OIL COMPANY** operated an extensive refinery complex in the vicinity of 2446 to 2464 East 28th Street in Vernon, California, between at least the 1920's to the 1940's, and potentially longer.

42.     Upon information and belief, the refinery operated by **CRESCENT REFINING AND OIL COMPANY** was involved in the production of leaded gasoline.   Even when manufacturing non-leaded gasoline products, refinery operations generate significant airborne lead emissions.   Lead and other hazardous substances may also have been released to soil, groundwater, and surface waters in industrial and commercial areas within the area designated by DTSC as "the Site."

43.     Upon information and belief, lead generated at the **CRESCENT REFINING AND OIL COMPANY** property was deposited in residential properties within the area designated by DTSC as the Site.

44.     Upon information and belief, **CRESCENT REFINING AND OIL COMPANY** disposed of hazardous substances at the Site defined by DTSC at the time it was an owner and/or operator of the refining property.

45.     Upon information and belief Third-Party Defendant "**CONTINENTAL HOLDINGS, INC.**" is a Wyoming Corporation with its principal place of business in Monroe, Louisiana, and is a subsidiary of Lumen Technologies, Inc.

46.     Upon information and belief, **CONTINENTAL HOLDINGS, INC.** is the successor in interest or successor by merger of Continental Can Company,

Inc. ("Continental Can").

47.    **CONTINENTAL HOLDINGS, INC.,** alone or through its predecessor Continental Can, operated at a property that manufactured metal cans from approximately 1929 through 1983 at a facility located at 3820 Union Pacific Avenue, Los Angeles, California.   Lead emitting operations at this location included solder pots with exhaust hoods, coating ovens, tins plates, plating, and a machine shop.

48.    The former Continental Can property is located immediately across the street from the Northern residential areas where DTSC alleges lead has come to be located and is within the Site as defined by DTSC.

49.    Upon information and belief, lead generated at the **CONTINENTAL HOLDINGS, INC.** facility was deposited in residential properties within the area designated by DTSC as the Facility.   Lead and other hazardous substances may also have been released to soil, groundwater, and surface waters in industrial and commercial areas within the area designated by DTSC as the Site.

50.    Upon information and belief, **CONTINENTAL HOLDINGS, INC.** or its predecessors disposed of hazardous substances at the Site defined by DTSC at the time it was an owner and/or operator of the Continental Can facility.

51.    Upon information and belief, Third-Party Defendant "**OWENS-BROCKWAY GLASS CONTAINER, INC.**" is a Delaware Corporation with its principal place of business in Ohio.

52.    Upon information and belief, Third-Party Defendant "**O-I GLASS, INC. f/k/a OWENS-ILLINOIS, INC**." is a Delaware corporation with its principal place of business in Ohio.

53.    Upon information and belief, **OWENS-BROCKWAY GLASS CONTAINER, INC.** and **O-I GLASS, INC. f/k/a OWENS-ILLINOIS, INC.** (together "**OWENS**") owned and/or operated, at certain times, a glass

20

manufacturing business at located in the vicinity of Fruitland Avenue near Soto Street and Boyle Avenue in Vernon, California and is within the area designated by DTSC as the Site.

54.     The **OWENS** glass plant was established in or around 1932 and has been in operation for approximately 90 years.     **OWENS** currently recycles 330 tons per day of glass and produces between 2 and 3 million glass bottles per day on five production lines at the property. **OWENS** currently operates three 80-foot tall exhaust stacks and has reported annual lead emissions of up to 96.8 pounds of lead per year since 1996.  It also reports fugitive lead emissions from the plant.

55.     Upon information and belief, lead generated at the **OWENS** plant was deposited in residential properties within the area designated by DTSC as the Site. Lead and other hazardous substances may also have been released to soil, groundwater, and surface waters in industrial and commercial areas within the area designated by DTSC as the Site.

56.     Upon information and belief, **OWENS** or its predecessors disposed of hazardous substances at the Site defined by DTSC at the time it was an owner and/or operator of the plant referenced above.

### **Third-Party Defendant "Public Entity Owners"**

57.      In or around 2019, DTSC expanded its sampling of residential neighborhoods to include "parkways," which are strips of land located between a residential or commercial property (or its sidewalk) and a roadway ("Parkway Properties").

58.     The sampling revealed that parkway properties owned by municipal entities allegedly contain hazardous substances, including lead at levels above DTSC's 80 mg/kg lead screening criteria.

59.     The results of all parkways sampling are publicly available on DTSC's                                              website                                              at

https://www.envirostor.dtsc.ca.gov/public/final_documents2?global_id=60002705 &doc_id=60456527 ("Parkways Report").

60.     DTSC has included the Parkway Properties within its definition of the Site it alleges is at issue in this litigation.

61.     Public entities also own and operate other parcels of real property which DTSC testing indicates contain hazardous substances at levels above the cleanup criteria within the area designated by DTSC as the Site.

62.     With regard to each public entity identified below, all provisions of the California Tort Claims Act have either been satisfied or do not apply.

**City of Bell**

63.     Third-Party Defendant "**CITY OF BELL**" is a California Municipality located in Los Angeles County, California.

64.     **CITY OF BELL** is the current owner of hundreds of parcels of "Parkway Properties."

65.     Numerous soil samples taken by DTSC's contractors have shown that Parkway Properties owned by the **CITY OF BELL** are locations where hazardous substances, including lead, have come to be located.

66.     Soil sampling results obtained by DTSC show that there is no relationship or connection between contamination in the soils of Parkway Properties owned by the **CITY OF BELL** and the former Exide property located more than one mile north of those properties.  *See* Parkways Report at Figures 10.1-10.2.

67.     A report commissioned by DTSC showed that there was only a weak or negligible correlation between lead levels on residential properties and adjacent Parkway Properties, confirming that airborne contamination from a distant property is not the source of contamination on properties owned by the **CITY OF BELL**.  *See* Parkways Report at Section 9.9.   If contamination in the

neighborhoods had been caused by airborne emissions from a property located more than a half mile away (rather than local sources like local idling and passing automobiles spewing lead-gasoline fumes), the level on the residential property and the adjacent Parkway Property would be highly correlated.

68.    **CITY OF BELL** also owns numerous parcels of real property within the area designated by DTSC as the Site, which, upon information and belief, also contain background soil lead above 80 mg/kg.  The pattern of contamination on **CITY OF BELL's** properties and the areas around these properties, indicates that the former Exide property is not a source of lead on **CITY OF BELL's** properties.

**City of Commerce**

69.    Third-Party Defendant "**CITY OF COMMERCE**" is a California Municipality located in Los Angeles County, California.

70.    **CITY OF COMMERCE** is the owner of hundreds of parcels of "Parkway Properties."

71.    Hundreds of soil samples taken by DTSC's contractors have shown that Parkway Properties owned by the **CITY OF COMMERCE** are locations where hazardous substances, including lead, have come to be located.

72.    Soil sampling results obtained by DTSC show that there is no relationship or connection between contamination in the soils of Parkway Properties owned by the **CITY OF COMMERCE** and the former Exide property. *See* Parkways Report at Figures 8.1 - 8.4.

73.    A report commissioned by DTSC also showed that there was only a weak correlation between lead levels on residential properties and adjacent Parkway Properties owned by the **CITY OF COMMERCE**, confirming that airborne contamination from a distant property is not the source of contamination on these **CITY OF COMMERCE** properties.  *See* Parkways Report at Section 9.9.  If contamination in the neighborhoods had been caused by airborne emissions

from a property located more than a half mile away (rather than local sources like local idling and passing automobiles spewing lead-gasoline fumes), the level on the residential property and the adjacent Parkway Property would be highly correlated.

74.     **CITY OF COMMERCE** also owns numerous parcels of real property within the area designated by DTSC as the Site, which, upon information and belief, contain background soil lead above 80 mg/kg. The pattern of contamination on these **CITY OF COMMERCE** properties and the areas around these **CITY OF COMMERCE** properties indicates that the former Exide property is not a source of lead to these **CITY OF COMMERCE** properties.

**City of Huntington Park**

75.     Third-Party Defendant "**CITY OF HUNTINGTON PARK**" is a California Municipality located in Los Angeles County, California.

76.     **CITY OF HUNTINGTON PARK** is the owner of hundreds of parcels of real property of a type known as "Parkway Properties" that are located between parcels of private or public property and the street.

77.     Hundreds of soil samples taken by DTSC's contractors have shown that Parkway Properties owned by the **CITY OF HUNTINGTON PARK** are locations where hazardous substances, including lead, have come to be located.

78.     Soil sampling results obtained by DTSC in the entire parkways investigation area clearly show that there is no relationship or connection between contamination in the soils of Parkway Properties owned by the **CITY OF HUNTINGTON PARK** and the former Exide property located more than one half mile southwest of those properties.  *See* Parkways Report at Figures 11.1 - 11.4.

79.     A report commissioned by DTSC also showed that there was only a weak correlation between lead levels on residential properties and adjacent Parkway Properties owned by the **CITY OF HUNTINGTON PARK**, confirming

that airborne contamination from a distant property is not the source of contamination on these properties. *See* Parkways Report at Section 9.9. If contamination in the neighborhoods had been caused by airborne emissions from a property located more than a half mile away (rather than local sources like local idling and passing automobiles spewing lead-gasoline fumes), the level on the residential property and the adjacent Parkway Property would be highly correlated.

80.     **CITY OF HUNTINGTON PARK** also owns numerous parcels of real property within the area designated by DTSC as the Site, which, upon information and belief, contain background soil lead above 80 mg/kg. The pattern of contamination on these **CITY OF HUNTINGTON PARK** properties and the areas around these **CITY OF HUNTINGTON PARK** properties indicates that the former Exide property is not a source of lead to these **CITY OF HUNTINGTON PARK** properties.

**City of Maywood**

81.     Third-Party Defendant "**CITY OF MAYWOOD**" is a California Municipality located in Los Angeles County, California.

82.     **CITY OF MAYWOOD** is the owner of hundreds of parcels of real property of a type known as "Parkway Properties" that are located between parcels of private or public property and the street.

83.     Hundreds of soil samples taken by DTSC's contractors have shown that Parkway Properties owned by the **CITY OF MAYWOOD** are locations where hazardous substances, including lead, have come to be located.

84.     Soil sampling results obtained by DTSC in the entire parkways investigation area clearly show that there is no relationship or connection between contamination in the soils of Parkway Properties owned by the **CITY OF MAYWOOD** and the former Exide property located more than one half mile southwest of those properties. *See* Parkways Report at Figures 9.1 – 9.9.

85.    A report commissioned by DTSC also showed that there was only a weak correlation between lead levels on residential properties and adjacent Parkway Properties owned by the **CITY OF MAYWOOD**, confirming that airborne contamination from a distant property is not the source of contamination on these properties. *See* Parkways Report at Section 9.9.  If contamination in the neighborhoods had been caused by airborne emissions from a property located more than a half mile away (rather than local sources like local idling and passing automobiles spewing lead-gasoline fumes), the level on the residential property and the adjacent Parkway Property would be highly correlated.

86.    **CITY OF MAYWOOD** also owns numerous parcels of real property within the area designated by DTSC as the Site, which, upon information and belief, contain background soil lead above 80 mg/kg. The pattern of contamination on these **CITY OF MAYWOOD** properties and the areas around these **CITY OF MAYWOOD** properties indicates that the former Exide property is not a source of lead to these **CITY OF MAYWOOD** properties.

**City of Los Angeles**

87.    Third-Party Defendant "**CITY OF LOS ANGELES**" is a California Municipality located in Los Angeles County, California.

88.    **CITY OF LOS ANGELES** is the owner of hundreds of parcels of real property of a type known as "Parkway Properties" that are located between parcels of private or public property and the street.

89.    Hundreds of soil samples taken by DTSC's contractors have shown that Parkway Properties owned by the **CITY OF LOS ANGELES** are locations where hazardous substances, including lead, have come to be located.

90.    Soil sampling results obtained by DTSC in the entire parkways investigation area clearly show that there is no relationship or connection between contamination in the soils of Parkway Properties owned by the **CITY OF LOS**

**ANGELES** and the former Exide property located more than one half mile southwest of those properties. *See* Parkways Report at Figures 6.1 - 6.6.

91.     A report commissioned by DTSC also showed that there was only a weak correlation between lead levels on residential properties and adjacent Parkway Properties owned by the **CITY OF LOS ANGELES**, confirming that airborne contamination from a distant property is not the source of contamination on these properties. *See* Parkways Report at Section 9.9.  If contamination in the neighborhoods had been caused by airborne emissions from a property located more than a half mile away (rather than local sources like local idling and passing automobiles spewing lead-gasoline fumes), the level on the residential property and the adjacent Parkway Property would be highly correlated.

92.     **CITY OF LOS ANGELES** also owns numerous parcels of real property within the area designated by DTSC as the Site which, upon information and belief, contain background soil lead above 80 mg/kg. The pattern of contamination on these **CITY OF LOS ANGELES** properties and the areas around these properties indicates that the former Exide property is not a source of lead to these **CITY OF LOS ANGELES** properties.

93.     **CITY OF LOS ANGELES** also operated an incinerator for the disposal of commercial trash on East 26th Street at the border with Vernon, California from as early as the 1920's to the late 1940's that would have generated airborne emissions that included lead.  The smelter had four "beehive" type furnaces that vented through a 100-foot-tall stack with no known method of emission control.  An article about the incinerator described that the incinerator operated with a 'fly-ash problem' of 'major consequence.'  *See* Geosyntec Draft Residential RFI Report, Appendix A, at *152 (citing Hume, 1967, History of Efforts at Incineration in the Los Angeles Area).

94.     According to estimates in Appendix A of the Draft Residential RFI Report prepared by Geosyntec, airborne lead emissions generated by the incinerator operated by the **CITY OF LOS ANGELES** would have been on the order of 6,000 pounds per year.  Lead and other hazardous substances may also have been disposed to soil, groundwater, and surface waters in industrial and commercial areas within the area designated by DTSC as the Site.

95.     The incinerator was closer to certain neighborhoods than the former Exide property and, upon information and belief, its operations contributed lead to the soils in those residential neighborhoods and is within the area designated by DTSC as the Site.

**County of Los Angeles**

96.     Third-Party Defendant "**COUNTY OF LOS ANGELES**" is a California County.

97.     **COUNTY OF LOS ANGELES** is the owner of hundreds of parcels of real property of a type known as "Parkway Properties" that are located between parcels of private or public property and the street.

98.     Hundreds of soil samples taken by DTSC's contractors have shown that Parkway Properties owned by the **COUNTY OF LOS ANGELES** are locations where hazardous substances, including lead, have come to be located.

99.     Soil sampling results obtained by DTSC in the entire parkways investigation area clearly show that there is no relationship or connection between contamination in the soils of Parkway Properties owned by the **COUNTY OF LOS ANGELES** and the former Exide property located more than one half mile southwest of those properties.  *See* Parkways Report at Figures 7.1-7.10.

100.     A report commissioned by DTSC also showed that there was only a weak correlation between lead levels on residential properties and adjacent Parkway Properties owned by the **COUNTY OF LOS ANGELES**, confirming

that airborne contamination from a distant property is not the source of contamination on these **COUNTY OF LOS ANGELES** properties. *See* Parkways Report at Section 9.9.  If contamination in the neighborhoods had been caused by airborne emissions from a property located more than a half mile away (rather than local sources like local idling and passing automobiles spewing lead-gasoline fumes), the level on the residential property and the adjacent Parkway Property would be highly correlated.

101.  **COUNTY OF LOS ANGELES** also owns numerous parcels of real property within the area designated by DTSC as the Site which, upon information and belief, contain background soil lead above 80 mg/kg. The pattern of contamination on these properties and the areas around these **COUNTY OF LOS ANGELES** properties indicates that the former Exide property is not a source of lead to these **COUNTY OF LOS ANGELES** properties.

**Housing Authority of the City of Los Angeles**

102.  Third-Party Defendant "**HOUSING AUTHORITY OF THE CITY OF LOS ANGELES**" is a California state-chartered public agency.

103.  **HOUSING AUTHORITY OF THE CITY OF LOS ANGELES** is the current owner of parcels of real property that, upon information and belief, are located within the area defined by DTSC as the Site and which contain lead at levels above 80 mg/kg.

**Bell Community Housing Authority**

104.  Third-Party Defendant "**BELL COMMUNITY HOUSING AUTHORITY**" is a California state-chartered public agency.

105.  **BELL COMMUNITY HOUSING AUTHORITY** is the current owner of parcels of real property that, upon information and belief, are located within the area defined by DTSC as the Site and which contain lead at levels above 80 mg/kg.

**Housing Authority of the County of Los Angeles**

106.   Third-Party Defendant **"HOUSING AUTHORITY OF THE COUNTY OF LOS ANGELES"** is a California state-chartered public agency.

107.   **HOUSING AUTHORITY OF THE COUNTY OF LOS ANGELES** is the current owner of parcels of real property that, upon information and belief, are located within the area defined by DTSC as the Site and which contain lead at levels above 80 mg/kg.

**Third-Party Defendant "Corporate Real Estate Investors"**

108.   The Third-Party Defendants identified below are all corporate entities such as corporations, limited partnerships, and limited liability companies.

109.   The properties owned by the Third-Party Defendants identified below are held as investments, and these investments have significant value.

110.   Upon information and belief, Third-Party Defendant **"12909 CORDARY LLC"** is a California Limited Liability Company with its principal place of business in Hawthorne, California.

111.   **12909 CORDARY LLC** owns real property located at 5219, 5307, and 5209 Maywood Ave., Maywood, CA 90270 (APNs 6311027020, 6311027007, and 6311027029), which real property has an aggregate appraised value of approximately $5,151,020.

112.   Upon information and belief, Third-Party Defendant **"20 20 08WYB02 LLC"** is a Wyoming Limited Liability Company with its business address in Redondo Beach, California.

113.   **20 20 08WYB02 LLC** owns real property located at 3429 and 3672 Percy Street, Los Angeles, CA 90023 (APNs 5188008015, 5188004019), which has a deed value of $2,700,000.

114.   Upon information and belief, Third-Party Defendant **"2013-1 IH BORROWER LP"** is a Delaware Limited Partnership with a principal place of

business in New York and a mailing address in Dallas, Texas.  An alternate name for this Third-Party Defendant is "**INVITATION HOMES**".

115.  **2013-1 IH BORROWER LP** owns real property located at 3635 E. 6th Street, Los Angeles, CA 90023 (APN 5188002024), which has an assessed value of $442,818.

116.  Upon information and belief, Third-Party Defendant "**2015-3 IH2 BORROWER LP**" is a Delaware Limited Partnership with a principal place of business in New York and a mailing address in Dallas, Texas.  An alternate name for this Third-Party Defendant is "**INVITATION HOMES**".

117.  **2015-3 IH2 BORROWER LP** owns real property located 3515 E. 55th Street, Maywood CA 90027 (APN 6311020023), which has an assessed value of $376,341.

118.  Upon information and belief, Third-Party Defendant "**2017-1 IH BORROWER LP**" is a Delaware Limited Partnership with a principal place of business in New York and a mailing address in Dallas, Texas.  An alternate name for this Third-Party Defendant is "**INVITATION HOMES**".

119.  **2017-1 IH BORROWER LP** owns real property located at 462 Rowan Avenue, Los Angeles, CA 90023 (APN 5238004002), 5929 Fishburn Ave., Huntington Park, CA 90255 (APN 63120250190), 4127 E. 61st St., Huntington Park, CA 90255 (APN 6317006020), which properties have an aggregate assessed value of $1,184,776.

120.  Upon information and belief, Third-Party Defendant "**2017-2 IH BORROWER LP**" is a Delaware Limited Partnership with a principal place of business in New York and a mailing address in Dallas, Texas.  An alternate name for this Third-Party Defendant is "**INVITATION HOMES**".

121.  **2017-2 IH 2 BORROWER LP** owns real property located at 1264 E. Arizona Ave., Los Angeles, CA 90022 (APN 5246018006) and 3647 E. 57th Street,

462 Rowan Avenue, Los Angeles, CA 90023 (APN 5238004002), which has an aggregate assessed value of $863,119.

122. Through its various corporate entities listed in the foregoing paragraphs, **INVITATION HOMES** owns real property worth an aggregate $2,867,054.

123. Upon information and belief, Third-Party Defendant "**3551 SABINA LLC**" is a California Limited Liability Company with a principal place of business in North Hollywood, California.

124. **3551 SABINA LLC** owns real property located at 3551 Sabina St., Los Angeles, CA 90023 (APN 5188003035), which has an assessed value of $1,242,540.

125. Upon information and belief, Third-Party Defendant "**3553 PERCY LLC**" is a California Limited Liability Company with a principal place of business in Beverly Hills, California.

126. **3553 PERCY LLC** owns real property located at 3553 Percy St., Los Angeles, CA 90023 (APN 5188006021), which has an assessed value of $1,171,265.

127. Upon information and belief, Third-Party Defendant "**4-1 ST. PROPERTIES LLC**" is a California Limited Liability Company with a principal place of business in Los Angeles, California.

128. **4-1 ST. PROPERTIES LLC** owns real property located at 3501 Percy Street, Los Angeles, CA 90023 (APN 5188006031), which has an assessed value of $832,737.

129. Upon information and belief, Third-Party Defendant "**525 HIGHLAND LLC**" is a California Limited Liability Company with a principal place of business in Beverly Hills, California.

130.   **525 HIGHLAND LLC** owns real property located at 4315 E. 58th Street, Maywood, CA 90027 (APN 6313028017), which has an assessed value of $988,107.

131.   Upon information and belief, Third-Party Defendant "**55 CORONA LLC**" is a California Limited Liability Company with a principal place of business in Maywood, California.

132.   **55 CORONA LLC** owns real property located at 4004 E. 55th Street, Maywood, CA (APN 6312014001), which has an assessed value of $1,083,028.

133.   Upon information and belief, Third-Party Defendant "**6317 FLORA AVE LLC**" is a California Limited Liability Company with a principal place of business in Arcadia, California.

134.   **6317 FLORA AVE LLC** owns real property located at 6317 Flora Ave., Bell, CA 90201 (APN 6317025006), which has an assessed value of $9,320,571.

135.   Upon information and belief, Third-Party Defendant "**943 BONNIE BEACH LLC**" is a California Limited Liability Company with a principal place of business in Los Angeles, California.

136.   **943 BONNIE BEACH LLC** owns real property located at 943 Bonnie Beach Place, Los Angeles, CA (APN 5239020009), which has an assessed value of $1,192,072.

137.   Upon information and belief, Third-Party Defendant "**AHUIGIS MANAGEMENT LLC**" is a California Limited Liability Company with a principal place of business in Long Beach, California.

138.   **AHUIGIS MANAGEMENT LLC** owns real property located at 6104 Mayflower Ave., Maywood, CA 90270 (APN 6316011001), which has an assessed value of $1,518,952.

139. Upon information and belief, Third-Party Defendant "**AJG REALTY INC**" is a California corporation with a principal place of business in Glendora, California.

140. **AJG REALTY INC** owns real property located at 1130 Rosalind Ave., Los Angeles, CA 90023 (APN 5190007015), which has an assessed value of $873,812.

141. Upon information and belief, Third-Party Defendant "**ALM UNITED LLC**" is a California Limited Liability Company with a principal place of business in San Gabriel, California

142. **ALM UNITED LLC** owns real property located at 1437 S. Woods Ave., Los Angeles, CA 90022 (APN 5245024014), which has an assessed value of $796,347.

143. Upon information and belief, Third-Party Defendant "**BEACHWOOD HOLDINGS LLC**" is a California Limited Liability Company with a principal place of business in West Hollywood, California.

144. **BEACHWOOD HOLDINGS LLC** owns real property located at 816 S. Eastman Ave., Los Angeles, CA 90023 (APN 5239010030), which has an assessed value of $1,545,849.

145. Upon information and belief, Third-Party Defendant "**CHAMPERY RENTAL REO LLC**" is a California Limited Liability Company with a principal place of business in Los Angeles, California.

146. **CHAMPERY RENTAL REO LLC** owns real property located at 3555 and 3557 Siskiyou St., Los Angeles, CA 90023 (APNs 5188016024 and 5188016025), which has an assessed value of $905,061.

147. Upon information and belief, Third-Party Defendant "**CLELA INVESTORS LLC**" is a California Limited Liability Company with a principal place of business in Los Angeles, California.

148.   **CLELA INVESTORS LLC** owns real property located at 1423 Clela Ave., Los Angeles, CA 90022 (APN 5245021058), which has an assessed value of $1,019,251.

149.   Upon information and belief, Third-Party Defendant "**DELECOR INVESTMENTS LLC**" is a California Limited Liability Company with a principal place of business in Downey, California.

150.   **DELECOR INVESTMENTS LLC** owns real property located at 6015 and 6021 Otis Ave, Huntington Park, CA, 90255 (APNs 6317006027 and 6317006028); 2693 Randolph Street, Huntington Park, CA 90255 (APN 6310021009); 1428 Woods Ave., Los Angeles, CA 90022 (APN 5245024006); and 3737 Slauson Ave., Maywood, CA 90270 (APN 5245024006), which property has an aggregate assessed value of $5,424,255.

151.   Upon information and belief, Third-Party Defendant "**E.N.E.A. MORA PROPERTIES LLC**" is a California Limited Liability Company with a principal place of business in West Covina, California.

152.   **E.N.E.A. MORA PROPERTIES LLC** owns real property located at 726  S. Ditman Ave., Los Angeles, CA 90023 (APN 5239009021); 601 S. Ditman Ave, Los Angeles, CA 90023 (APN 5238010044); 1140 S Rowan Ave., Los Angeles, CA 90023 (5242003002); 1150, 1150 ½, 1152 S. Ditman Ave, Los Angeles, CA 90023 (5242005004); 1134 S. Rowan Ave., Los Angeles, CA 90023 (APN  5242003001); and 1143 S Rowan Ave., Los Angeles, CA (APN 5242004013), which property has an aggregate assessed value of $1,727,886.

153.   Upon information and belief, Third-Party Defendant "**ELA PROPERTIES LLC**" is a California Limited Liability Company with a principal place of business in Los Angeles, California.

154.   **ELA PROPERTIES LLC** owns real property located 1336 S. Ferris Ave., Los Angeles, CA 90022(APN 5245019009), 4921 Leonis Street, Commerce,

CA 90040 (APN 5244027019); 1326 S. La Verne Ave., Los Angeles, CA 90022 (APN 5245020006), which property has an aggregate assessed value of $1,176,363.

155. Upon information and belief, Third-Party Defendant "**F5 PROSPECT LLC**" is a California Limited Liability Company with a principal place of business in Whittier, California.

156. **F5 PROSPECT LLC** owns real property located at 6118 Prospect Ave., Maywood, CA 90027 (APN 6316010005), which has an assessed value of $1,073,259.

157. Upon information and belief, Third-Party Defendant "**FG PROPERTY MANAGEMENT INC**" is a California Corporation with a principal place of business in Los Angeles, California.

158. Upon information and belief, Third-Party Defendant "**NICOLAS AND SONS MANAGEMENT LLC**" is a California Limited Liability Company with a principal place of business in Los Angeles, California.

159. **FG PROPERTY MANAGEMENT INC** and **NICOLAS AND SONS MANAGEMENT LLC** own real property located at 3571 Atlantic, Los Angeles, CA 90023 (APN 5188014031), which has an assessed value of $1,585,506.

160. Upon information and belief, Third-Party Defendant "**FOUNTAINHEAD 30 LP**" is a California Limited Partnership with a principal place of business in Downey, California.

161. **FOUNTAINHEAD 30 LP** owns real property located at 4632 E. 59th Place, Maywood, CA 90270 (APN 6314011030), which has an assessed value of $1,211,553.

162. Upon information and belief, Third-Party Defendant "**GMN ENTERPRISES INC**" is a California Corporation with a principal place of

business in Downey, California.

163.   **GMN ENTERPRISES INC** owns real property located at 3656 E. 58th Street, Maywood, CA 90270 (APN 6311009010), which has an assessed value of $2,679,474.

164.   Upon information and belief, Third-Party Defendant "**GOLDSTAR ENTERPRISES INC**" is a California Corporation with a principal place of business in Downey, California.

165.   **GOLDSTAR ENTERPRISES INC** owns real property located at 3538 E. 56th Street, Maywood, CA 90270 (APN 6311022030), which has an assessed value of $803,841.

166.   Upon information and belief, Third-Party Defendant "**GREEN BAY LLC**" is a California Limited Liability Company with a principal place of business in Diamond Bar, California.

167.   **GREEN BAY LLC** owns real property located at 3638 Percy Street, Los Angeles, CA 90023 (APN 5188008008), which has an assessed value of $2,607,334.

168.   Upon information and belief, Third-Party Defendant "**GROUP XII PROPERTIES LP**" is a California Limited Partnership with a principal place of business in El Monte, California.

169.   **GROUP XII PROPERTIES LP** owns real property located at 5917 Carmelita Ave., Huntington Park, CA (APN 6318033014), which has an assessed value of $3,400,787.

170.   Upon information and belief, Third-Party Defendant "**HH PERCY LLC**" is a California Limited Liability Company with a principal place of business in Westlake Village, California.

171.   **HH PERCY LLC** owns real property located at 3559 Percy Street, Los Angeles, CA 90023 (APN 5188006020), which has an assessed value of

$1,060,878.

172.   Upon information and belief, Third-Party Defendant "**HOOVER PROPERTIES LLC**" is a California Limited Liability Company with a principal place of business in Alhambra, California.

173.   **HOOVER PROPERTIES LLC** owns real property located at 3700 E. 61st Street., Huntington Park, CA (APN 6318026028), which has an assessed value of $2,734,112.

174.   Upon information and belief, Third-Party Defendant "**JEM 3 PROPERTIES LLC**" is a California Limited Liability Company with a principal place of business in Torrance, California.

175.   **JEM 3 PROPERTIES LLC** owns real property located at 6055 Fishburn Ave., Huntington Park, CA (APN 6317005010), which has an assessed value of $2,160,000.

176.   Upon information and belief, Third-Party Defendant "**KLGV INVESTMENTS III LLC**" is a California Limited Liability Company with a principal place of business in Huntington Park, California.

177.   **KLGV INVESTMENTS III LLC** owns real property located at 4030 E. 52nd Street, Maywood, CA 90270 (APN 6312005008), which has an assessed value of $1,049,898.

178.   Upon information and belief, Third-Party Defendant "**KLGV INVESTMENTS LLC**" is a California Limited Liability Company with a principal place of business in Huntington Park, California.

179.   **KLGV INVESTMENTS LLC** owns real property located at 3527 E. 56th Street, Maywood, CA 90270 (APN 6311021025), and 4113 Randolph Street, Huntington Park, CA 90255 (APN 6317011007) which have an aggregate assessed value of $1,938,370.

180.   Upon information and belief, Third-Party Defendant "**MAYWOOD**

**PLAZA PARTNERS LLC**" is a California Limited Liability Company with a principal place of business in West Hollywood, California.

181.   **MAYWOOD PLAZA PARTNERS LLC** owns real property located at 4037 and 4041 East 57th St., Los Angeles, CA (APNs 6312017009 and 6312017010), which has an aggregate assessed value of $826,715.

182.   Upon information and belief, Third-Party Defendant "**MENLO APARTMENT GROUP LLC**" is a California Limited Liability Company with a principal place of business in Los Angeles, California.

183.   **MENLO APARTMENT GROUP LLC** owns real property located at 3860 Eagle St., Los Angeles, CA (APN 5238005001), which has an assessed value of $1,179,158.

184.   Upon information and belief, Third-Party Defendant "**MOLINA INVESTMENT INC**" is a California Corporation with a principal place of business in Los Angeles, California.

185.   **MOLINA INVESTMENT INC** owns real property located at 5961 and 6060 Fishburn Ave., Huntington Park, CA 90255; and 4901 Jillson Street, Commerce, CA 90040 (APNs 6312025012, 6317004013, and 5244026015), which has an aggregate assessed value of $1,976,638.

186.   Upon information and belief, Third-Party Defendant "**MULTI-UNIT ACQUISITION GROUP CORP**" is a California Corporation with a principal place of business in Downey, California.

187.   **MULTI-UNIT ACQUISITION GROUP CORP** owns real property located at 4226 E. 54th St., Maywood, CA (APN 6312012013), which has an assessed value of $756,848.

188.   Upon information and belief, Third-Party Defendant "**MYWD 4 LP**" is a California Limited Partnership with a principal place of business in Downey, California.

189.   **MYWD 4 LP** owns real property located at 4532 and 4540 E 57th St., Maywood, CA (APNs 6313009019, 6313009029), and 4826 E. 58th Street, Maywood, CA 90270 (APN 6314024008) which has an aggregate assessed value of $1,007,979.

190.   Upon information and belief, Third-Party Defendant "**NEW SEASON LLC**" is a California Limited liability Company with a principal place of business in Los Angeles, California.

191.   **NEW SEASON LLC** owns real property located at 1231 and 1233 Arizona Ave., Los Angeles, CA 90022 (APNs 5246015054 and 5246015055) and 1215 McDonnell Ave., Los Angeles, CA 90022 (APN 5246010003) which has an aggregate assessed value of $1,064,910.

192.   Upon information and belief, Third-Party Defendant "**NEWSHIRE INVESTMENTS INC**" is a California Corporation with a principal place of business in Downey, California.

193.   **NEWSHIRE INVESTMENTS INC** owns real property located at 3971 E. 6th Street, and 1139 S. Lorena Street, Los Angeles, CA 90023(APN 5238007048 and 5190014029), which has an aggregate assessed value of $1,289,893.

194.   Upon information and belief, Third-Party Defendant "**PERCY ENTEPRISES LLC**" is a California Limited Liability Company with a principal place of business in North Hollywood, California.

195.   **PERCY ENTEPRISES LLC** owns real property located at 3525 Percy Street, Los Angeles, CA (APN 5188006027), which has an assessed value of $1,647,795.

196.   Upon information and belief, Third-Party Defendant "**PYRAMID INVESTMENTS INC**" is a California Corporation with a principal place of business in Covina, California.

197. **PYRAMID INVESTMENTS INC** owns real property located at 3529 Percy Street, Los Angeles, CA (APN 5188006026), which has an assessed value of $1,350,487.

198. Upon information and belief, Third-Party Defendant "**RCK INVESTMENTS LLC**" is a California Limited Liability Company with a principal place of business in North Hollywood, California.

199. **RCK INVESTMENTS LLC** owns real property located at 6039 Prospect Ave., 6138 Vinevale Ave., 5615 Heliotrope Ave., and 4753 E. 57th Street, Maywood, CA 90270 (APNs 6316004017, 6316012008, 6314016029 and 6314016028), which has an aggregate assessed value of $1,000,371.

200. Upon information and belief, Third-Party Defendant "**SALGADO FAMILY INVESTMENTS LLC**" is a California Limited Liability Company with a principal place of business in Los Angeles, California.

201. **SALGADO FAMILY INVESTMENTS LLC** owns real property located at: 3046 Atlantic St., Los Angeles, CA (APN 5188025005); 826, 918, 922 S. Rowan Ave., Los Angeles, CA (APNs 5239007017, 5239007023, and 5239008058); 820, 823, 829 and 919, S. Eastman Ave., Los Angeles, CA (APNs 5239008043, 5239010031, 5239007022, and 5239008046); 807 Townsend Ave., Los Angeles, CA 90023 (APN 5239008014); 3718 Siskiyou Street, Los Angeles, CA 90023 (APN 5188009023), the aggregate assessed value of this property is $1,746,447.

202. Upon information and belief, Third-Party Defendant "**STAMCO LP**" is a California Limited Partnership with a principal place of business in Gardena, California.

203. **STAMCO LP** owns real property located at 3530 E. 61st Place, Huntington Park, CA (APN 6318017034), which has an assessed value of $2,400,000.

204.   Upon information and belief, Third-Party Defendant "**SUNRISE INVESTMENTS - SRI NO 5 LLC**" is a California Limited Liability Company with a principal place of business in Covina, California.

205.   **SUNRISE INVESTMENTS - SRI NO 5 LLC** owns real property located at 955 S. Downey Rd., Los Angeles, CA 90023(APN 5236006009), which has an assessed value of $752,795.

206.   Upon information and belief, Third-Party Defendant "**THURMAN INTERIM CALIFORNIA LLC**" is a Delaware Limited Liability Company with a principal place of business in Irvine, California.

207.   **THURMAN INTERIM CALIFORNIA LLC** owns the Wyverwood Gardens Apartment Complex, which is located at 2901 E. Olympic Blvd., Los Angeles, California, and consists of the following APNs:   5170018001, 5170020001, 5170021001, 5170022001, 5170023001, 5190025005 and potentially more.   The total assessed value of the real property at the Wyverwood Gardens Apartment Complex is $36,928,488.

208.   Upon information and belief, Third-Party Defendant "**WOOD ROCK PROPERTIES LLC**" is a California Limited Liability Company with a principal place of business in Pasadena, California.

209.   **WOOD ROCK PROPERTIES LLC** owns real property located at 1431 Woods Ave., Los Angeles, CA 900220 (APN 5245024013), which has an assessed value of $1,554,448.

210.   Upon information and belief, Third-Party Defendant "**YNFANTE HOLDINGS I LLC**" is a California Limited Liability Company with a principal place of business in San Gabriel, California.

211.   **YNFANTE HOLDINGS I LLC** owns real property located at 3716 E. 5th Street, Los Angeles, CA 90063 (APN 5238003034), which has a deed value of $836,578.

212.   The Third-Party Defendants identified in paragraphs 110-211 are referred to hereinafter, collectively, as the "**Corporate Real Estate Investors**".

213.   According to the testing data on DTSC's website, parcels of property owned by the Corporate Real Estate Investors within the area defined by DTSC as the Site, have soil lead levels above the 80 mg/kg cleanup criteria set by DTSC.

214.   According to the testing data on DTSC's website, many of the parcels of property owned by the Corporate Real Estate Investors have exterior lead paint chips.

215.   The Corporate Real Estate Investors have a pre-existing legal duty to prevent, abate or control any lead hazards on their property.

216.   Upon information and belief, the Corporate Real Estate Investors have not paid any share of DTSC's costs for investigating and/or remediating their properties.

217.   The pattern of contamination within each parcel of property owned by the Corporate Real Estate Investors is not consistent with the former Exide property being the cause of lead levels above 80 mg/kg, on the Corporate Real Estate Investors' property.

218.   The pattern of contamination in the neighborhoods around each parcel of property owned by the Corporate Real Estate Investors is not consistent with the former Exide property being the cause of lead levels above 80 mg/kg in the neighborhood where the Corporate Real Estate Investors' properties are situated.

219.   The pattern of contamination on parcels owned by the Corporate Real Estate Investors is entirely consistent with background lead sources being the source of all lead present on the Corporate Real Estate Investors' properties. Background lead sources include naturally-occurring soil lead, poorly-maintained lead paint, historic emissions from leaded gasoline, historic use of pesticides containing lead, local foundries and incinerators (including backyard incinerators),

contaminated construction fill, auto-body shops, and a myriad of other local sources entirely unrelated to the former Exide property.

220.   DTSC has included parcels of property owned by the Corporate Real Estate Investors within its definition of the single Site or Facility it alleges is at issue in this litigation.

221.   Neither the activities of NL individually, nor of all Defendants targeted by DTSC collectively, would require any cleanup on the parcels of property owned by the Corporate Real Estate Investors according to DTSC's own published guidance.

## JURISDICTION AND VENUE

222.   The Court has jurisdiction over these third-party claims under 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b). The Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367 because the federal and state claims arise from a common nucleus of operative facts.

223.   Venue is proper in this district under 28 U.S. § 1391(b) and 42 U.S.C. § 9613(b) because the alleged releases and/or threatened releases occurred in this district.

## COUNT ONE
### (Contribution Under CERCLA § 113(f))

224.   NL incorporates the allegations in the preceding paragraphs by reference.

225.   Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides, *inter alia*, that:

> (1)   the owner and operator of a vessel or a facility,
>
> (2)   any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of

> (3)  any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances...
>
> shall be liable for—
>
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan . . . .

226.  CERCLA Section 113(f), 42 U.S.C. § 9613(f) provides, *inter alia*, that:

> (1) Contribution –
>
> Any person may seek contribution from any other person who is liable or potentially liable under section 107(a), during or following any civil action under section 106 or under section 107(a). Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 106 or section 107.

227.  DTSC alleges that the Site, is a "facility" within the meaning of 42 U.S.C. § 9601(9).  If true, the Site as defined by DTSC, or as that term is ultimately defined by the Court, is a "facility."

228.   The Third-Party Defendants are each a "person" as defined in 42 U.S.C. § 9601(21).

229.   Upon information and belief, the Third-Party Defendants, are currently "owners" or "operators" of property within the Site as defined by DTSC, or were previously "owners," "operators," and/or "arrangers" within the meaning of §§ 101 and 107(a) of CERCLA, 42 U.S.C. §§ 9601(20), 9607(a), relating to the hazardous substances disposed of, released at, and/or impacting the Site as defined by DTSC in its Complaint.

230.   NL has been sued by DTSC under Section 107 of CERCLA.  If NL is found liable to DTSC in this action, which liability NL denies, NL contends that its liability should be limited to NL's equitable share of the response costs. If any liability assessed to NL is joint and several, pursuant to CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1), NL is entitled to contribution from the Third-Party Defendants for each of their equitable shares of the response costs, including each Third-Party Defendant's equitable share of any orphan share of the response costs.

231.   While denying liability, in the event NL is found liable for response costs, NL demands contribution against the Third-Party Defendants pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f).

## COUNT TWO
**(Declaratory Relief Under CERCLA § 113(g)(2) and 28 U.S.C. § 2201)**

232.   NL incorporates the allegations in the preceding paragraphs by reference.

233.   DTSC has alleged that it will continue to incur response costs in the future with respect to the environmental contamination at the Site as defined by DTSC in its Complaint.

234.   An actual and justiciable controversy within the meaning of 28 U.S.C. §§ 2201 and 2202 exists between NL and the Third-Party Defendants concerning

their respective obligations and potential liability for response costs allegedly already incurred and that may be incurred in the future as a result of the release and threatened release of hazardous substances at the Site as defined by DTSC in its Complaint.

235.   If DTSC is able to establish that NL is liable in this action, the Court should allocate the response costs sought by DTSC among all liable parties, including the Third-Party Defendants, and as current owners and operators of the Site, as defined by DTSC or as determined by this Court, as current or former owners and operators of facilities, or as "arrangers" at the Site as defined by DTSC or this Court, using such equitable factors as the Court determines are appropriate, under 42 U.S.C. § 9613(f)(1), and grant appropriate declaratory relief under 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201.

236.   Pursuant to Section 113(g) of CERCLA, 42 U.S.C. § 9613(g), and 28 U.S.C. § 2201, NL seeks a declaratory judgment that the Third-Party Defendants are liable for contribution for their equitable share of future response costs or damages, which judgment will be binding in any subsequent action to recover further response costs or damages at the Site as determined by this Court.

## **COUNT THREE**
### **(Contribution/Indemnity Under HSAA § 25300)**

237.   NL incorporates the allegations in the preceding paragraphs by reference.

238.   The Third-Party Defendants caused or permitted a release or threatened release of hazardous substances into, on, or about the Site as defined by DTSC or, as that term is ultimately defined by the Court, as set forth in the Hazardous Substances Account Act ("HSAA"), Cal. Health and Safety Code, § 25300 *et seq*.

239.   The Third-Party Defendants are each a "liable person" as defined in Cal. Health and Safety Code, § 25323.5.

240. NL has denied liability for response or corrective action costs incurred as the result of alleged releases or threatened releases of hazardous substances at or from the Site as defined by DTSC or, as that term is ultimately defined by the Court. But NL may incur such liability in this action and/or in the future.

241. The Third-Party Defendants are each liable to NL for contribution and/or indemnity under Cal. Health and Safety Code, § 25363(d) for some or all of any amounts NL incurs or will incur as a result of any release or threatened release of hazardous substances at the Site, as that term is ultimately defined by the Court.

## COUNT FOUR
### (Equitable Indemnity)

242. NL incorporates the allegations in the preceding paragraphs by reference.

243. NL specifically denies that it created or assisted in creating any nuisance, but to the extent that a judgment is entered under CERCLA, HSAA, or other law subjecting NL to liability, or to the extent that DTSC proves the nuisance that it alleges in its Complaint, the Third-Party Defendants are liable to NL for contribution and indemnity for the abatement of, or the costs of abating, the nuisance that DTSC alleges in its Complaint because the Third-Party Defendants are jointly and severally liable for the creation or maintenance of that alleged nuisance for the reasons set forth above and as the Third-Party Defendants failed to meet their legal or statutory obligations and maintained, created, or assisted in, creating the nuisance.

244. Section 372 of the California Penal Code states "every person who maintains or commits any public nuisance . . . is guilty of a misdemeanor."

245. Civil Code Section 3483 states "Every successive owner of property who neglects to abate a continuing nuisance upon, or in the use of, such property, created by a former owner, is liable therefor in the same manner as the one who first created it."

246.  The Third-Party Defendants' conduct was a substantial factor in creating or maintaining the nuisance alleged by DTSC.

247.  The Third-Party Defendants failed to meet their legal and statutory obligations and maintained, created, or assisted in creating, the nuisance and contributed as a substantial factor in causing the alleged nuisance, if one exists.

248.   As a result, NL is entitled to total or partial equitable indemnity from the Third-Party Defendants.

**WHEREFORE**, NL asks the Court to enter judgment in favor of NL, and against the Third-Party Defendants, as follows:

- For contribution under 42 U.S.C. § 9607(f) to response costs incurred, in an amount to be determined;
- For contribution and indemnity under HSAA, Cal. Health and Safety Code § 25300 *et seq*., and California common or other statutory law for response costs incurred, in an amount to be determined;
- For partial or total contribution or indemnity, as permitted by law;
- For litigation expenses and costs, including reasonable attorneys' fees and expert fees, as permitted by law;
- For an award of interest at the maximum legal rate on any and all damages from the earliest date permitted by law.

**WHEREFORE**, in addition, if NL is held liable for any response costs incurred by DTSC, NL requests that the Court issue a declaratory judgment, pursuant to Section 113(g) of CERCLA, 42 U.S.C. § 9613(g), or 28 U.S.C. § 2201, that the Third-Party Defendants are each liable in contribution for their equitable share of future response costs or damages, which judgment will be binding in any subsequent action to recover further response costs or damages at the Site.

Date:   August 16, 2021                    Respectfully submitted,


                                           */s/ Joel L. Herz*
                                           Joel L. Herz
                                           LAW OFFICES OF JOEL L. HERZ
                                           3573 East Sunrise Drive, Suite 215
                                           Tucson, AZ  85718
                                           (520) 529-8080
                                           (520) 529-8077 (facsimile)
                                           Email:  joel@joelherz.com
                                           Admitted Pro Hac Vice

                                           Kenneth A. Ehrlich (Bar #150570)
                                           ELKINS KALT WEINTRAUB REUBEN
                                           GARTSIDE LLP
                                           10345 W. Olympic Blvd
                                           Los Angeles, CA  90064
                                           (310) 746-4412
                                           (310) 746-4499 (facsimile)
                                           KEhrlich@elkinskalt.com
                                           Counsel for NL Industries, Inc.

1

## **<u>CERTIFICATE OF SERVICE</u>**

2

3       I certify that on August 16, 2021, I electronically transmitted the

4   foregoing document to the Clerk's Office using the CM/ECF system, which will

5   be sent electronically to all registered participants as identified on the Notice of

6   Electronic Filing.

7

8

9                             By: */s/ Joel L. Herz*_____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28