1    ROB BONTA
     Attorney General of California
2    SARAH E. MORRISON, SBN 143459
     TIMOTHY E. SULLIVAN, SBN 197054
3    Supervising Deputy Attorneys General
     DAVID ZAFT, SBN 237365
4    DENNIS A. RAGEN, SBN 106468
5    ELIZABETH B. RUMSEY, SBN 257908
     AARTI S. KEWALRAMANI, SBN 247068
6    DONALD A. ROBINSON, SBN 72402
     Deputy Attorneys General
7    300 South Spring Street Suite 1702
8    Los Angeles, CA 90013
     Phone: (213) 269-6372
9    Fax: (213) 897-2802
     E-mail: David.Zaft@doj.ca.gov
10

11   *Attorneys for Plaintiffs*
     *California Department of Toxic Substances Control*
12   *and the Toxic Substances Control Account*

13

14            IN THE UNITED STATES DISTRICT COURT

15          FOR THE CENTRAL DISTRICT OF CALIFORNIA

16               LOS ANGELES DIVISION

17

18   CALIFORNIA DEPARTMENT OF          2:20-cv-11293-SVW-JPR
     TOXIC SUBSTANCES CONTROL
19   and the TOXIC SUBSTANCES         **PLAINTIFF'S REPLY**
     CONTROL ACCOUNT,                 **MEMORANDUM IN SUPPORT OF**
20                                     **MOTION TO DISMISS**
                        Plaintiffs,   **DEFENDANTS'**
21                                     **COUNTERCLAIMS**

22        v.                          Date:        September 13, 2021
                                      Time:        1:30 p.m.
23   NL INDUSTRIES, INC., et al.,     Courtroom:   10A
                                      Judge:       Hon. Stephen V. Wilson
24                      Defendants.   Trial Date:  TBD
                                      Action Filed: December 14, 2020
25

26

27

28

1

# TABLE OF CONTENTS

2

Page

3

Introduction..................................................................................................1

4

Argument .....................................................................................................3

5      I.    Because Defendants Have Not Alleged Conduct that Would
             Make DTSC an Operator of the Vernon Plant, Their CERCLA

6            and HSAA Counterclaims Should Be Dismissed. ...........................3

7            A.    Post-Bestfoods, courts continue to dismiss CERCLA
                   claims against the government as an "operator" on a Rule
                   12(b)(6) motion to dismiss. .................................................3

8      II.   Cases Decided Both Before and After Bestfoods Have Rejected
             Claims that the Government is Liable as an "Operator" Under

9            CERCLA Because of its Regulatory Actions. .................................4

10           A.    Defendants' allegations are insufficient to establish
                   operator liability against DTSC under CERCLA or the

11                 HSAA..................................................................................9

12                 1.    DTSC's alleged actions regarding the hazardous
                         waste facility permit for the Vernon Plant are

13                       insufficient to give rise to "operator" liability. ........9

14                 2.    Allegations that DTSC "mismanaged" cleanup
                         actions are insufficient to establish DTSC was an

                         "operator." ...............................................................10

15           B.    Defendants' allegations of "operator" liability against

16                 DTSC also fail under the HSAA. .......................................14

17     III.  The Court Lacks Subject Matter Jurisdiction Over Defendants'
             Recoupment Counterclaims and Defendants Fail to State

             Adequate Negligence and Gross Negligence Claims. ....................14

18           A.    Defendants' recoupment counterclaims are not

19                 compulsory; they are not logically related to DTSC's
                   claims and, therefore do not waive DTSC's immunity

20                 from suit..............................................................................15

21                 1.    Recoupment counterclaims against the government
                         in CERCLA cases undermines Congressional

22                       intent. ......................................................................16

                   2.    The few CERCLA cases holding that recoupment

23                       counterclaims were compulsory are distinguishable. ....18

24                 3.    The timing of events provides a basis to reject a
                         "logical relationship."............................................20

25           B.    The HWCL does not impose mandatory duties on DTSC
                   to protect Defendants from financial liabilities under

26                 CERCLA.............................................................................21

                   1.    The HWCL was not designed to protect Defendants

27                       from financial injury...............................................21

28

i

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3       2.      California Health and Safety Code sections allow
               DTSC discretion in performing its enforcement
4              obligations. ..................................................................22

5       3.      California Health and Safety Code section 25400(b)
               does not create a mandatory duty...................................24

6    Conclusion ..........................................................................................25

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants'
Counterclaims (2:20-cv-11293-SVW-JPR)

# TABLE OF AUTHORITIES

**Page**

CASES

*AMW Materials Testing Inc. v. Town of Babylon*
348 F. Supp. 2d 4 (E.D.N.Y. 2004)................................................................7, 12

*Auto-Ion Litigation Group v. Auto-Ion Chemicals*
910 F. Supp. 328 (W.D.Mich. 1994)........................................................12, 13

*Berrey v. Asarco Inc.*
439 F.3d 636 (10th Cir. 2006) .......................................................................19

*California Department of Toxic Substances Control v. Jim Dobbas, Inc.*
No. 2:14-595 WBS EFB, 2014 WL 4627248 (E.D. Cal., Sept. 16, 2014)..................................................................................................................8, 9

*California Department of Toxic Substances Control v. Payless Cleaners*
No. 02-2389, 2007 WL 2580626 (E.D. Cal. Aug. 17, 2007) ...........................20

*Catellus Development Corporation v. United States*
34 F.3d 748 (9th Cir. 1994) ............................................................................16

*Center for Biological Diversity v. Department of Conservation*
26 Cal. App. 5th 161 (Cal. Ct. App. 2018)..........................................................23

*City of Waukegan, Illinois v. National Gypsum Co.*
560 F. Supp. 2d 636 (N.D.Ill. 2008)..................................................................4

*Eastburn v. Regional Fire Protection Authority*
31 Cal. 4th 1175 (Cal. 2003) .........................................................................24

*El Paso National Gas Co., LLC v. United States*
390 F. Supp. 3d 1025 (D. Ariz. 2019)...............................................................8

*Exxon Mobil Corporation v. U.S.*
108 F. Supp. 3d 486 (S.D.Tex. 2015)...........................................................8, 11

*Fedex Ground Package System, Inc. v. Ingenito*
86 F. Supp. 3d 1121 (E.D. Cal. 2015) ............................................................22

iii

**TABLE OF AUTHORITIES**
**(continued)**

Page

*FMC Corp. v. United States Dept. of Commerce*
  29 F.3d 833 (3d Cir. 1994) ...................................................................... 17

*Fox v. County of Fresno*
  170 Cal. App. 3d 1238 (Cal. Ct. App. 1985) ......................................... 23

*Haggis v. City of Los Angeles*
  22 Cal. 4th 490 (Cal. 2000) ............................................................. 22, 24

*In re Lazar*
  237 F.3d 967 (9th Cir. 2001) .................................................................. 20

*In re Madigan*
  270 B.R. 749 (B.A.P. 9th Cir. 2001) ..................................................... 15

*In re Pegasus Gold Corp.*
  394 F.3d 1189 (9th Cir. 2005) ............................................................... 20

*Jabo v. YMCA of San Diego County*
  27 Cal. App. 5th 853 (Cal. Ct. App. 2018) ........................................... 24

*Long Beach Unified School District v. Dorothy B. Godwin California
  Living Trust*
  32 F.3d 1364 (9th Cir. 1994) ............................................................... 5, 8

*New York v. General Electric Company*
  No. 14-747, 2015 WL 12748007 (N.D. N.Y. Sept. 2, 2015) ................. 15

*OHM Remediation Services v. Evans Cooperage Co., Inc.*
  116 F.3d 1574 (5th Cir. 1997) .................................................................. 2

*Osgood v. County of Shasta*
  50 Cal. App. 3d 586 (Cal. Ct. App. 1975) ............................................. 22

*PPG Industries Inc. v. United States*
  957 F.3d 395 (3d Cir. 2020) ..................................................................... 7

*Regents of University of California v. Superior Court*
  4 Cal. 5th 607 (Cal. 2018) ...................................................................... 25

iv

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3

*Sierra Club v. Whitman*

4

268 F.3d 898 (9th Cir. 2001) ................................................................. 22

5

*Steadfast Insurance Company v. United States*

6

No. 06-4686, 2009 WL 3785565 (C.D. Cal. Nov. 10, 2009) ........................ 7, 12

7

*Stilloe v. Almy Bros., Inc.*

8

782 F. Supp. 731 (N.D.N.Y. 1992) ........................................................ 4

9

*Thompson v. City of Lake Elsinore*

18 Cal. App. 4th 49 (Cal. Ct. App. 1993) ............................................... 22

10

*United States v. American Color and Chemical Corp.*

11

858 F. Supp. 445 (M.D. Pa. 1994) ................................................. 18, 19, 20, 21

12

*United States v. Amtreco, Inc.*

13

790 F. Supp. 1576 (M.D. Ga. 1992) ...................................................... 19

14

*United States v. Atlas Minerals and Chemicals, Inc.*

15

797 F. Supp. 411 (E.D. Pa. 1992) ......................................................... 17

16

*United States v. Azrael*

17

765 F. Supp. 1239 (D.C.Md. 1991) ............................................... 13, 14, 17

18

*United States v. Bestfoods*

19

524 U.S. 51 (1998) ............................................................... *passim*

20

*United States v. Conagra Grocery Products Company, LLC*

No. 11-455, 2014 WL 971780 ............................................................. 3

21

*United States v. Dart Industries, Inc.*

22

847 F.2d 144 (4th Cir. 1988) .............................................................. 4

23

*United States v. Green*

24

33 F. Supp. 2d 203 (W.D. N.Y. 1998) .............................................. 16, 18

25

*United States v. Iron Mountain Mines*

26

812 F. Supp. 1528 (E.D. Cal. 1993) ................................................ 15, 18

27

*United States v. Iron Mountain Mines, Inc.*

28

881 F. Supp. 1432 (E.D. Cal. 1995) ............................................. 16, 17, 18

v

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants'
Counterclaims (2:20-cv-11293-SVW-JPR)

**TABLE OF AUTHORITIES**
**(continued)**

Page

*United States v. Iron Mountain Mines, Inc.*
  952 F. Supp. 673 (E.D. Cal. 1996) ...................................................................... 19

*United States v. Montrose Chemical Corporation of California*
  788 F. Supp. 1485 (C.D. Cal. 1992) ...................................................... 18, 19, 21

*United States v. Moore*
  703 F. Supp. 455 (E.D. Va. 1988) ....................................................................... 19

*United States v. New Castle County*
  727 F. Supp. 854 (D.Del. 1989) ............................................................................. 5

*United States v. Placer Mining Corp.*
  No. 04-126, 2007 WL 1576559 (D. Idaho May 20, 2007) ........................... 16, 18

*United States v. Qwest Corporation*
  353 F. Supp. 2d 1048 (D.Minn. 2005) ................................................................... 3

*United States v. Rohm & Haas Co.*
  939 F. Supp. 1157 (D. N.J. 1996) ........................................................................ 16

*United States v. Skipper*
  781 F. Supp. 1106 (E.D. N.C. 1991) .................................................................... 17

*United States v. Sterling Centrecorp Inc.*
  977 F.3d 750 (9th Cir. 2020) ....................................................................... *passim*

*United States v. Sterling Centrecorp. Inc.*
  No. 08-02556, 2010 WL 6430190, *at 1 (E.D. Cal. Feb. 23, 2010) ................. 18

*United States v. Stringfellow*
  20 Envtl. L. Rep. 20656 (C.D.Cal. Jan. 9, 1990) ............................................ 7, 8

*United States v. Township of Brighton*
  153 F.3d 307 (6th Cir. 1998) ............................................................................. 7, 9

*United States v. Western Processing Co., Inc.*
  761 F. Supp. 725 (W.D. Wash. 1991) .................................................................. 17

*Washington v. County of Contra Costa*
  38 Cal. App. 4th 890 (Cal. Ct. App. 1995) ......................................................... 22

vi

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Wells Fargo Bank, N.A. v. Renz*
   795 F. Supp. 2d 898 (N.D. Cal. 2011)................................................................17

*Wood v. County of San Joaquin*
   111 Cal. App. 4th 960 (Cal. Ct. App. 2003) .........................................22, 24, 25

*Zepeda v. City of Los Angeles*
   223 Cal. App. 3d 232 (Cal. Ct. App. 1990).......................................................24

**STATUTES**

United States Code, Title 33
   § 1251 ................................................................................................................22

United States Code, Title 42
   § 9601 ..................................................................................................................1
   § 9607(a)(4) .......................................................................................................14

California Government Code
   § 810 ..................................................................................................................21
   § 810.8 ...............................................................................................................21
   § 815.6 ....................................................................................................21, 23, 24

California Hazardous Substances Account Act...............................................*passim*

California Health & Safety Code
   § 1799.106 .........................................................................................................24
   § 1799.107 .........................................................................................................24
   § 17980 ..............................................................................................................23
   § 25187 ..............................................................................................................10
   § 25187.1 ...........................................................................................................10
   § 25200(a)...........................................................................................................23
   § 25200.10 .........................................................................................................10
   § 25200.10(b)..........................................................................................15, 22, 23
   § 25200.11(a).........................................................................................15, 22, 23
   § 25205(b).............................................................................................15, 22, 23
   § 25300 ................................................................................................................1
   § 25323.5 ...........................................................................................................14
   § 25363(d) ..........................................................................................................17
   § 25400(b)...............................................................................................15, 24

1
2

# TABLE OF AUTHORITIES
## (continued)

**Page**

Comprehensive Environmental Response, Compensation, and Liability
    Act
    § 107 ..................................................................................... 4, 17
    § 107(a) ................................................................................... 1, 4
    § 107(a)(4) .................................................................................. 14
    § 107(b) ...................................................................................... 17
    § 113 ........................................................................................... 17
    § 113(f) ....................................................................................... 17

CONSTITUTIONAL PROVISIONS

United States Constitution Eleventh Amendment ........................... 14, 15

COURT RULES

Federal Rules of Civil Procedure
    Rule 12(b)(6) ............................................................................ 3, 4
    Rule 13(a) .................................................................................. 15

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants'
Counterclaims (2:20-cv-11293-SVW-JPR)

1    Plaintiffs California Department of Toxic Substances Control ("DTSC") and

2  the Toxic Substances Control Account ("Plaintiffs") respectfully submit this reply

3  memorandum in support of their Motion to Dismiss the counterclaims filed by

4  Defendants' Clarios, LLC ("Clarios") (ECF No. 50); International Metals Ekco,

5  LTD. ("International Metals Ekco") (ECF No. 55); Quemetco, Inc. ("Quemetco")

6  (ECF No. 53); Gould Electronics Inc. ("Gould") (ECF No. 60); Kinsbursky Bros.

7  Supply, Inc. ("Kinsbursky") (ECF No. 58); Ramcar Batteries, Inc. ("Ramcar")

8  (ECF No. 51); and Oregon Tool, Inc. ("Oregon Tool") (ECF No. 59) (collectively

9  "Defendants").

10                    **INTRODUCTION**

11    Defendants' oppositions to DTSC's motion to dismiss[1] primarily rest on an

12  erroneous interpretation of "operator" liability under the Comprehensive

13  Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.

14  §§ 9601 et seq., and the Hazardous Substance Account Act (HSAA), Cal. Health &

15  Safety Code §§ 25300 et seq. This interpretation, if accepted by the Court, would

16  impose sweeping liability on the federal, state, and local government agencies

17  charged with protecting public health and the environment from the dangers of

18  hazardous substances whenever they exercise their statutory authority to require or

19  undertake environmental investigations and cleanups. Defendants' interpretation of

20  "operator" liability under CERCLA section 107(a) and the HSAA would

21  discourage government agencies from taking action in response to releases of

22  hazardous substances out of a concern that aggressive regulation and remedial

23  action would subject it to liability, thereby exacerbating the risks faced by the

24  public and the environment from the hazardous substance contamination.

25        [1] Five defendants filed memoranda in opposition to Plaintiffs' Motion to
26  Dismiss Defendants' Counterclaims: Clarios (ECF No. 106); Quemetco (ECF No.
   108); Gould, which joined in portions of Clarios's and Quemetco's oppositions
27  (ECF No. 110, at 2); with one additional argument; International Metals Ekco (ECF
   Nos. 107, 112); and Oregon Tool (ECF No. 109). Kinsbursky and Ramcar filed
28  joinders in the oppositions filed by Clarios and Quemetco (ECF Nos. 104 and 105).

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants'
Counterclaims (2:20-cv-11293-SVW-JPR)

Such a result would thwart the will of Congress, which, when it enacted CERCLA in 1980, sought to hold those who engage in commerce involving hazardous substances legally responsible for the environmental consequences resulting from their activities. "CERCLA's broad, remedial purpose [with respect to liable parties] is to shift the cost of environmental response from the taxpayers to the parties who benefitted from the wastes that caused the harm." *OHM Remediation Services v. Evans Cooperage Co., Inc.* 116 F.3d 1574, 1578 (5th Cir. 1997).

Defendants' oppositions cite a litany of allegations of DTSC actions and inaction regarding its regulation of the Vernon Plant. Defendants' glaring omission, however, is their failure to allege that DTSC ever engaged in, operated, or directed the hands-on, day-to-day operation of the furnaces, battery dismantling equipment and lead recovery equipment at the Vernon Plant that would make DTSC an "operator" of that plant. Also absent from Defendants' counterclaims is any allegation that DTSC built or financed the Vernon Plant; that DTSC hired or fired employees at the plant; that DTSC made managerial decisions with regard to customers, working hours, output, purchase of equipment, prices for recovered lead, or investment of profits; or that DTSC decided whether and how the *actual* operators would comply with the requirements necessary for the Vernon Plant to receive a hazardous waste facility permit. Without allegations of DTSC's active involvement in running the lead recovery business, Defendants' allegations of DTSC's regulation of the Vernon Plant are insufficient to support a claim that DTSC was an "operator" of the Vernon Plant, as defined in CERCLA and the HSAA.[2]

Defendants' contentions in support of their counterclaims for recoupment, negligence and gross negligence also fail because those counterclaims are not

---

[2] It is telling that the Defendants seem unable to decide whether their theory is based on the alleged absence of regulation by DTSC or on DTSC's extensive regulation.

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants' Counterclaims (2:20-cv-11293-SVW-JPR)

1  logically related to DTSC's claims, do not impose mandatory duties on DTSC, and

2  do not arise under any statute specifically designed to protect against financial

3  injuries.

4      Because all of Defendants' counterclaims fail as a matter of law, they should

5  be dismissed.

6                                **ARGUMENT**

7  **I.   BECAUSE DEFENDANTS HAVE NOT ALLEGED CONDUCT THAT WOULD**
       **MAKE DTSC AN OPERATOR OF THE VERNON PLANT, THEIR CERCLA**
8      **AND HSAA COUNTERCLAIMS SHOULD BE DISMISSED.**

9      **A.   Post-*Bestfoods*, courts continue to dismiss CERCLA claims**
            **against the government as an "operator" on a Rule 12(b)(6)**
10          **motion to dismiss.**

11     Defendants argue that whether the government is an "operator" is a factual

12  determination that should not be made at the motion to dismiss stage.[3] However,

13  courts have dismissed such claims at this stage, and, contrary to Defendant'

14  mistaken position that the decision in *United States v. Bestfoods*, 524 U.S. 51

15  (1998), imposed a higher bar on deciding the "operator" issue, courts have

16  continued to reject "operator" liability claims against the government on a Rule

17  12(b)(6) motion to dismiss. For example, in *United States v. Qwest Corporation*,

18  353 F. Supp. 2d 1048, 1051–53 (D.Minn. 2005), the court dismissed a cost

19  recovery action against an utility company and its drilling subcontractor on a Rule

20  12(b)(6) motion where the plaintiff contended their drilling operations, resulted in

21  the release of hazardous substances into the environment, thereby making them

22  "operators." *See also United States v. Conagra Grocery Products Company, LLC*,

23  No. 11-455, 2014 WL 971780, at *4–*6 (D.Maine Mar. 12, 2014) (dismissing

24  Conagra's counterclaims on Rule 12(b)(6) motion where Conagra alleged United

25  States was an "operator" under CERCLA because it financed the development of

26  the tannery facility, permitted its operations, and approved and ratified agreements

27  ───────────
       [3] *See, e.g.*, Clarios's opposition (ECF No. 106, at 12–13); International
28  Metals Ekco's opposition (ECF No. 107, at 12–13; Oregon Tools' opposition (ECF
    No. 109, at 10–12).

                                    3

that transferred ownership of the tannery); *City of Waukegan, Illinois v. National Gypsum Co.*, 560 F. Supp. 2d 636, 641–43 (N.D.Ill. 2008) (dismissing City's CERCLA section 107 claim against the Port District under Rule 12(b)(6) despite allegations that the District had the authority to regulate deep-draft vessels that had displaced contaminants in the harbor). These decisions discussed the *Bestfoods* holding, but nonetheless dismissed actions under Rule 12(b)(6) alleging "operator" status because the allegations were insufficient to state a claim upon which relief could be granted.

Therefore, it is entirely appropriate for this Court to dismiss Defendants' counterclaims on a Rule 12(b)(6) motion to dismiss.

## II.   CASES DECIDED BOTH BEFORE AND AFTER *BESTFOODS* HAVE REJECTED CLAIMS THAT THE GOVERNMENT IS LIABLE AS AN "OPERATOR" UNDER CERCLA BECAUSE OF ITS REGULATORY ACTIONS.

The fundamental flaw in Defendants' contention is that DTSC is liable as an "operator" under CERCLA solely because of the extent of its regulation and cleanup of the hazardous substance contamination at and surrounding the Vernon Plant. A government regulator performing its functions properly, and indeed aggressively, is expected to be *extensively* involved at the most heavily contaminated sites. Contrary to Defendants' position, such involvement by itself does not automatically give rise to CERCLA "operator" liability. It is critical, therefore, to distinguish—legally and factually—which actions by a government cross the line from regulator to "operator."

Numerous pre-*Bestfoods* decisions rejected claims that government agencies exercising their regulatory and cleanup authority to prevent and remediate hazardous substance contamination are "operators" under CERCLA section 107(a).[4] Defendants contend, however, that *Bestfoods* established a new test for

---

[4] *See, e.g., United States v. Dart Industries, Inc.,* 847 F.2d 144 (4th Cir. 1988), and *Stilloe v. Almy Bros., Inc.*, 782 F. Supp. 731 (N.D.N.Y.

1  CERCLA "operator" liability. *See, e.g.*, ECF 106 at p. 5. Yet none of the pre-

2  *Bestfoods* cases cited in note 4, above, have been overruled or seriously questioned

3  following the Supreme Court's ruling; consequently, they remain good law on the

4  proper resolution of the "operator" issue when applied to government regulatory

5  agencies. Indeed, in *United States v. Sterling Centrecorp Inc.*, 977 F.3d 750 (9th

6  Cir. 2020), the Ninth Circuit recently rejected the contention that the United States

7  was liable as a CERCLA "operator." *Sterling Centrecorp* cited with approval its

8  earlier ruling in *Long Beach Unified School District v. Dorothy B. Godwin*

9  *California Living Trust*, 32 F.3d 1364 (9th Cir. 1994), in the same paragraph that it

10  discussed the *Bestfoods* decision. 977 F.3d at 758.

11        Plaintiffs do not deny that the Supreme Court held in *Bestfoods* that "operator"

12  liability can be applied to government agencies, but the factual context in that case

13  must be considered. *Bestfoods* concerned the actions of a corporate parent over a

14  subsidiary, and not a government environmental agency authority over a private

15  hazardous waste facility. Accordingly, *Bestfoods* must be applied thoughtfully,

16  recognizing that the parent/subsidiary context is very different from the

17  regulator/regulated context.

18        In *Bestfoods*, the Supreme Court explained that "an operator must manage,

19  direct, or conduct operations specifically related to pollution, that is, operations

20  having to do with the leakage or disposal of hazardous waste, or decisions about

21  compliance with environmental regulations." 524 U.S. at 66. Of course, a

---

22  1992). Both cases reject government liability for engaging in cleanup

23  activities, even when these actions were allegedly negligent. *See also United States v. New Castle County*, 727 F. Supp. 854 (D.Del. 1989), in which the

24  court was "convinced that certain factors should be considered in determining whether to impose operator status," including whether the

25  government controlled the finances of the facility; managed employees of the facility; managed the daily business operations of the facility; was

26  responsible for the maintenance of environmental control at the facility; and conferred or received any commercial or economic benefit from the facility

27  other than the payment or receipt of taxes. 727 F. Supp. at 869. The court found that the allegations by the defendants against the State of Delaware,

28  even if true, did not establish "operator" liability under CERCLA.

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants'
Counterclaims (2:20-cv-11293-SVW-JPR)

government regulator charged with hazardous waste enforcement is always involved in "operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations" at a hazardous waste facility, indeed sometimes heavily involved. *Id.* Such involvement is essential to a government regulator charged by law to apply the rules by which a private entity must operate. The legislative authority granted to the agency typically includes compelling the facility to comply with the hazardous waste laws by issuing orders, permits, and fines.

However, the mission of an agency like DTSC, and its relation to the facility, are quite different from those of a parent company, which balances profits and financial and legal risks to determine how and whether to comply with environmental regulations. Accordingly, statements in *Bestfoods* about making "decisions about compliance with environmental regulations" must be considered in this context and should not be applied to impose "operator" liability on a government regulator that is always—via the act of regulating—approving permits and plans, and issuing orders, fines and citations, based on the regulator's decision about whether the operator is in "compliance with environmental regulations." A close look at the facts of the CERCLA "operator" cases reveals the common thread that liability results when *the person, including the government, engaged in activities like a business, with the ability to decide the balance between a facility's profits and production and environmental protection*. Defendants do not and cannot allege that DTSC has ever engaged in such activity with respect to the Vernon Plant.

In *Sterling Centrecorp Inc.*, *supra*, the Ninth Circuit explained that "[t]he definition of 'operator' in *Bestfoods* clarifies that *actual participation* in decisions related to pollution is necessary for a finding of liability." 977 F.3d at 758 (emphasis added). Citing *Long Beach Unified School District*, the court explained "[w]e have similarly held that '[t]o be an operator of a hazardous waste facility, a

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants' Counterclaims (2:20-cv-11293-SVW-JPR)

1   party must do more than stand by and fail to prevent the contamination. [*The party*]
2   *must play an active role in running the facility*, typically involving hands-on, day-
3   to-day participation in the facility's management.'" 977 F.3d at 758 (emphasis
4   added) *citing* 32 F.3d at 1367.

5          Numerous other courts have declined to find a government entity liable as an
6   "operator" following *Bestfoods*. *See AMW Materials Testing Inc. v. Town of*
7   *Babylon*, 348 F. Supp. 2d 4 (E.D.N.Y. 2004), affirmed on appeal, 584 F.3d 436 (2d
8   Cir. 2009) (holding that a state agency was not an operator solely by conducting
9   inspections and issuing permits); *Steadfast Insurance Company v. United States*,
10  No. 06-4686, 2009 WL 3785565, at *6–*8 (C.D. Cal. Nov. 10, 2009) ("Even
11  accepting [the] contention that the DOD Safety Manual did direct [the facility's]
12  employees as to how to perform their waste disposal duties, courts have
13  consistently held that contract provisions, specifications, and even mandates . . . are
14  insufficient to show 'direction' or 'control' over waste disposal for purposes of
15  establishing operator liability."); *PPG Industries Inc. v. United States*, 957 F.3d
16  395, 404 (3d Cir. 2020) (The government's awareness of the unsafe waste disposal
17  practices that led to the contamination is not a sufficient allegation of the
18  government's liability under CERCLA because it "is not the same as undertaking
19  that practice . . . ."; *United States v. Township of Brighton*, 153 F.3d 307, 314 (6th
20  Cir. 1998) (to find the township liable as an operator, there must be some "actual
21  control"—i.e., the performance of "affirmative acts").[5]  The common thread in
22  these cases is that the courts did not find evidence that the government actively
23  controlled operations that resulted in, or contributed to, releases of hazardous
24  substances from the facility.

25         Government actions sometimes can rise to a level that equates closer to
26  CERCLA "operator" liability, such as in *United States v. Stringfellow*, 20 Envtl. L.

27  _____
          [5] *Township of Brighton* was decided the same year as *Bestfoods*, yet it
28  discussed the *Bestfoods* decision extensively and still found the township not liable
    as an operator.

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants'
Counterclaims (2:20-cv-11293-SVW-JPR)

Rep. 20656 (C.D.Cal. Jan. 9, 1990), one of the two cases Defendants rely upon. In

the *Stringfellow* case, the government effectively acted like a business owner in

locating the site, persuading a quarry operator to use the property for waste

disposal, designing the facility, overseeing its construction, and promoting its use

by the arrangers for waste disposal. *Stringfellow*, at 20657–58. By contrast,

Defendants have not alleged that DTSC engaged in any of these types of activities

at the Vernon Plant.

The other case that Defendants rely upon is *California Department of Toxic

Substances Control v. Jim Dobbas, Inc.*, No. 2:14-595 WBS EFB, 2014 WL

4627248 (E.D. Cal., Sept. 16, 2014). In the *Dobbas* case, the district court denied

DTSC's motion to dismiss a CERCLA counterclaim, finding that the defendant's

allegations that DTSC issued and implemented remedial action plans at the facility

"could plausibly constitute management or direction of operations there." *Id.* at *3.

*Dobbas* has been criticized, however, as unhelpful guidance. *El Paso Nat. Gas Co.,

LLC v. United States*, 390 F. Supp. 3d 1025, 1046 n.18 (D. Ariz. 2019) (*Dobbas* is

"not helpful . . . [because] [t]he case did not attempt to specify what level of

involvement is necessary to trigger CERCLA liability and provides no

guidance . . ."). Additionally, while the *Dobbas* court was dismissive of the

interpretation of "operator" in *Long Beach Unified School District* because it pre-

dated *Bestfoods*, the Ninth Circuit does not share that view. *See Sterling

Centrecorp*, 977 F.3d at 758, *citing Long Beach Unified,* 32 F.3d 1364, with

approval in the same paragraph as its discussion of the *Bestfoods* decision.[6]

--------

[6] An example of factual allegations against the government sufficient for
"operator" liability is *Exxon Mobil Corp. v. U.S.*, 108 F. Supp. 3d 486 (S.D.Tex.
2015). In that case, the court absolved the United States of liability for its
involvement in certain wartime refineries because the evidence showed that "the
government did not hire, fire, or otherwise manage the refineries' employees" and
did not design[], specif[y], or provide[] the refineries" equipment. *Id.* at 526.
However, with respect to the rubber plant operations, the United States was held
liable as an "operator" because it approved the plant designs and oversaw day-to-
day operations, and Exxon had to get prior government approval for expenses over
$1,000, disposal actions, and wage and salary increases. *Id.* at 531.

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants'
Counterclaims (2:20-cv-11293-SVW-JPR)

Accordingly, the Court should decline to follow the *Dobbas* decision because, as discussed below, there are no allegations that DTSC was actively involved in running the Vernon Plant's battery recycling business with "hands-on, day-to-day participation."

> **A.** **Defendants' allegations are insufficient to establish operator liability against DTSC under CERCLA or the HSAA.**
>
> > **1.** **DTSC's alleged actions regarding the hazardous waste facility permit for the Vernon Plant are insufficient to give rise to "operator" liability.**

Defendants' allegations of DTSC's regulatory actions related to the hazardous waste permit applications and modification requests for the Vernon Plant are consistent with DTSC's statutory and regulatory authority and do not provide a basis for holding DTSC liable as an "operator" of the plant.[7]

Defendants suggest that DTSC should have made different decisions during its review of the Part A permit application for the Vernon Plant, or that DTSC failed to act expeditiously during the permit application process. Inaction, however, does not make a government agency an "operator" under CERCLA. *Township of Brighton*, *supra*, 153 F.3d at 314 ("Before one can be considered an 'operator' for CERCLA purposes, one must perform affirmative acts. The failure to act, even when coupled with the ability or authority to do so, cannot make an entity into an operator."); *Sterling Centrecorp Inc.*, 977 F.3d at 758 ("We have similarly held that '[t]o be an operator of a hazardous waste facility, a party must do more than stand by and fail to prevent the contamination.'"). For example, defendants' allege that DTSC's failure to secure financial assurances for the Vernon Plant somehow transformed DTSC into an "operator" of the plant.[8] Yet, an allegation that DTSC did not secure

---

[7] Clarios Counterclaim (ECF 50, at ¶¶ 11–46); Int'l Metals Ekco Counterclaim (ECF 55, at ¶¶ 11–47); Oregon Tools Counterclaim (ECF 59, at ¶¶ 9–19).

[8] See, e.g., Clarios counterclaim (ECF 50, at ¶¶ 47-60); Int'l Metals Ekco counterclaim (ECF 55, at ¶¶ 47–60; Gould counterclaim (ECF 60, at ¶¶ 47–62).

9

those assurances is precisely that—i.e., an omission—and not the type of
affirmative act necessary for a determination that DTSC was an "operator" of the
plant. In sum, all of Defendants' allegations regarding DTSC's failure to act are
inadequate to establish "operator" liability as to DTSC.

**2.    Allegations that DTSC "mismanaged" cleanup actions are
insufficient to establish DTSC was an "operator."**

As an initial matter, Defendants' contention that DTSC allegedly mismanaged
the cleanup is contradicted by Defendants' acknowledgment that DTSC has taken
extensive regulatory actions to remedy contamination at the plant and in the
surrounding community. Defendants allege, and thus acknowledge, that DTSC
released an offsite interim measures work plan; released a final time-critical
removal action implementation plan for offsite properties; issued a cleanup plan for
offsite properties; released an amended final offsite remedial measures work plan;
released a final amended time-critical removal action implementation plan; and,
since late 2015, performed cleanups at more than 2,000 offsite sensitive land use
properties in the area surrounding the Vernon Plant. Clarios Opp. (ECF 106, at pp.
6–8). Prior to those actions, DTSC issued a Corrective Action Consent Order
("CACO") in 2002 requiring Exide Technologies LLC ("Exide") to promptly carry
out certain corrective actions.[9]

In a fit of hyperbole, however, Defendants erroneously assert that, by issuing
the CACO, "DTSC 'seized control' of most environmental operations at the
facility, and . . . used its control to approve and issue a slew of environmental
mandates." *See, e.g.*, ECF 106, at p. 8. Defendants misunderstand the CACO and
exaggerate DTSC's authority as a regulator. DTSC did not "seize control of most
environmental operations at the facility" when it approved the CACO. First, in
approving the order, DTSC acted pursuant to its express authority in California

---

[9] Corrective Action Consent Order, ¶ 1.6, Exh. 1 to Clarios Opp., (ECF No.
106-1).

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants'
Counterclaims (2:20-cv-11293-SVW-JPR)

1   Health and Safety Code sections 25187, 25187.1, and 25200.10. CACO (Exh. 1 to

2   Clarios Opp., (ECF No. 106-1)), ¶ 1.3. Second, Exide voluntarily agreed to the

3   CACO in order "to avoid the expense of litigation and to carry out promptly the

4   corrective action described" in the order. *Id.*, ¶ 1.6. Exide agreed "to implement all

5   approved work plans and to undertake all actions required by" the order. *Id.*, ¶ 1.6.

6   Far from "seizing control," DTSC merely "reserve[d] the right to perform any

7   portion of the work [Exide] consented to [in the 2002 order] or any additional site

8   characterization, feasibility study, and/or remedial actions it deems necessary to

9   protect human health and/or the environment." *Id.*, ¶ 20.3. Thus, as the owner and

10  operator of the facility, Exide remained in control of "environmental operations" at

11  the facility, including whether and how to comply with the CACO's provisions.

12      Moreover, the CACO did not establish or alter Exide's battery recycling

13  operations or its hazardous waste disposal practices. Although Defendants make the

14  vague, unsubstantiated assertion in their oppositions that DTSC "seize[d] control of

15  most *environmental operations* at the facility" (*see* Clarios Opp., at p. 8 (emphasis

16  added) (ECF No. 106)), they do *not* allege that the CACO, or DTSC's subsequent

17  actions, actually controlled or directed the manner in which Exide's battery

18  recycling operations or its hazardous waste disposal practices were carried out. And

19  the CACO itself does not do this.

20      Quemetco does allege that "DTSC . . . ha[s] been *actively, continuously, and

21  closely involved in managing* the treatment, storage, and/or disposal of hazardous

22  materials" at the Vernon Plant. ECF 53 at ¶ 5 (emphasis added). But Quemetco's

23  further allegations show that DTSC's alleged actions are nothing more than the

24  typical regulatory conduct of any environmental agency: "DTSC *imposed specific

25  requirements* for treatment, storage, handling, transportation, and/or discharge of

26  hazardous substances at the Vernon Plant." *Id.*, ¶ 6 (emphasis added); *see also*

27  Quemetco Opp. (ECF No. 108 at p. 4). As explained in Section I.B., above, the

28  imposition of requirements by a regulatory agency is insufficient to support the

1    government's "operator" status. *AMW Materials Testing*, 348 F. Supp. 2d at 4;

2    *Steadfast Insurance Company,* 2009 WL 3785565 at *6–*8. Hazardous waste

3    facilities that present persistent contamination problems are—and should be—

4    subject to rigorous government oversight, and the regulator's exercise of such

5    oversight authority does not, by itself, subject the agency to liability under

6    CERCLA. Simply put, the type of actions DTSC is alleged to have taken do not

7    amount to "the hands-on, day-to-day participation in the facility's management"

8    that gives rise to "operator" liability. *Sterling Centrecorp*, 977 F.3d at 758.

9          Next, Defendants attempt to characterize DTSC's attempts to *remedy* releases

10   of hazardous substances from the plant and *prevent* further releases as evidence that

11   DTSC somehow is a CERCLA "operator." Such a contention is counterintuitive

12   and illogical. Allegations that DTSC "mismanaged" the remedial actions it

13   undertook do not give rise to operator liability. *Auto-Ion Litigation Group v. Auto-*

14   *Ion Chemicals*, 910 F. Supp. 328, 332 (W.D.Mich. 1994) ("Congress did not intend

15   to create liability for federal and state government entities who are only involved in

16   clean-up, even if those entities' actions in the clean-up are negligent.").[10] [11]

17         In *Auto-Ion*, the court explained that the government's participation in the

18   cleanup of a hazardous waste site does not lead to "operator" liability:

19              [I]n cases where the federal or state governmental entity's only

20              involvement at a site is in its participation in the cleanup, done in a

21              regulatory and remedial capacity, those entities are immune from

22              liability notwithstanding hands-on involvement in any clean-up

23              activities. [Citations omitted.] To establish liability for state and

24   ─────────────────
         [10] Even though *Auto-Ion* predates *Bestfoods*, the court reached this
25   conclusion after accepting the allegation that the government's "hands-on approach
     to managing the clean-up activities" and its demolition of certain structures at the
     site was deemed to be "active participation." 910 F. Supp. at 332.
26       [11] Defendants do not explain how DTSC's expenditures from the State's
     General Fund, which Defendants allege are evidence of cleanup mismanagement in
27   the affected community, have any bearing on whether DTSC was an "operator" of
     the Vernon Plant.
28

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants'
Counterclaims (2:20-cv-11293-SVW-JPR)

1    federal governmental entities for carrying out their clean-up duties

2    would contradict the policies of CERCLA. Congress' intent under

3    CERCLA was to "ensure that those who benefit financially from a

4    commercial activity should internalize the health and environmental

5    costs of that activity into the costs of doing business."

6    *Auto-Ion*, 910 F. Supp. at 331–32 (citing *United States v. Azrael*, 765 F. Supp.

7    1239, 1245 (D.C.Md. 1991)). As the post-*Bestfoods* cases cited above demonstrate,

8    the court's reasoning in *Auto-Ion* remains valid.

9         Notably, none of Defendants' counterclaims allege that DTSC took or

10   required any *specific action* that resulted in the release of lead from the Vernon

11   Plant onto the facility property or into the surrounding neighborhoods.[12] There is no

12   allegation that DTSC operated the furnaces at the Vernon Plant that allowed lead

13   and other contaminants to escape into the soil and air. There is no allegation that

14   DTSC was present at the Vernon Plant on a daily basis while batteries and other

15   materials were melted down and while lead and other contaminants were released

16   into the environment through the furnace smokestacks. And there are certainly no

17   allegations that DTSC was involved in the typical "business" decisions involving

18   employees, customers, profits and losses, or whether the Vernon Plant should

19   comply with DTSC's regulatory dictates. Indeed, the allegations concerning the

20   cleanup involve actions that DTSC allegedly took *after* the plant—and its pollution-

21   causing operations—ceased entirely.

22        At its core, Defendants' "mismanagement" argument is not the basis for a

23   counterclaim but instead a basis for arguing that certain of DTSC's cleanup costs

24   are not recoverable. Defendants will have the opportunity to prove that DTSC's

25   _____

26   [12] The allegation in paragraph 6 of the Quemetco Counterclaim (ECF No. 103) that "DTSC directed the excavation, movement, and/or dispersal of contaminated soil, dust, and other substrates at, from, and/or near the Vernon Plant"

27   does not allege that DTSC's actions, as described, resulted in the release of hazardous substances from the Vernon Plant.

28

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants' Counterclaims (2:20-cv-11293-SVW-JPR)

1    cleanup actions were inconsistent with the National Oil and Hazardous Substances

2    Pollution Contingency Plan ("NCP"), and therefore not recoverable. *See, United*

3    *States v. Azrael*, 765 F. Supp. at 1245–46 (dismissing defendants' contribution

4    counterclaims against Environmental Protection Agency ("EPA") and Maryland

5    because section 107(a)(4) of CERCLA, 42 U.S.C. 9607(a)(4), "establishes that

6    [NCP non-compliance is] the *exclusive* method by which allegedly improper

7    cleanup activity of the EPA or a state affects the [government's] ability to recover

8    cleanup costs from the liable parties") (emphasis added).

9
          **B.**    **Defendants' allegations of "operator" liability against DTSC
10                also fail under the HSAA.**

11        Defendants' Counterclaim Three seeks indemnity and contribution under

12    California's HSAA, specifically section 25323.5 of the California Health and

13    Safety Code. That section of the HSAA, however, incorporates the definitions of

14    "responsible party" or "liable person" found in CERCLA. Accordingly, the

15    argument above, as to why DTSC should not be considered an "operator" under

16    CERCLA, applies with equal force to its liability under the HSAA.

17   **III.**  **THE COURT LACKS SUBJECT MATTER JURISDICTION OVER
           DEFENDANTS' RECOUPMENT COUNTERCLAIMS AND DEFENDANTS FAIL
18          TO STATE ADEQUATE NEGLIGENCE AND GROSS NEGLIGENCE CLAIMS.**

19        Defendants assert several arguments in opposition to DTSC's motion to

20    dismiss Counterclaims Four and Five, all of which fail.

21        Defendants' state law recoupment counterclaims (*see, e.g.*, ECF No. 50,

22    Counterclaims ¶¶ 98, 105; *see also* ECF 87, p. 15) are not "logically related" to

23    DTSC's CERCLA and HSAA cost recovery claims; rather, they are based on

24    different occurrences—the Vernon Plant operations versus DTSC post-operation

25    cleanup actions. Absent a logical relationship, the recoupment counterclaims are

26    not compulsory and do not necessitate any waiver of Eleventh Amendment or

27    sovereign immunity. This result is consistent with CERCLA, Congressional intent,

28

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants'
Counterclaims (2:20-cv-11293-SVW-JPR)

and case law. Defendants even acknowledge Counterclaim Five is actually a claim for setoff (*see, e.g.*, ECF No. 106, p. 25), which is permissive and properly subject to dismissal. See *United States v. Iron Mountain Mines*, 812 F. Supp. 1528, 1551–52 (E.D. Cal. 1993).

Additionally, no duty exists under the state Hazardous Waste Control Law ("HWCL"), Health and Safety Code sections 25100 et seq., that would mandate DTSC protect Defendants from financial injury caused by disposing of hazardous substances at the Vernon Plant. In particular, Defendants assert that DTSC violated alleged duties under Health and Safety Code sections 25200.11(a), 25200.10(b), and 25205(b) (*see, e.g.*, ECF No. 50, counterclaims ¶¶ 20, 40–44, 50–52, 92–96; ECF No. 106, p. 20; ECF No. 108, p. 7), but any duties DTSC may have under these HWCL provisions are discretionary, and these statutes are not designed to protect potential responsible parties ("PRPs") against the financial liability that CERCLA and the HSAA impose. Further, the language of Health and Safety Code section 25400(b) does not establish a mandatory duty for DTSC to enforce particular HWCL provisions. For these reasons, dismissal of Defendants' negligence and gross negligence counterclaims is warranted.

**A. Defendants' recoupment counterclaims are not compulsory; they are not logically related to DTSC's claims and, therefore do not waive DTSC's immunity from suit.**

The government may waive immunity from suit under the Eleventh Amendment and the doctrine of sovereign immunity with respect to compulsory counterclaims when it files suit in federal court. *See New York v. General Electric Company*, No. 14-747, 2015 WL 12748007, at *11 (N.D. N.Y. Sept. 2, 2015). The "logical relationship test [] applied under Fed. R. Civ. P. 13(a)" determines whether a counterclaim is compulsory, "i.e., whether the claim 'arises out of the transaction or occurrence that is the subject matter of the opposing party's claim.'" *Id.* If a "logical relationship exists," then a recoupment counterclaim is compulsory;

however, setoff remains a permissive counterclaim. *See In re Madigan*, 270 B.R. 749, 755 (B.A.P. 9th Cir. 2001).

Waiver of DTSC's immunity from suit has not occurred here because Defendants' recoupment counterclaims are not compulsory. As stated in DTSC's motion (ECF No. 87, pp. 15–17), the recoupment counterclaims are not "logically related" to DTSC's claims for recovery of cleanup costs because the events underlying DTSC's claims occurred after the hazardous substances were released from the Vernon Plant and are based on CERCLA, while the events underlying Defendants' counterclaims occurred before DTSC's cleanup and are based on a separate state law. *See United States v. Iron Mountain Mines, Inc.*, 881 F. Supp. 1432, 1456 (E.D. Cal. 1995) ("*Iron Mountain Mines II*") (declining to extend recoupment counterclaim where "made under another legal regime"); *United States v. Green*, 33 F. Supp. 2d 203, 225 (W.D. N.Y. 1998) (rejecting counterclaim where defendants sought to recoup costs unrelated to the later cleanup); *United States v. Placer Mining Corp.*, No. 04-126, 2007 WL 1576559, at * 3 (D. Idaho May 20, 2007) (negligence counterclaims were not logically related to CERCLA cost recovery claims).

### 1. Recoupment counterclaims against the government in CERCLA cases undermines Congressional intent.

Congress intended CERCLA to avoid the absurd result Defendants' recoupment counterclaims would lead to: taxpayers bearing financial responsibility whenever private industry suffers financial liability for the contamination it caused because the government allegedly failed to prevent the contamination.[13] *See United States v. Rohm & Haas Co.*, 939 F. Supp. 1157, 1162–63 (D. N.J. 1996) (holding

---

[13] Defendants suggest they were "just [] lawful recycling customers" and "innocent victim[s]" (*see, e.g.,* ECF No. 106, p. 20), but even recyclers of materials containing hazardous waste are liable under CERCLA. *See, e.g., Catellus Development Corp. v. United States*, 34 F.3d 748, 749, 752–53 (9th Cir. 1994) (finding party who sold scrap batteries for recycling liable under CERCLA).

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants' Counterclaims (2:20-cv-11293-SVW-JPR)

that "allowing recoupment claims in effect allows remnants of the common law to infect what Congress meant to establish with CERCLA" because CERCLA provides "clear statutory relief"); *FMC Corp. v. United States Dept. of Commerce*, 29 F.3d 833, 841 (3d Cir. 1994) (noting CERCLA was not meant to make the government liable for regulatory activities undertaken to clean up hazardous substances that would not exist but for generators and transporters of hazardous waste).

Specifically, CERCLA limits challenges to the government in cost recovery actions to the defenses listed in CERCLA Section 107(b), and/or to challenges that assert CERCLA section 113(f) contribution, inconsistency with the NCP, and divisibility of harm. *See, e.g., United States v. Atlas Minerals and Chemicals, Inc.*, 797 F. Supp. 411, 418 (E.D. Pa. 1992) (noting Congress intended NCP inconsistency to be the sole method to challenge cleanup activities); *Azrael*, 765 F. Supp. at 1244–46 (finding Congress intended only to allow those defenses enumerated in CERCLA section 107(b) in a government cost recovery action); *Iron Mountain Mines II*, 881 F. Supp. at 1444, 1447 (noting CERCLA limits claims to adjust liability to those for contribution under section 113).

Further, "Section 107 cannot be considered a waiver of sovereign immunity for the purpose of charging the [government] with negligence . . . under CERCLA;" and, in fact, Congress rejected negligence as a separate defense to CERCLA. *See United States v. Western Processing Co., Inc.*, 761 F. Supp. 725, 729–30 (W.D. Wash. 1991) (approving of cases holding the government cannot be liable for negligent enforcement of environmental laws); *see also United States v. Skipper*, 781 F. Supp. 1106, 1112–13 (E.D. N.C. 1991) (noting NCP inconsistency is the proper vehicle to resolve purported government tort liability). HSAA, the state counterpart to CERCLA (see *Wells Fargo Bank, N.A. v. Renz*, 795 F. Supp. 2d 898, 910 (N.D. Cal. 2011)), contains a contribution provision (Health and Safety Code

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants' Counterclaims (2:20-cv-11293-SVW-JPR)

1    Section 25363(d)); so by extension, the rationale for limiting claims under

2    CERCLA applies equally to HSAA.

3         Because CERCLA was not intended to place the burden of cleaning up

4    contamination on the taxpayer, some courts have held the relationship between

5    recoupment counterclaims and cost recovery claims too attenuated to be logically

6    related. *See, e.g., Placer Mining Corp.*, 2007 WL 1576559 at *3, *7–8 (holding

7    "the acts underlying [the] need for remediation and the conduct of such clean up

8    activity is too attenuated to demonstrate that the counterclaims are compulsory");

9    *United States v. American Color and Chemical Corp.*, 858 F. Supp. 445, 450–51

10   (M.D. Pa. 1994) (recoupment claim alleging EPA was liable under CERCLA based

11   on its remedial activities at the site was not allowed in cost recovery action). Thus,

12   CERCLA's purpose and intent, and by extension that of the HSAA, support the

13   dismissal of Defendants' negligence and gross negligence counterclaims.

14                **2.    The few CERCLA cases holding that recoupment
                          counterclaims were compulsory are distinguishable.**

15

16        Courts reviewing recoupment counterclaims in the CERCLA context generally

17   reject them. For example, the court in *Iron Mountain Mines II* upheld government

18   immunity against a recoupment counterclaim, casting doubt on cases like *United*

19   *States v. Montrose Chemical Corporation of California*, 788 F. Supp. 1485 (C.D.

20   Cal. 1992). The court reasoned that allowing recoupment counterclaims in

21   CERCLA cost recovery actions would result in "rather extraordinary exposure" for

22   the government. *Iron Mountain Mines II*, 881 F. Supp. at 1453; *see also United*

23   *States v. Sterling Centrecorp. Inc.*, No. 08-02556, 2010 WL 6430190, *at 1 (E.D.

24   Cal. Feb. 23, 2010) (approving the holding in *Placer Mining Corp*. that recoupment

25   counterclaims in response to CERCLA claims are not compulsory); *Green*, 33 F.

26   Supp. 2d at 224 (citing *Iron Mountain Mines II* and dismissing recoupment

27   counterclaim because they "are not permitted in a CERCLA cost recovery action").

28

Defendants cite cases that either recognize DTSC's position or can be distinguished. In *United States v. Iron Mountain Mines, Inc*., 952 F. Supp. 673, 677–78 (E.D. Cal. 1996), a decision that follows *Iron Mountain II* cited above, the court acknowledged its prior decision that recoupment counterclaims are not always compulsory in the CERCLA context. *See* 952 F. Supp. at 677 (noting "it appears unwise, unnecessary, and inconsistent with [CERCLA] to treat an action by the [government] as a waiver in recoupment as to any federal or state law claim that otherwise would have been barred by sovereign immunity").

Further, the other cases Defendants cite are distinguishable because the government either damaged property, took defendants' property, or assumed contractual responsibility. For example, in *Montrose*, the court denied dismissal of the recoupment counterclaim based on allegations the government damaged the property. *See* 788 F. Supp. at 1490–92, 1494. In *United States v. Moore*, 703 F. Supp. 455 (E.D. Va. 1988), the court allowed the recoupment claim to proceed based on allegations the government took defendants' property, including 400 fire extinguishers, during the cleanup. 703 F. Supp. at 458–59; *see also United States v. Amtreco, Inc.*, 790 F. Supp. 1576, 1578 (M.D. Ga. 1992) (allowing the recoupment claim to proceed based on allegations the government damaged defendants' property during the cleanup); *Berrey v. Asarco Inc*., 439 F.3d 636, 645–46 (10th Cir. 2006) (finding leases requiring the Tribal landowner to dispose of the waste provided a basis for counterclaim).

Here, Defendants have not alleged that DTSC damaged property during the cleanup, took property, or assumed contractual liability. *See American Color and Chemical Corp.*, 858 F. Supp. at 452 (noting recoupment claims properly arose where defendant sought recover of property the government allegedly took or destroyed); *Amtreco*, 790 F. Supp. 1576, 1580 (M.D. Ga. 1992) (finding a logical relationship because the counterclaims and cost recovery claims arose solely from the cleanup and pursuant to allegations the government damaged property).

19

Defendants also allege DTSC's actions will cause Defendants to suffer economic loss (see, e.g., ECF No. 106, 19:21); but, "mere economic loss" without property damage or physical injury cannot serve as the basis for negligence claims. *See California Dept. of Toxic Substances Control v. Payless Cleaners*, No. 02-2389, 2007 WL 2580626, at *4–5 (E.D. Cal. Aug. 17, 2007) (rejecting environmental contamination as the requisite element of property damage to satisfy the existence of a cognizable negligence claim).

### 3.    The timing of events provides a basis to reject a "logical relationship."

Defendants cite *In re Lazar*, 237 F.3d 967 (9th Cir. 2001) to contend that courts liberally construe the "logical relationship" test for compulsory counterclaims. The Ninth Circuit has subsequently narrowed *In re Lazar*, finding that even if the claims "obviously involve the same general subject matter, the timing of events [] provides a critical distinction . . . ." *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1196 (9th Cir. 2005). The timing of events provides a critical distinction here. DTSC's cost recovery claims involve DTSC's alleged actions in cleaning up contamination at and from the Vernon Plant. DTSC's cleanup actions commenced in 2015 after the Vernon Plant ceased operations. *See, e.g.,* ECF No. 1, ¶ 93. In contrast, Defendants' recoupment counterclaim involves DTSC's actions regulating the Vernon Plant during its operations, *i.e.*, before 2015. While both DTSC's claims and Defendants' counterclaims generally involve contamination, events underlying them were distinct, occurred at different times, and not logically related. *See e.g., American Color and Chemical Corp.*, 858 F. Supp. at 453 (determining claims arising from "different series of events . . . do not satisfy the . . . requirements of recoupment. They do not arise out of the same event or occurrence").[14] Absent the requisite "logical relationship," Defendants' recoupment

---

[14] The district court acknowledged in *American Color and Chemical Corp.* that courts differ on the "restrictiveness of the standards applied" for the "logical

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants' Counterclaims (2:20-cv-11293-SVW-JPR)

1  counterclaims are not compulsory and, therefore, DTSC has not waived immunity
2  from suit.

**B.  The HWCL does not impose mandatory duties on DTSC to protect Defendants from financial liabilities under CERCLA.**

5  California Government Code section 815.6 carves out a narrow exception to
6  government immunity for injuries caused by an agency's acts or omissions and
7  authorizes liability where the government fails to discharge a mandatory duty
8  imposed by a specific statute, and the statute is designed to protect against the type
9  of injury that occurred. Seeking to apply Section 815.6's narrow exception here,
10  Defendants contend that DTSC owed them a duty of care because the HWCL
11  imposes mandatory duties that are designed to protect Defendants against financial
12  liability imposed by CERCLA and HSAA. *See e.g.*, ECF No. 50, ¶ 93. As
13  explained in DTSC's motion and below, Defendants' contention is unsupported.
14  *See* ECF No. 87, pp. 19–21.

**1.  The HWCL was not designed to protect Defendants from financial injury.**

17  Defendants cite *Montrose* for a proposition the court never addressed: whether
18  the HWCL is designed to protect PRPs from the financial injury imposed by
19  CERCLA and the HSAA. Instead, the court in *Montrose* considered a broader
20  claim: whether defendants suffered an injury under the California Tort Claims Act.
21  The court examined Government Code section 810.8's definition of "injury" and
22  found that being singled out as a PRP was a "cognizable injury" per that definition.
23  *See* 788 F. Supp. at 1494. The court in *Montrose* did not consider the point
24  Defendants raise and, as such, is unhelpful to their cause. The HWCL was designed
25  for the enforcement of hazardous waste management and to protect against injury to

27  relationship" test, while noting that "most recent cases have rejected recoupment claims arising out of [government] cleanup operations asserted in a defense of a CERCLA claim to recover [] response costs." 858 F. Supp. at 452.

1    public health and the environment and, as Defendants admit, to protect the state

2    (not PRPs) from the creation of more contaminated sites. *See* ECF No. 106, p. 21. It

3    was not designed to protect against Defendants' potential financial liability under

4    CERCLA and HSAA for the contamination they created. *See, e.g.*, *Fedex Ground*

5    *Package System, Inc. v. Ingenito*, 86 F. Supp. 3d 1121, 1127 (E.D. Cal. 2015)

6    (noting the legislature enacted HWCL to ensure "generators of hazardous waste

7    safely handle and treat their hazardous waste prior to disposal").

8 / 9                    **2.    California Health and Safety Code sections allow DTSC
                              discretion in performing its enforcement obligations.**

10    California Health and Safety Code sections 25200.10(b), 25200.11(a),

11    25205(b) are designed for enforcement and do not impose mandatory duties on

12    DTSC to protect against the costs of cleaning up the release of hazardous

13    substances. *See, e.g., Washington v. County of Contra Costa*, 38 Cal. App. 4th 890,

14    895–87 (Cal. Ct. App. 1995) (rejecting assertions that chapter 6.95 of the California

15    Health and Safety Code contains mandatory duties to protect against releases of

16    hazardous materials).[15] Statutes requiring DTSC to enforce particular rules, even

17    those that include terms like "shall" and "must," do not reflexively create

18    mandatory duties. *See, e.g., Wood v. County of San Joaquin*, 111 Cal. App. 4th 960,

19    974 (Cal. Ct. App. 2003) (citing *Osgood v. County of Shasta*, 50 Cal. App. 3d 586,

20    590 (Cal. Ct. App. 1975) (the Harbors and Navigations Code did not impose a

21    mandatory duty, even though it required that peace offers "shall enforce" the speed

22    limit)); *Sierra Club v. Whitman*, 268 F.3d 898, 903–4 (9th Cir. 2001) (determining

23    the Clean Water Act did not create mandatory duties and was within the EPA's

24    discretion to enforce regulations); *Thompson v. City of Lake Elsinore*, 18 Cal. App.

25    4th 49, 53–57 (Cal. Ct. App. 1993) (rejecting the term "shall" imposed a statutory

26 / 27 / 28    [15] Courts look at "[w]hether a particular statute is intended to impose a mandatory duty, rather than a mere obligation to perform a discretionary function," and such a determination "is a question of statutory interpretation for the courts." *See Haggis v. City of Los Angeles*, 22 Cal.4th 490, 499–500 (Cal. 2000).

22

obligation and finding the decision to issue a permit or not is discretionary, not mandatory).

Mandatory language, like "shall require" and "must satisfy" can suggest "an intent to leav[e] the course of action to the discretion" of the agency. *Center for Biological Diversity v. Department of Conservation*, 26 Cal. App. 5th 161, 172–73, 175 (Cal. Ct. App. 2018) (determining terms like "shall" and "require" "do not mandate a specific course of action" and leave agency with discretion to select and consider the best methods to protect the public and the environment); *see also Fox v. County of Fresno*, 170 Cal. App. 3d 1238, 1241–42 (Cal. Ct. App. 1985) (finding Health and Safety Code section 17980 requirement to abate or take other action with regard to nuisances is discretionary; therefore, Government Code section 815.6 was inapplicable and the county was not liable for damage).

Applying the case law, enforcement language in the HWCL does not mandate a specific course of action; rather, it shows an intent to leave the course of action to DTSC's discretion. For example, section 25200.10(b) states that DTSC "shall require" corrective action for releases of hazardous waste, but does not enumerate specific "corrective actions," and leaves it to DTSC's discretion. Section 25200.11(a) states that DTSC "shall take" action on permit applications, but leaves the considerations and methods for deciding permit applications to DTSC. Section 25205(b) states that DTSC's "grant of interim status . . . shall terminate . . . unless [DTSC] certifies" compliance with financial assurances requirements, but vests in DTSC the authority to review and determine adequate financial assurances. In short, the HWCL confers discretion on DTSC in how it enforces the law. *See, e.g.*, Cal. Health & Safety Code § 25200(a) (allowing DTSC to use "judgment" in issuing hazardous waste facility permits).

Plaintiffs' Reply Memorandum in Support of Motion to Dismiss Defendants' Counterclaims (2:20-cv-11293-SVW-JPR)

3.    **California Health and Safety Code Section 25400(b) does**
**not create a mandatory duty.**

Defendants' allege DTSC breached a statutory standard of care established in Health and Safety Code section 25400(b) because DTSC allegedly was grossly negligent in abating hazardous substances at and around the Vernon Plant. *See, e.g.*, ECF 106, pp. 22–23. However, Health and Safety Code section 25400(b) does not provide an independent claim for relief against DTSC because it does not create a mandatory duty, and absent a mandatory duty, Government Code section 815.6's narrow exception does not apply. *See Haggis*, 22 Cal. 4th at 498–99.

Relying on *Eastburn v. Regional Fire Protection Authority*, 31 Cal. 4th 1175 (Cal. 2003), Defendants assert that section 25400(b) authorizes gross negligence suits because both Health and Safety Code sections 1799.107 and 25400(b) employ the phrase: "unless the action taken was performed in bad faith or in a grossly negligent manner." But, *Eastburn* relies on *Zepeda v. City of Los Angeles*, 223 Cal. App. 3d 232 (Cal. Ct. App. 1990), which found such phrasing did not create a mandatory duty, even for gross negligence, stating: "[h]ad the Legislature desired to impose upon emergency personnel the mandatory duty . . . it could have easily said so. It did not, and we will not impose such a requirement here." *Id.* at 1181–83.[16] (). Because as Defendants noted, the language of section 1799.107 and section 25400(b) are similar (*see, e.g.*, ECF No. 106, p. 23), the analysis in *Zepeda* is applicable here.

Even assuming Defendants correctly interpret Health and Safety Code section 25400(b) as imposing a mandatory duty, DTSC's alleged actions or inactions do not amount to gross negligence.[17] *See, e.g., Wood*, 111 Cal. App. 4th at 971–72,

_____

[16] The court noted that *Zepeda* "more correctly interpret[ed]" section 1799.107 that no mandatory duty existed because section 1799.106, which expressly imposes gross negligence liability, and not section 1799.107, imposed a mandatory duty. 31 Cal. 4th at 1181–83.

[17] In the gross negligence context, the nature and extent of any alleged duty is a question of law. *See Jabo v. YMCA of San Diego County*, 27 Cal. App. 5th 853,

24

974–75. The court in *Wood* determined that a public entity's failure to take any

safety precautions, or enforce statutes that require specific enactments for safety,

despite 25 years of knowledge of the dangerous conditions, did not amount to gross

negligence. *Id*. The allegations here mirror those in *Wood*, and as such, DTSC's

alleged failure to act, even for 20-plus years, would not constitute to gross

negligence.

Because the HWCL imposes no mandatory duty and was not designed to

protect against financial injuries, Counterclaims Four and Five should be dismissed.

## CONCLUSION

For all the reasons stated herein, Plaintiffs respectfully request the Court issue

an order dismissing Defendants' counterclaims against Plaintiffs.

Dated:  August 23, 2021                    Respectfully submitted,

ROB BONTA
Attorney General of California
SARAH E. MORRISON
Supervising Deputy Attorney General


*/s/ David Zaft*
DAVID ZAFT
Deputy Attorney General
*Attorneys for Plaintiffs California
Department of toxic Substances
Control and the Toxic Substances
Control Account*

LA2020603986
Plaintiff's Reply Memorandum in Support of Motion to Dismiss.docx

_____

868 (Cal. Ct. App. 2018) (citing *Regents of University of California v. Superior Court*, 4 Cal. 5th 607, 618 (Cal. 2018) for the proposition that under a gross negligence theory, the question of whether a duty of care is owed is a legal question for the court to decide). Because DTSC did not owe Defendants any duty of care, Defendants' gross negligence counterclaim fails as a legal matter.