1  Krista M. Enns (CA 206430)
   kenns@beneschlaw.com
2  Lily A. North (CA 260709)
   lnorth@beneschlaw.com
3  BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
   100 Pine Street, Suite 3100
4  San Francisco, CA 94111
   Telephone:312.212.4949 628.600.2250
5  Facsimile: 628.221.5828

6  Thomas D. Warren (CA 160921)
   tom.warren@warrenterzian.com
7  WARREN TERZIAN LLP
   222 North Pacific Coast Highway Suite 2000
8  Los Angeles, CA 90245
   Telephone: 213-410-2620
9
   *additional counsel listed on following page*
10
   Counsel for Defendant and Counter-Claimant
11 Gould Electronics Inc.

12

13            IN THE UNITED STATE DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF CALIFORNIA
14              WESTERN DIVISION – LOS ANGELES

15 CALIFORNIA DEPARTMENT OF TOXIC          Case No. 2:20-cv-11293-SVW-JPR
   SUBSTANCES CONTROL, et al.,
16                                          **TRIAL DECLARATION OF DR.**
                                            **SHAHROKH ROUHANI**
17              Plaintiffs,
                                            Judge: Hon. Stephen V. Wilson
18       v.
                                            Complaint Filed:   12/14/20
19 NL INDUSTRIES, INC., a New Jersey        Trial Date: 4/19/22
   corporation; et al.,
20
21              Defendants.
22 AND RELATED COUNTERCLAIMS
23
24
25
26
27
28

John A. Rego (*pro hac vice*)
jrego@beneschlaw.com
Gregory T. Frohman (*pro hac vice*)
gfrohman@beneschlaw.com
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
200 Public Square, Suite 2300
Cleveland, OH 44114
Telephone: 216.363.4500

Nicholas J. Secco (*pro hac vice*)
nsecco@beneschlaw.com
Andy J. Jarzyna (*pro hac vice*)
ajarzyna@beneschlaw.com
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: 312.212.4949

Dan Terzian (CA 283835)
dan.terzian@warrenterzian.com
Erick Kees Kuylman (CA 313202)
erick.kuylman@warrenterzian.com
WARREN TERZIAN LLP
222 North Pacific Coast Highway Suite 2000
Los Angeles, CA 90245
Telephone: 213-410-2620

*Counsel for Defendant and Counter-Claimant
Gould Electronics Inc.*

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

My name is Shahrokh Rouhani.  I am more than 18 years old, make this declaration based on personal knowledge and experience, and the opinions herein are my own.

1.      I am the President of NewFields Companies, LLC, which is an international partnership of environmental experts.  I am a practicing environmental scientist and licensed professional engineer, with special expertise in statistical and geostatistical evaluations of environmental sites.

2.      I have reached the following expert opinions to a reasonable degree of scientific certainty, using widely recognized and powerful geostatistical techniques, including variography, an EPA-recommended method for identifying impacts from a point source like the Vernon smelter:

- The effects of emissions from the former Vernon smelter on measured soil lead concentrations are confined to the industrial areas surrounding the Vernon smelter.

- There is no evidence that DTSC's surface soil lead measurements within the PIA residential areas include contamination attributable to the Vernon smelter.

- Lead-based paint remains ubiquitous throughout the relatively aged housing stock that makes up the PIA, and the longer a residential structure has been present on a parcel, the higher the measured soil lead level is expected to be.

- Residential soil lead measurements of properties developed within the PIA prior to 1978 are predominantly affected by proximity to buildings.

- However, neither the widespread lead-based paint contamination nor other sources of lead in the PIA are "masking" evidence of a relationship between the former Vernon smelter and lead detected in the residential soils of the PIA.  Rather, the data simply demonstrates that there is no such relationship.

- The results of my geostatistical analyses provide an objective and scientific geographic basis for apportioning the impacts in the PIA attributable to the

former smelter from the impacts attributable to other causes, such as lead-based paint residues and leaded vehicle emissions.

- The "directional analysis" prepared by Dr. Allen Medine misrepresents and curates site data, misuses accepted statistical procedures, and engages in numerous subjective contortions to arrive a predetermined result.

These opinions, including the basis for them, are described below in greater detail.

**My Qualifications and Experience**

3. I hold a Ph.D. in Environmental Sciences (1983) and a S.M. in Environmental Engineering (1980), both from Harvard University, as well as a B.S. in Civil Engineering and B.A. in Economics from the University of California, Berkeley (1978).

4. My environmental research dates back to 1980, when I developed optimal geostatistical procedures for the analysis and monitoring of groundwater systems during my post-graduate studies. I subsequently developed geostatistical algorithms to analyze environmental spatial datasets within the framework of geographical information system (GIS) databases.

5. From 1983 until 2004, I was a Professor at the Georgia Institute of Technology (Georgia Tech) in the School of Civil and Environmental Engineering. I received tenure from Georgia Tech in 1990 and, after founding my environmental consulting company, NewFields, in 1996, I continued to serve as an adjunct professor until 2004.

6. While a professor at Georgia Tech, I taught courses for both undergraduates and graduate students, including classes on both conventional statistics and geostatistics. My research activities, which were primarily funded by the U.S Environmental Protection Agency, the U.S. Department of Energy, and the National Science Foundations, focused on developing techniques for applying geostatistical methods to the assessment of environmental conditions.

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

7.      During 1987-88, I was selected by the National Science Foundation to serve as a visiting scientist at Centre de Géostatistique, Ecole Nationale Supérieure des Mines de Paris, considered the premier geostatistics research center in the world.

8.      In the course of my professional career, I have conducted research addressing a variety of environmental analytic issues. I have authored or co-authored numerous research publications, several invited reviews and book chapters, a compendium on applications of geostatistics in environmental and geotechnical engineering, a series of American Society for Testing and Materials (ASTM) standard guides for application of geostatistics in environmental site investigations, and a four-volume guidance document series on environmental background data analysis for the United States Department of the Navy.

9.      I am active in several professional societies and have served on the editorial boards of the American Geophysical Union's *Water Resources Research* journal and the Association for Environmental Health and Sciences' *Environmental Forensic Journal*.

10.     I was the chair of the American Society of Civil Engineers' National Ground Water Hydrology Committee and its Task Committee on Geostatistical Techniques in Geohydrology.  I have also served as the expert member of ASTM's Geostatistics Standardization Committee

11.     During the past four decades, I have led numerous investigations and conducted research in environmental statistics and geostatistics, deterministic and stochastic modeling of environmental systems at Superfund (CERCLA) and Resource Conservation and Recovery Act sites.  My recent technical efforts included assisting the United States National Oceanic and Atmospheric Administration by taking a lead role in sampling design and analysis of the comprehensive environmental data collected as part of the federal government's Natural Resource Damage Assessment in connection with the 2010 Deepwater Horizon oil spill in the Gulf of Mexico.

12.     A copy of my curriculum vitae, which includes a list of my publications and presentations, and a list of recent expert depositions and trial testimony, are attached as

Exhibits 1 and 2. The hourly rate for my time on this engagement is $350, except for testimony at deposition or trial, for which my hourly rate is $600.

**The role of geostatistics in environmental site assessments**

13.     To perform my analyses in this case, I used both conventional statistical techniques and advanced geostatistical techniques.  The fundamental difference between these two disciplines is that geostatistics considers both the value of a data point and the precise geographic coordinates of the location where that data was collected. This added information for each data point allows a geostatistician to directly compare all of the data points along any desired direction to see if any pattern is present in the data.

14.     The ability of geostatistics to assess the "directionality" of a dataset at a very precise level makes this discipline particularly well suited to identifying spatial patterns and trends in data collected at environmental contamination sites, where there is a need to know whether, for instance, measurements of soil contamination distributed across a site can be traced back to a common origin or source.

15.     When used to assess environmental contamination sites, geostatistical methods present multiple advantages over conventional statistical methods.  Specifically, geostatistics is better able to evaluate datasets that contain a mixture of background and impacted data, like DTCS's data in this case.  Similarly, geostatistics is also better suited to analyzing datasets where the sampling locations were not randomly chosen, like DTSC's data in this case.  At the most fundamental level, conventional statistical methods are best suited to analyze a group of measurement that contain no patterns or relationships between particular measurements, while geostatistical methods are specifically designed to analyze and identify such patterns or relationships on the data.

16.     In light of its inherent advantages for environmental assessments, the United States Environmental Protection Agency (EPA) pioneered the use of this discipline for such assessments beginning in the mid-1980's.  One of EPA's early applications of geostatistics involved the study of soil lead concentrations at a former secondary lead

smelter near Dallas, TX to produce probabilistic maps of the lead concentrations around the smelter. EPA promoted the use of geostatistics in environmental site investigations in guidance documents issued in 1989 and 1990.  EPA even published two public domain software programs for use by scientists in performing geostatistical analyses.

17.    Following EPA's lead, geostatistical techniques have been extensively applied to a wide variety of environmental sites, including many involving smelters and lead-contaminated residential areas.  Among the many examples are:

- Flatman GT, Brown KT and Mullins JW. (1985) "Probabilistic spatial contouring of the plume around a lead smelter." The 6th National Conference on Management of Uncontrolled Hazardous Waste Sites, Superfund '85 Proceedings, Hazardous Material Control Research Institute: 442-448. (Exhibit 3a)

- Pyrcz M. (2000). "An Application of Geostatistical Tools to Characterize an Environmental Site." University of Alberta. http://www.ccgalberta.com/ccgresources/report02/2000-119-dallas_example.pdf (Exhibit 3b)

- Tedaldi D. (2001) "The Tacoma Asarco smelter site: the use of geostatistics to guide residential soil clean-up." In Manufactured Sites: Rethinking the Post-Industrial Landscape. Kirkwood N. (Editor). Taylor & Francis. London. (Exhibit 3c)

- Demougeot-Renard H and De Fouquet C. (2004). "Geostatistical approach for assessing soil volumes requiring remediation: validation using lead-polluted soils underlying a former smelting works." Environ. Sci. Technol. 38(19): 5120–5126. (Exhibit 3d)

- Schaefer K, Einax JW, Simeonov V, Tsakovski S. (2010). "Geostatistical and multivariate statistical analysis of heavily and manifoldly contaminated soil samples." Analytical and Bioanalytical Chemistry. 396(7): 2675-2683. (Exhibit 3e)

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

- Yuan GL, Sun TH, Han P and Li J. (2013). "Environmental geochemical mapping and multivariate geostatistical analysis of heavy metals in topsoils of a closed steel smelter: Capital Iron & Steel Factory, Beijing, China." J. of Geochemical Exploration. 130: 15-21. (Exhibit 3f)

- Goovaerts P and Glass G. (2014). "Geostatistical modeling of the spatial distribution of surface soil arsenic around a smelter." J. Jpn. Soc. Soil Phys. 128. 5-10. (Exhibit 3g)

18.     Although each smelter site presents its own unique conditions and challenges, requiring site-specific adaptation of geostatistical tools to address those challenges, EPA has specifically identified geostatistics as ideally suited to distinguishing between background conditions and contamination at lead-impacted residential sites.  In 2003, EPA issued guidance entitled, "Superfund Lead-Contaminated Residential Sites Handbook," (Exhibit 3h), which explicitly noted the effectiveness of geostatistics in delineating impacts at residential lead contamination sites and distinguishing between background conditions and contamination:

> Statistical approaches to delineating contaminant zones are useful for some sites. In these cases, the project manager should consult with a statistician to design an efficient sampling plan. The Agency is developing guidance on characterizing background chemicals in soil that includes statistical methods for delineating contaminated areas (EPA, 2001i). **Geostatistics is widely recognized for offering graphical methods that are ideally suited for delineating contaminant zones** (Gilbert and Simpson, 1983; Flatman and Yfantis, 1984; Journel, 1984; Englund and Heravi, 1994; Goovaerts, 1997). **Geostatistics also provides powerful methods for detecting contaminated areas from background when sample locations have not been randomly selected** (*e.g.*, Quimby, 1986; Borgman and Quimby, 1996), for sampling plan design (*e.g.*, Flatman and Yfantis, 1984; Borgman et al., 1996), and for aiding in the design of remedial responses (*e.g.*, Ryti, 1993). For smaller sites, rigorous statistical analyses may be unnecessary because site-related and non-site-related contamination clearly differ. For these sites, the sampling plan should focus on establishing a reliable representation of the extent (in two or three dimensions) of a contaminated area (EPA, 1989).

(Emphasis added).

19.     The environmental conditions presented in this case, which involve over ten densely urban square miles of both residential and industrial properties and a wide variety of potential lead sources, are squarely within the category of lead-impacted sites where geostatistics represents the preferred method to determine whether one such potential source (the former Vernon smelter) had a statistically detectable effect on lead measurements from elsewhere on the site.

**The Key Features of a Geostatistical Analysis of an Environmental Contamination Site**

20.     The first step in a geostatistical study is to review the available site data and assess the spatial relationship (i.e., the correlation) among all of the data points located along a chosen direction.  When the chosen direction points towards a suspected source, this assessment will determine whether there is any pattern in the data that indicates a link between the suspected source and the site data in that direction.  This process requires a computer to perform millions or billions of separate, complex calculations which are designed to assess the magnitude of variations in the data along the chosen direction.

21.     Once they are completed, the quantitative outcomes of these mathematical functions are plotted on a chart and thereby transformed into a fairly simple picture or graph: the directional variogram. Variograms, as the name implies, do not assess the absolute magnitude of sample data, but instead evaluate the differences between pairs of data points lying along the chosen direction.  One useful byproduct of how variograms are calculated is that, compared to less sophisticated statistical methods, variograms are much less influenced by localized sources of lead concentrations, such as "hot spots" caused by the presence of leaded paint residue at a particular house. Because variograms are based on the difference between paired sample values, where each member of the pair is affected by the same localized source of lead, the method automatically accounts for it.

This attribute is especially beneficial in this case because of the high density of soil sampling in numerous relatively small yards throughout the PIA residential areas.

22.    Directional variograms derived from an analysis of soil concentrations will take on one of several well-established, standard shapes. These shapes have widely-acknowledged interpretations that have been investigated and corroborated by successive generations of geostatisticians and are documented in peer reviewed literature and seminal textbooks.  In sum, the nature of the relationship (if any) between the suspected source and site data being evaluated will determine the variogram's shape.  Figure 1 depicts the four typical variogram shapes:  (1) "Trend"; (2) "Structured"; (3) "Hole Effect"; and (4) "Pure Nugget".



Figure 1. Typical Variogram Results

23.    The "Trend" variogram shape (Figure 1A) is typically found in situations in which a source of contamination has released contamination, leaving a detectable trend of increasing or decreasing impacts, moving away from the original source, and the trend is detected throughout the studied area.  This is the sort of directional variogram shape one would expect to see if the concentration of lead in surface soil gradually decreased as a function of distance from the Vernon smelter, as predicted by Dr. Medine.

24.     The "Structured" variogram shape (Figure 1B) is typically found in situations in which there has been a release with a relatively clear, but finite, impacted area, beyond which there is no evidence of any impact from the source. The "range" calculated by the directional variogram represents the distance from the source at which there ceases to be any detectable impact from the source.

25.     The "Hole Effect" variogram shape (Figure 1C) typically describes the presence of isolated sources surrounded by lower ambient concentrations.

26.     The "Pure Nugget" variogram shape (Figure 1D) typically describes a site at which the investigated data are devoid of any discernible spatial correlation with the suspected source.

27.     These common shapes provide a guide to interpreting the meaning of the directional variograms generated during my assessment of DTSC's soil data in this case.

**The use of soil data in geostatistics**

28.     Soil is a particularly powerful subject for geostatistical analysis because it acts as a historical record of local human influence and industry. To the extent that activities in or near the PIA impacted soil lead, that contribution is written indelibly into the patterns of lead contamination detected by the soil sampling and investigated by my geostatistical techniques.  For example, Plaintiffs assert that I did not study the operational history and equipment configurations (such as stack height) of the Vernon smelter.  This criticism misses the point.  My analysis focused on the sources and patterns of soil contamination, and to the extent stack height or other operational parameters of the plant actually affected the smelter's deposition of lead in the soil, that incremental effect will necessarily be reflected in the soil samples I analyzed.

**Geostatistical analysis of data from the industrial buffer zone**

29.     As depicted Figure 2, the former Vernon smelter is surrounded on all sides by an industrial buffer zone roughly at the center of the PIA. The soil samples collected

within this industrial area were collected between approximately 300 and 6000 feet away from the former smelter property, and are referred to as the "industrial" samples. I performed a geostatistical analysis of the industrial samples to assess whether emissions from the former smelter had impacted soil concentrations in the industrial area. To answer this question, I calculated a variogram for the industrial area looking for patterns in the soil data that are attributable the former smelter.



Figure 2. Industrial Surface Soil Lead Samples

30.    My directional variograms of the industrial surface soil lead data in the directions examined by the Plaintiffs' expert, Dr. Allen Medine (north, northeast, east and southwest), are displayed in Figures 3a through 3d. Each of these variograms displays a Structured shape (*see* Figure 1B), which is indicative of a source that has impacted

concentrations within a finite area. The extent of the impact is calculated by determining the distance at which the variogram flattens out (this is done by a sophisticated formula, not mere visual inspection of the chart).

31.    Figures 3a through 3d depict the typical output of a directional geostatistical analysis.  The key features for purposes of this explanation are (i) the variogram in the upper left portion of the figure and (ii) a multicolored "map" in the lower left portion with a series of arrows or chevrons that illustrate the direction from the smelter being evaluated in that particular analysis.



Figure 3a. Industrial Surface Soil Lead Measurement Variogram Analyses along the Predominant Wind Direction (North)

32.    As depicted in Figure 3a, the variogram flattens out in the North direction approximately 1500 feet from the former smelter. This falls within the industrial buffer zone surrounding the former smelter. For distances greater than approximately 1500 feet from the former smelter along the North direction, there is no statistically detectable effect of emissions from the Vernon smelter on the measured soil lead concentrations.

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

The sensitivity of this result is equivalent to the sensitivity of the methods used by DTSC to generate the underlying soil concentrations.



Figure 3b. Industrial Surface Soil Lead Measurement Variogram Analyses along the Predominant Wind Direction (Northeast)

33.    As depicted in Figure 3b, the variogram flattens out in the Northeast direction approximately 1875 feet from the former smelter. This falls within the industrial buffer zone surrounding the former smelter. For distances greater than approximately 1875 feet from the former smelter along the Northeast direction, there is no statistically detectable effect of emissions from the Vernon smelter on the measured soil lead concentrations.

1

2

3

4

5

6

7

8

9

10

11



Figure 3c. Industrial Surface Soil Lead Measurement Variogram Analyses along the Predominant Wind Direction (East)

34.     As depicted in Figure 3c, the variogram flattens out in the East direction approximately 2825 feet from the former smelter. This falls within the industrial buffer zone surrounding the former smelter. For distances greater than approximately 2825 feet from the former smelter along the East direction, there is no statistically detectable effect of emissions from the Vernon smelter on the measured soil lead concentrations.

Figure 3d. Industrial Surface Soil Lead Measurement Variogram Analyses along the Predominant Wind Direction (Southwest)

35.     As depicted in Figure 3d, the variogram flattens out in the Southwest direction approximately 1565 feet from the former smelter. This falls within the industrial buffer zone surrounding the former smelter. For distances greater than approximately 1565 feet from the former smelter along the Southwest direction, there is no statistically detectable effect of emissions from the Vernon smelter on the measured soil lead concentrations.

36.     On Figure 4, I have used the results of my four directional variograms to describe the general area of detectable lead soil impacts from the former Vernon smelter as an ellipse.

Figure 4. Ellipse of Computed Variogram Ranges within the PIA

37.     My industrial variograms are inherently conservative and, for that reason, may overstate the range of impact of the Vernon smelter. There were other historical sources of lead in the industrial area, including other lead smelters. It is conceivable that these other sources, and not the Vernon smelter, created the patterns reflected in the industrial variograms. However, for purposes of my analysis, I assumed that any and every discernible pattern of contamination in the industrial variograms was attributable to the Vernon smelter.

38.     Based on the results of my geostatistical analysis, it is my expert opinion, to a reasonable degree of scientific certainty, that effects of emissions from the former Vernon smelter on measured soil lead concentrations are confined to the industrial areas surrounding the Vernon smelter.

**Geostatistical analysis of PIA residential areas**

39.     My geostatistical study of the Vernon soil data also included analysis of surface soil lead measurements (*i.e.,* samples collected within a depth of 0 to 6 inches of the ground surface) in the PIA residential areas. To do this, I computed a set of directional variograms that collectively encompassed all PIA residential areas in a 360° circle around the former Vernon smelter.

40.     With the exception of 525 of samples with unusable geographic coordinates (out of 217,316 soil lead measurements), I conducted my initial calculations using all of DTSC's surface soil data collected within the PIA residential areas and I evaluated all residential parcels located in the full 360° zone surrounding the former smelter.  It was important to conduct my assessment using all of DTSC's data so there would be no basis to suggest that I had subjectively altered the dataset to manipulate the results of my analysis.

41.     The results of my geostatistical analysis of the PIA residential parcels are presented in the directional variograms at upper left in Figures 5a through 5i.  These nine variograms divided the PIA into nine sectors, which were then individually assessed to see if there was any pattern in DTSC's soil data that could be attributed the former Vernon smelter.

42.     In Figures 5a through 5i, the upper right quadrant identifies the portion of the residential area being investigated and its direction from the smelter.  The other three quadrants represent three iterations of my geostatistical analysis.  The upper left quadrant presents the results of my primary analysis using all data (*see* ¶ 40), while the lower quadrants present the results of my sensitivity analyses that I conducted to assess whether

lead-based paint residues might be "masking" a signal from the former smelter.  The lower left quadrant assess the effect of excluding samples collected within 10 feet of a structure (*see* ¶46) and the lower right quadrant assesses the effect of using only data collected from the parkway in front of a structure (*see* ¶ 47).  In each of the three analyses presented, the graph at the top is the variogram itself, while the multicolored "map" below represents the entire PIA with a series of arrows or chevrons pointing from the smelter at the center to the portion of the residential area under investigation.

43.    These variograms present mainly Pure Nugget shapes (*see* Figure 1D), which means that there is no statistical evidence of any relationship between emissions from the former Vernon smelter and the measured lead concentrations within the PIA residential areas.

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

Figure 5a. Directional Variograms of Surface Soil Lead Measurements toward/from the Vernon Plant within the Northwest Sector of the PIA Residential Areas

Upper Left: Using all Surface Soil Samples within the PIA Residential Areas

Lower Left: Excluding Surface Soil Samples Situated within 10 feet of Buildings

Lower Right: Using only Parkway Samples

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

Figure 5b. Directional Variograms of Surface Soil Lead Measurements toward/from the
Vernon Plant within the North Sector of the PIA Residential Areas

Upper Left: Using all Surface Soil Samples within the PIA Residential Areas

Lower Left: Excluding Surface Soil Samples Situated within 10 feet of Buildings

Lower Right: Using only Parkway Samples

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

Figure 5c. Directional Variograms of Surface Soil Lead Measurements toward/from the Vernon Plant within the North-Northeast Sector of the PIA Residential Areas

Upper Left: Using all Surface Soil Samples within the PIA Residential Areas

Lower Left: Excluding Surface Soil Samples Situated within 10 feet of Buildings

Lower Right: Using only Parkway Samples

Figure 5d. Directional Variograms of Surface Soil Lead Measurements toward/from the Vernon Plant within the Northeast Sector of the PIA Residential Areas

Upper Left: Using all Surface Soil Samples within the PIA Residential Areas

Lower Left: Excluding Surface Soil Samples Situated within 10 feet of Buildings

Lower Right: Using only Parkway Samples

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

Figure 5e. Directional Variograms of Surface Soil Lead Measurements toward/from the Vernon Plant within the East Sector of the PIA Residential Areas

Upper Left: Using all Surface Soil Samples within the PIA Residential Areas

Lower Left: Excluding Surface Soil Samples Situated within 10 feet of Buildings

Lower Right: Using only Parkway Samples

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

Figure 5f. Directional Variograms of Surface Soil Lead Measurements toward/from the
Vernon Plant within the East-Southeast Sector of the PIA Residential Areas

Upper Left: Using all Surface Soil Samples within the PIA Residential Areas

Lower Left: Excluding Surface Soil Samples Situated within 10 feet of Buildings

Lower Right: Using only Parkway Samples

Figure 5g. Directional Variograms of Surface Soil Lead Measurements toward/from the Vernon Plant within the Southeast Sector of the PIA Residential Areas

Upper Left: Using all Surface Soil Samples within the PIA Residential Areas

Lower Left: Excluding Surface Soil Samples Situated within 10 feet of Buildings

Lower Right: Using only Parkway Samples

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

Figure 5h. Directional Variograms of Surface Soil Lead Measurements toward/from the Vernon Plant within the South-Southwest Sector of the PIA Residential Areas

Upper Left: Using all Surface Soil Samples within the PIA Residential Areas

Lower Left: Excluding Surface Soil Samples Situated within 10 feet of Buildings

Lower Right: Using only Parkway Samples

Figure 5i. Directional Variograms of Surface Soil Lead Measurements toward/from the Vernon Plant within the Southwest Sector of the PIA Residential Areas

Upper Left: Using all Surface Soil Samples within the PIA Residential Areas

Lower Left: Excluding Surface Soil Samples Situated within 10 feet of Buildings

Lower Right: Using only Parkway Samples

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

44.    In some instances, the directional variograms of the PIA residential areas have weak structures (bumps or small rises) that suggest the presence of weak localized effects that can be attributed to anthropogenic (man-made) lead sources in closer proximity to a given sample, such as lead-based paint releases and deposition from leaded fuel emissions unrelated to the Vernon smelter.

45.    As a result of my geostatistical analyses, it is my expert opinion, to a reasonable degree of scientific certainty, that there is no evidence that DTSC's surface soil lead measurements within the PIA residential areas include contamination attributable to the Vernon smelter.

**Sensitivity analyses for the PIA residential areas**

46.    Based on my review of DTSC's expert rebuttal reports, one of their primary contentions in this lawsuit is that the "signal" of the Vernon smelter is camouflaged by so-called "confounding factors." That is, DTSC's experts argue that lead paint, vehicle emissions, and other sources somehow obscure the soil lead contributions of the Vernon smelter (even as they say at the same time that the Vernon smelter is the "predominant" source of lead in the PIA).  They criticize me for failing to subjectively and arbitrarily exclude data from my analysis to account for these "confounding factors."

47.    But this is simply wrong. I did several iterations of my variography that would account for any confounding factors, if they existed. As described, following the scientific method, I started with all of the data to establish that there was no connection between the Vernon smelter and soil lead patterns in the residential area. Then, to confirm that other effects were not obscuring an underlying connection to the former Vernon smelter, I repeated my calculations using three alternative sets of data that might expected to include far less influence from painted structures or other sources of lead. These are sometimes referred to as sensitivity analyses.

48.    First, I re-ran my calculations after excluding all samples that were collected within 10 feet of buildings, where the lead-based paint contamination would be greatest.

The results of this analysis are at lower left in Figures 5a through 5i, and they show that excluding the soil measurements closest to the residences would not alter my opinion.

49.     Second, I also re-ran my calculations based exclusively on the soil samples DTSC collected from the "parkways" (*i.e.,* the strips of grass located between the street and the sidewalk), because the parkway sample locations would be relatively far away from the corresponding residence. The results of this analysis are at lower right in Figures 5a through 5i, and they show that looking exclusively at the parkway lead concentrations would not alter my opinion.

50.     Third, I also re-ran my calculations using the same exact data used by Dr. Allen Medine in his so-called directional analysis to determine objectively whether his "vetting" of the DTSC dataset would reveal patterns of impact that were obscured by my use of all of DTSC's data.  Specifically, I assessed the data in Dr. Medine's "front yard + back yard" and "front yard only" datasets, the two data sets he used in his directional analysis for evidence of impacts attributable to the former Vernon smelter.  The results of this analysis are presented in Figures 6a through 6e, and they show that use of Dr. Medine's "vetted" dataset (which he asserts will minimize "confounding factors" such as lead paint to the fullest extent possible) would not alter my opinion.

51.     Figures 6a through 6d depict the results of a geostatistical analysis using Dr. Medine's "front yard + back yard" dataset (top) and Dr. Medine's "front yard only" dataset (bottom).  As with Figures 3a through 3d, the key features for each of the two scenarios being presented are (i) the variogram in the upper left portion of the figure and (ii) a multicolored "map" in the lower left portion with a series of arrows or chevrons that illustrate the direction from the smelter being evaluated in that particular analysis.

52.     The results from my testing of these three alternate data sets, as depicted in Figures 5a through 5i and 6a through 6e, confirm my conclusion that lead emitted from the former smelter have not had a statistically detectable effect on DTSC's surface soil lead measurements within the PIA residential areas, and demonstrate that the widespread contamination from other sources in the PIA residential areas is not obscuring evidence

of a relationship between the former Vernon smelter and lead detected in the residential

soils of the PIA.

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

Figure 6a. North Direction.

Top: Front Yard + Back Yard Samples;
Bottom: Front Yard Samples Only

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI



Figure 6b. NE Direction

Top: Front Yard + Back Yard Samples;
Bottom: Front Yard Samples Only

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

Figure 6c. East Direction

Top: Front Yard + Back Yard Samples;
Bottom: Front Yard Samples Only

Figure 6d. SE Direction

Top: Front Yard + Back Yard Samples;
Bottom: Front Yard Samples Only

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

Figure 6e. SW Direction

Top: Front Yard + Back Yard Samples;
Bottom: Front Yard Samples Only

53.     Plaintiffs' experts assert that my variography is not suitable for areas where soils have been disturbed by human enterprise and activity. They cite no scientific literature supporting this unusual critique. In fact, the opposite is true.  As set forth in detail below, Dr. Medine's method simply ignores the variability in the data by using a smattering of unrepresentative averages. By contrast, variography is designed to specifically assess and plot variability. To the extent there is variability across the entire PIA due to human disturbance, variography is best suited to ascertain any patterns underlying that disturbance. Furthermore, I based my variograms on the maximum concentration within the upper 6 inches of soil at any sample location to specifically account for the prospect that disturbance of the soils buried or redistributed lead contamination.

**Soil lead concentration mapping of the entire DTSC database**

54.     To further test and confirm my overall findings, I used a geostatistical tool known as "kriging," to generate a map of soil lead concentrations calculated by a geostatistical assessment across all of the areas sampled by DTSC.  On a basic level, if each individual DTSC soil measurement is thought of as a "dot" on the map, kriging "connects the dots" by mathematically predicting the level of soil lead that would occur at every location between the dots. Figure 7a depicts these predicted concentrations, with the PIA outlined in black and the former Vernon smelter at the center. Figure 7b, is a blow-up of the central portion of Figure 7a, with the former smelter location represented by the red L-shaped symbol near the center.

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI



Figure 7a. Kriging Predicted Map of Surface Soil Lead Concentrations (mg/kg)

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI



Figure 7b. Kriging Predicted Map of Surface Soil Lead Concentrations (mg/kg)
Zoomed Over the Industrial Area Surrounding the Vernon Plant

55.     The colors on the maps correspond to different concentrations of lead in the surface soils, with blue areas representing areas that fall below DTSC's stringent 80 ppm cleanup standard.  Green, yellow and red areas represent higher levels of lead.

56.     Figures 7a and 7b, which were generated using all the data collected by DTSC, show the following:

- The results of the kriging are striking and corroborate the range of emission calculations from the industrial variograms. Note that the Vernon Smelter on the kriging map is surrounded by a moat or halo of much lower concentrations, depicted in blue. This halo confirms that the impact from the smelter stopped in the industrial area, and that soil lead descends to very low levels (blue) before spiking upwards again at the threshold of the residential neighborhoods due to localized sources like lead paint (yellow and red). The elevated surface soil lead concentrations in the vicinity of the former smelter are confined to the industrial buffer zone and do not extend into the PIA residential areas.

- Soil lead measurements within the PIA residential areas are highly variable. They do not show any recognizable trend that would indicate a connection between those areas and the former Vernon smelter.  Instead, lead concentrations in the residential areas fluctuate up and down regardless of their proximity to the former smelter, which indicates the dominant effects of localized sources.

57.     My kriging analysis covering the entire DTSC dataset and confirms my expert opinions, to a reasonable degree of scientific certainty, that the effects of emissions from the former Vernon smelter on measured soil lead concentrations are confined to the industrial buffer area surrounding the former smelter, and thus have no statistically detectable effect on DTSC's surface soil lead measurements within the PIA residential areas.

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

58.     The geostatistical analyses I conducted, which are all based on widely accepted and proven methods, constitute a reasonable basis for dividing between the contributions of releases from the Vernon Plant to lead soil levels in the PIA and the contributions of releases attributable to other human activities (such as the historic application of lead-based paint and the use of leaded gasoline) to lead soil levels in the PIA.  Applying these established geostatistical methods, my analyses demonstrate that releases from the Vernon Plant did not contribute to the lead concentrations detected in the residential areas of the PIA.  Contributions of lead from releases at the Vernon Plant were limited to the geographic region described in my variogram and kriging analyses, beyond which soil lead concentrations are not related to the Vernon Plant.

**The widespread presence of lead-based paint on residential structures in the PIA**

59.     The data compiled by DTSC demonstrates that today, more than 30 years after the use of lead-based paint was banned in the United States, it remains widespread within the area at issue in this case.  DTSC conducted over 50,000 tests of residences in the PIA for lead-based paint on their exterior walls.  DTSC lead in half of the tests it conducted and in almost a quarter of the tests the concentration of lead was so high that it met the criteria for lead-based paint.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Figure 8. Distribution of PIA Measured Lead-Based Paint

60.    I plotted the DTSC data on Figure 8, which is a map of the PIA with red dots used to indicate the location of residences with lead-based paint.  As Figure 8 illustrates the lead-based paint remains ubiquitous in the PIA long after the use of such paint was legally banned.  Parcels at which residences were first developed prior to the 1978 lead-based paint ban constitute more than 90% of the PIA residential parcels.



Figure 9. Mean Lead in Paint Concentration versus Parcel Development Year (Error bars correspond to the 95% confidence interval of the computed mean concentrations)

61.     I also evaluated these DTSC's data to see if it correlated with the age of he structure.  When I factored in the date on which a residence was first built on each PIA parcel, I found a strong relationship between that date and the average level of lead detected on a residence's exterior.  As depicted in Figure 9, the highest levels of lead were found in properties first developed before 1940—which represents the majority of residential properties in the PIA—followed by properties first developed between 1940 and 1978, and then by properties constructed after 1978.

62.     My statistical review of tens of thousands of paint measurements led me to the opinion, to a reasonable degree of scientific certainty, that lead-based paint remains

ubiquitous throughout the relatively aged housing stock that makes up the PIA, and the longer a residential structure has been present on a parcel, the higher the measured soil lead level is expected to be.

**The relationship between the levels of lead measured in the PIA residential soils and proximity to buildings**

63.    In addition to investigating the relationship between housing age and soil lead measurements, I also investigated whether the amount of lead detected in a soil sample related to how close to a residence the sample was.  The results are depicted in Figure 10.



Figure 10. Pattern of Surface Soil Lead Measurements versus Distance to Nearest Building in Parcels with Varying Development Years

(Error bars correspond to the 95% confidence interval of the computed mean concentrations.)

64.    My analysis demonstrated that lead concentrations in the PIA generally increase as the sampling location moves closer to the walls of a residence, especially when sampling within 10 feet of a wall. As Figure 10 demonstrates, this effect is most pronounced at parcels first developed before 1940, the category with the highest lead paint concentrations measured by DTSC.  The effect was also detected in properties developed between 1940 and the leaded-paint ban in 1978.

65.    Figure 10 also demonstrates that the proximity effect extends as far as 20 feet from the wall and even to the parkway of properties developed before the lead-based paint ban.

66.    I view this association between lead concentrations and proximity to structures as an important fact since over half of the PIA residential parcels fall within the pre-1940 category and over 90% of the parcels were developed before 1978.

67.    Statistical analyses of the extensive lead measurements led me to the opinion, to a reasonable degree of scientific certainty, that residential soil lead measurements of properties developed within the PIA prior to 1978 are predominantly affected by proximity to buildings.

68.    This conclusion should not, however, be viewed as precluding additional localized impacts, possibly significant impacts, to PIA residential properties from other well recognized anthropogenic lead sources, such as leaded fuel emissions and lead-based pesticides.

**My review of Dr. Medine's "directional analysis and lead concentration mapping**

69.    In addition to conducting a geostatistical assessment of the potential impacts of emissions from the former Vernon smelter, I reviewed the report and rebuttal report authored by Dr. Allen Medine in this case.

70.    In his initial report, Dr. Medine presents what he describes as a "directional analysis."  Many of the specific steps used by Dr. Medine are contrary to commonly accepted statistical standards designed to ensure the accuracy and reliability of statistical

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

interpretations. Furthermore, as a general matter, it is not sound science to subject data to layers of contortions and idiosyncratic adjustments in order to finally arrive at a preferred, predetermined outcome.  The conclusion should fit the data, not vice versa.

71.    The first step in Dr. Medine's analysis was to subjectively censor DTSC's data such that his final analysis relied on an inaccurate dataset that entirely ignored over half of the available data.  At page 26 of his expert report, Dr. Medine actually references his "database manipulations."

72.    The second step in Dr. Medine's analysis was to apply various manipulations to his censored dataset to essentially create new data points.  These new data points that were then used to impose decreasing trend lines from which Dr. Medine estimated the extent of impacts from the former Vernon smelter along selected wind directions.

73.    Ultimately, as a consequence of these steps, Dr. Medine reduces a robust data set of hundreds of thousands of individual soil samples to *fewer than fifteen averages* in each direction, which he then uses to come to the unfounded conclusion that the Vernon smelter's impact extends up to 3.4 miles.

74.    Dr. Medine's analyses suffer from fundamental deficiencies that render the results scientifically unreliable.  The following subsections provide more detailed information about the technical deficiencies of Dr. Medine's analyses, starting first with his creation of an unreliable dataset and then turning to his unscientific manipulation of the data to generate unreliable conclusions.

## A.    The dataset used by Dr. Medine

75.    Dr. Medine chose to censor the dataset used in his directional analyses to exclude samples that he believed were unduly influenced by lead-based paint. Specifically, Dr. Medine purported to only include data collected from the "front yard" and the "backyard" of residential partials, while omitting other categories of samples, most notably those collected close to the exterior walls of a residence (known and

"dripline" samples).  In doing so, Dr. Medine filtered the data in a way that did not produce a dataset free from lead paint impacts, and he refused to include DTSC data sets from categories of properties that should have been included.

### i.   Erroneous inclusion and exclusion of data

76.   In selecting which data to include in his analysis, Dr. Medine relied exclusively upon subjective descriptions of sample locations included in sampling reports, rather than the actual geographic coordinates of the sample locations.  Since I had compiled and used such coordinates in my geostatistical study, I was able to check each sample included and excluded by Dr. Medine to assess its proximity to the residence.

77.   There are various definitions of "dripline," so I focused on identifying samples collected within 10 feet of a residence, based on Dr. Medine's statement on Page 21 of his expert report that "concentrations of lead along the driplines are typically higher than areas greater than 5-10 feet from the house, in the front yard or back yard."

78.   This objective quantitative analysis of the data used by Dr. Medine in his directional analysis shows that over 58 percent of the samples he included were, according to their geographic coordinates, within 10 feet of a residence.  Moreover, about 18 percent of the samples excluded by Dr. Medine were collected more than 10 feet away from a structure.

79.   The errors in Dr. Medine's censoring of the available data highlights two problems with his subjective methodology.  First, it illustrates that he did not apply an objective, fact-based approach to selecting the data he used in his analysis.  Second, and more importantly, his claim that he performed his directional analysis using a specially "vetted" dataset from which the effects of lead-based paint had been removed was incorrect.  Actually, the majority of the data he used was collected near the wall of a residential structure.  Considering that the PIA residential parcels are overwhelmingly dominated by those developed prior to the 1978 lead-based paint ban, Dr. Medine's

analyses are highly influenced by the lead-based paint impacts he believed he was excluding.

### ii.     Exclusion of datasets with limited lead-based paint influences

80.     Dr. Medine claims that it was necessary and defensible to exclude all but the front yard and back yard residential soil data from his directional analysis to minimize the uses of samples historically impacted by lead-based paint.  However, he did not consistently apply his rationale across all of the available data, because he also excluded two large sets of DTSC soil measurements that are likely to be least affected by lead-based paint: data from public parks (434 samples) and from the grass "parkways" located between each residence's sidewalk and the street (8,895 samples).

81.     The parks will have relatively few painted structures and the parkways are, by definition, even further from the painted walls of the residence.  On page 26 of his original expert report, Dr. Medine attributed the exclusion of these relevant datasets to "the complexity of the database manipulations." On page 10 of his rebuttal report, Dr. Medine offers a different excuse by stating that he "made a professional decision that [the parkway and park datasets] were not relevant to [his] analysis of historical atmospheric emissions and 'chose' to exclude [the parkway and park datasets]." Ironically, despite these inexplicable excuses, Dr. Medine used the step-out data in his analyses, although these samples were predominantly collected in parkways.

82.     This subjective exclusion of thousands of relevant data points, combined with the inclusion of thousands of samples collected within 10 feet of residence, injects serious doubt about the credibility of Dr. Medine's choices and results.

### iii.    Exclusion of thousands of parcels based on their location

83.     Unlike my geostatistical study of the PIA residential area, which addressed conditions in all directions from the former smelter, Dr. Medine's directional analysis addresses only four directions that he deems to be "predominant" wind directions and one

direction that he deems a "non-predominant" wind direction, encompassing less than 113º of the 360º circle that DTSC drew around the former smelter when it created the PIA.

84.     PIA residential data in the other 247º are entirely excluded from his directional analyses, representing over half of the residential parcels in the PIA and over half the residential data in DTSC's dataset.  Dr. Medine's method, by design, reaches conclusions from a minority of the data and then extrapolates those conclusions to the excluded majority.

85.     The objective scientific approach to determining whether to exclude otherwise valid data is to include all valid data in the initial calculations and then compare the results with an alternative set of results based on calculations using the smaller dataset.  This is how I conducted my geostatistical study, in which I used all of DTSC's data to assess the potential impact of the former Vernon smelter in the PIA and then stress-tested those results via sensitivity tests using alternate datasets to see if the results were affected.

86.     Good statistical practice dictates that data should only be excluded if an objective and quantifiable comparison of these results demonstrates that such data adversely impacted the results.  Dr. Medine did not do this.  He subjectively and, worse yet, inaccurately excluded more than half of DTSC's PIA database to generate his results. No statistical method can produce credible results if, as here, the dataset used in that method is unreliable.

## B.     The methodology used by Dr. Medine

87.     In addition to his use of a seriously flawed and manipulated dataset, Dr. Medine applied a methodology to that data that is full of statistical errors and produced scientifically unreliable results.  I explain those statistical errors below.

### i.      Double averaging and over-smoothing data

88.     Instead analyzing the actual DTSC residential surface soil measurements, as I did in my study, Dr. Medine uses multiple levels of data averaging to convert the thousands of actual soil measurements into a handful of plotted points, which creates an illusion of regularity not present in the actual data.  First, he converts the data for a given parcel into single averages for the front and back yards which are then placed artificially at the center of the parcel.  Next, he averages together all of the parcels within a given distance interval, such as all parcels located between 1.0 and 1.5 miles from the former smelter, and coverts them to a single double-averaged data point.  Such "averaging of already parcel-averaged" data is a classic case of improperly "over-smoothing" the dataset, which results in the masking of actual variations in the data.

89.     Having reduced thousands of actual soil samples to about a dozen plotted points, Dr. Medine then wrongly claims that his synthetic data proves that his conclusions are supported by a strong correlation of the data in the underlying dataset.  This is not true.

90.     Dr. Medine's own work files indicate that he tested the correlation of the data for one of his directional analyses both before and after double-averaging.  This showed there was virtually no statistical correlation in the data—that is, no pattern of contamination attributable to the former smelter—unless he used double-averaging to create the appearance of correlation.  Dr. Medine did not acknowledge this fact in his expert report.

91.     I draw two conclusions from Dr. Medine's use of double-averaging.  First, he did not conduct or present a scientifically objective analysis of the DTSC data, but instead selectively reported only those results that supported a particular interpretation.  Second, once the invalid effects of Dr. Medine's data smoothing are eliminated, his directional analysis shows no pattern of contamination attributable to the former smelter.

### ii.     Inclusion of non-directional data in a directional analysis

92.     A fundamental tenet of Dr. Medine's method is that it purports to specifically describe soil data trends from the former Vernon smelter along specific wind directions from the Vernon smelter.  However, he violates this principle by "embedding" the same initial set of data points in every direction.

93.     Regardless of the direction he is assessing, in all of his fitted trend lines Dr. Medine embeds the same initial data points as representative of emission impacts from the former Vernon smelter in soils within 3000 feet downwind of the smelter.  He improperly compares lumps together this ***non-directional*** data from the first 3000 feet with ***directional*** (e.g., to the North) PIA residential data collected beyond 3000 feet.  The mixing and matching of data points from different directions renders his supposedly "directional" analysis statistically invalid.

### iii.     Manipulated data points from the industrial area

94.     To make matters even worse, Dr. Medine's non-directional embedded data points, were subjectively derived using only 201 of 339 available surface soil lead measurements within 3000 feet of the Vernon smelter, with no objective explanation for why he ignored more than 40% of the surface soil data collected in the industrial buffer zone.

95.     Moreover, Dr. Medine subjectively skews the dataset by replacing selected data points with more averaging.  For example, when he calculates a single embedded value to replace all data collected within 2000-3000 feet away from the former smelter, he first replaces 21 distinct measurements with four averages, which artificially increases the plotted value for that interval by more than 100% (from 96 ppm to 194 ppm).  This distorts his analysis by disguising how quickly lead soil concentrations decrease with distance from the smelter.

96.     Dr. Medine's embedded data points further distort his directional analysis because they are derived in part from at least 14 data points that he has placed in the

wrong distance interval.  When Dr. Medine mistakenly places samples in the wrong double-averaged distance interval, the mistake is magnified because he relies on only a handful of such points to reach his conclusions.

97.     These various manipulations or misstatements of the data from the industrial buffer zone surrounding the former smelter materially bias his directional analyses.  They produce substantial overstatements of the soil lead concentrations immediately downwind of the former smelter, which misrepresents how quickly such concentrations decrease in the distance intervals of 0-1000, 1000-2000, and 2000-3000 feet from the former smelter. Without his manipulations, the average soil lead concentration for each distance interval would have been much lower.

98.     Dr. Medine's directional trend lines are all strongly influenced by these first three artificially manipulated interval averages, because he applies them indiscriminately in all directions.  Therefore, they inject an understatement of how quickly the measured effects from the smelter decrease into all of his conclusions.  Such data manipulations mean that Dr. Medine cannot credibly claim that he evaluated the actual site data in his directional analysis.

### iv.     Inconsistent averaging and distance designation

99.     The reliability of Dr. Medine's directional analyses are further compromised by the fact that none of Dr. Medine's directional analyses are based on consistent distance intervals. For example, the embedded industrial data points are based on a small industrial dataset – not associated with any wind direction. In contrast, parcel-averaged residential PIA data are grouped into either uniform 1000-foot or half-mile intervals with a different number of parcels in each interval. The step-out data, on the other hand, are grouped on much wider and variable intervals. So, each plotted data point in Dr. Medine's directional analysis represents a different number of measurements and inconsistent intervals.

### v.   Misapplication of statistical trend analysis

100.   Dr. Medine's conclusions from his "directional analysis" are derived from the trend lines that he superimposes over his handful of double-averaged data points.  I have described above the multitude of ways in which he misused data and violated commonly accepted statistical practices.  As a threshold matter, no scientific method can produce reliable conclusions from an unreliable dataset, which is what Dr. Medine attempts to do here.  However, even if Dr. Medine had simply used all of the site data, his methodology would still not produce statistically valid results.

101.   Dr. Medine's first fundamental error was his failure to establish a trend line based on data solely impacted by the smelter, comparing the result of that analysis to data from the PIA residential area.  Mixing data impacted by a variety of lead sources, such as lead-based paint, leaded vehicle emissions and industrial lead sources and treating the data as if they all came from the same population was a statistically invalid procedure to determine the extent of impact of the former smelter.  And, since his trend lines reflect the same faulty premise, they are not statistically valid either.

102.   Dr. Medine's second fundamental error was his failure to recognize that even after all of his manipulations to distill the residential data to a handful of artificial double-averaged points, those points are basically devoid of any statistically detectable trend.

103.   For example, a review of Dr. Medine's directional analysis in the Northern direction (Figure 11a) reveals that when the superimposed trend line is removed, the error bars for Dr. Medine's selected distance intervals from the Vernon smelter overlap (Figure 11b). Where the error bars of two averages overlap, those averages are statistically indistinguishable from each other (*i.e.*, from a statistical point of view they should be treated as equal measures).  The absence of statistical differences based on distance from the smelter is especially evident among lead concentrations from the intervals situated within the PIA residential areas (Figure 11c).  Despite Dr. Medine's substantial data filtering and manipulations, the results clearly refute his conclusions regarding the

presence of a declining trend emanating from the Vernon smelter.  Statistically detectable trends are likewise absent in each of the other "directions" Dr. Medine evaluated.

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

Figure 11. (a) Dr. Medine's Trend Analysis along the North Direction. (b) Dr. Medine's interval average lead concentrations with their 95% confidence intervals. (c) Dr. Medine's PIA residential area interval average lead concentrations with their 95% confidence intervals.

104.   I tested Dr. Medine's interval-based methodology on an unfiltered dataset—using essentially all of the data in DTSC's dataset from the PIA residential area—to see if the results of his directional analysis would have been any different without his subjective censoring of his client's data.  My dataset included all properties within the residential areas, including residential parcels, parkways, parks, public properties and commercial properties.  I included both the wind directions addressed by Dr. Medine and the wind directions his directional analysis excluded.  There was no statistically significant trend in any of these directions.

105.   I also conducted a sensitivity analysis of my results to assess the effect of using data collected within 10 feet of a residence's wall.  Even with this data removed, there was no statistically identifiable trend in the residential soils data in any direction.  This tells me that (i) there was no distance-related trend in the data being obscured by the inclusion of samples with a higher likelihood of containing lead-based paint residue, and (ii) straightforward statistical analyses of the extensive PIA database should have led Dr. Medine to the conclusion that surface soil lead measurements within the PIA residential areas are devoid of spatial statistical patterns attributable to the former Vernon smelter.

106.   Dr. Medine submitted a rebuttal report in which he presented revised values (using his preferred average concentrations, as opposed to maximum values) for the soil lead concentrations within 3000 feet of the former smelter, within the industrial buffer area (Table 2 at page 13; Figure 1 at page 14) and he also presented a revised directional analysis in the North direction covering distances greater than 3000 feet from the former smelter (Figure 2 at page 15), but he did not present the data on a single figure.



Figure 12. Combined Data from Table 2 and Figure 2
of Dr. Medine's Rebuttal Report

107.    Figure 12 presents such a combination in a single figure.  For the reasons
stated above, I do not believe that Dr. Medine's vetting and averaging process produces
plotted values are statistically reliable.  However, to the extent that Dr. Medine believes
them to be reliable, he should feel compelled to acknowledge that the plotted data
represents at lease two distinct trends due to at least two distinct impacts.  Dr. Medine has
no justification for assuming that these distinct trends represent a single population and
then directing his software to impose a trend line based on that unjustified assumption.

108.    I understand that Dr. Medine does not consider himself an expert in the area
of geostatistics. Nor does he consider himself a statistician. I am such an expert.  While
the data tools available in any off-the-shelf copy of Microsoft Excel will fit a trend line to

any dataset if directed to do so, that does not mean the dataset or the trend line are statistically defensible. Dr. Medine's fitted trend lines represent invalid profiles of manipulated lead concentrations from a vast array of natural and anthropogenic sources. Using such results to opine on the extent of lead deposition from the former Vernon smelter is simply a misapplication of the selected statistical procedures and inconsistent with accepted scientific methods for reaching such a determination.

## C.   Dr. Medine's lead concentration mapping

109.   In his initial expert report, Dr. Medine presents a map that purports to show what the lead concentrations in the PIA would look like after DTSC's dataset is filtered to remove the influence of lead-based paint. Like his directional analyses, these maps are based on a partial data set: front yards and industrial samples, excluding all other sample locations in the PIA, even the back yard samples that he used in his directional analyses. Further, the presented maps clearly indicate the presence of multiple, randomly located areas of elevated surface soil lead concentrations unrelated to a given location's distance from the former Vernon smelter.  Concentrations along a given direction from the former smelter go up and down randomly.

110.   Such patterns are inconsistent with Dr. Medine's conceptual site model for the Vernon smelter, which predicts that once lead-based paint impacts are eliminated from the dataset, soil lead concentrations will decrease based on distance from the Vernon smelter.  The patchwork pattern of high and low concentrations also contradicts his qualitative opinion that the Vernon smelter is the "predominant" source of lead impacts within the PIA residential areas.

111.   Dr. Medine's use of his mapping application, known as IDW, is also scientifically flawed.  First, one of Dr. Medine's bedrock positions is that contamination from the former Vernon smelter was distributed in accordance with wind direction, but IDW is incapable of directly incorporating directionally distributed data.

112.    Second, although IDW and other mapping applications are fully capable of plotting all data directly, Dr. Medine once again uses averaging to "over-smooth" the data.  Injecting such smoothing in a mapping application is particularly improper because it distorts features of the map; it is the equivalent of "averaging" a mountain and the adjacent valley to generate a nonexistent plain.

### D.    Conclusion regarding Dr. Medine's "directional analysis"

113.    As detailed above, Dr.  Medine's largely unrecognized methodology suffers from myriad violations of commonly accepted statistical standards, including:

Data Errors

- Erroneous inclusion and exclusion of samples
- Exclusion of datasets with limited lead-based paint influences
- Exclusion of thousands of parcels based on location

Methodology Errors

- Over-smoothing and double-averaging
- Inclusion of non-directional data in a directional analysis
- Manipulated data points from the industrial area
- Inconsistent averaging and distance designations
- Misapplication of statistical trend analysis

Lead Concentration Mapping Errors

- Use of tool incompatible with directional data

114.    These statistical violations, individually and collectively render the results of Dr. Medine's "directional analysis" scientifically unreliable.  They do not warrant any change in my opinions based on my geostatistical analyses.

115.    In addition to my training, experience, and general knowledge of environmental and statistical principles, I have reviewed and analyzed the extensive soil concentration database and relevant documents downloaded from DTSC and Los Angeles

TRIAL DECLARATION OF DR. SHAHROKH ROUHANI

County online sources, as well as databases provided by Geosyntec Consultants, Inc.  The primary sources of information considered in developing my opinions were:

- DTSC's Excel file of compiled PIA soil sampling data tables, dated May 31, 2020
- DTSC's GIS database of the PIA
- DTSC's Parkway data report
- Los Angeles County Parcels and Buildings
- On-site, industrial, and step-out data compiled by Geosyntec Consultants, Inc. based on technical reports publicly available at DTSC's EnviroStor website, including:
  - Advanced GeoServices and E2 Environmental. "Phase 2 RCRA Facility Investigation." October 13, 2006.
  - Advanced GeoServices and E2 Environmental. "Phase 3 RCRA Facility Investigation." April 18, 2011.
  - Unknown Author. "FINAL XRF Summary Table - Geoprobe Sampling." September 10, 2013.
  - Advanced GeoServices. "Comprehensive RCRA Facility Investigation Report - Part 1 (On-site Soil and Soil Gas)." February 19, 2016.
  - Advanced GeoServices. "Non-residential Dust and Dirt Sampling Data." July 15, 2016.
  - Advanced GeoServices. "Emergency Response Interim Measures for Stormwater Management System Removal Completion Report." April 28, 2014.

116.   I created all of the figures that appear in this declaration.  The figures all accurately reflect my calculations, analyses, and opinions, including my variography.  The figures also accurately reflect the underlying data that I relied upon. Figures, charts, and maps depicting the PIA and soil sample locations or values are true and accurate

representations based on my understanding of the area and my review of DTSC source materials and other voluminous records. The charts and figures included in this declaration aid me in explaining my opinions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of April 2022.

Shahrokh Rouhani, Ph.D, P.E.