Rob Bonta
Attorney General of California
Sarah E. Morrison
Timothy E. Sullivan
Supervising Deputy Attorneys General
Donald A. Robinson, SBN 72402
Jon Tangonan, SBN 216705
Aarti S. Kewalramani, SBN 247068
Elizabeth B. Rumsey, SBN 257908
Kate M. Hammond, SBN 293433
Adrianna Lobato, SBN 332026
Deputy Attorneys General
300 South Spring Street
Los Angeles, CA 90013
Phone: (213) 269-6328
Fax: (916) 731-2128
E-mail: Donald.Robinson@doj.ca.gov

MATTHEW K. EDLING (SBN 250940)
matt@sheredling.com
ADAM M. SHAPIRO (SBN 267429)
adam@sheredling.com
TIMOTHY R. SLOANE (SBN 292864)
tim@sheredling.com
YUMEHIKO HOSHIJIMA (SBN 331376)
yumehiko@sheredling.com
SHER EDLING LLP
100 Montgomery Street, Ste. 1410
San Francisco, CA 94104
Tel: (628) 231-2500
Fax: (628) 231-2929

*Attorneys for Plaintiffs California Department of Toxic Substances Control and the Toxic Substances Control Account*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL and the TOXIC SUBSTANCES CONTROL ACCOUNT,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**NL INDUSTRIES, INC., et al.,**<br><br>Defendants. | No. 2:20-cv-11293-SVW-JPRx<br><br>**PLAINTIFFS' TRIAL BRIEF**<br><br>Courtroom: 10A<br>Judge: Stephen V. Wilson<br>Action Filed: December 14, 2020<br><br>Trial Date: May 11, 2022<br>Time: 9:00 a.m. |

# <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ....................................................................................... **1**

    I.    Plaintiffs will meet their burden under CERCLA. ............................. 1

    II.    Defendants cannot succeed when the burden shifts. ...........................7

**SCOPE OF TRIAL** ...................................................................................... **9**

    I.    Issues within the scope of the April trial. ......................................... 9

    II.    Issues not within the scope of the April trial. .................................. 10

**DISCUSSION** ............................................................................................ **12**

    I.    The radius of contamination from the Vernon Plant extends at
             least 1.7 miles – Defendants cannot meet their burden to show
             otherwise. ....................................................................................... 12

            A.    There were harmful releases and threatened releases of
                  hazardous substances from the Vernon Plant. .......................... 13

            B.    Releases from the Vernon Plant reached surrounding
                  communities at least 1.7 miles away. ....................................... 14

            C.    Defendants' experts cannot dispute that lead from the
                  Vernon Plant reached soils in the PIA. ..................................... 17

            D.    DTSC took response actions throughout the PIA because
                  of airborne lead emissions from the Vernon Plant. ................. 20

    II.    Plaintiffs' burden under CERCLA is to show *only* a "loose"
             nexus between releases and threatened releases from the Vernon
             Plant and the incurrence of response costs. ...................................... 21

             A.    Plaintiffs will establish the requisite nexus by
                  demonstrating a plausible migration pathway of
                  contaminants from the Vernon Plant. ....................................... 22

            B.    Defendants cannot meet their burden to disprove
                  causation after Plaintiffs demonstrate a plausible
                  migration pathway. .................................................................. 24

**CONCLUSION** ......................................................................................... **24**

i

# TABLE OF AUTHORITIES

**Cases**

*3550 Stevens Creek Assoc. v. Barclays Bank of Cal.*,
　915 F.2d 1355 (9th Cir. 1990) ................................................................... 2

*Artesian Water Co. v. Gov't of New Castle Cnty.*,
　659 F. Supp. 1269 (D. Del. 1987) .............................................................. 22

*Asarco LLC v. Cemex, Inc.*,
　21 F. Supp. 3d 784 (W.D. Tex. 2014) ............................................. 21, 22, 23, 24

*Brookfield-N. Riverside Water Comm'n v. Martin Oil Mktg., Ltd.*,
　No. 90 C 5884, 1991 WL 24476 (N.D. Ill. Feb. 21, 1991) ................................ 10

*Burlington N. & Santa Fe Ry. Co. v. United States*,
　556 U.S. 599 (2009) ............................................................................ 11

*California Dep't of Toxic Substances Control v. Alco Pacific*,
　317 F. Supp. 2d 1188 (C.D. Cal. 2004) ....................................................... 20

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
　270 F.3d 863 (9th Cir. 2001) ................................................................... 11

*Carson Harbor Village Ltd. v. Unocal Corp.*,
　287 F. Supp. 2d 1118 (C.D. Cal. 2003) ............................................ 2, 3, 6, 21

*Castaic Lake Water Agency v. Whittaker Corp.*,
　272 F. Supp. 2d 1053 (C.D. Cal. 2003) ............................................ 3, 10, 21, 22

*Cose v. Getty Oil Co.*,
　4 F.3d 700 (9th Cir. 1993) ............................................................. 2, 9, 11, 16

*Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns, Inc.*,
　No. 11-CV-0252-CVE-PJC, 2017 WL 2662195 (N.D. Okla. June 20, 2017) ..... 23

*Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*,
　171 F.3d 1065 (6th Cir. 1999) .................................................................. 23

*Lincoln Props. Ltd. v. Higgins*,
　No. S-91-760DFL/GGH, 1993 WL 217429 (E.D. Cal. Jan. 21, 1993) ................. 7

*New York v. Shore Realty Corp.*,
　759 F.2d 1032 (2d Cir. 1985) .............................................................. 21, 23

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
　596 F.3d 112 (2d Cir. 2010) ..................................................................... 2

ii

*Nw. Mut. Life Ins. Co. v. Atl. Research Corp.*,
   847 F. Supp. 389 (E.D. Va. 1994) ...................................................................... 2

*Pakootas v. Teck Cominco Metals, Ltd.*,
   868 F. Supp. 2d 1106 (E.D. Wash. 2012) .......................................................... 21

*Santa Clarita Valley Water Agency v. Whittaker Corp.*,
   No. 2:18-CV-06825-SB-RAO, 2021 WL 2549066 (C.D. Cal. Apr. 5, 2021) . 3, 23

*Tesoro Ref. & Mktg. Co. v. City of Long Beach*,
   No. 2:16-cv-06963-VAP-FFMx, 2018 WL 11348067 (C.D. Cal. Nov. 21, 2018)
   .................................................................................................................... 3, 7

*Thomas v. FAG Bearings Corp.*,
   846 F. Supp. 1382 (W.D. Mo. 1994) ................................................................. 23

*United States v. Bliss*,
   667 F. Supp. 1298 (E.D. Mo. 1987) ............................................................ 21, 23

*United States v. Cap. Tax Corp.*,
   545 F.3d 525 (7th Cir. 2008) ............................................................................ 11

*United States v. Monsanto Co.*,
   858 F.2d 160 (4th Cir. 1988) ............................................................................ 24

*United States v. Seymour Recycling Corp.*,
   679 F. Supp. 859 (1987) ................................................................................... 20

*United States v. Sterling Centrecorp Inc.*,
   977 F.3d 750 (9th Cir. 2020) ........................................................................... 2, 9

*United States v. W. Processing Co.*,
   734 F. Supp. 930 (W.D. Wash. 1990) ............................................................... 11

*Wash. State Dep't of Transp. v. Pacificorp*,
   59 F.3d 793 (9th Cir. 1995) ................................................................................ 2

*Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n*,
   66 F.3d 669 (4th Cir. 1995) .................................................................... 7, 21, 24

**Statutes**

42 U.S.C. § 9601 ..................................................................................... 1, 11, 20

42 U.S.C. § 9607(a) ................................................................................ 1, 2, 21, 23

Cal. Health and Safety Code § 57008 ................................................................ 13

iii

**Regulations**

40 C.F.R. § 300.1 ................................................................................................. 2

40 C.F.R. § 302.4 ............................................................................................... 12

Cal. Code Regs., tit. 22, §§ 68400.5, 69020-69022 .................................... 12

iv

# INTRODUCTION

The Court set trial to determine the geographic extent of lead contamination from the former secondary lead smelter located in Vernon, California[1] ("Vernon Plant") – i.e., the "compensable cleanup area." ECF 231. However, proving such a determination is not the Plaintiffs' burden under CERCLA. Rather, Plaintiffs only need show a "plausible migration pathway" by which lead released from the Vernon Plant could have traveled to the residential areas where Plaintiffs investigated and cleaned up lead. Once Plaintiffs make such a showing, Defendants[2] have the burden to show that none of the lead cleaned up came from the Plant. Defendants will be unable to meet this burden because, as Plaintiffs will show, the strength and direction of prevailing wind currents more than plausibly carried the lead emitted from over nearly ninety years of Vernon Plant operations as far as two miles away.

## I. PLAINTIFFS WILL MEET THEIR BURDEN UNDER CERCLA.

Plaintiffs' burden under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, is low. To establish Defendants' liability under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Plaintiffs need only demonstrate that: (1) the site is a "facility";[3] (2) a

---

[1] The Vernon Plant is a former secondary smelter located at 2700 and 2717 South Indiana Street, 3900 East 26th Street, and 3841 and 3901 Bandini Boulevard in Vernon, California 90058, identified by Assessor's Parcel Numbers 5243-021-024, 5243-022-007, 5243-022,009, 5243-022-010, and 5192-030-009.

[2] Defendants in this action are NL Industries Inc., Gould Electronics Inc., Kinsbursky Bros. Supply Inc., Trojan Battery Company, LLC, Ramcar Batteries, Inc., Clarios, LLC, Quemetco, Inc., and International Metals Ekco, Ltd., and Oregon Tool Inc. (fka Blount, Inc.) (collectively, "Defendants").

[3] CERCLA defines "facility" broadly to mean "any building, structure . . ." or to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9)(A)–(B). "The expansiveness of this definition is well recognized." *Nw.*

(continued…)

1

1  "release" or "threatened release" of a "hazardous substance" from the facility has

2  occurred; (3) the release or threatened release has caused the State to incur

3  "response costs"; and (4) Defendants fall within at least one of the four classes of

4  liable parties described in Section 107(a). *United States v. Sterling Centrecorp Inc.*,

5  977 F.3d 750, 756 (9th Cir. 2020).[4] Relevant to the "compensable cleanup area,"

6  Plaintiffs only burden at this trial is the third element of CERCLA, to show the

7  release or threatened release caused DTSC to incur "response costs." 42 U.S.C.

8  § 9607(a); *Cose v. Getty Oil Co.*, 4 F.3d 700, 703–04 (9th Cir. 1993).

9       Plaintiffs' burden under the third element is low because Congress

10  "purposefully lowered the liability bar" under CERCLA and adopted a "relaxed

11  liability standard." *See Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596

12  F.3d 112, 130 (2d Cir. 2010). "In evaluating whether this element of a CERCLA

13  claim has been proved, courts do not apply traditional tort notions of causation."

14  *Carson Harbor Vill., Ltd. v. Unocal Corp.*¸ 287 F. Supp. 2d 1118, 1186 (C.D. Cal.

15  2003) (collecting decisions). "The language of the statute requires that plaintiff

16  establish a causal link between the release for which defendant is responsible, and

17

18  _____

19  *Mut. Life Ins. Co. v. Atl. Research Corp.*, 847 F. Supp. 389, 395 (E.D. Va. 1994);

20  *see 3550 Stevens Creek Assoc. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1360, n.10 (9th Cir. 1990). It is undisputed that the Vernon Plant is a building or structure from which there has been a release. 42 U.S.C. § 9607(a)(4).

21

22  [4] Under the third element, a plaintiff seeking to recover response costs

23  usually must show that the expenditure of response costs is consistent with the National Contingency Plan ("NCP"), a set of regulations that hold "the

24  organizational structure and procedures for preparing for and responding to . . . releases of hazardous substances." *See Wash. State Dep't of Transp. v. Pacificorp*,

25  59 F.3d 793, 799 (9th Cir. 1995) (quoting 40 C.F.R. § 300.1). Plaintiffs need not

26  make such a showing because they are state agencies that are entitled a presumption that their response costs are consistent with the NCP. *See Sterling Centrecorp Inc.*,

27  977 F.3d at 759. In any case, NCP-related issues will not be addressed at the April

28  trial and are reserved for a later stage.

2

1  the response costs incurred by plaintiff. . . . *The nexus that must be shown, however,*

2  *is a loose one*." *Id.* (citations omitted) (emphasis added).

3       Plaintiffs can meet their burden of establishing a "nexus" between the

4  Vernon Plant's releases and Plaintiff Department of Toxic Substances Control's

5  ("DTSC") response actions if they: (a) identify the contaminant at a site; (b)

6  identify the same (or perhaps a chemically similar) contaminant off-site; and (c)

7  provide evidence of a plausible migration pathway by which the contaminant could

8  have traveled from a site to the off-site locations. *Castaic Lake Water Agency v.*

9  *Whittaker Corp.*, 272 F. Supp. 2d 1053, 1065–66 (C.D. Cal. 2003).[5] At trial,

10  Plaintiffs will present evidence showing a "plausible migration pathway" by which

11  lead released from the Vernon Plant could have traveled to properties within the

12  approximately 1.7-mile radius area that DTSC refers to as the "Preliminary

13  Investigation Area" ("PIA") where it has investigated soil lead contamination and

14  remediated thousands of properties. Put simply, Plaintiffs do not need to prove

15  whether lead from the Vernon Plant actually reached the properties within the PIA.

16  Below is a diagram of the PIA with the Vernon Plant in the center[6]:

17

18

19

20

21

---

22      [5] Numerous district courts in the Ninth Circuit have followed this "plausible

23  migration pathway" standard. *E.g.*, *Santa Clarita Valley Water Agency v. Whittaker Corp.*, No. 2:18-CV-06825-SB-RAOx, 2021 WL 2549066, at *2 (C.D. Cal. Apr. 5,

24  2021); *Tesoro Ref. & Mktg. Co. v. City of Long Beach*, No. 2:16-cv-06963-VAP-FFMx, 2018 WL 11348067, at *3 (C.D. Cal. Nov. 21, 2018).

25      [6] Diagram Source:

26  https://dtsc.maps.arcgis.com/apps/webappviewer/index.html?id=d8a6b586685f46f7

27  93e39759c71be3ef&utm_source=From_Exide_Soil_Sampling_Page&utm_medium=Map_Image&utm_campaign=Exide_PIA_Soil_Sampling

28

3



     Here, it is uncontested that the Vernon Plant released airborne lead emissions. It is also uncontested that soil lead contamination has been found throughout the PIA. It is uncontested that DTSC and its contractors undertook significant efforts to sample for and clean up lead contamination in soil, principally in the PIA. A map depicting many sample locations, with the Vernon Plant at the center of the PIA, is provided below for reference:

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16  Additional samples not contained on the above map were taken to the north and

17  northeast of the PIA. A map depicting cleanup locations within the PIA also is

18  provided below:

19
20
21
22
23
24
25
26
27
28

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15   Plaintiffs will meet their burden to show a loose causal nexus by showing a

16   plausible migration pathway, *see Carson Harbor Vill., Ltd.*, 287 F. Supp. 3d at

17   1186, between the Plant's emissions and DTSC's response actions in the PIA.

18   Plaintiffs will show that such pathway is the air and associated wind patterns

19   between the Plant and the PIA. Plaintiffs will also show that Defendants cannot

20   meet their burden to show that none of the lead actually got to the PIA because,

21   through a range of evidence, Plaintiffs will show that lead emitted from the Plant

22   traveled in the air, carried by prevailing wind currents, and was deposited in the soil

23   in the PIA. Plaintiffs' evidence will include Dr. Allen J. Medine's testimony

24   (further supported by Mr. Lyle Chinkin and other rebuttal experts) that the lead air

25   emissions released from the Vernon Plant over approximately ninety years actually

26   reached properties in the PIA.

27

28

6

Specifically, Plaintiffs will show:

- Lead emitted from the Vernon Plant could have traveled, and did travel, in the air along the prevailing wind directions to land in soils at least as far as the outer boundaries of the PIA.

- Directional, geospatial, ratios, statistical, and speciation analyses support a pattern that demonstrates lead within the PIA is directly attributable to the Vernon Plant's emissions.

- Smelter lead can be identified as a source in the soil extending throughout the 1.7-mile PIA surrounding the Vernon Plant.

- Lead from gasoline, paint, pesticides, and other industrial sources cannot account for the high concentration of lead found in the PIA.

## II.   DEFENDANTS CANNOT SUCCEED WHEN THE BURDEN SHIFTS.

Once Plaintiffs meet their burden under CERCLA to show a plausible migration pathway, "the burden of proof falls on the defendant to disprove causation." *Tesoro Ref. & Mktg. Co.*, 2018 WL 11348067, at *3 (quoting *Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n*, 66 F.3d 669, 681 (4th Cir. 1995)). Defendants' burden is high because CERCLA sets no minimum contamination amount for liability. *Lincoln Props. Ltd. v. Higgins*, No. S-91-760DFL/GGH, 1993 WL 217429, at *19 (E.D. Cal. Jan. 21, 1993) ("There is no quantitative, or threshold concentration, requirement for releases of hazardous substances"). So, for Defendants to prevail at trial, they must therefore show that *none* of the lead in the PIA that DTSC investigated and/or cleaned up came from the Vernon Plant.

Defendants likely will take the scientifically unfounded position—which their experts are unwilling to fully endorse—that lead emissions from the Vernon

7

Plant did not travel beyond one-half mile from the Plant. Plaintiffs will show that Defendants' position is riddled with flaws including:

- Defendants ignore the significance of soil samples and air dispersion modeling that confirm the presence of lead from the Vernon Plant in soil extending at least 1.7 miles from the Vernon Plant.

- Defendants adopt inappropriate geostatistical methods in order to ignore a pattern of soil contamination that shows decreasing concentrations with increasing distance from the Vernon Plant, which is a hallmark of point source emissions.

- Defendants assert lead paint and other non-industrial sources of lead in the environment must be the major contributor to high lead soil concentrations. But this assertion ignores contrary expert testimony and the basic fact that the level of lead in PIA residential soils is significantly higher than other urban neighborhoods in the Los Angeles area. These other neighborhoods also would have been impacted by lead-based paint and other non-industrial sources, and therefore these sources do not explain why PIA soil lead levels are elevated.

- By pointing to non-smelter sources as the only contributors to lead in soil more than one-half mile from the Vernon Plant, Defendants ignore the unique characteristics that show lead in the PIA came from a lead smelter.

Given the flaws in Defendants' arguments, after the burden shifts to Defendants, they will be unable to show that no lead from the Vernon Plant reached the PIA areas where DTSC conducted response actions.

8

# SCOPE OF TRIAL

## I.   ISSUES WITHIN THE SCOPE OF THE APRIL TRIAL.

Plaintiffs bring this action under CERCLA and state law against Defendants seeking to recover response costs they incurred because of releases of hazardous substances from a former secondary smelter located at the Vernon Plant.

The Court set the April trial "to determine the scope of the compensable cleanup area." ECF No. 231 at 2. While the term "compensable cleanup area" is foreign to the CERCLA statute and case law, the Court explained that, for the purposes of the April trial, the Court is concerned only with determining the extent of the Vernon Plant's contamination. It should be uncontested that the Vernon Plant released contaminants into the environment.

At trial, Plaintiffs will prove that lead emissions released from the Vernon Plant traveled by air for a radius of at least 1.7 miles and were deposited on the soil at surrounding properties in the PIA, including homes, schools, parks, day care centers, and other sensitive land use properties. In doing so, Plaintiffs will have met their burden to demonstrate a "loose" nexus/plausible migration pathway; but, upon shifting the burden, Defendants will be unable to show that none of the lead in the PIA that DTSC cleaned up came from the Vernon Plant. Therefore, Plaintiffs will show that the "compensable cleanup area" encompasses the PIA.

By carrying their burden of proving a "plausible migration pathway" to the PIA, and therefore resolving the "compensable cleanup area" issue, Plaintiffs will have proven several elements of Defendants' liability under CERCLA and state law, including: (i) the Vernon Plant is a facility; (ii) releases or threatened releases of hazardous substances occurred from the Vernon Plant; (iii) DTSC took response actions and incurred response costs in the PIA; and (iv) the releases from the Vernon Plant caused DTSC to take response actions. *See, e.g., Sterling Centrecorp Inc.*, 977 F.3d at 756 (*citing Cose*, 4 F.3d at 703–04).

## II. ISSUES NOT WITHIN THE SCOPE OF THE APRIL TRIAL.

The parties expressly agreed that the following issues will not be tried at the April trial: (1) whether any of the parties are "liable persons" under CERCLA Section 107, (2) the amount of Plaintiffs' recoverable response costs, (3) whether Plaintiffs' response actions were inconsistent with the National Contingency Plan, (4) contribution, divisibility, and third-party liability, and (5) any issues related to nuisance. ECF No. 263 at 3.

Plaintiffs anticipate that Defendants nevertheless will attempt to raise issues expressly excluded from the April trial or irrelevant to the "compensable cleanup area" inquiry.

First, Defendants may argue that the radius of the compensable cleanup area is not more than one-half mile because lead found beyond this point is indistinguishable from other anthropogenic sources. But this argument is not consistent with CERCLA. As noted in Section I of the Introduction above, Plaintiffs meet their burden of establishing a nexus between the Vernon Plant's releases and DTSC's response actions if they (a) identify the contaminant at a site, (b) identify the same (or perhaps a chemically similar) contaminant off-site, and (c) provide evidence of a plausible migration pathway by which the contaminant could have traveled from a site to the off-site locations. *Castaic Lake Water Agency*, 272 F. Supp. 2d at 1065–66. Plaintiffs will show a plausible migration pathway, and Defendants cannot prove that all the lead found beyond one-half mile from the Plant came from other sources.

Second, Defendants may argue that the amount of lead found within the PIA that originated from the Vernon Plant is minimal. But "nowhere in CERCLA is there any reference to a level of a release of hazardous substance necessary to trigger liability. . . . Indeed, the statute attaches liability upon the release of any quantity of hazardous substances." *Brookfield-N. Riverside Water Comm'n v.*

10

1   *Martin Oil Mktg., Ltd.*, No. 90 C 5884, 1991 WL 24476, at *2 (N.D. Ill. Feb. 21,

2   1991); *see* 42 U.S.C. § 9601(22) ("release" under CERCLA means "any" release);

3   *see also Cose*, 4 F.3d at 708–09 ("Liability is imposed under CERCLA regardless

4   of the concentration of the hazardous substances present in a defendant's waste, as

5   long as the contaminants are listed "'hazardous substances' . . . ."); *United States v.*

6   *W. Processing Co.*, 734 F. Supp. 930, 936 (W.D. Wash. 1990) (recognizing that the

7   statutory definitions of "hazardous substance" and "release" contain no threshold

8   quantity requirement). And "[o]nce a party is found to be liable under CERCLA,

9   the party is jointly and severally liable . . . 'regardless of that party's relative fault.'"

10  *United States v. Cap. Tax Corp.,* 545 F.3d 525, 534 (7th Cir. 2008).[7]

11          Third, Defendants may argue that lead contamination from the Vernon Plant

12  is "divisible" from other sources of lead. However, divisibility is a *defense* to joint

13  and several liability under CERCLA. This defense is typically raised after liability

14  is established, and Defendants—not Plaintiffs—bear the burden of proof. *See*

15  *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614–18 (2009);

16  *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 871 (9th Cir. 2001)

17  ("Once liability is established, the defendant may avoid joint and several liability by

18  establishing that it caused only a divisible portion of the harm . . . ."). Because the

19  parties agreed the April trial will not determine CERCLA liability,[8] there can be no

20          [7] Plaintiffs note that applying this case law would not risk an inequitable

21  result. If Defendants believe their contribution to lead contamination in the PIA was

22  minimal, they could—at a later phase—prove that third parties should share some

23  or most of the costs. Indeed, Defendant NL Industries, Inc. filed a Third Party

    Complaint seeking contribution against over 60 third parties.

24          [8] ECF No. 263 at 3 (Joint Rule 26(f) Report). On February 18, 2022,

25  Defendants submitted a "clarification" to the Joint Rule 26(f) Report. ECF No. 310

    at 3. Defendants purported to draw a distinction between "individual divisibility

26  arguments" (i.e., whether the lead contamination attributable to one Defendant is

    divisible from the lead contamination attributable to other defendants) and the issue

27  of whether the "impact attributable to releases from the Vernon Plant is divisible or

                                                                              (continued…)

28

                                            11

basis to divide the harm among defendants because the parties do not yet even know the universe of potentially liable parties. ECF No. 175 (order staying third-party deadlines); ECF No. 313 (Plaintiffs' response to Defendants' "clarification" to Joint Rule 26(f) Report, which explains this problem). And the existence of other sources is immaterial to the "compensable cleanup area"—as the Court has defined the term—because that area focuses on a single source: the Vernon Plant.

## DISCUSSION

I. **THE RADIUS OF CONTAMINATION FROM THE VERNON PLANT EXTENDS AT LEAST 1.7 MILES – DEFENDANTS CANNOT MEET THEIR BURDEN TO SHOW OTHERWISE.**

Plaintiffs' burden is limited to showing a plausible migration pathway. Plaintiffs can and will show such pathway; Plaintiffs do not have to show Vernon Plant lead actually landed in the PIA. It is Defendants' burden to show no lead from the Vernon Plant landed in the PIA. Defendants will not be able to meet that burden because Plaintiffs will demonstrate that the radius of contamination from the Vernon Plant—that is, the "compensable cleanup area"—extends to an area that includes at least the PIA.

As this section will demonstrate, Plaintiffs will establish the requisite elements under CERCLA relevant for this April trial. First, the parties do not dispute that lead, a hazardous substance, *see* 40 C.F.R. § 302.4, tbl. 302.4, was released from the Vernon Plant. *See also* Cal. Code Regs., tit. 22, §§ 68400.5, 69020-69022. Second, the parties do not dispute that DTSC took response actions in the PIA. Third, and important to the question the Court wants to resolve at this

_____

distinguishable from [other] lead sources." *Id.* Plaintiffs responded to this "clarification" to explain why Defendants' newly adopted position is contrary to the parties' agreement, why adjudication of these divisibility issues is premature and imprudent at this procedural juncture, and why these divisibility issues are inappropriate for the April trial. *See generally* ECF No. 313.

12

trial, Plaintiffs will demonstrate the requisite loose causal nexus between the releases and the response actions. By this showing, Plaintiffs will demonstrate the "compensable cleanup area."

**A.     There were harmful releases and threatened releases of hazardous substances from the Vernon Plant.**

As the Court stated at the status conference on March 28, 2022, it should be uncontested that, during the course of its operation, the Vernon Plant released hazardous substances. In any case, Plaintiffs will present evidence that the Vernon Plant released millions of pounds of lead into the air. The soil lead sampling results also provide indirect evidence of releases: soil lead concentrations in residential properties surrounding the Vernon Plant are substantially higher than in similar neighborhoods in the Los Angeles area. Most of the homes in the PIA have soil lead concentrations that exceed the residential California Human Health Screening Levels for lead in soil of 80 mg/kg. *See* Revised California Human Health Screening Levels for Lead,[9] developed pursuant to Cal. Health & Safety Code § 57008. The releases from the Vernon Plant have impacted thousands of residential, commercial and industrial properties. Thousands of residents, including children, currently live in the affected communities in the PIA, and continue to be exposed to this contamination.

It should be uncontested that lead contamination is toxic, even at low levels. Dr. Gettmann will testify that lead toxicity is cumulative and that lead exposure, through contaminated soils, causes a broad array of adverse health effects, especially in children. Lead permanently impairs neurological development and function, and lead causes sensory, motor, cognitive and behavioral harm in children, who are particularly vulnerable and sensitive to lead. Dr. Gettmann will testify that current research indicates lead toxicity does not have a known or

---

[9] Source: https://oehha.ca.gov/risk/soils091709.

13

discernable threshold, confirming that exposure to even the smallest amount should be prevented if possible.

### B.   Releases from the Vernon Plant reached surrounding communities at least 1.7 miles away.

Plaintiffs' expert, Dr. Allen J. Medine, will testify that hazardous substances released from the Vernon Plant were transported well beyond the Plant boundaries. Dr. Medine will testify, based on his analysis of wind directions and available air modeling done by Environ on behalf of the last owner/operator of the Vernon Plant, Exide Technologies, LLC, that air dispersion and deposition of lead emitted from the Vernon Plant is a plausible pathway for these hazardous pollutants to travel beyond the plant's boundaries and to contaminate the soils across the PIA.

Dr. Medine used statistical and geospatial techniques to analyze the pattern of lead concentrations in over 100,000 soil samples, taken at DTSC's direction, within a few miles of the Vernon Plant. Based on the results of his analyses, Dr. Medine concluded that lead released from the Plant is a source of lead in soils within the PIA. Furthermore, he found that lead emitted from the Plant deposited onto soil beyond the PIA's boundaries.

Dr. Medine analyzed the pattern of lead concentrations in residential soils in the PIA. Dr. Medine determined the predominant wind directions using historical data from nearby meteorological stations. Then, Dr. Medine distinguished between soil samples taken in areas that are in the predominant and non-predominant wind directions. The results of this "directional analysis" showed that lead concentrations decreased with distance from the Vernon Plant in the predominant wind directions, indicating that the Plant was a dominant source of the lead contamination found in those samples. The concentration of lead found in soil samples did not start to level off until two to three miles from the Plant, where the lead levels were in the range

14

1    of 105 to 150 mg/kg. Even at that distance, the effects of the Vernon Plant on soil

2    lead concentrations were still discernable.

3         Plaintiffs' expert Mr. Lyle Chinkin confirmed Dr. Medine's conclusion that

4    lead emissions from the Vernon Plant traveled at least 1.7 miles away by reviewing

5    Environ's air dispersion modeling for the Plant. Mr. Chinkin will testify that the

6    modeling shows that it is plausible that the wind carried lead from the Vernon Plant

7    1.7 miles or more and deposited lead in the PIA. Mr. Chinkin also relied on his

8    understanding of the fate and transport of contaminants to support his view that

9    lead particles emitted from the Vernon Plant would be carried several miles away.

10        Dr. Medine bolstered his directional analysis with additional geospatial

11   analyses, which show the same trend of decreasing concentrations as one moves

12   away from the Vernon Plant in all directions. Dr. Medine's additional analyses

13   show that the lead concentration in the upper few inches of residential soil were

14   greater than in the deeper soil, which also is consistent with aerial dispersion and

15   surface deposition of lead.

16        Dr. Medine compared the ratio of lead to antimony in samples in local

17   residential and industrial areas, which the literature has shown to be a characteristic

18   "fingerprint" of secondary lead smelter waste. He concluded that the lead-to-

19   antimony ratios found in the residential and industrial areas were remarkably

20   similar to the lead-to-antimony ratios near the Vernon Plant and also were within

21   the reported values for other secondary lead smelters. This "ratios analysis" further

22   supports Dr. Medine's opinion that the Vernon Plant is the predominant source of

23   lead in the soils in those residential areas in the PIA.

24        Finally, Dr. Medine evaluated other potential sources of lead in the PIA to

25   assess whether those sources, rather than the Vernon Plant, could explain the

26   elevated lead levels within the 1.7-mile radius of the Vernon Plant.[10] Dr. Medine

27   ────────────────────
        [10] As noted above, CERCLA does not require Plaintiffs to prove the Vernon

28                                                                    (continued…)

                                        15

identified several studies of the background level of lead in the Vernon area – i.e., the level of lead that would exist in the PIA if the Vernon Plant had never operated. He then determined that PIA soil concentrations were greater than the background level in each of those studies. Dr. Medine will testify that, because PIA soil lead concentrations are significantly higher than the background level, he is able to rule out lead-based paint, leaded gasoline, and other non-industrial sources as the cause of the PIA's widespread elevated lead levels.

Plaintiffs' expert Dr. Singh, an environmental statistician, also evaluated the soil-lead concentrations in the PIA and compared them to established background levels. Her analysis confirmed that the lead levels are significantly above background across the PIA, including in the dripline areas impacted by lead-based paint, allowing her to opine that lead-based paint cannot explain the elevated levels of lead in the PIA.

Dr. Medine's determination that non-industrial sources did not cause the elevated soil lead levels in the PIA is buttressed by his review of published studies. These studies revealed that non-industrial sources, such as lead paint, leaded gasoline, and pesticides, are not capable of causing the significant levels of lead contamination found in the front and back yards of residential properties in the PIA. Rather, these studies indicated that contamination from non-industrial sources would not be widely dispersed, as would emissions from the tall smokestack of a lead smelter carried by wind. For example, contamination due to leaded gasoline would be limited to areas that are immediately adjacent to freeways and secondary highways. Elevations in residential soil concentrations attributable to lead paint

---

Plant was the predominant source of lead in the PIA. Liability may be imposed regardless of the concentration of the hazardous substances released. *See, e.g., Cose*, 4 F.3d at 708–09.

typically would be confined to areas along the dripline of the home.[11] Dr. Medine concluded that the pattern of soil contamination within the residential properties, as well as the magnitude of soil lead, are inconsistent with non-industrial sources and point instead to an area-wide source such as the Vernon Plant.[12]

Plaintiffs' experts will demonstrate that the lead particles emitted from the Vernon Plant's buildings and stacks for ninety years did not stop at the Plant's boundaries, nor did they stop at an arbitrary one-half mile distance away from the Plant. Instead, emitted lead traveled (in the air, via the wind) into the surrounding industrial and adjacent residential areas in the PIA and at least 1.7 miles. This phenomenon is not unique to the Vernon Plant. Well-documented investigations of lead smelters around the country have found widespread lead contamination caused by air emissions from those facilities, with a telltale pattern of higher concentrations of lead in the soil near the smelter, trending downward with distance away from the smelter. Essentially, the lead contamination in the PIA from the Vernon Plant fits an established pattern, consistent with other smelters and basic laws of physics.

## C. Defendants' experts cannot dispute that lead from the Vernon Plant reached soils in the PIA.

Defendants' experts Dr. Walter J. Shields, Dr. Shahrokh Rouhani, and Mr. Ranjit Machado will opine that emissions from the Vernon Plant did not contaminate the residential areas of the PIA, and that lead found in those areas is attributable primarily to lead-based paint. Plaintiffs' experts, and the cross examination of Defendants' experts, will expose the flaws in the defense experts' analysis, and demonstrate why Defendants cannot possibly show lead emitted by

---

[11] The dripline is the area immediately next to a building's exterior walls where leaded paint dust and chips tend to land.

[12] Essentially, Dr. Medine and Plaintiffs' other experts independently confirm DTSC's preliminary findings dating back to 2015.

17

the Vernon Plant did not travel more than one-half mile. For example, Plaintiffs' expert Dr. Drexler "speciated" to a granular and microscopic level the lead particles from soil samples and concluded that particles of lead unique to smelter emissions ("pyrometallurgical" lead forms) are found in the soil samples taken at the Vernon Plant and in the PIA.

Defendants' expert Dr. Rouhani will opine that the trends of lead concentration as one moves away from the Vernon Plant show that the Plant did not contribute to contamination outside of a one-half mile radius. But Dr. Rouhani utilized a method, known as a variogram, that is not capable of identifying contamination from a point source (like the Vernon Plant) when there are multiple other sources of contamination present (like lead-based paint and leaded gasoline) as well as disturbances of the soil related to human activity.

Unlike Dr. Medine and Dr. Singh, Dr. Shields did not perform a statistical or geospatial analysis of the pattern of lead contamination. Instead, Dr. Shields opines that the level of lead found in the PIA residential soils is consistent with the background level found in similar urban neighborhoods in metropolitan Los Angeles. Dr. Shields therefore concludes there is no reason to suspect there is an area-wide source of contamination in the PIA, since if there were such a source, he would expect the soil lead levels to be above the background level. But, Dr. Shields made a fatal mistake in performing his analysis—he used a background reference (the Waterstone study) that was limited to dripline samples reflective of the highest lead contribution from lead paint and then compared it to PIA soil concentrations that were based on front and back yard samples outside of the reach of the majority of any lead paint contamination. Dr. Shields thus compared apples (dripline samples targeting lead from lead paint) to oranges (yard samples reflecting little, if any, lead from paint). Once the proper apples-to-apples comparison is made (for example, dripline to dripline), as Dr. Singh did, then the data clearly demonstrate

18

that PIA soil lead concentrations are significantly higher than the corresponding background concentrations reported in the Waterstone study.

Further, Dr. Shields relies on a flawed interpretation of the relationship between lead paint and soil lead levels to try and pin the blame for PIA soil contamination on lead-based paint. In response, Dr. Medine will establish that the purported relationship between lead-based paint and soil lead contamination is not nearly as strong as Dr. Shields suggests, and that the best predictor of soil lead concentration is home age rather than the presence of lead paint. Dr. Medine will explain that older homes generally have higher soil lead levels because these homes have had a longer time to accumulate lead from various sources of lead, including atmospheric dispersion from a nearby point source like the Vernon Plant.

Dr. Medine also will testify that redevelopment of residential, parkland, and other properties results in soil disturbances that reset the soil lead levels by mixing and replacing surface soils. These disturbances give the impression that newer homes have lower soil lead concentrations, which in turn can obscure a pattern of contamination that would be more apparent if the redevelopment had never occurred. Defendants' observation that soil lead levels are lower in more recent homes, regardless of the homes' proximity to the Vernon Plant, does not account for the important role played by redevelopment in resetting the soil lead levels.

Finally, defense expert Mr. Machado assails the use of air dispersion modeling as a predictor of lead emissions from the Vernon Plant. But Plaintiffs' expert, Mr. Chinkin, will testify that airborne concentrations calculated using air modeling (AERMOD) are a reliable indication of airborne deposition, and indicate that lead emitted by the Vernon Plant blanketed the entire PIA.

Plaintiffs' Trial Brief
(Case No. 2:20-cv-11293-SVW-JPR)

**D.    DTSC took response actions throughout the PIA because of airborne lead emissions from the Vernon Plant.**

DTSC has undertaken one of the largest and most complex response actions in its history because of the releases and threatened releases from the Vernon Plant. DTSC has collected samples at over 10,000 properties throughout the PIA, overseen the cleanup of lead contaminated soil at over 3,000 residential properties in the PIA, and incurred many millions of dollars in costs. DTSC's investigation and response actions are ongoing. While these facts should be undisputed, Plaintiffs will nevertheless prove them through the testimony of Peter Ruttan, a Senior Engineering Geologist for DTSC, who served as the department's project manager and project manager supervisor for investigation, cleanup, and other activities[13] arising from the Vernon Plant.[14]

---

[13] The term "response" action is defined in Section 101 of CERCLA as including "removal" actions. 42 U.S.C. § 9601(25). Correspondingly, the term "removal" is expressly defined in Section 101(23) of CERCLA, 42 U.S.C. § 9601(23), as encompassing two types of activities authorized by law: (1) "the cleanup or removal of released hazardous substances from the environment" – i.e., cleanup of contaminated soil – and (2) "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances" – i.e., investigation and sampling by DTSC, or others acting on DTSC's behalf or according to DTSC's orders.

[14] The Parties already have agreed that any challenges to DTSC's response actions will not be determined at the April trial, but reserved to a later stage of the case. In the unlikely event the Court elects to entertain challenges to DTSC's response actions, its review should be limited to DTSC's administrative record, *Cal. Dep't of Toxic Substances Control v. Alco Pacific*, 317 F. Supp. 2d 1188, 1193 (C.D. Cal. 2004), under an arbitrary and capricious standard of review, *see, e.g.*, *United States v. Seymour Recycling Corp.*, 679 F. Supp. 859, 860-861 (1987).

**II.   PLAINTIFFS' BURDEN UNDER CERCLA IS TO SHOW *ONLY* A "LOOSE" NEXUS BETWEEN RELEASES AND THREATENED RELEASES FROM THE VERNON PLANT AND THE INCURRENCE OF RESPONSE COSTS.**

CERCLA requires Plaintiffs to show "a release or threatened release" from the Vernon Plant "cause[d] the incurrence of response costs[,]" but this showing does not require "but for" or "proximate" causation. 42 U.S.C. § 9607(a)(4); *see Pakootas v. Teck Cominco Metals, Ltd*., 868 F. Supp. 2d 1106, 1110 (E.D. Wash. 2012) ("CERCLA's strict liability scheme precludes the need to prove causation in the traditional sense."). Rather, and in contrast to traditional tort law, CERCLA only requires Plaintiffs to demonstrate a "loose" nexus between releases and response costs. *See, e.g., Carson Harbor Vill., Ltd.*, 287 F. Supp. 2d at 1186 ("[T]he plaintiff need only prove that the defendant's hazardous materials were deposited at the site, that there was a release at the site, and that the release caused it to incur response costs."). Courts interpret this loose nexus to mean that plaintiffs need only show a "plausible migration pathway" of the contaminant between the source and cleanup site(s); that is, Plaintiffs are not required to "show that defendant's waste was the source of the release or that defendant's waste caused it to incur response costs." *Id.*[15]

---

[15] *See also Asarco LLC v. Cemex, Inc.*, 21 F. Supp. 3d 784, 807 (W.D. Tex. 2014) ("The Court concludes that CERCLA's goals are better served by the framework laid out by the Fourth Circuit in *Westfarm*," which sets out the plausible migration pathway standard.); *United States v. Bliss*, 667 F. Supp. 1298, 1311 (E.D. Mo. 1987) (relaxed standard of causation furthers congressional goals); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043–44 (2d Cir. 1985) (finding Section 9607(a) "unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release, without regard to causation"); *Castaic Lake Water Agency*, 272 F. Supp. 2d at 1066 (plaintiff meets its burden by showing "plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site"); *Westfarm Assocs. Ltd. Pshp. v. Wash. Suburban Sanitary Comm'n*, 66 F.3d 669, 681 (4th Cir. 1995) ("The plaintiff must prove only that contaminants which were once in the custody of the defendant could have travelled onto the plaintiff's land, and that subsequent

(continued…)

21

**A.    Plaintiffs will establish the requisite nexus by demonstrating a plausible migration pathway of contaminants from the Vernon Plant.**

To show a "plausible migration pathway," a plaintiff must identify: (1) a contaminant at the cleanup site; (2) the same, or perhaps chemically similar, contaminant at the defendant's facility; and (3) evidence by which the contaminant could have traveled from the defendant's facility to the cleanup site. *Castaic Lake Water Agency*, 272 F. Supp. 2d at 1067. In *Castaic*, the court found the migration pathway "plausible" based on a hydrogeology expert's testimony that perchlorate detected in surface water runoff tests from areas in the southwest corner of the defendant's site could travel through the site and enter the river upstream of plaintiff's wells. *Id.* at 1067; *see also Artesian Water Co. v. Gov't of New Castle Cnty.*, 659 F. Supp. 1269, 1281 (D. Del. 1987) (plaintiffs offered several studies and analyses demonstrating that hazardous substances were present in the groundwater and in the sediment near the site).

*Asarco LLC v. Cemex, Inc.*, is instructive. There, the court concluded Asarco demonstrated "plausible" migration of arsenic from the plant's cement kiln to the cleanup site based on testimony from Asarco's air emissions expert that fugitive emissions of arsenic from the plant possibly could have traveled to the cleanup site and contaminated the soil. *Id.* at 797, 810. Importantly, the court found the migration "plausible" even though Cemex's expert testified that they considered the soil levels of arsenic at the cleanup site to be within the range of natural background. *Id.* The court also found relevant that the plant and cleanup site were in proximity, the plant's stack heights meant arsenic emissions settled in the surrounding areas, environmental site inspection reports contained warnings about fugitive arsenic emissions, and Asarco's expert testified that it was scientifically

---

contaminants (chemically similar to the contaminants once existing in defendant's custody) on the plaintiff's land caused the plaintiff to incur cleanup costs.").

22

reasonable that the plant contributed to the contamination at the cleanup site via air emissions. *Id.* at 798–99, 810; *cf. Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns, Inc.*, No. 11-CV-0252-CVE-PJC, 2017 WL 2662195 (N.D. Okla. June 20, 2017) (no plausible migration pathway where, inter alia, there was little evidence of hazardous substances dispersed via air emissions).[16]

Plaintiffs' evidence here is more than sufficient to show a "plausible" migration pathway. Plaintiffs' experts, Dr. Medine and Mr. Chinkin, will testify it is plausible, if not certain, that lead from the Vernon Plant traveled via air dispersion to the entire PIA.

For example, Dr. Medine will opine that the Vernon Plant released lead contaminants into the air from stack and fugitive emissions, and these contaminants traveled in the wind currents along the prevailing directions, and the lead emissions contaminated residential areas beyond the half-mile industrial area depositing in soils at least 1.7 miles away. Dr. Medine's directional analysis of residential lead

---

[16] Some courts outside the Ninth Circuit have applied a strict standard that requires plaintiffs to show a defendant actually contributed to the contamination, *see, e.g.*, *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1072 (6th Cir. 1999), or even applying a substantial factor test, *see, e.g.*, *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1382, 1390 (W.D. Mo. 1994) (requiring proof that the release was a "substantial factor" in the plaintiff's incurrence of response costs where contamination was found outside the vicinity). But courts in the Ninth Circuit apply the "loose" nexus causation standard of "plausible migration pathway," which comports with and furthers the congressional goals imposed by CERCLA. *See, e.g.*, *Santa Clarita Valley Water Agency v. Whittaker Corp.*, No. 2:18-cv-06825-SB-RAOx, 2021 WL 2549066 (C.D. Cal. April 5, 2021); *see also Cemex*, 21 F. Supp. 3d at 807 ("The Court concludes that CERCLA's goals are better served by the framework laid out by the Fourth Circuit in *Westfarm* (plausible migration standard)"); *Bliss*, 667 F. Supp. at 1311 (relaxed standard of causation furthers congressional goals); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043–44 (2d Cir. 1985) (finding Section 9607(a) "unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release, without regard to causation").

23

1   concentrations in the predominant wind directions show a cognizable pattern of soil

2   lead concentrations that decrease with distance from Vernon Plant. Dr. Medine will

3   reference examples of other smelters where soil contamination from smelter

4   emissions extended for several miles in predominant wind directions.

5         Mr. Chinkin will testify that fundamental principles of physics establish that

6   some of the lead particles released from the Vernon Plant will travel at least several

7   miles before they are deposited on the ground. Mr. Chinkin also will use the results

8   of air dispersion modeling to demonstrate the geographic extent of lead emissions

9   from the Vernon Plant.

10        **B.     Defendants cannot meet their burden to disprove causation**

11              **after Plaintiffs demonstrate a plausible migration pathway.**

12        Plaintiffs anticipate that Defendants will argue that Plaintiffs have not proved

13  that releases from the Vernon Plant caused DTSC's response actions. But once

14  Plaintiffs demonstrate the requisite "loose" nexus by establishing a plausible

15  migration pathway, the burden shifts to Defendants to disprove actual causation.

16  *Asarco LLC*, 21 F. Supp. 3d at 805; *see also Westfarm*, 66 F.3d at 681 ("The

17  plaintiff need not produce any evidence that the contaminants did flow onto [the

18  cleanup site] from the defendant's land. Rather, once plaintiff has proven a prima

19  facie case, the burden of proof falls on the defendant to disprove causation.");

20  *United States v. Monsanto Co.*, 858 F.2d 160, 170 (4th Cir. 1988) ("Congress has,

21  therefore, allocated the burden of disproving causation to the defendant who

22  profited from the generation and inexpensive disposal of hazardous waste."). As

23  discussed above, this is a burden Defendants cannot meet.

24                           **CONCLUSION**

25        Based on the foregoing, Plaintiffs will establish the "compensable cleanup

26  area" by showing there was a plausible migration pathway by which lead released

27  from the Vernon Plant could have traveled to the PIA, and therefore such releases

28

24

caused DTSC to incur response costs. Defendants will not be able to disprove this causation because their expert opinions are deeply flawed and, in any event, Plaintiffs' experts will show lead from the Vernon Plant actually traveled to the PIA. Having made this showing, Plaintiffs will have proven some of the elements of CERCLA and the HSAA liability, including that: (i) the Vernon Plant is a facility; (ii) releases or threatened releases of hazardous substances occurred from the Vernon Plant; (iii) DTSC took response actions and incurred response costs in the PIA; and (iv) the releases from the Vernon Plant caused DTSC to take said response actions and incur said costs.

Dated:  April 12, 2022

Respectfully submitted,

By  */s/ Matthew K. Edling*

Matthew K. Edling
Adam M. Shapiro
**SHER EDLING LLP**
100 Montgomery St. Suite 1410
San Francisco, CA 94104
Tel:  (628) 231-2500
Fax:  (628) 231-2929

ROB BONTA
Attorney General of California
SARAH E. MORRISON
Supervising Deputy Attorney General
AARTI S. KEWALRAMANI
Deputy Attorney General

*Attorneys for Plaintiffs California Department of Toxic Substances Control and the Toxic Substances Control Account*

25