Gary J. Smith (SBN 141393)
gsmith@bdlaw.com
Eric L. Klein (*pro hac vice*)
eklein@bdlaw.com
Bina R. Reddy (*pro hac vice*)
breddy@bdlaw.com
BEVERIDGE & DIAMOND, P.C.
456 Montgomery Street, Suite 1800
San Francisco, CA 94104-1251
Telephone:  (415) 262-4000
Facsimile:   (415) 262-4040

*Attorneys for Defendant*
*Clarios, LLC*

*Additional counsel on signature page*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL, *et al.*<br><br>Plaintiffs and Counterdefendants,<br><br>vs.<br><br>NL INDUSTRIES, INC., *et al.*<br><br>Defendants and Counterclaimants. | Case No. 2:20-cv-11293-SVW-JPR<br><br>**DEFENDANTS' PRETRIAL BRIEF**<br><br>Judge:        Hon. Stephen V. Wilson<br><br>Trial Date:  May 11, 2022<br>Action Filed:  December 14, 2020 |

## STATEMENT OF THE CASE

The compensable cleanup area in this case is no more than 0.5 miles from the former Exide smelter ("Vernon Plant") in any direction.  Vernon Plant contamination is not detectable in residential soils outside that radius.  To the extent that trace quantities of lead from the facility traveled farther than 0.5 miles, they are not visible in soil data, and are far below both background levels of lead and DTSC's own cleanup threshold – effectively drops in an ocean of legacy lead from paint, gasoline exhaust, and other industrial sources.  As such they do not satisfy CERCLA's requirement of some causal nexus between contamination and cleanup.  This means that while the State of California may choose to remediate lead contamination in residential soils surrounding Vernon resulting from decades of exposure to common urban sources other than the Vernon Plant, those costs are not compensable under CERCLA from the Vernon Plant parties.

Lead has been used and released into the air and soil of Los Angeles – from deteriorated lead paint, leaded fuel emissions, industrial plants and other sources – for more than a century. This is particularly true in DTSC's "preliminary investigation area" ("PIA"), where the majority of the residential properties were first developed before 1940 and 90 percent were developed before lead-based paint was banned. For decades, those structures were caked in layers of lead-based paint, which deteriorated over time, flaked or was scraped off, and blew into surrounding yards.  Nearby, Los Angeles' infamous traffic clogged the highways, sending leaded vehicle exhaust over lawns and patios.  For a time, lead-based pesticides were in vogue for controlling weeds like crabgrass, and would have been sprayed periodically by residents directly onto their yards. A vast array of industrial operations contributed yet more lead to the environment.

As a result of all this history, the accumulated "urban background" level of lead in the soils of Los Angeles County (ranging between 120 and 250 parts per million or "ppm") generally exceeds DTSC's 80 ppm residential cleanup standard.  In light of its history, it should come as no surprise that Plaintiffs' own experts opine that the levels of lead in PIA residential soils from *sources other than the former Vernon smelter* would,

all by itself, exceed DTSC's 80 ppm cleanup standard.  That is, DTSC's conclusion that residential properties in the PIA require cleanup would be the same even if the former smelter had never existed.

The former Vernon smelter sits at the center of the PIA, physically separated from the residential areas on all sides by a variety of historic industrial properties that represent an industrial buffer zone between the smelter and the nearest residential properties. Over the past century, the industrial buffer zone has included a wide range of operations—including other lead smelters, battery recyclers, and foundries—that would have released lead and done so in much closer proximity to the residential areas than the former Vernon smelter. Inexplicably, DTSC has never attempted to even investigate, much less measure, the impacts from any of these closer industrial lead sources. Instead, even after its own scientists advised its management and members of the community that there was no pattern of soil contamination tying conditions in the residential areas to the former smelter, DTSC chose to assign all blame to a single facility.  But neither common sense nor DTSC's own cold hard data support the expedient story DTSC has told the community and now tells this Court.

Easily observable conditions disprove DTSC's theory of causation. Basic particle physics demands that deposition of lead from the former smelter would be highest immediately next to the smelter and then gradually decrease in all directions as distance from the original source increases. Indeed, Dr. Walter Shields, an expert in soil science, conducted such an assessment of DTSC's data and such a pattern of decreasing lead concentrations is readily observable in the industrial buffer zone surrounding the former smelter. But, the expected deposition pattern disappears about a half-mile downwind, well before reaching the residential areas of the PIA.  Beyond a half-mile, DTSC's own measurements of lead levels in the residential areas present a seemingly random patchwork of higher and lower lead concentrations, in which "hot spots" of higher lead concentrations are associated with areas of older residences (*i.e.*, more influenced by past

leaded paint usage), but are unrelated to their proximity to the former smelter, which would not occur if the smelter were the "predominant source" of lead in the PIA.

Nor is the chemical "fingerprint" of lead emissions from the former Vernon smelter found in the residential areas. As Dr. Shields notes, the primary feedstock of secondary lead smelters, including the former Vernon smelter, is used auto batteries, which include the element antimony along with lead, meaning the co-occurrence of lead and antimony can be an indicator of lead that originated at a secondary lead smelter. While lead samples collected at the former smelter and in the industrial zone around the former smelter display the expected lead/antimony fingerprint, no such correlation is found in the residential soil samples.

DTSC seeks to avoid the easily observable physical evidence by arguing that the conditions presented in the PIA are so complex that its own data should not be accepted at face value. The agency claims that the former smelter is the "predominant" source of lead in the PIA, and dismisses the area's legacy of lead-based paint, leaded emissions and hundreds of uninvestigated industrial sources located far closer to the residential areas as insignificant. *See* Declaration of Allen Medine ("Medine Decl."), ECF 351-2 § VII.  But Dr. Medine, DTSC's primary expert, also claims that "the soil lead data do not show a clear pattern that is visible to the naked eye," and that – "quite the contrary" – "at first glance the data reveal what appear to be random variations." *Id.* ¶ 40.  DTSC is insisting that effects from the ***predominant*** source are somehow obscured in DTSC's data by effects from ***insignificant*** sources. This contradicts science as well as common sense.

In fact, the effect of the Vernon Plant on residential soils is hard to perceive because it does not exist.  In addition to the common-sense analyses discussed above regarding soil patterns, winds, and antimony fingerprinting, two experts in this case will present statistical analyses from which they calculate the distance within which historic emissions from the former smelter impacted the measured concentration of lead in soils. Defendants' expert, Dr. Shahrokh Rouhani, has employed state-of-the-art "geostatistical" techniques that were pioneered and promoted by U.S. EPA for use at complex

environmental sites, including residential lead investigations. His methods are memorialized in regulatory guidance and standards published by ASTM International, among others.  By contrast, Plaintiffs' expert, Dr. Medine – who does not claim to be an expert in statistics, much less geostatistics – has employed a homemade method using only generic statistical functions.

Dr. Rouhani's geostatistical analysis of DTSC's data, using EPA's recommended analytical tool for the task, establishes that the former smelter's detectable contributions of lead to surficial soils in the vicinity of the former Vernon smelter extend off-site for distances ranging from approximately 1500 feet (0.28 miles) to approximately 2825 feet (0.54 miles), depending on direction, all confined to the industrial buffer zone surrounding the former smelter. Dr. Rouhani's rigorous calculations, relying on DTSC's own data, demonstrate there are no detectable effects on DTSC's soil measurements beyond these distances. Rather, multiple lines of statistical analysis reveal that the strongest predictors of the lead level present in a residential soil sample from the PIA is the age of the structure on the property (which correlates with the likelihood of encountering historic lead-based paint) and how close the sample location was to the exterior wall of the residence (where lead-based paint residue would be most concentrated).

DTSC has amassed, at great expense, a large and comprehensive dataset recording the concentrations of lead in soil throughout the PIA, including over 216,000 soil samples, of which more than 150,000 are surface samples. Consistent with basic principles of unbiased scientific analysis, Dr. Rouhani strove to include every one of DTSC's surface soil samples in his assessment, unless there was an objective and quantifiable basis for excluding particular data. In contrast, Dr. Medine rejected the use of all available data. Instead, he subjectively censored his own client's dataset – in a process he describes as "database manipulations" – that excluded the majority of DTSC's surficial soil data from any consideration.

Yet even after all of his non-scientific manipulations, the surviving data points plotted by Dr. Medine confirm that observable effects from the former smelter are only apparent in the portion of the industrial buffer zone within a half-mile of the former smelter, and cannot be detected in any of the residential areas.  The factual and scientific record indicates from every angle that the "predominant" source of the lead in the PIA residential areas is the legacy of lead-based paint in the older neighborhoods that make up the PIA, not emissions from a single, distant industrial source.

On this record, DTSC cannot, as a matter of law, establish that emissions from the Vernon Plant caused the incurrence of response costs under CERCLA.  It is undisputed that the urban background level of lead (*i.e.,* the level attributable to historic sources other than the former smelter) within the PIA exceeds the level at which DTSC deems a cleanup necessary, meaning that DTSC would have reached identical conclusions and taken identical actions even if the smelter had never existed.  Moreover, Defendants' multifaceted scientific analyses prove that emissions from the former smelter had no detectable effect on the soil sampling results DTSC used to make its cleanup decisions. If the former smelter had no discernable effect on those results, it necessarily could not have caused or contributed to DTSC's incurrence of cleanup costs based on those results.

### "COMPENSABLE CLEANUP AREA"

The Court ordered the April 2022 "Scope Trial" for the purpose of determining the "compensable cleanup area" in this case, *i.e.*, the area within which DTSC has established the required legal nexus between contamination from the Vernon Plant and the agency's incurred and expected cleanup costs.  ECF 231.  In other words, the "compensable cleanup area" issue involves two core, related questions: (1) How far did lead from the Vernon Plant go? (2) Where did Vernon Plant lead satisfy CERCLA's fundamental requirement of a nexus between Vernon Plant lead and DTSC's response costs?  Defendants ask the Court to answer these questions following the Scope Trial by actually defining the compensable cleanup area on a map.

As the "compensable cleanup area" involves legal questions of causation in addition to factual questions of geography and contaminant migration, this section provides a brief overview of the applicable law of CERCLA causation. While not the easiest legal question in environmental law, the causation questions in this case are relatively straightforward once framed properly.

**Causation exists in CERCLA**

As a threshold matter, it is critical for the Court to recognize that the requirement of proving causation *exists* in CERCLA. Courts occasionally conflate the lack of a causation requirement in one particular circumstance – "defendant-specific" causation, described below – as an absence of a causation requirement in CERCLA on a conceptual level. But causation in CERCLA is there in the black-letter text of the statute: A defendant is liable for the release or threatened release "which <u>causes</u> the incurrence of response costs." 42 U.S.C. § 9607(a)(4) (emphasis added). Causation is also embedded in the well-known purpose of the statute – CERCLA is not merely a tax; it instead imposes liability for environmental cleanup on parties in connection with their conduct at a site. *See, e.g.*, *United States v. Burlington Northern & Santa Fe Ry. Co.*, 520 F.3d 918, 933 (9th Cir. 2008) ("A key purpose of this [CERCLA] scheme is shifting the cost of cleaning up the environmental harm from the taxpayers to the parties who benefitted from the disposal of the wastes that caused the harm."), *rev'd on other grounds*, 556 U.S. 599 (2009) (internal quotes and citation omitted). Congress enacted CERCLA "to force polluters to pay for costs associated with remedying their pollution," and "one of the statute's principal goals is 'assuring that <u>those who caused</u> chemical harm bear the costs of that harm.'" *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 257-58 (3d Cir. 1992) (citing and quoting legislative history) (emphasis added). CERCLA does not require negligence, but nor does it hold a defendant at one site responsible for similar contamination at all sites. *See, e.g.*, *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1382, 1387 (W.D. Mo. 1994) (CERCLA without causation would mean that "[a] party who discovers TCE groundwater contamination in Missouri could successfully sue every party

who released TCE in the entire country. Although CERCLA's liability provisions are far-reaching, there is no indication that Congress intended this absurd result."). A causal nexus is required between a defendant's actions and a plaintiff's cleanup costs.

**Two types of CERCLA causation**

The key insight is that CERCLA cases draw a distinction between two different types of causation questions. In the first type, a CERCLA defendant argues that its own individual contribution to environmental contamination did not – on its own, among many other contributors – cause the plaintiff to incur response costs. In these cases, courts are in wide agreement that a plaintiff need not prove individual causation against individual defendants. Such distinctions are often simply too difficult to untangle as a matter of threshold liability, and so the untangling is left for a later allocation phase. This common circumstance has produced many quotations in many CERCLA cases to the effect that "[t]he government is not required to show that a <u>specific defendant's</u> waste caused the incurrence of cleanup costs in order for strict liability to attach to that defendant." *See, e.g.*, *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 184 (2d Cir. 2003) (emphasis added). As noted above, such citations are sometimes used overbroadly, and the critical distinction – that a plaintiff is not required to prove that a *specific defendant's* particular waste caused broader cleanup costs to be incurred – is lost. This type of causation is referenced here as "defendant-specific" causation.

In the other type of causation question – essentially, "collective" causation – it is not one defendant's contamination at issue, but *all of the contamination* from the defendants, and the question at issue is whether *any* defendant caused the plaintiff to incur cleanup costs. CERCLA requires, on a basic level, that cleanup be causally connected to the activities of site-specific defendants. This is the causation requirement that prevents a plaintiff from cleaning up all TCE contamination in the country and charging it to one polluter in Missouri, *see supra*, or – more to the point – prevents DTSC from cleaning up all soil lead in the Los Angeles area and charging it to the former owners and customers at a single battery recycling facility in Vernon. Courts are in wide

agreement about collective causation too, to the extent the distinction is observed.  *See, e.g.*, *Kalamazoo River Study Group v. Rockwell Intern. Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999); *Alcan*, 964 F.2d at 264-266 (government need not prove that defendant's emulsion caused a release or caused the incurrence of response costs; "[r]ather, the Government must simply prove that the defendant's hazardous substances were deposited at the site from which there was a release and that the <u>release</u> caused the incurrence of response costs.") (emphasis in original).  Where the release at issue is collective in nature – as airborne lead emissions from the Vernon Plant are collective here – then defendant-specific causation principles do not apply.  The plaintiff must prove that the collective *release* caused the incurrence of response costs.

**The Ninth Circuit test for CERCLA causation in this case**

The Ninth Circuit observes this distinction and ratifies that a CERCLA plaintiff must actually prove that a release caused the incurrence of response costs.  Indeed, DTSC does not disagree; the agency conceded earlier in this case that "Plaintiffs do not dispute that under CERCLA, Plaintiffs must show that the releases from the Vernon Plant caused Plaintiffs to incur response costs[.]"  *See* ECF 240, at 7:26-27 (DTSC reply in support of motion to strike affirmative defenses).  In *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177 (9th Cir. 2000), the Ninth Circuit explains that the collective causation requirement in Section 107(a)(4) of CERCLA is a "but-for" or "*sine qua non*" standard, except in cases where response costs are "causally overdetermined," meaning that multiple sources independently caused the same response costs.  *Id.* at 1182-86.  In other words, a CERCLA plaintiff can recover response costs from defendants only if response costs would not have been incurred in the absence of the defendants' collective contribution ("*sine qua non*" causation), unless the defendants' collective contribution were also independently sufficient to require response costs even in the absence of other causes ("causal overdetermination").  *Id.*  The practical application of this standard is explained in more detail in *Carson Harbor Village, Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1185-89 (C.D. Cal. 2003).

This is DTSC's burden under Ninth Circuit law: It must prove that Defendants caused the agency to incur response costs, and it must do so by proving that either (1) in the absence of the Vernon Plant, no soil remediation in the residential areas would have been necessary ("*sine qua non*" causation) in spite of the contributions of historic lead paint, leaded gasoline emissions, and other local industry, including multiple other smelters; or (2) soil remediation in the residential areas *would* have been required as a result of Vernon Plant emissions even if those other sources themselves had not existed ("causal overdetermination").  The arguments in the remainder of this brief demonstrate that neither of these propositions is remotely true: Cleanup would have still been necessary in the absence of the Vernon Plant, but cleanup would *not* have been necessary in the absence of all other lead sources in the residential areas.

DTSC is expected to argue that a different framework applies to the burden of proof for CERCLA causation: the burden-shifting approach of *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp. 2d 1053 (C.D. Cal. 2003), which has been adopted by a handful of other District Court opinions within the Ninth Circuit.  Under *Castaic Lake*, the plaintiff must prove a *prima face* causation case by (1) identifying a contaminant where response costs are incurred; (2) identifying the same (or a chemically similar) contaminant at the alleged source; and (3) proving a plausible migration pathway for the contaminant between the source and the location of response costs.  *Id.* at 1066.  Under the *Castaic Lake* approach, if this *prima facie* is established, the burden shifts to the defendant to "disprove" causation.  *Id.*

*Castaic Lake* is not consistent with the Ninth Circuit's *Boeing* decision and was wrongly decided.[1]  *Boeing* makes clear that a plaintiff has a certain burden of proof with respect to causation, and *Castaic Lake* does not justify reversing that burden.  The errors

---

[1] Among other problems, *Castaic Lake* is inconsistent with the later-decided U.S. Supreme Court case *Schaffer v. Weast*, 546 U.S. 49, 56 (2005) ("Absent some reason to believe that Congress intended otherwise… we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief.").

in *Castaic Lake* seem to be (1) its reliance on out-of-circuit cases that do not distinguish clearly enough the "defendant-specific" and "collective" causation standards; and (2) insufficient attention to *Boeing*, which is not cited.  The result is analytical muddle.

Even if *Castaic Lake* does apply, however, Defendants prevail in this case for the same reasons explained above. *Castaic Lake* and its progeny do not explain what it means to "disprove" causation, but since the Ninth Circuit standard for causation is set forth in *Boeing* and is not altered by *Castaic Lake*, a reversal of the burden of proof would simply mean that Defendants would have to affirmatively prove the same elements identified in *Boeing*.  Specifically, Defendants would need to prove that cleanup in the residential areas would still be necessary even in the absence of the Vernon Plant, but cleanup would conversely *not* be necessary in the absence of all other lead sources in the residential areas.  As set forth below, Defendants will easily prove these points.

**Divisibility**

Even if DTSC carries its burden with respect to causation, the Court can confine the compensable cleanup area to the industrial area if it identifies a reasonable basis for apportioning the overall harm at the site on such a basis. *Burlington Northern and Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 613-14 (2009) (apportionment is proper when there is a reasonable basis for determining the contribution of each cause to a single harm, which may include geographic considerations). This is commonly referred to as "divisibility" and it is embodied in the terms of Section 443A of the Restatement (Second) of Torts. *Matter of Bell Petroleum Services Inc*., 3 F.3d 889, 897 (1993) (Congress understood CERCLA could produce harsh and unfair results, and intended for courts to use common law principles of the Restatement to ameliorate that harshness).

If Defendants' proof provides the Court with a reasonable basis for distinguishing between the industrial and residential areas with respect to the harm from lead contamination, the "compensable cleanup area" should still be defined to include the industrial area alone.

## FACTUAL AND PROCEDURAL BACKGROUND

**The nearby industrial and distant residential areas**

The Vernon Plant is situated within a much larger, highly industrialized area in Vernon, California. The City of Vernon and neighboring Commerce were founded as exclusively industrial cities in the early 1900s. *See* Declaration of Walter Shields, ("Shields Decl."), ECF 354 ¶¶ 7, 63.  Now and historically, a dense array of commercial operations has fully encircled the facility.  *Id.*  Neighboring facilities have included metal foundries and smelters, railroads, can-making, metal scrap yards, machine plants, asphalt plants, and petroleum refineries. *Id.* ¶ 10.   The former Los Angeles municipal incinerator and several other industrial incinerators were located nearby.  *Id.* ¶¶ 9-11.

A number of residential areas are located outside the larger industrial area, including the communities of Huntington Park, Maywood, Commerce, Boyle Heights, Bell, and East Los Angeles.  *Id.* ¶ 8.  These are the areas where property-by-property cleanup is the driver of environmental response costs in this case.  The closest residential property to the Vernon Plant is approximately 4,000 feet from the facility. *Id.* ¶ 9. Thus, an industrial/commercial zone encircles the Vernon Plant, forming a buffer between the Vernon Plant and the residential areas. The facility is positioned roughly in the middle of this industrial zone.

**The Vernon Plant and its history**

Around 1928, operations had begun at the location of the Vernon Plant. *See* Exhibit 1 (1923 aerial photograph); Exhibit 2 (1928 aerial photograph); Exhibit 3 (Nov. 12, 1931 document).  *See also* Shields Decl.  ¶ 12.  Documents available from 1931 show that the operations already had pollution control measures that featured a "bag house," a pollution control device which traps particles of lead and other metal particulates before they are emitted into the atmosphere.  *See* Ex. 3 (Nov. 12, 1931 document).  Over the years, the Vernon Plant was upgraded and featured an increased the number of baghouses and other pollution control equipment over the years, including in or about 1949.  *See* Exhibit 4 (1949 *Los Angeles Times* article). In the 1980s, the facility underwent a

modernization upgrade where six new baghouses, which encompassed 34,000 square feet, were installed to capture lead particulates. *See* Shields Decl. ¶ 14. Through these measures, the facility captured tons of metallic particulates, which it recycled for lead recovery. *Id.*

As a DTSC-regulated battery recycling facility, the Vernon Plant served thousands of customers across California and nationwide, with the state-encouraged goal of keeping spent batteries and their materials out of the waste stream and the environment.

**Lead contamination in the residential areas**

Lead is a naturally occurring element existing in all California soils, occurring at an average of 23.9 ppm in the state and ranging between 12.4 and 97.1 ppm. Shields Decl. ¶ 15. Lead contamination has been identified throughout the residential areas of the PIA, the result of many potential sources. Shields Decl. ¶¶ 15-19. In particular, lead-based paint is a primary source of lead in residential soils. Lead-based paint was frequently used and is commonly found on homes constructed prior to 1940. *Id.* ¶ 16. Even though lead-based paint was banned for residential use in 1978, the deterioration of historic lead-based paint continues to be a significant potential source of lead contamination. *Id.* By one very conservative measure, roughly 61 percent of properties in the residential areas from which samples were taken confirmed the current presence of lead-based paint, though this measure almost certainly does not count homes where lead-based paint contaminated soils in the past but was not detected. *Id.*

Leaded gasoline is also a significant source of lead to the residential areas. From the 1920s until the 1990s, leaded gasoline was the primary commercial gasoline sold to consumers. *Id.* ¶ 17. The concentration of lead contamination due to leaded-gasoline emissions originates from transportation infrastructure, and the residential areas are transected by several major highways, including I-5, I-710, and SR-60.

Finally, the cities that encompass the residential areas, including the cities of Vernon and Commerce, were specifically incorporated to attract industrial and commercial activities, which impacted the lead soil concentrations. *Id.* ¶¶ 7-8. Numerous

categories of industrial point sources have been identified that could have potentially impacted the residential areas, including metal smelters, metal foundries and/or metal manufacturing, can manufacturing or recycling, battery manufacturing or recycling, machine plants, petroleum refineries, asphalt plants, automobile repair facilities, and railyards. *Id.* ¶¶ 10-11.

## ARGUMENT

Multiple lines of evidence – soil patterns, winds, antimony "fingerprinting," statistical analysis – demonstrate that the contamination radius in this case is 0.5 miles. DTSC's case to the contrary, challenged for the first time in this case, has comprehensively fallen apart during the preceding five months of discovery.

## I.  BASIC SCIENCE SHOWS THAT DETECTABLE CONTAMINATION MIGRATED NO FARTHER THAN 0.5 MILES FROM THE PLANT.

### A.  Lead levels in soil generally decrease with distance from the Vernon Plant up to 0.5 miles, then stop decreasing.

The parties agree on a key point about how to evaluate contamination in this case: Contamination attributable to the Vernon Plant should be highest closest to the facility, and should decrease with distance from the facility, particularly in predominant wind directions. *See e.g.*, Medine Decl. ¶ 48;  Shields Decl. ¶ 21.  The term for this expected inverse relationship between contamination and distance is "decreasing gradient." Shields Decl. ¶ 21.  A decreasing gradient is clearly visible in the first half-mile from the Vernon Plant, but after that, it disappears, and the pattern in the residential areas is random and variable, characteristic of legacy lead paint, gasoline exhaust, and localized industrial sources. *Id.* ¶¶ 22-26.  In particular, a band of sampling southwest of the facility – the primary downwind direction – shows the lowest lead levels in the entire contested investigation area, a pattern that effectively disproves DTSC's central theory about widespread aerial lead emissions from the Vernon Plant. *Id.* ¶¶ 28-29.  While elevated lead levels were found near the Vernon Plant, lead levels drop off dramatically to the southwest, a comparable industrial areas roughly one half-mile downwind of the

Vernon Plant, and then rise again.  *Id.*  Aerial emissions from the Vernon Plant obviously did not skip over these areas of low lead and contaminate the more distant residences more heavily.  *Id.* ¶ 32.  Those areas were contaminated by other sources.  *Id.*

The phenomenon is plainly visible in the figure on the lower left from the report of Defendants' expert soil scientist, Dr. Walter Shields.  *See* Shields Decl., Ex. 3.  A zoomed-in view is on the lower right.  *Id.* Ex. 3.

 

The same phenomenon is visible in the graphs of DTSC's own expert, Dr. Medine, who also describes a decreasing gradient moving away from the Vernon Plant.  Shields Decl. ¶¶ 36-37.  Dr. Medine's graph tries to visually show a decreasing gradient stretching several miles from the Vernon Plant by plotting contamination as a function of distance from the facility.  *Id.* ¶ 34.  But Dr. Medine's graphs make *Defendants'* point much better than they make DTSC's point.  Dr. Medine's graphs actually document the much steeper gradient that Defendants identify, with lead from the Vernon Plant tapering off within 0.5 miles.  *Id.* ¶ 35.  This is a remarkable conclusion, because – as discussed *infra* – Dr. Medine powerfully biased his data set by excluding vast quantities of relevant

1    data.  Yet the trend Defendants have identified – a lead drop-off within 0.5 miles of the

2    Vernon Plant, with unrelated lead contamination throughout the residential areas – is so

3    clear in the data that it shines through even Dr. Medine's powerful methodological bias in

4    the other direction.

5          One of Dr. Medine's graphs is reproduced below.  It depicts average lead levels

6    (y-axis) with increasing distance from the facility to the north (x-axis).  *See* Shields Decl.,

7    Ex. 6 (citing Medine report, Fig. 12); *see also* Medine Decl., ¶ 42, Ex. PX050.   Dr.

8    Medine imposes the dotted red line to depict an approximation of a single, miles-long

9    decreasing gradient if there were no distinction between the industrial and residential

10   areas.  But the dotted red line – representing Dr. Medine's primary theory that lead levels

11   continue decreasing for miles to the north of the Vernon Plant –  is a poor fit for his data.



Instead, Dr. Medine's own graph actually shows *two separate* trends: a steep decreasing curve within 0.5 miles of the Vernon Plant, and an independent flat line in the residential area, where there is widespread lead-paint contamination but no lead from the Vernon Plant. *Id.* Dr. Medine's graph is reproduced below with these two trends emphasized with green lines.



*See* Shields Decl., Ex. 6. The yellow vertical line represents the boundary between the industrial and residential areas almost 4,000 feet from the Vernon Plant. *Id.* ¶¶ 36-37. The two separate trends depicted by the green lines – one in the industrial area, one in the residential area – are clearly a better fit for Dr. Medine's data than his own red line. *Id.* The green trend line on the left represents Vernon Plant lead, decreasing steeply within the industrial area. This green line points sharply downward toward negligible lead levels – *i.e.*, approaching the x-axis – around 0.5 miles. *Id.* The green line on the right, by contrast, depicts higher and essentially steady average lead levels for a mile into the

northern residential area, where legacy lead paint and other lead contamination is widespread.  *Id.*  Lead levels then unsurprisingly taper slightly in the residential areas miles away from industrialized southeast Los Angeles.[2]  *Id.*  The two separate green lines are a better fit for Dr. Medine's graph because there are two separate phenomena at work: Vernon Plant contamination tapers off within the industrial area, and lead in the residential areas is entirely from other sources.

The same basic pattern is evident in Dr. Medine's other graphs in different directions from the Vernon Plant.  Shields Decl. ¶ 37.  Defendants do not endorse Dr. Medine's graphs, but include this example for the purpose of showing that even with its flaws, it cannot hide the basic data trends that support Defendants' theory of this case.

### B.    Lead contamination patterns in the residential areas do not correspond to prevailing winds around the Vernon Plant.

The experts in this case concur that contamination generally follows wind patterns: DTSC's expert Dr. Medine agreed that lead deposited by airborne emission "is expected to be expressed as a pattern of [lead] concentrations" that are "[e]levated closest to the point source and in areas along the primary wind direction(s)."  Medine Tr. 242:16-243:15.  DTSC's air modeling expert, Lyle Chinkin, agrees, noting that the "Expected Deposition Pattern" of airborne lead is "Higher concentrations in primary wind direction(s)."  ECF 351-5, Demon. 1.  The experts agree that the prevailing winds at the Vernon Plant blow most prominently toward the southwest, with secondary winds to the east and tertiary winds to the north/northeast.  *See, e.g.*, Exhibit 5 ("Medine Tr."), 225:9-226:25; Shields Decl. ¶ 21.  Based on these patterns, all experts would therefore agree that Vernon Plant contamination in the residential areas, if it exists, should be expected to be most visible to the southwest of the facility, secondarily to the east, and lastly to the north, followed by other directions not downwind.

---

[2]    The appearance of a downward trend toward the last dot in the graph is also illusory because the last dot represents a much larger geographic area and does not include residential samples that could be impacted by lead paint.  Shields Decl. n.10.

The actual pattern around the Vernon Plant is the opposite.



FIGURE 3. The hot spots of soil lead (Pb) in the Exide study area. Hot spots are statistically significant spatial clusters of high soil lead sample locations.

The *lowest* lead levels in the residential areas are in the two primary downwind directions: southwest and east.  Shields Decl. ¶ 28.  The map above – prepared by independent researchers, not retained experts in this case – displays clear "cold spots" in the residential areas in those directions.  Shields Decl. ¶¶ 30-32.  As noted above, the industrial area immediately southwest of the Vernon Plant – the primary downwind direction – contains a band of the lowest lead levels seen in areawide sampling.  By contrast, the highest lead levels are where the wind tends to *not* blow, or blows only weakly.  *Id.*  The map depicts "hot spots" across the neighborhoods to the northwest, north, and northeast of the facility, only parts of which are downwind, and then only modestly.  *Id.*  The other largest "hot spot" is to the southeast of the Vernon Plant, which DTSC's expert explicitly identifies as a non-predominant wind direction.  *Id.*  These patterns defy DTSC's own model of how airborne emissions behave in relation to wind, and show that the contamination in the residential areas did not originate with the Vernon Plant.

As noted above, the experts also agree that contamination should generally decrease with distance from its source, not increase, in prevailing wind directions.  Yet it is clear in the graph above that the highest lead levels due north of the Vernon Plant, where tertiary winds blow, are also the farthest away; contamination levels clearly *increase*, not decrease, with distance from the facility to the north.  Shields Decl. ¶ 32, Ex. 5.  In other words, if the northern "hot spots" are the result of Vernon Plant lead emissions, those emissions somehow skipped over closer soils, in violation of the laws of physics and DTSC's own conceptual model.  *Id.*

For the same reason, Dr. Medine's conclusions about where Vernon Plant lead migrated make no sense.  Dr. Medine opines that Vernon Plant lead migrated 3.0-3.4 miles to the north and northeast, but only 1.6-1.8 miles to the east and 1.9-2.8 miles to the southwest.  Medine Tr. 39:25-40:21.   In other words, Dr. Medine opines that Vernon Plant lead traveled farthest in the third-strongest wind direction.  This not only defies common sense; it defies Dr. Medine's own model for how airborne contamination should behave.  Dr. Medine's conclusions should be disregarded.

The same contradiction is evident in the gradient graph created by Dr. Medine specifically for the area to the southwest of the Vernon Plant, where the area's strongest winds blow from the Vernon Plant, and where all experts agree that downward gradient trends should be most visible if they exist.  But Dr. Medine's graph, again, shows exactly the opposite: Outside a half-mile, lead is *increasing*, not decreasing, with distance from the Vernon Plant – the blue dots are going up, not down, as distance from the Vernon Plant increases to the southwest.  Shields Decl. ¶ 29, Ex. 4.  The Vernon Plant is not the source. *Id.*

Specifically, in the graph on the next page, Dr. Medine again tries to impose his red dotted-line, but it looks nothing like the data pattern.  Shields Decl. ¶ 29.  He suggested at his deposition that a foundry to the southwest, Bethlehem Steel, was the cause of the increasing lead that begins more than two miles (~10,000 ft.) southwest of the Vernon Plant, but confronted with the fact that Bethlehem Steel was less than two miles from the

Vernon Plant and therefore also upwind of the trend of increasing lead levels, he conceded that the trend of rising lead levels downwind to the southwest is unexplained.   Medine Tr. 250:16-253:25.



In fact, this graph of the lead levels in the southwest direction from the Vernon Plant is another direct refutation of DTSC's theory of this case.   DTSC's expert committed to an explanatory model that claims that contamination should decrease with distance from its source, particularly in dominant wind directions.   If this is true anywhere, it should be true to the southwest of the Vernon Plant where winds blow the strongest, but the actual data show that lead levels rise steadily with increasing distance from the facility in this direction, across two miles of residential areas. DTSC's expected contamination patterns are not appearing because the Vernon Plant was not the source of contamination in the residential areas.

### C.   A known smelter "fingerprint" is strongly visible in soil sampling in the industrial areas, but absent in the residential areas.

An element called antimony is often found together with lead at secondary lead smelter sites because antimonial lead was used in lead batteries and antimony was used as an alloy for certain lead products.   Shields Decl. ¶¶ 65-66.   Antimony is also found in typical urban soils, but at much lower levels, from things like wheel weights or friction material on brake pads.   *Id.* ¶ 65.   This means that the relationship between lead and antimony can be used as a kind of "fingerprint" for smelter-related lead contamination: The statistical tendency of antimony and lead to be found together in soil samples will indicate whether the lead came from a smelter.   *Id.* ¶ 66.   Defendants' expert Dr. Shields

calculated that the lead/antimony relationship is statistically strong in the industrial area but statistically weak in the residential areas. *Id.* ¶ 67. Dr. Medine did not disagree. Medine Tr. 213:17-216:6; *see also id.* at 94:17-19. This reinforces the 0.5-mile contamination radius.

Specifically, the tendency of two variables to be correlated is expressed in a statistic called the "coefficient of determination," or $R^2$, which can range from 0 to 1. Shields Decl. ¶ 68. An $R^2$ value near 1 means that two variables are highly correlated, *e.g.*, when lead is elevated, antimony is almost always elevated. *Id.* A $R^2$ value near 0 means that there is little relationship between the variables, *e.g.*, when lead is elevated, antimony could be high or low, with no consistent pattern across samples. *Id.* This is a commonly used statistical measure; both Dr. Medine and Dr. Shields agree on how to characterize high and low values. *Id.*; Medine Tr. 93:13-94:19. Dr. Shields calculated that the $R^2$ relationship for lead/antimony in the industrial area of the PIA is 0.81, which both experts agree is a strong relationship. *Id.* ¶ 69; Medine Tr. 92:7-12, 93:6-11. Dr. Shields calculated that the $R^2$ relationship for lead/antimony in the residential areas of the PIA is 0.18, which both experts agree is a very low $R^2$ value. *Id.* ¶ 69; Medine Tr. 94:17-19. This "fingerprint" is strong evidence of the limited impact of lead emissions from the Vernon Plant. Shields Decl. ¶ 69.

Dr. Medine did not take issue with these calculations or the approach of measuring the statistical strength of the lead/antimony relationship in the industrial and residential areas. Medine Tr. 203:23-217:11. Instead, he argued only that lead/antimony ratios ranged widely in both the industrial area and the residential areas. *Id.* This is true but irrelevant; lead/antimony ratios range widely across the state, and $R^2$ values are calculated precisely to determine the correlation of variables even when they range widely. Shields Decl. ¶ 70. Dr. Medine could point to no literature or guidance supporting his antimony analysis. Medine Tr. 205:2-211:16.

Finally, Dr. Shields also applied the "downward gradient" analysis to antimony, and found no decreasing gradient of antimony in the residential areas relative to distance

from the Vernon Plant.  Shields Decl. ¶ 71.  Medine tried to do the same, but did not believe enough antimony was present to do the calculation.  Medine Tr. 217:16-218:8.

**D.    EPA's state-of-the-art geostatistical methods show that the Vernon Plant had no detectable effect on conditions in the PIA residential areas.**

Statistical techniques like those relied upon by Drs. Medine and Singh, are not sufficiently powerful to calculate the range of impact from a single potential lead source (such as the Vernon Plant) located amid an uncharted sea of other potential lead sources, whether they be lead-based paint residues, leaded vehicle emissions, lead-based pesticides or lead releases from other industrial operations. However, the modern availability of large-scale, low-cost computer processing capability has led to the development and use of a scientific discipline, known as geostatistics, that is capable of answering such questions. Unlike the methods used by Plaintiffs' experts, which simply process numbers, geostatistics uses the geographic location of each data point to assess "directionality" in the data at a very precise level. Declaration of Shahrokh Rouhani ("Rouhani Decl."), ECF 352 ¶¶ 14-15. This makes geostatistical techniques particularly well suited to identifying whether, for instance, measurements of soil contamination distributed across a site (like the PIA) can be traced back to a common origin or source. *Id.*

In light of its inherent advantages for environmental assessments, the United States Environmental Protection Agency (EPA) pioneered the use of geostatistics for such assessments beginning in the mid-1980's. *Id.* ¶ 16. EPA has since promoted geostatistics' value in environmental site investigations in its guidance documents, and EPA has even published two public domain software programs for use by scientists in performing geostatistical analyses. *Id.* ¶ 18. In 2003, EPA issued guidance entitled, "Superfund Lead-Contaminated Residential Sites Handbook," in which EPA explicitly noted the particular power of geostatistics to delineate impacts at residential lead contamination sites and to distinguish between background conditions and contamination:

> Geostatistics is widely recognized for offering graphical methods that are ideally suited for delineating contaminant zones. . . . Geostatistics also provides powerful methods for detecting contaminated areas from background when sample locations have not been randomly selected . . . ."

Rouhani Decl. Ex. 3h (Superfund handbook), ECF 352-10 at 18.

Dr. Shahrokh Rouhani is an expert in both classical statistics and state-of-the-art geostatistics who has conducted geostatistical research and site assessments for both public and private entities, including EPA, the Department of Energy and the U.S. Navy. *See* Rouhani Decl. ¶¶ 3-11. Dr. Rouhani applied geostatistical analysis to the very robust DTSC dataset of soil lead data and determined:

- The effects of emissions from the former Vernon smelter on measured soil lead concentrations extend between 1,500 and 3,000 feet from the Vernon Plant, depending on direction, and are thus confined to the industrial area.[3]

- The predominant predictors of lead contamination in the residential areas are (i) how long ago a parcel was first developed, and (ii) how close to an exterior wall a sample is collected. Both factors are associated with the presence of lead-based paint residues.

- Neither the widespread lead-based paint contamination nor other sources of lead in the PIA are "masking" evidence of a relationship between the Vernon Plant and lead in the residential soils of the PIA. Rather, the data simply demonstrate that there is no such relationship.

*Id.* ¶ 2.

Dr. Rouhani also closely reviewed the statistical validity of the "directional analysis" upon which Plaintiffs rely and identified a multitude of statistical errors in both how Dr. Medine subjectively "vetted" his own client's dataset (resulting in the exclusion of over half the site data from that analysis) and how Dr. Medine misused commonly

---

[3] Dr. Rouhani opines that at its farther extent, contamination reaches 3,000 ft. – or just over 0.5 miles – to the east of the Vernon Plant. Declaration of Shahrokh Rouhani ("Rouhani Decl."), ¶¶ 32-38. This does not reach residential areas, the closest of which (to the east) is 5,000 ft. away, and there are no response costs at issue in the small 360-ft. industrial zone to the east of the Vernon Plant between 0.5 miles and 3,000 ft. *See* Shields Decl. ¶ 9. For concision this brief refers to the radius as 0.5 miles.

DEFENDANTS' PRETRIAL BREF, No. 2:20-cv-11293-SVW                                23

accepted statistical procedures when he analyzed that dataset. *Id.* ¶¶ 50, 69-116. In short, the results of Dr. Medine's directional analysis are unreliable conclusions derived from applying unreliable methods to an unreliable dataset.

## II.   DTSC's CURSORY 2015 CASE FOR A TEN-SQUARE-MILE CLEANUP AREA FELL APART WHEN CHALLENGED IN DISCOVERY.

In late July 2015, DTSC gave a PowerPoint presentation to the public and said, of the residential areas around the Vernon Plant: "Immediate cleanup is not needed"; "Lead concentrations do not show a simple pattern of dispersion"; and there was "No consistent decreasing trend in lead concentrations with distance."  Exhibit 6 (DTSC PowerPoint), at 5.  The public responded negatively, and DTSC quickly pulled the PowerPoint down from its website.  Exhibit 7 (DTSC Notice) ("The Department removed the document because it summarizes information in a way that caused concern within the community"); *see also* Exhibit 8 ("DTSC 2 Tr."), at 158-164 ("the community can get very irate… they don't want to hear your explanation of what we have found").  Two months later, in September 2015, DTSC released a report that defined the PIA for the first time as the roughly 1.7-mile contamination radius that is the subject of dispute in this action.  *See* Exhibit 9 ("2015 DTSC Report").

The 2015 DTSC Report and the 1.7-mile definition of the PIA were essentially the work of one DTSC geologist who had never analyzed airborne emissions before, except in a high school project.  Exhibit 10 ("Burger Tr."), at 32:12-21; Exhibit 11 ("DTSC 1 Tr."), at 74:14-75:9.  All of the subsequent investigation and cleanup work DTSC did in the ensuing years based on its definition of the PIA – including all of the costs DTSC seeks to recover in this case – were founded solely on this one underqualified geologist's identification of a 1.7-mile contamination radius.  *Id.*, 72:7-15.  DTSC's work defining that boundary was never subject to real accountability until this Court ordered the forthcoming Scope Trial in late 2021, and discovery got underway.  Now, discovery over the past five months in this case – again, the first outside scrutiny DTSC's 1.7-mile contamination radius has ever received – has demolished the analytical basis for the PIA.

First, fact discovery has demonstrated that DTSC never did any meaningful investigation into alternative sources of lead in the PIA, despite the existence of numerous other smelters and other industrial lead sources *closer to the residential areas* than the Vernon Plant.  A senior manager at DTSC, responsible for corrective action at the Vernon Plant until 2017, excoriated the agency internally and then publicly for ignoring other lead sources in favor of Exide.  *See infra*, § I.A.  The agency's blindness to alternative causes of lead in the residential areas is relevant to the compensable cleanup area because it fatally undermines the expert case DTSC is making in the Scope Trial.

For instance, a key expert witness whom the agency proffers for the Scope Trial has submitted a declaration claiming that he identified smelter-related lead under a microscope from samples taken at significant distances from the Vernon Plant.  *See* Declaration of John Drexler ("Drexler Decl."), ECF 351-6  ¶ 29.  But a large number of Dr. Drexler's samples turn out to have been taken *directly from other smelter properties* or their near-neighbors, closer to the residential areas, a fact that DTSC remarkably did not disclose to Defendants or the Court when the agency produced the data and analysis on the eve of trial.  The agency is either attempting to mislead this Court by omission about the actual source of the lead in these samples, or it is – somehow – simply unaware that it tested lead samples taken from the properties of other smelters and concluded that they came from the Vernon Plant.  *Infra*, § I.B.

The agency's arguments about lead "background" levels suffer from the same flaw.  The agency seeks to prove that the Vernon Plant contaminated the residential areas, even miles away, on the basis that so-called "background" levels of lead are lower than observed lead.  But such a conclusion is only as good as the "background" calculation itself, and the agency calculates "background" in inconsistent and indefensible ways that fail to account for the multitude of other smelters and lead sources closer to the residential areas than the Vernon Plant.  The agency cannot even decide what the "background" level is – the number has changed four times, including the night before these briefs were filed.  *Infra*, § I.C.

DTSC's primary expert witness ignores relevant information too.  In his case, it is environmental data, which he purports to analyze to find patterns indicating Vernon Plant contamination in the residential areas.  But he has cherry-picked away more than half of the available samples from his data set for various reasons.  *Infra*, § I.D.

In the end, DTSC does not even propose a definition for "compensable cleanup area," the basic purpose of the "Scope Trial" in the first place.  DTSC instead offers broad geographic ranges, which are useless to the Court in actually defining this site and which, if adopted, would add more uncertainty to this case and its scope, not less.  *Infra*, § II.E.

### A.   DTSC refused to consider obvious industrial sources of lead much closer to the residential areas.

Discovery in this case has revealed that DTSC not only refused to investigate alternative sources of lead to the residential areas – specifically, a number of other smelters and lead processors operating much closer to those areas than the Vernon Plant – but that the agency refused to do so even after significant internal red flags were raised.  This is relevant to the compensable cleanup area in this case because much of DTSC's quantitative analysis for the Scope Trial is premised on the *assumption* that the Vernon Plant was the dominant contributor of lead in the area, and that analysis falls apart if that assumption is untrue – which it is.

The PIA contains over 500 fixed sources of lead, and 355 of these are industrial sources.  Shields Decl. ¶ 55.  These other industrial sources notably include the Federated Metals/ASARCO lead smelter and refinery located next door to the former Vernon Plant, which operated as a lead smelter from at least 1946 through 1971, and had a stack height of 104 feet.  *Id*. ¶ 57.  Other examples of industrial sources of lead emissions located closer to the residential areas than the Vernon Plant include the Western Lead facility in Commerce (1946-1960 lead manufacturing, including production of powdered lead, litharge, red lead, and batteries); Chersky & Sons (metal scrap yard and lead smelter 1950s-1970s); Acme White Lead and Color Works (constructed 1928; for roughly 50 years operations included paint manufacturing and mixing, and varnish cookers with

stacks); the Bethlehem Steel foundry (1914-1982, very large facility with as many as 13 open hearth furnaces, and 5 stacks); and Continental Can (metal manufacturing facility that operated for approximately 50 years and had 10 solder pots with accumulated lead powder in the ductwork which vented directly out to the roof.). *Id.* ¶ 58.

DTSC's own employee responsible for corrective action at the Vernon Plant through 2017, Philip Chandler, repeatedly asked DTSC to complete a more thorough investigation of other industrial sources, in order to have "a more evidence-based approach." Exhibit 12 ("Chandler Tr."), 166:3-168:12. In a letter to DTSC's director in 2015, Chandler charged that the agency had "demonized" Exide "for all off-site lead," which had the effect of "masking historical airborne emissions contributions from other facilities in DTSC's portfolio, as well [as] those former smelting, paint manufacturing, scrap operations, etc. not currently in that portfolio." Exhibit 13 (Chandler letter).

Of particular concern to Mr. Chandler was the Continental Can site, located just 300 feet from the northern residential area, "much closer to the northernmost of Exide's 'nearest affected residents' than Exide itself." *Id.* The Continental Can facility included "metal smelting operations," and Chandler urged the agency to "require specific investigation of potential off-site deposition/accumulation of the lead-bearing dust… that was directly emitted through its smelting pot ducts into the air from 1927 to 1983." *Id.* Mr. Chandler testified in this case that "Continental Can sits closer to the residents that were being – were listed as being impacted by Exide. And we ignored, apparently, the significance of the activities at Continental Can and reached 4,000 feet away to explain lead on the site." Chandler Tr. 179:24-180:5.

Neither Continental Can nor any of the other industrial sources in PIA were evaluated by DTSC for potential contribution of lead to soil in the residential areas. DTSC itself confirmed this in its deposition. DTSC 1 Tr. 104:10-14 (Q: "Was there any effort made to differentiate lead from the Exide facility or the Vernon plant in residential yards from lead from any other industrial sources?" A: "Not that I'm aware of.").

Now, however, DTSC's arguments are based primarily on the assumption that the Vernon Plant was the sole source of industrial lead in the area.  For example, DTSC argues that a recent study on lead-based paint in 30 Los Angeles-area school districts (the "Waterstone" study) demonstrates that the Vernon Plant contributed lead to the PIA because lead-based paint contamination in the Waterstone study was lower than comparable lead-based paint contamination in the PIA.  Medine Tr. 183:8-14; 245:10-246:4; Shields Decl. ¶ 24.  But this argument is only relevant in the Scope Trial if the Vernon Plant is the only industrial lead source in the area, and any industrial contribution to residential lead levels cannot be explained by other, closer lead emitting facilities.  The Waterstone study considered a much less industrial area on average than the PIA, which sits on the border of the cities of Vernon and Commerce, incorporated in the early 1900s specifically to facilitate industrial operations within Los Angeles County and now one of the most industrialized parts of California.  Shields Decl. ¶ 24.  It is not surprising that there are higher lead levels, on average, from sources other than lead-based paint in the vicinity of Vernon and Commerce than in a cross-section of Los Angeles-area school districts.  *Id.*  Indeed, there are many industrial lead sources, including other smelters, that sit much closer to the residential areas of the PIA than the Vernon Plant does.  *Id.* ¶ 21.  But DTSC has consistently refused to investigate those sources.

This blind spot manifests in an even more dramatic way in the analysis of DTSC's microscope expert.

### B.   DTSC's late-disclosed microscope expert failed to disclose critical information about alternative sources of lead in the PIA.

Just weeks before the Scope Trial, DTSC served limited information about previously undisclosed soil samples, collected and analyzed at least five years ago, that the agency claimed bore the hallmarks of smelter lead when analyzed under a microscope, supposedly demonstrating the reach of Vernon Plant lead.[4]  DTSC's expert

---

[4] Defendants moved to exclude Dr. Drexler on the grounds that his report is improper rebuttal, and that the data and analysis underlying it were not disclosed in discovery as

"microscopist," Dr. John Drexler, used an electron microprobe to evaluate 22 samples from twelve "residential" and "commercial" addresses within and outside the PIA, and concluded that 17 of the 22 samples bore at least some traces of so-called "pyrometallurgical" lead.  Drexler Decl., ECF 351-6, ¶ 29.  Dr. Drexler's report implies that these pyrometallurgical traces are a link to the Vernon Plant, noting that such traces were found "in the sample… collected furthest from the Exide Site."  *Id.*  This statement, however, omits a staggeringly relevant fact: The sample collected "furthest from the Exide facility" was collected *at the site of a different lead smelter* that DTSC has been investigating and remediating for decades.  In fact, no less than *four* of the twelve addresses from which Dr. Drexler examined microscopic lead samples *were themselves the direct locations of other lead manufacturers or smelters*.  And a number of Dr. Drexler's residential samples were taken from the immediate neighbors of other historical lead operations.  Dr. Drexler's report is almost astonishingly misleading.

Dr. Drexler's sample site "furthest from the Exide Site" was taken 2.6 miles to the northwest, at 2182 E. 11th Street (Dr. Drexler's sample E11-2182). *Id.*, Table 1. This is the location of the former International Co./Western Lead and Metal Co., a lead smelter from 1946-1965.[5]  Similarly, Dr. Drexler's sample P-S1 was taken at 4530 E. Pacific Way, the location of the former Western Lead Products lead battery manufacturer from 1946-1960.[6]  *Id.*  Dr. Drexler's sample E11-2201 was taken at 2201 E. 11th Street, the location of the former Eastern Smelting and Refining, a battery and metal reclamation

---

required.  ECF 339-340.  The motion remains pending.  DTSC counsel noted at the hearing on that motion that the data in Dr. Drexler's report may have been withheld as work product.  But environmental sampling data are not work product and may not be withheld, only to be produced at the eleventh hour for tactical advantage.

[5] *See* DTSC Envirostor ID 19390044; online at www.envirostor.dtsc.ca.gov/public/profile_report?global_id=19390044 (last visited April 8, 2022).

[6] *See* DTSC Envirostor ID 19330383; online at https://www.envirostor.dtsc.ca.gov/public/profile_report?global_id=19330383 (last visited April 8, 2022).

operation.[7]  Dr. Drexler's Sample E26-4060 was taken at 4060 E. 26th Street, the location of the former United Industries Corporation fertilizer manufacturing plant next door to the Federated Metals smelter noted above (itself next door to the Vernon Plant).  *Id.*

Five of Dr. Drexler's sampling addresses are residential, but two of those residences are almost directly adjacent to the Continental Can smelting operation that operated for decades on the border of the northern residential areas, and which DTSC never meaningfully investigated despite repeated internal requests to do so.  *Id.*, Fig. 1.

Finally, on the substance of Dr. Drexler's report, Dr. Drexler acknowledges that his methods do not rule out gasoline emissions or weathered lead-based paint as the source of the forms he calls "pyrometallurgical" lead.  *Id.* ¶ 31.  Moreover, while Dr. Shields is not qualified to evaluate the microscope-related aspects of Dr. Drexler's analysis – and DTSC has not produced the actual samples in any case – as a soil scientist Dr. Shields will explain that so-called "pyrometallurgical" lead is not a unique signature of a lead smelter; it is also associated with the other types of industry that were widely present in the area, as well as with weathered lead-based paint and leaded gasoline.  Shields Decl. ¶ 23.  Dr. Drexler's opinion is as irrelevant as it is misleading.

### C.    DTSC's repeatedly shifting calculations about "background" lead levels cannot define the contamination radius.

In addition to Dr. Medine's gradient analysis, with its ill-fitting red dotted-lines, DTSC's other primary argument in support of its expanded PIA is expected to be a comparison between average lead levels in the residential areas and DTSC's calculation of the "background" lead level – *i.e.*, the lead level that would exist in the same area if the Vernon Plant had never existed.  DTSC will argue that lead levels in the residential areas are "above background," meaning that lead levels are higher in the residential areas than they theoretically "should" be, thereby supposedly proving that the Vernon Plant contaminated those areas.  But DTSC itself cannot decide what the "background" is in

---

[7] *See* DTSC Envirostor ID 19330382; online at https://www.envirostor.dtsc.ca.gov/public/profile_report?global_id=19330382 (last visited April 8, 2022).

the PIA.  The agency has cycled through four calculations of background and ultimately relies in this case on its first attempt, a 2014 study in Long Beach involving just 19 samples, which the agency admitted was not conducted in accordance with the agency's own guidance on "background" studies.  The agency has repudiated the Long Beach study repeatedly but now relies on it as primary evidence in this case.

## 1.   DTSC has repeatedly changed its mind, including as recently yesterday, about the "background" lead level in the PIA.[8]

The first reason the Court cannot rely on DTSC's "background" projection in the residential areas is that DTSC itself cannot decide what that number should be.  DTSC has now offered four conflicting numbers for "background" in the residential areas.

DTSC first ordered a "background" study in 2013-2014, consisting of 19 samples taken in Long Beach, Cal., approximately 14 miles away from the Vernon Plant.  *See* Exhibit 14 ("Long Beach Study"), at ES-1.  The Long Beach Study determined that the "background" in the entire PIA, based on those 19 samples, was 76.6 ppm.[9]  *Id.* at 5-1. DTSC chose its final cleanup target at this site, 80 ppm, in part based on the study. DTSC 1 Tr. 234:22-235:1; *see also* Exhibit 15 (Final Removal Action Plan), at ES-2.

DTSC itself also apparently later concluded that the Long Beach Study's "background" result was too low: It "didn't seem representative of the city of Vernon," according to an agency scientist who worked on the Exide project.  *See* Burger Tr., 162:23-163:16.  Accordingly the agency calculated a second "background" number in a September 2015 report that was the agency's first attempt to define the contamination radius around the Vernon Plant.  *See* 2015 DTSC Report.  The report analyzed approximately 20,000 samples and concluded that "background" (or "urban lead level")

---

[8] The word "yesterday" means April 11, 2022, the day before this brief was filed.

[9] This number was expressed as a "UCL$_{95}$" meaning the "Upper Confidence Limit" of the mean, or average, of a group of numbers – in this case lead samples in soil.  UCL$_{95}$ is similar in concept to a simple average, except that it allows for uncertainty about what the true average is in a population of data. Unless indicated otherwise, background concentrations in this brief are expressed in terms of UCL$_{95}$.

was 210-250 ppm in the residential areas to the north of the Vernon Plant; 165-195 ppm in the residential areas to the south; and 170-195 ppm in the residential areas to the east and northeast. *Id.* Table 1. All of these ranges were more than twice as high as the Long Beach Study "background"; the range in northern areas was three times as high.

Then, on March 21, 2022 – three weeks before this filing – DTSC designated a new rebuttal expert who zig-zagged again on DTSC's "background" calculation. Dr. Singh used a statistical method – the "site-specific" background method, *supra*, not previously used by DTSC – to calculate a site-wide "background" of 148.2 ppm – twice as high as the result of the Long Beach Study. Exhibit 17 ("Singh Tr."), 55:14-17.

Finally, on April 11, 2022, just one day before the parties filed these pretrial briefs, Dr. Singh herself changed her mind. Now, instead of 148.2 ppm – her "background" calculation just three weeks ago – she says "background is not one discrete value but a range of values," and "it is not appropriate to refer to background as a single number." *See* Declaration of Anita Singh, ("Singh Decl."), ECF 351-4 ¶ 9. She abandons her "site-specific" background calculation of 148.2, omitting all reference to it in her declaration, even though it was the primary basis of the opinions in her expert report. Instead she returns to the Long Beach Study.

All these numbers purport to represent the same thing – lead levels in the residential areas if the Vernon Plant had never existed – but they all conflict with each other and are therefore unreliable. If DTSC itself cannot make up its mind about the "background" around the Vernon Plant, this Court cannot use this concept to determine the scope of contamination around the Vernon Plant.

## 2. DTSC's relies now on its Long Beach Study, which it has repeatedly repudiated and which has no value for this purpose.

The eight-year-old Long Beach Study has become newly important in this case as a primary basis for DTSC's effort to establish a broad compensable cleanup area. Both of DTSC's primary experts, Dr. Medine and Dr. Singh, commit in their expert declarations to a defense of the Long Beach Study. *See, e.g.*, Medine Decl. ¶ 61 ("[t]he best

background study available was conducted specifically for the Vernon Plant site and is referred to as the Long Beach study"); Singh Decl. ¶ 18 ("[t]he Long Beach Study represents the most appropriate background dataset for comparison with PIA in residential soils").  But DTSC itself has repeatedly repudiated the Long Beach Study by redoing it, as noted above, first in a 2015 report finding lead levels at levels two to three times higher than in Long Beach, then in 2022 for this case, finding lead levels twice as high.  The Long Beach study was never intended to evidence the scope of contamination around the Vernon Plant, and cannot bear the weight DTSC places on it now.

The Long Beach Study was ordered by DTSC in 2013 for the purpose of determining whether soil investigation in the residential areas was needed in the first place.  Ex. 14, at ES-1.  The study was for the purpose of determining whether lead was elevated in the residential areas, *id.*, and the method was to compare a small number of samples (~19) in each of three areas: the northern residential area, the southern residential area, and an offsite location, which turned out to be Long Beach.  *Id.*  In other words, the Long Beach Study was the agency's first attempt to determine whether *any* Vernon Plant contamination had potentially migrated to the residential areas.  The study was not designed to determine the scope of contamination, and it cannot be used that way now.

Second, the Long Beach Study was not properly designed even for its own purpose of establishing a "background" level of lead in the residential areas.  DTSC has a specific guidance document setting forth best practices for determining a "background" level of metals like lead.  *See* Exhibit 16 (Appendix B Guidance).  But DTSC ignored that guidance – its own document – entirely with respect to the Long Beach Study, never referencing it or evaluating whether the Long Beach study complied with it.  DTSC 1 Tr. 202:21-203:2; *id.* at 206:10-15. And in fact, the Long Beach Study did *not* comply with that guidance, because the guidance advised trying to find a site as close as possible to the Vernon Plant, and DTSC made no effort to do that.  DTSC 1 Tr. 216:3-217:17.

Third, DTSC experts now tout the value of the Long Beach Study, but they have made no effort to meaningfully compare the Long Beach sample site to the residential

areas around the Vernon Plant.  Dr. Medine explicitly noted that he is not an expert on
the lead "background" in the residential areas.  Medine Tr. 181:20-182:2.  Dr. Singh
testified that she did nothing to evaluate the Long Beach Study on its merits other than
read it.  Singh Tr. 171:25-185:1.  Neither expert, for example, evaluated whether Long
Beach has a comparable number of legacy lead smelters and industrial lead-related
manufacturers as exist – unlike the Vernon Plant – in the close vicinity of the residential
areas around Vernon.  Neither expert apparently noted, for example, that the samples in
the northern residential area in the Long Beach Study were collected from properties
directly adjacent to (and downwind of) Continental Can, the same facility DTSC refused
to investigate even at the urging of its management.

Finally, the Long Beach Study cannot tell the Court *where* contamination went,
which is the point of this Scope Trial.  The Long Beach Study compared one small area
in Long Beach to one small area north of the Vernon Plant, and to one small area south.
The study could not – and does not – purport to characterize soil conditions throughout
the entire PIA, though DTSC offers it to this Court for that purpose.  DTSC relies so
heavily on this one small study because the agency is desperate for evidence.

### D.    DTSC's primary expert cherry-picks away more than half the site data.

DTSC's primary expert, Dr. Medine, engages in a similar misuse of data.
Purporting to isolate the impact of the Vernon Plant on residential area soils, Dr. Medine
cherry-picks only data from residential yards, while excluding a vast number of samples
– nearly nine thousand – from the grass "parkways" located between the sidewalk and the
street in residential neighborhoods.  *See* Rouhani Decl. ¶ 80.  He gives no
comprehensible reason for excluding the parkway data.  *Id.* ¶ 81.  Because the parkway
data is farthest from structures and the influence of lead-based paint, however, it has
consistently lower lead levels, and its exclusion biases Dr. Medine's dataset powerfully in
the direction of higher lead levels.  *Id.* ¶ 80.  Dr. Medine excludes data from area parks
for the same reason, with similar upwardly- biased lead levels as a result.  *Id.* ¶ 80.

Conversely, Dr. Medine claims that he is pruning from his data set samples taken within ten feet of a structure, in the so-called "dripline" where lead paint can often collect, in order to remove the confounding influence of lead-based paint.  *Id.* ¶ 76-77.  But Dr. Rouhani's geospatial analysis of Dr. Medine's samples revealed that more than half of the samples Dr. Medine included in his data set were, in fact, taken within ten feet of a residence.  *Id.* ¶ 78.  This is another bias in favor of higher lead levels in Dr. Medine's dataset, in this case because Dr. Medine is analyzing a dataset more heavily influenced by lead paint than he admits.

Dr. Medine then takes his biased dataset and over-averages it.  Samples in a single yard are converted to parcel averages, then those averages are averaged together within a certain distance.  *Id.* ¶ 88.  The result is to create an illusion of patterns in the data – like Dr. Medine's supposed downward gradient over many miles – that are not actually there.

Notwithstanding all that data manipulation, however, the real trends in the data cannot be suppressed.  As discussed above, Dr. Medine's own graphs depict the two independent trends identified by Defendants in this case: A sharp downward gradient as Vernon Plant lead dissipates entirely within the industrial area; and widespread, generally flat lead contamination in the residential areas, unimpacted by Vernon Plant lead.  *Supra*.  Dr. Medine's dataset, as biased as it is, still tells Defendants' story.

### E.    DTSC grasps unsuccessfully at an old, unrelated air model.

Plaintiffs attempt to inject a red herring into this case: air modeling. But no expert has ever run any air model which attempts to calculate how much lead the Vernon Plant could have deposited in the residential areas. Instead, DTSC's experts reach for older air modeling studies which were done for different health risk assessment purposes and – according to their express user-defined settings – could not and did not calculate how much lead the Vernon Plant contributed to soils.  DTSC's experts have not investigated any of the myriad variables, including the size of the lead particles leaving the smelter stacks, which would be required to even estimate how far that lead traveled or how much of it ended up in the residential soil.  More generally, the old air modeling which DTSC

now misinterprets is inherently unrealistic and simply assumes that any plume from the smelter would carry on undepleted for vast distances – up to 50 kilometers – that the air modeler himself arbitrarily chooses when he runs the model. These models tell the court nothing about what happened in the real world in the soils surrounding the Vernon Plant.

### F.   DTSC does not actually propose a contamination radius for this Court's evaluation, and instead seeks a blank check.

Defendants sought a trial on the question of the "compensable cleanup area" for two specific reasons: First, it would encourage efforts to resolve the case by making the scope of potentially compensable response costs known to all parties, bringing expectations into alignment; and second, it would make the case more efficient by defining the area within which the parties will contest liability, and within which various industrial operators may be third-party defendants.  ECF 227 at 21-24.  The Court agreed as a general matter, ordering the Scope Trial "as set forth in the Defendants' proposal."  ECF 231.  But for these purposes to be served, the Court must actually, specifically determine the compensable cleanup area.  DTSC has not given the Court a proposal with which the Court can do so.

Instead, DTSC has suggested that contamination extended "several miles" from the Vernon Plant.  Medine Decl. ¶ 36.  These are not specific enough numbers to allow the Court to actually rule on the scope of the "compensable cleanup area."  Even at his most specific, Dr. Medine estimated wide ranges; for instance, his proposed contamination range to the southwest of the plant, where winds blow strongest, is 1.9-2.8 miles.  Medine Tr. 40:17-21.  But the difference in area between a circle of radius 1.9 miles and a circle of radius 2.8 miles is more than thirteen square miles – *i.e.*, much bigger than the roughly ten-square-mile area of the original PIA itself.  Accordingly, if the Court rules that the "compensable cleanup area" is "1.9-2.8 miles" in radius from the Vernon Plant, there will be *more* area in dispute between the parties after the Scope Trial than there was before, including tens of thousands of new properties in dispute.  This would mean the Scope Trial was a waste of time; there is no point to having a trial over the "compensable

cleanup area" if the result is so vague that it does not streamline the case further than this. By failing to actually define a proposed compensable cleanup area, DTSC is effectively seeking a blank check from this Court.

## III. UNDER NINTH CIRCUIT LAW, VERNON PLANT EMISSIONS DID NOT CAUSE DTSC RESPONSE COSTS IN THE RESIDENTIAL AREAS.

No matter which party has the burden of proof, it is clear that releases from the Vernon Plant did not cause DTSC to incur response costs in the residential areas, which are all farther than 0.5 miles from the Vernon Plant. As set forth above, contamination from the Vernon Plant did not migrate that far in detectable amounts.[10]

As a legal matter, under *Boeing*, the standard for causation in CERCLA can be met in two ways: through "*sine qua non*" causation, or "causal overdetermination." *Supra*. In this case, that means that the compensable cleanup area is the geographic region where either (1) no cleanup would have been necessary if the Vernon Plant had never existed ("*sine qua non*" causation) in spite of the contributions of historic lead paint, leaded gasoline emissions, and other local industry, including multiple other smelters; or (2) soil remediation in the residential areas *would* have been required as a result of Vernon Plant emissions even if those other sources themselves had not existed ("causal overdetermination"). Conversely, an area is *not* within the compensable cleanup area if (1) soil remediation would have been needed in that area whether the Vernon Plant had existed or not; and (2) Vernon Plant emissions would not have been enough, on their own, to require soil remediation in that area.

The residential areas are definitively in the latter category. They are *not* within the compensable cleanup area, under Ninth Circuit CERCLA law, because (1) the impact of contamination in the residential areas from lead-based paint, leaded gasoline emissions, and other nearer local industry sources was more than enough, on its own, to surpass

---

[10] If burden-shifting applies under *Castaic Lake*, for the reasons set forth in Sections I-II of this brief, DTSC has not met its burden to prove a "plausible pathway" of material quantities of lead from the Vernon Plant to the residential areas, let alone to all reaches of the PIA and beyond.

DTSC's soil-lead cleanup threshold of 80 mg/kg; and (2) contamination resulting from Vernon Plant emissions was far below 80 mg/kg in residential soils.

A. **According to DTSC itself, the residential areas would have been cleaned under DTSC's lead standard even in the absence of the Vernon Plant.**

DTSC's Final Removal Action Plan – the "Cleanup Plan" – for the PIA determined that residential properties in the PIA with lead concentrations above 80 ppm would be cleaned up.  *See* Ex. 15 (Final Removal Action Plan) § 3.2.  Moreover, when properties are cleaned, they are cleaned *only* to 80 ppm (not lower); the agency does not remove all lead.  DTSC 1 Tr. 175:4-5 ("If the decision to clean up a property was made, we would clean it up to 80 parts per million.").

Even DTSC's own expert statistician, Dr. Singh, calculated the background level of lead in the residential areas of the PIA as 148 ppm ($UCL_{95}$).  Singh Tr. 55:14-21.  This functions as an admission; 148 ppm is the floor in this case.  DTSC's own background calculations in 2015 were even higher, with estimated background levels of 210-250 ppm in the residential areas to the north of the Vernon Plant; 165-195 ppm in the residential areas to the south; and 170-195 ppm in the residential areas to the east and northeast. 2015 DTSC Report, Table 1. This means that DTSC itself acknowledges that under DTSC's cleanup threshold of 80 ppm, DTSC would be cleaning up the residential areas of the PIA *even if the Vernon Plant had never existed*.  Accordingly, DTSC fails the first half of the *Boeing* causation test: "but-for" or "*sine qua non*" causation.  The Vernon Plant was not a "but-for" cause of DTSC's response costs in the residential areas because those costs would have been incurred regardless of Vernon Plant emissions or releases. Based on the first half of the *Boeing* causation test, the residential areas of the PIA are not within the compensable cleanup area.

B. **Any impact of the Vernon Plant would not have necessitated soil cleanup in the residential areas.**

Sections I and II of this brief set forth Defendants' argument for why the Vernon Plant did not contaminate the residential areas to any detectable degree, and therefore

would not have necessitated cleanup in the residential areas if residential soils were otherwise unimpacted by lead paint, gasoline, and other industrial contamination. Those arguments are not repeated here. They will be developed in the trial record and set forth in more detail in post-trial briefings and proposed contentions of fact and conclusions of law.

At the highest level, that argument is as follows: DTSC's cleanup threshold was set at 80 ppm, equal to the agency's statewide "screening level" for lead in residential soils, meaning the level chosen conservatively for evaluating the potential health risk from lead concentrations in soil. *See* Ex. 15 (Final Removal Action Plan) § 2.4. The agency does not chase every molecule of lead in the soil; it cleans up where soil lead levels are above 80 ppm. Indeed, the agency only cleans up *to* 80 ppm – 80 ppm is what is left in the ground *after* DTSC's cleanup. DTSC 1 Tr. 174:13-175:5.

Here, while Defendants' experts have not been able to rule out trace lead contamination in the residential areas from the Vernon Plant, they have testified consistently that any such contamination is not detectable, and its contribution to residential soil lead levels is far below 80 ppm. Dr. Rouhani has testified that his quantitative methods have detected no lead beyond approximately 0.5 miles from the Vernon Plant to a high degree of sensitivity. Dr. Shields used complementary methods of soil pattern analysis, less purely quantitative, but with an estimated sensitivity level of approximately 50 ppm – meaning that Dr. Shields testified that he is confident that his methods would detect a contribution of Vernon Plant lead to the residential soils of more than 50 ppm. Together, these analyses robustly confirm that any contribution from the Vernon Plant, on its own, would not have contaminated residential soils anywhere near DTSC's 80 ppm screening threshold. In the absence of lead-based paint, legacy gasoline emissions, and the impact of other smelters and industrial facilities, the influence zone of the Vernon Plant would be considered perfectly safe under DTSC's own soils screening criteria. Based on the second half of the *Boeing* test, therefore, the residential areas of the PIA are not within the compensable cleanup area.

## IV.   EVEN IF CAUSATION EXISTS, THE DIVISIBILITY DOCTRINE STILL ALLOWS A 0.5-MILE COMPENSABLE CLEANUP AREA.

Defendants have proven a reasonable basis for distinguishing between the impacts form the former smelter and the impacts from other causes, such as the legacy of lead-based paint.  *See supra; Burlington Northern*, 556 U.S. at 613-14 (divisibility doctrine applicable when there is a reasonable basis for determining the contribution of each cause to a single harm). Expert testimony from Drs. Rouhani and Shields provide an objective, scientific basis for the Court to apportion harm between Defendants (on one side) and other causes of lead contamination (on the other).

First, Dr. Rouhani has testified that smelter emissions had no statistically detectable impact on DTSC's soil lead measurements in the residential areas, necessarily meaning that such emissions "did not… *when mixed with other hazardous wastes*, contribute to the release and the resultant response costs[.]" *Alcan*, 964 F.2d at 270 (emphasis in original).[11]  DTSC's decision whether to incur response costs to clean up a particular property is not made on a molecular level, it is based on lead concentrations reported in a lab report, the very data that Dr. Rouhani used in his analysis.  If, as he testifies, smelter emissions did not affect the lab results, those emissions did not contribute to the identified release or DTSC's resultant response costs.

Second, the courts have often found a basis for divisibility based on the geographic distribution of contamination. [12]  Here, Drs. Shields and Rouhani have presented scientific bases for determining that the geographic extent of Vernon Plant contamination is limited to a radius of 0.5 miles.  Thus the doctrine of divisibility provides the Court with an additional legal basis for defining the compensable cleanup area to extend no further than the industrial area.

---

[11] *See also Dent v. Beazer Materials and Services, Inc*., 156 F3d. 523, 531 (4th Cir. 1998) (zero apportionment where hazardous substances did not require remediation).

[12] *See, e.g., U.S. v. Rohm & Haas Co*., 2 F.3d 1265, 1280 (3d Cir. 1993) (if defendant could show that none of the hazardous substances at a site were fairly attributable to it, court could conclude that apportioned share should be zero).

BENESCH FRIEDLANDER
COPLAN & ARONOFF LLP

By: ___/s/ John A. Rego_____
John A. Rego
Nicholas J. Secco
Krista Enns

*Counsel for Gould Electronics Inc.*

MURCHISON & CUMMING, LLP

By: ___/s/ Richard A. Dongell_____
Richard A. Dongell

*Attorneys for Kinsbursky*
*Bros. Supply, Inc. dba KBI*

FARELLA BRAUN + MARTEL LLP

By: ___/s/ Donald Sobelman_____
Donald Sobelman
Christopher Rendall-Jackson
John Ugai

*Attorneys for Oregon Tool, Inc.,*
*formerly known as Blount, Inc.*

LAW OFFICES OF JOEL L. HERZ

By: ___/s/ Joel L. Herz_____
Joel L. Herz

*Attorney for NL Industries, Inc.*

LAW OFFICES
OF JAMES C. MACDONALD

By: _/s/ James C. Macdonald_____
James C. Macdonald

*Attorney for Ramcar Batteries, Inc.*

BEVERIDGE & DIAMOND, P.C.

By: ___/s/ Eric L. Klein_____
Gary J. Smith
Bina R. Reddy (*pro hac vice*)
Eric L. Klein (*pro hac vice*)

*Counsel for Defendant Clarios, LLC*

GIBSON, DUNN & CRUTCHER LLP

By: ___/s/ Alexander P. Swanson_____
Patrick W. Dennis
Alexander P. Swanson
Thomas F. Cochrane

*Attorneys for Quemetco, Inc.*

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP

By: ___/s/ Stephen J. O'Neil_____
Stephen J. O'Neil
Jeffrey J. Parker

*Attorneys for Trojan*
*Battery Company, LLC*

RAF LAW GROUP

By: ___/s/ Anna L. Le May_____
Ruben A. Castellon
Anna L. Le May

*Counsel for*
*International Metals Ekco, Ltd.*

DEFENDANTS' PRETRIAL BREF, No. 2:20-cv-11293-SVW                    1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SIGNATURE ATTESTATION**

Pursuant to Local Rule 5-4.3.4(a)(2)(i), I, Eric L. Klein, attest that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.

Dated: April 12, 2022                    _____*/s/ Eric L. Klein*_____

                                         Eric L. Klein