Joel L. Herz, Esq. (Admitted Pro Hac Vice)
joel@joelherz.com
LAW OFFICES OF JOEL L. HERZ
3573 East Sunrise Drive, Suite 215
Tucson, AZ 85718
(520) 529-8080 (telephone)
(520)529-8077 (facsimile)

Kenneth A. Ehrlich (Bar #150570)
kehrlich@elkinskalt.com
Sean A. McCormick (Bar #295711)
smccormick@elkinskalt.com
ELKINS KALT WEINTRAUB REUBEN
GARTSIDE LLP
10345 W. Olympic Blvd
Los Angeles, CA  90064
(310) 746-4412 (telephone)
(310) 746-4499 (facsimile)

Attorneys for Defendant NL Industries, Inc.

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL, et al.<br><br>                              Plaintiffs,<br><br>v.<br><br>NL INDUSTRIES, INC., et al.<br><br>                              Defendants.<br>_____ | Case No. 2:20-cv-11293-SVW-JPR<br><br>**DEFENDANT NL INDUSTRIES, INC.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:   May 23, 2022<br>Time:  1:30 p.m.<br>Place:  Courtroom 10A<br>Before:  Hon. Stephen V. Wilson<br>Complaint Filed:  December 14, 2020<br>Phase 1 Trial Date:  May 11, 2022<br>Time: 9:00 a.m.<br>(No trial date set on this issue) |

i

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

MEMORANDUM OF POINTS AND AUTHORITIES .......................... 1

ARGUMENT .................................................................................... 1

    SUMMARY OF ARGUMENT .......................................................... 1

    SUMMARY OF FACTS ................................................................... 2

    POINT I – DTSC'S CLAIM FOR COST RECOVERY FOR THE
    OFF-SITE RESIDENTIAL AREAS ON THE BASIS THAT NL
    IS A PAST OWNER OR OPERATOR OF THE EXIDE PLANT
    MUST BE DISMISSED AS A MATTER OF LAW ......................... 3

    POINT II – THE EXIDE PLANT AND THE RESIDENTIAL
    AREAS ARE NOT A SINGLE UNITARY FACILITY .................. 7

        A.  NONE OF THE FACTORS SUPPORT DTSC ................. 8

        B.  NONE OF THE POLICY REASONS SUPPORT A
            UNITARY FACILITY THEORY ................................... 11

        C.  DTSC HAS ADMITTED THAT 1) THE EXIDE PLANT
            AND 2) THE RESIDENTIAL AREAS ARE NOT A
            SINGLE UNITARY FACILITY ................................... 12

        D.  THE RECORD IS NOW FULLY DEVELOPED SO THAT
            SUMMARY JUDGMENT CAN BE ENTERED IN FAVOR
            OF NL ........................................................................ 13

        E.  CASE LAW SUPPORTS NL'S POSITION THAT
            MULTIPLE "CONTAMINATING FACILITIES" EXIST,
            WHICH BARS DTSC'S CERCLA CLAIMS ................. 14

CONCLUSION .............................................................................. 17

1

## **TABLE OF AUTHORITIES**

2

**Cases**

3

*Alprof Realty LLC v. Corp. of the Presiding Bishop of the Church of Jesus
    Christ of Latter-Day Saints*, No. 09-CV-5190 (CBA) (RER), 2012 WL
    4049800 (E.D.N.Y. Sep. 13, 2012) ...................................................8, 15, 16, 17

*Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 191 F.3d 409 (4th Cir. 1999) ......17

*Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 480 F. Supp. 3d 430
    (E.D.N.Y. 2020)................................................................................8, 15, 16, 17

*Center for Community Action and Environmental Justice*, 764 F.3d 1019
    (9th Cir. 2014) ............................................................................................6

*Cytec Industries, Inc. v. the B.F. Goodrich Co.*, 232 F. Supp. 2d 821
    (S.D. Ohio 2002)........................................................................................16

*Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486 (S.D. Tex. 2015) .........16

*Hamilton v. State Farm Fire Cas. Co.*, 270 F.3d 778 (9th Cir. 2001) ....................10

*MPM Silicones, LLC v. Union Carbide Corp.*, No. 1:11-CV-1542,
    2016 WL 3962630 (N.D.N.Y. July 7, 2016) *vacated and remanded
    in part on other grounds,* 966 F.3d 200 (2d Cir. 2020) ....................................17

*New York v. Gen. Elec. Co .*, No. 14-CV-747, 2017 WL 1239638
    (N.D.N.Y. Mar. 31, 2017) ..............................................................................16

*Niagara Mohawk Power Corp. v. Consolidated Rail Corp.,* 291 F. Supp. 2d
    105 (N.D.N.Y. 2003), *rev'd on other grounds*, *Niagara Mohawk Power
    Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112 (2d Cir. 2010)...............8, 14, 16, 17

*Ohio ex rel. Dewine v. Breen*, 362 F. Supp. 3d 420 (S.D. Ohio 2019) ...................16

*Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565 (9th Cir. 2018)...........passim

*Pakootas v. Teck Cominico Metals, Ltd.*, 830 F.3d 975 (9th Cir. 2016)..........passim

*Union Carbide Corp. v. Thiokol Corp.*, 890 F. Supp. 1035
    (S.D. Ga. 1994).................................................................................8, 15, 16, 17

iii

*U.S. v. Township, Brighton,* 153 F.3d 307 (6th Cir. 1998) ....................................17

*U.S. v. Vertac Chemical Corp.*, 364 F. Supp. 2d 941 (E.D. Ark. 2005) ................16

*U.S. v. Washington State Department of Transp*, No. 08-5722RJB
     (W.D. Wash. Nov. 17, 2020) ............................................................................ 17

**Statutes**

42 U.S.C. § 6903(3) ...................................................................................................4

42 U.S.C. § 9607 ........................................................................................................4

42 U.S.C. § 9607 (a)(2). ........................................................................................4, 8

# **NOTICE OF MOTION AND MOTION**

TO PLAINTIFF AND TO ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 23, 2022 **at 1:30 p.m.** in the courtroom of the Honorable Stephen V. Wilson, located in Courtroom 10A on the 10th Floor of the First Street Courthouse, 350 W. 1st Street, Los Angeles, California 90012, Defendant NL Industries, Inc. ("NL") will and hereby does move for partial summary judgment against Plaintiff California Department of Toxic Substances Control and the Toxic Substances Control Account's ("DTSC" or "California") pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.

NL bases the Motion on this Memorandum of Points and Authorities, the Statement of Uncontroverted Facts and Conclusions of Law, the Declaration of John Powers, the concurrently lodged Proposed Order; and on such oral argument and evidence that may be represented at the hearing.

PLEASE TAKE FURTHER NOTICE that, pursuant to L.R. 7-9 and 7-10, an opposition, if any, shall be served at least twenty-one (21) days before the motion hearing date and a reply brief may be filed no later than May 9, 2022.

This Motion is made following the conference of counsel pursuant to L.R. 7-3.  On March 18, 2022, counsel for Plaintiff and I, Joel L. Herz, conducted a conference via telephone pursuant to L.R. 7-3 to discuss the substance of NL's contemplated Motion for Partial Summary Judgment.  The conference did not resolve this motion as Plaintiff's counsel disagreed with the arguments presented.

DATED:  April 22, 2022

LAW OFFICES OF JOEL L. HERZ                    ELKINS KALT WEINTRAUB
                                               RUEBEN GARTSIDE LLP

/s/ Joel L. Herz                               /s/ Kenneth A. Ehrlich

Counsel for NL Industries, Inc.

NL INDUSTRIES, INC'S NOTICE OF MOTION AND MOTION
FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES                                          CASE NO. 2:20-CV-11293-SVR-JPR

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant NL Industries, Inc. ("NL") submits this Memorandum of Law in Support of its Motion for Partial Summary Judgment as to Plaintiff California Department of Toxic Substances Control and the Toxic Substances Control Account's ("DTSC" or "California") Complaint pursuant to Fed. R. Civ. P. 56 and L.R. 56.

## ARGUMENT

## SUMMARY OF ARGUMENT

The question in *Pakootas v. Teck Cominco Metals, Ltd.*, 830 F.3d 975 (9th Cir. 2016) ("Pakootas III") was a simple one:

> When a **smelter emits lead**, arsenic, cadmium, and mercury compounds **through a smokestack and those compounds contaminate land** or water **downwind, can the owner-operator of the smelter be held liable for cleanup costs** and natural resource damages **under** the Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**"), 42 U.S.C. § 9607(a)(3)?

*Pakootas III*, 830 F.3d at 978 (emphasis added).

The Ninth Circuit unequivocally answered this question, stating:

> "we **must** answer **no**."

*Id.* (emphasis and underline added).

The Ninth Circuit did not provide District Courts with a choice. As stated unequivocally by the Ninth Circuit – the answer **must be no.**

The question presented by NL's Motion for Partial Summary Judgment is identical to the one that the Ninth Circuit faced in 2016 in *Pakootas III*:

1     Can NL be held liable for emitting lead through a smokestack that

2     traveled through the air, downwind to residential areas at least one-half

3     mile away?

4     The Ninth Circuit has supplied the answer -- and it **must be no.** There is no

5     other choice.

6     At the Motion to Dismiss phase, to avoid *Pakootas III*'s dictate that a former

7     owner of a lead smelter cannot be liable for the cleanup of airborne lead emissions

8     that allegedly traveled to the Residential Areas more than one-quarter mile away

9     from the Exide Plant, DTSC argued:

10     "**Plaintiffs do not rely on <u>aerial deposition</u> as "disposal" for**

11     **purposes of CERCLA liability**".

12     *See* Docket No. 72, page 1, lines 25- 26. (emphasis and underline added)

13     But the undisputed truth has now been laid bare.

14     DTSC's Rule 30(b)(6) witness, Peter Ruttan, swore under oath:

15     "I'm not aware of **any other pathways** that would **contribute to the**

16     **lead in residential areas <u>other than airborne emissions</u>.**"

17     SUF 23.  (emphasis and underline added)

18     With this fact now undisputed – nothing else matters.  NL cannot be held liable

19     under the dictates of *Pakootas III* for air lead emissions out of a smokestack (or, for

20     the same reason, air lead emissions from a vent, window, or door), and all claims for

21     cleanup costs in the Residential Areas must be dismissed.

22     <u>**SUMMARY OF FACTS**</u>

23     This case involves two entirely distinct and physically separated areas.

24     One area -- the Exide Plant ("Exide Plant") -- is less than 14 acres and is

25     located in the center of an industrial area in Vernon, California.  Statement of

26     Undisputed Facts and Conclusions of Law ("SUF") 1-4.  The second area -- the

27     residential areas ("Residential Areas") -- is over 10 square miles (6,400 acres) and

28

contains approximately 10,000 residential properties located in various cities and unincorporated areas outside the Vernon industrial area.  SUF 9, 10.  The area of land that DTSC alleges NL formerly owned or operated -- the Exide Plant -- is no more than **0.218** percent of the size of the Residential Area.  SUF 11.  NL never owned or operated any of the Residential Areas.  SUF 12.

DTSC's Rule 30(b)(6) witness, Peter Ruttan, has now admitted that the only way lead traveled from the Exide Plant to the Residential Areas was via air emissions, as follows:

> "I'm not aware of **any other pathways** that would **contribute to the lead in residential areas <u>other than airborne emissions</u>.**"

SUF 23.  (emphasis and underline added)

## POINT I

## <u>DTSC'S CLAIM FOR COST RECOVERY FOR THE OFF-SITE RESIDENTIAL AREAS ON THE BASIS THAT NL IS A PAST OWNER OR OPERATOR OF THE EXIDE PLANT MUST BE DISMISSED AS A MATTER OF LAW.</u>

Under Section 107(a) of CERCLA, liability can be imposed on four classes of persons (known in CERCLA parlance as "potentially responsible parties" or "PRPs"):

1. the owner and operator of a vessel or a facility,
2. any person **who at the time <u>of disposal</u>** of any hazardous substance owned or operated any facility <u>**at which** such **hazardous substances were disposed of**</u>,
3. any person who by contract, agreement, or otherwise arranged for **disposal** or treatment, or arranged with a transporter for transport for **disposal** or treatment, of hazardous substances

owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

4.   any person who accepts or accepted any hazardous substances for transport to **disposal** or treatment facilities, incineration vessels or sites selected by such person. . . .

42 U.S.C. § 9607 (emphasis and italics added).

DTSC alleges that NL is liable for response costs to address soil lead contamination in the Residential Areas solely as an alleged former owner/operator under CERCLA § 107(a)(2).  Unlike CERCLA § 107(a)(1) (current owner/operator liability), CERCLA § 107(a)(2)(former owner/operator, requires that DTSC prove that NL is a person "who ***at the time of disposal*** of any hazardous substance ***owned or operated any facility*** ***at which*** such hazardous substances were **disposed of**" (emphasis added).   42 U.S.C. § 9607 (a)(2).  The properties within the Residential Areas were not facilities owned by NL "at which" a "disposal" occurred.

CERCLA defines "disposal" for purposes of CERCLA § 107(a) by cross-referencing to the definition of "disposal" in RCRA, *see* 42 U.S.C. § 9601(29), which defines "disposal" as follows:

The term "disposal" means the *discharge, deposit, injection, dumping, spilling, leaking, or placing* of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3) (emphasis added).

It is undisputed that: (1) NL never owned or operated any location in the Residential Areas where hazardous substances have come to be located, and (2) any

alleged airborne lead emissions from the former Exide Plant that theoretically reached the Residential Areas were not hazardous substances "disposed of" at the Residential Areas within the meaning of CERCLA.  Accordingly, with regard to locations in the Residential Areas, NL cannot constitute a person "who at the time of disposal of any hazardous substance owned or operated any facility ***at which* such hazardous substances were disposed of**" and cannot be liable under CERCLA.

In *Pakootas v. Teck Cominico Metals, Ltd.*, 830 F.3d 975, 978 (9th Cir. 2016), the Ninth Circuit ruled that CERCLA "disposal" does not, as a matter of statutory construction, encompass the dispersal of airborne materials emitted from a lead smelter, even if it is assumed that such materials eventually contaminate downwind properties.

In *Pakootas*, the plaintiffs alleged that the owner of a Canadian lead smelter "arranged for disposal" of hazardous substances, withing the meaning of CERCLA § 107(a)(3), by emitting them into the air, after which air currents carried them to the Upper Columbia River Site, where they eventually settled to the ground. *Pakootas,* 830 F.3d at 979.

Based on extended consideration of the statutory text, the common meanings of the relevant terms, applicable Ninth Circuit precedent and relevant legislative history, the Ninth Circuit concluded as a matter of statutory construction that the passive dispersal of air emissions from a lead smelter cannot amount to a "deposit" of hazardous substances "into or on any land or water", and thus did not fall within CERCLA's definition of "disposal." *Pakootas,* 830 F.3d at 983-84.

As dictated by *Pakootas,* airborne "releases" of hazardous substances into a particular geographic area do not become actionable if a party separately engages in "disposal" in some other area within the meaning of CERCLA.

In response to NL's Motion to Dismiss, DTSC argued that *Pakootas* does not apply because "**Plaintiffs do not rely on aerial deposition as "disposal" for purposes of CERCLA liability**".   *See* Docket No. 72, page 1, lines 25- 26.

But DTSC has now conceded that the Residential Areas were only allegedly contaminated through the aerial deposition of contaminants emitted from the Exide Plant.  As stated by DTSC's Rule 30(b)(6) witness, Peter Ruttan: "I'm not aware of **any other pathways** that would **contribute to the lead in residential areas other than airborne emissions.**" SUF 23.  Under *Pakootas'* interpretation of the statutory language, such impacts do not arise from "disposal" and thus NL cannot be liable under CERCLA.  *See also Center for Community Action and Environmental Justice*, 764 F.3d 1019, 1024 (9th Cir. 2014) (under RCRA's definition, "'disposal' does not extend to emissions of solid waste directly into the air."); *cf. Carson Harbor Village, Ltd. v. Unocal Corporation*, 270 F.3d 863, 887 (9th Cir. 2001) (*en banc*) (Under CERCLA § 107(a)(2), "disposal" does not encompass the gradual passive migration of contaminants through soil after their initial release).

Moreover, as noted below, DTSC actually participated in the Ninth Circuit 2016 *Pakootas* appeal as *amicus curiae*, arguing unsuccessfully against the ultimate holding.  In fact, DTSC specifically acknowledged before the Ninth Circuit that the circumstances of the Exide Plant were analogous to the fact pattern at issue in *Pakootas* and raised the specter of this future litigation, correctly observing that the holding ultimately adopted by the Ninth Circuit would leave "contamination caused by Exide outside the scope of the HSAA or CERCLA because the hazardous substances were, initially, emitted into the air."

DTSC cannot now reasonably ask this Court to disregard the legal analysis and holding in *Pakootas* so as to hand DTSC the very outcome that DTSC could not persuade the Ninth Circuit to adopt.

DTSC's concocted disposal/release theory to avoid *Pakootas* has no legal basis.  In fact, the smelter at issue in *Pakootas* had separately "disposed of" massive amounts of lead-bearing slag by dumping it directly into the river and separately incurred CERCLA liability arising from that disposal.  *See Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 571 (9th Cir. 2018) (noting that "dispute centered on Teck Metals' liability for dumping **several million tons** of industrial waste **into** the Columbia River."); *see also Pakootas III*, 830 F.3d at 979, n. 2 ("Teck stipulated that it had dumped slag into the Columbia River . . .[and] the district court found Teck liable . . . ").   This did not, however, prevent the Ninth Circuit from holding that CERCLA liability did not attach to the smelter's airborne emissions.

Contrary to the DTSC's position in the previous Motion to Dismiss, the *Pokootas* plant's location in Canada has no legal significance.  Indeed, the Ninth Circuit directly rejected that the plant's location in Canada affected the analysis of the Ninth Circuit's rulings.  *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 573 (9th Cir. 2018) ("We held that the suit ***did not*** involve an extraterritorial application of CERCLA because Teck's pollution had "come to be located" in the United States." (emphasis added)).

As the HSAA employs the same liability standard as CERCLA and the same definition of "disposal," DTSC's HSAA aerial deposition claim meets the same fate as the CERCLA claim:  off-site impacts attributable solely to the aerial deposition of emissions from the Exide Plant are not compensable as "disposals" under CERCLA or the HSAA.

<u>**POINT II**</u>

<u>**THE EXIDE PLANT AND THE RESIDENTIAL AREAS ARE NOT A SINGLE UNITARY FACILITY.**</u>

To avoid the holding of *Pakootas*, DTSC has argued that the Exide Plant and the Residential Areas are a "single unitary facility".  This label does not matter

because under the plain language of CERCLA § 107(a)(2), NL must be the owner of the facility "at which" the hazardous substances were disposed to incur liability under this provision. 42 U.S.C. § 9607(a)(2).  But NL has never owned or operated any property within the Residential Areas.  Regardless, courts that have addressed the CERCLA definition of "facility" for determining the scope and breadth of CERCLA liability have consistently ruled that separately owned and geographically separated properties are not a "single unitary facility" under CERCLA when:

- the different properties do not have a single source of contamination (SUF 21);

- the governing entity making cleanup decisions has treated the two different areas as separate facilities (SUF 22);

- the separate properties are not contiguous or adjacent (SUF 9, 10);

- the separate properties are separated by physical distance of at least one-half mile (SUF 3);

- the separate properties have geographical features that separate them such as a large railyard or a river (SUF 6-8);

- the separate properties do not have the same cleanup plan (SUF 13); and

- the separate properties were never under common ownership or commonly operated (SUF 14).

*See, e.g. Niagara Mohawk, Alprof, Thiokol* and *Brooklyn Union* discussed below.

Yet, DTSC claims that the Exide Plant and the Residential Areas are one single unitary facility when all of the factors support NL.  The case law does not support DTSC's position.

### A. **NONE OF THE FACTORS SUPPORT DTSC**

First, the Exide Plant and the Residential Areas do not have a single source of contamination. SUF 21.  Lead from battery recycling operations impact the Exide

Plant. Residential uses including lead paint, leaded gasoline and leaded pesticides impact the Residential Areas. Indeed, DTSC's own expert, Dr. Allen Medine, states that lead paint is a source of lead in the Residential Areas contributing somewhat less than **35 tons** to the lead mass. SUF 21. *See* excerpts from Expert Report of Allen Medine, Ph.D. attached as Exhibit I to SUF at page 15 (emphasis added). Dr. Medine also states that leaded gasoline has released **974 tons** of lead into the Residential Areas. *Id.* at pages 15 and 83. He has also identified a Bethlehem Steel Plant outside Vernon that has released **181 tons** of lead into the Residential Areas. *Id.* at page 83.

Moreover, as specified in the Rule 30(b)(6) deposition of Peter Ruttan, DTSC's Rule 30(b)(6) deponent admitted that lead paint was found on many of the residential properties that DTSC is seeking money from NL for cleanup costs, as follows:

> 13   Q. **Was lead-based paint found on many of the**
> 14   **10,000 residential properties**?
> 15   A.   Lead-based paint has been found on -- on
> 16   the residential properties, **yes**.

SUF 20. *See* excerpt of Transcript of Peter Ruttan, DTSC Rule 30(b)(6), at page 267, lines 13 – 16 attached as Exhibit C to SUF. (emphasis added)

Thus, unlike situations where there is either a single factory, or a single defined off-site water contamination plume, such that it might make sense to determine a "single unitary site" because there is a "single unitary source of contamination", there is no such unitary source here. Therefore, no basis exists for calling the 14-acre Exide Plant and the separate 6,400 acre Residential Area that is at least one-half mile, and up to over 2.2 miles away -- a single unitary site.

Second, up to the point of filing the Complaint in this lawsuit, DTSC treated the Exide Plant as a separate facility from the Residential Areas. Indeed, DTSC

agreed to the Ninth Circuit that the two areas were separate and that the "facility" is the Exide Plant, and that Residential Areas are "off-site":

> **From 2000 to 2014, Exide Technologies ("Exide") operated a battery ==recycling facility== in Vernon, California, just south of downtown Los Angeles. The ==facility itself== was in operation for 90 years. … Exide's practices caused <u>airborne lead emissions ==*from the facility*==</u> to drift off-site and land in the surrounding community. As a result, the ground in the residential neighborhoods became contaminated with lead.**

(emphasis added). SUF 15. *See* DTSC Amicus Brief filed in *Pakootas*, Case No. 15-35228, dated 10/13/2015, Docket 53, attached to the Reply Declaration of John Powers ("Powers Reply Decl.") as Exhibit A, pp. 007-008, attached to SUF as Exhibit D. As discussed by DTSC in its *amicus* brief, the "facility" is the Exide Plant itself, the location from which the alleged pollution emanated. The Court must bind DTSC to this position. *See e.g.*, *Hamilton v. State Farm Fire Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001) ("The application of judicial estoppel is not limited to bar the assertion of inconsistent positions in the same litigation, but is also appropriate to bar litigants from making incompatible statements in two different cases."). DTSC should not now be allowed to redefine "the facility" to include the Residential Areas.

Third, the separate properties are not contiguous or adjacent. SUF 9, 10. The Exide Plant and the Residential Areas are in separate political and municipal jurisdictions, are separated by a physical distance of at least one-half mile (SUF 3), and are separated physically by a large railyard to the North, and the Los Angeles River to the South. SUF 5-8. The Residential Areas are zoned residential while the Exide Plant is zoned industrial. SUF 2.

Fourth, the separate properties do not have the same cleanup plan. SUF 13.

The Residential Area plan is to remove yard soil.  The Exide Plant plan is to clean and remove a recycling plant. SUF 16.

Fifth, the Exide Plant and the Residential Areas were never under common ownership or commonly operated.  SUF 14.

None of the factors that would allow a court to combine the no more than 14 acre Exide Plant and the separate and distinct 6,400 acre Residential Areas into a "single unitary facility" are present.

**B. <u>NONE OF THE POLICY REASONS SUPPORT A UNITARY FACILITY THEORY</u>**

First, if this Court determines the Exide Plant and the Residential Areas are a single unitary facility, the ramifications to current and former owners of each apartment building and house in the Residential Areas would be enormous.  For example, if the Exide Plant and the 10,000 residential properties contained within the Residential Areas are all deemed to constitute one single site or facility, each and every current owner might be deemed a current owner or operator under CERCLA § 107(a)(1) of the entire 6,400 acre "facility", and all are subject to being sued under CERCLA § 113 for any amounts that DTSC seeks from any party.  Furthermore, each and every former owner could be deemed a former owner or operator of the entire 6,400 acre "facility" under CERCLA § 107(a)(2) and subject to suit under CERCLA § 113 for any amounts that DTSC seeks from any party.  Thousands, if not tens of thousands, of parties would be joined to this lawsuit.  DTSC should not be allowed to create such a morass for property owners in the Residential Area – some of whom may have limited means to pay, sue or defend litigation – and subject them to being part of this lawsuit by saying that their properties are all part of one large "facility" – when they are not.

Second, unlike a factory that produces a man-made chemical that will only be found from a human manufacturing process, the contaminant in question is a

naturally occurring element, lead, ubiquitously found throughout Earth's soils and air.  DTSC's own expert has freely stated that naturally occurring lead exists in soils throughout the Residential Areas and the agency's remedial efforts seek to achieve levels that approach or are above DTSC's 80 ppm proposed cleanup levels.  If the definition of a "facility" is merely predicated on where lead "otherwise came to be located", a facility will have no bounds as there is naturally occurring lead everywhere, not to mention the lead contributed to these urban residential neighborhoods by paint, solder, leaded gasoline, pesticides, fertilizers and other localized sources.

Third, since NL (and none of the other Defendants) never owned any of the properties within the Residential Areas, it had no ability to maintain or control the lead paint on those properties, or the leaded gasoline or other activities that may have contaminated those properties.  As such, NL should have no liability.

C. **DTSC HAS ADMITTED THAT 1) THE EXIDE PLANT AND 2) THE RESIDENTIAL AREAS ARE NOT A SINGLE UNITARY FACILITY**

DTSC's Rule 30(b)(6) deponent fully recognized that the Residential Areas and the Exide Plant are not a "single unitary site" as a matter of law.   When asked in his Rule 30(b)(6) deposition if the Exide Plant and the Residential Areas were part of a single unitary facility, DTSC's witness, Peter Ruttan, stated that he did not think it was, as follows:

1  Q.   And the same question, **was it ever a**

2   **single unitary facility of any kind?**

3  A.  I'm not sure I understand your question.

4  Could you d**efine "unitary"?**

5  **Q. All commonly run for the same purpose.**

6  MR. ROBINSON: Objection as to form.

7    THE WITNESS: **I don't believe so.**

(Emphasis added)  SUF 22.

## D. <u>THE RECORD IS NOW FULLY DEVELOPED SO THAT SUMMARY JUDGMENT CAN BE ENTERED IN FAVOR OF NL</u>

NL fully recognizes that this Court previously addressed the issue of whether the Exide Plant and the Residential Areas are a "single unitary facility" in deciding NL's Motion to Dismiss.  *See* Order on NL and Trojan Battery Motion to Dismiss (July 19, 2021), Docket No. 103.  In previously addressing the issue of whether the Exide Plant and the Residential Areas should be considered a single unitary site, this Court stated:

> **"The Court recognizes that the above cases and others contain language suggesting that the Court may have discretion to designate separate facilities.** See *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc*., 191 F.3d 409, 419 (4th Cir. 1999) ("This is not to say that every widely contaminated property must be considered a single facility."); *Cytec Indus., Inc*., 232 F. Supp. 2d at 835 ("This court concludes that, where appropriate, the broadest geographical definition of a facility that is appropriate under the specific facts and circumstances of a given case would likely best advance CERCLA's ... purposes." (citation omitted and emphasis added)). However**, any discretion the Court may possess to divide or limit the facility alleged in the complaint is better reserved for summary judgment with the benefit of a full record."**

(emphasis added)  *See* Order on NL and Trojan Battery Motion to Dismiss (July 19, 2021), Docket No. 103, at page 15.

NL respectfully submits that the parties have developed a sufficiently full record to resolve this issue.  This Court should now determine that the Exide Plant

and the Residential Areas are separate facilities -- as DTSC had repeatedly said --
right up until it filed this lawsuit, and as it told the Ninth Circuit in a formal pleading.

In denying NL's Motion to Dismiss, this Court noted that DTSC was the
"master of its claim" (Docket 103 at page 13).   The Court further stated it was
inappropriate to dismiss NL's Complaint because "Plaintiff here pleads widespread
contamination, primarily of lead, **from a single source**, namely the Vernon Plant."
(Docket 103 at page 15).   However, while NL disputes that any lead traveled off the
Exide Plant, as noted above, DTSC has now admitted that there was not a "single
source" of the contamination, the Vernon Plant as DTSC alleged in its Complaint;
the agency now admits that multiple, additional contaminant sources exist including
lead paint, leaded gasoline, and leaded pesticides.  SUF 18.

### E.  CASE LAW SUPPORTS NL'S POSITION THAT MULTIPLE "CONTAMINATING FACILITIES" EXIST, WHICH BARS DTSC'S CERCLA CLAIMS

In *Niagara Mohawk Power Corp. v. Consolidated Rail Corp.,* 291 F. Supp. 2d
105 (N.D.N.Y. 2003), *rev'd on other grounds*, *Niagara Mohawk Power Corp. v.
Chevron U.S.A., Inc.*, 596 F.3d 112 (2d Cir. 2010), the plaintiff, Niagara Mohawk,
operated a gas plant on a large site. *Id.* at 114. Niagara Mohawk brought a CERCLA
§ 107 case against various prior owners of portions of the site, which had since been
broken up into separate parcels.  Niagara Mohawk sought to designate as part of the
gas plant "facility" an adjacent parcel of land onto which contamination from the
plant had migrated. At the time of the litigation, Conrail owned this adjacent
parcel.  *Id*. at 114-15.  The *Niagara Mohawk* court concluded that the adjacent
Conrail parcel should not be considered part of one single unitary "facility" because
the parcels were "'reasonably or naturally divided into multiple parts or functional
units.'"  *Id*. at 125 (quoting *United States v. 150 Acres of Land*, 204 F.3d 698, 709
(6th Cir. 2000)).   The court rejected Niagara Mohawk's attempts to integrate the

adjacent Conrail property into a single unitary facility as a means of holding Conrail liable under CERCLA. *Id.*

In *Alprof Realty LLC v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, No. 09-CV-5190 (CBA) (RER), 2012 WL 4049800 (E.D.N.Y. Sep. 13, 2012) (unpublished), the District Court noted that, even though an entire property involved in the subject litigation fell within the statutory definition of "facility" because it is a site where a hazardous substance has come to be located, distinct portions of the property should be designated as a *separate* CERCLA facility for liability purposes. *Id.* at *5. The court rejected the claim that the parties' properties constitute a single "facility". *Id.* at *8. *Alprof* concluded that, if the two properties "had been owned and operated together as a single waste disposal facility", then the properties might be "designated a single CERCLA facility for liability purposes." *Id.* But "no such relationship between the properties is alleged in this case." *Id.* *Alprof* found that **CERCLA does not "stand for the proposition that an unrelated neighboring property onto which contamination spreads becomes part of the CERCLA facility."** *Id.* (emphasis added).

In *Union Carbide Corp. v. Thiokol Corp.*, 890 F. Supp. 1035, 1043 (S.D. Ga. 1994), the court refused to find that all hazardous waste on 3,000 acres of property, of varying origin, location, and level of risk, constituted one "facility" under CERCLA. The court then legally separated a landfill and other different areas of the 3,000-acre site into separate facilities because the areas were "**geographically distinct**", **contained** a variety of **wastes** that were **not present in the landfill**, may **require different removal and remedial actions** than the landfill, and **were not treated as part of a unitary CERCLA facility** with the landfill. *Thiokol Corp.*, 890 F. Supp. at 1043 (emphasis added).

In *Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 480 F. Supp. 3d 430, 442 (E.D.N.Y. 2020), the court "found no authority . . . that treats an area containing

various structures that were never under common ownership or control and that does not involve contamination by a single contaminant as a single 'facility.'" *Id.*

In *New York v. Gen. Elec. Co* ., No. 14-CV-747, 2017 WL 1239638, at *21 (N.D.N.Y. Mar. 31, 2017), the Court found that the subject two sites were not a single "facility" despite a "common source of contamination" because "[t]he properties were not operated as a single unit together" and "did not have a common owner at the time of the contamination".

The holdings of *Niagara Mohawk, Alprof, Thiokol* and *Brooklyn Union* dictate that this Court designate Exide Plant and the Residential Areas as separate facilities.

NL recognizes that certain courts have found a "single site" under CERCLA, but have done so only where all properties are contiguous, owned by a single owner, or had a single source of contamination emanating from a single plant or two plants that were closely integrated. *See e.g. U.S. v. Vertac Chemical Corp.*, 364 F. Supp. 2d 941 (E.D. Ark. 2005)(the Court found a "single site" because **one single plant** caused all of the contamination."); *Ohio ex rel. Dewine v. Breen*, 362 F. Supp. 3d 420, 435 (S.D. Ohio 2019) ("Here, the parties agree that Buckeye was the **sole source of contamination** at the Neighboring Properties and the Site."); *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 518 (S.D. Tex. 2015) ("The Ordnance Works had a sewer line leading to the refinery's "West Ditch" **and exchanged byproducts with the refinery in an integrated fashion**. (Docket Entry No. 67 at 49)....But **the close integration between the refinery and the Ordnance Works** is enough to group them as one "facility" under CERCLA."); *Cytec Industries, Inc. v. the B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 837 (S.D. Ohio 2002) (Court ruled that Cytec owned and operated the entire 54 acres and no other source of contamination, existed, as follows:  "In the present matter, the "facility", as that term is defined under CERCLA, is the **entire fifty-four-acre site on which Cytec, and**

other owners and operators of the Marietta facility have operated a chemical
plant and waste disposal area. All of the twenty-eight SWMUs identified by the
USEPA are a result of the manufacturing activities conducted at the Marietta facility
since the early part of the last century."); *Axel Johnson, Inc. v. Carroll Carolina Oil
Co.*, 191 F.3d 409, 419 (4th Cir. 1999) ("Furthermore, **the entire Refinery property
was at all relevant times operated by a single party, and both the EPA and Axel
itself treated the entire property as a single facility for CERCLA remediation
purposes** in the consent decree that they signed."); *U.S. v. Township, Brighton*, 153
F.3d 307, 322 (6th Cir. 1998) ("**All contiguous land** operating as a landfill
constitutes a facility under CERCLA, regardless of whether hazardous substances
occupy the entire site."); *MPM Silicones, LLC v. Union Carbide Corp.*, No. 1:11-
CV-1542, 2016 WL 3962630, *26 (N.D.N.Y. July 7, 2016), *vacated and remanded
in part on other grounds*, 966 F.3d 200 (2d Cir. 2020)(finding a single site because
the property **had the same source of contamination and the entire property has
been operated by a single owner).**

But when the properties are not contiguous, do not have a common owner,
were not operated as a single unit, or where the contamination did not come from a
single source, courts have routinely found separate facilities. *See e.g. Niagara
Mohawk, Alprof, Thiokol*, *Brooklyn Union* and *U.S. v. Washington State Department
of Transp*, No. 08-5722RJB (W.D. Wash. Nov. 17, 2010)(stating that two properties
should be treated as two separate facilities or two sites).

The above cases also dictate that the Exide Plant and the Residential Areas be
designated as separate facilities.

## CONCLUSION

For the reasons set forth herein, NL requests this Court grant NL partial
summary judgment in its favor and dismiss all claims that NL is responsible for any
cleanup of the Residential Areas.

Date:  April 22, 2022                     Respectfully submitted,

/s/ Joel L. Herz
LAW OFFICES OF JOEL L. HERZ
3573 East Sunrise Drive, Suite 215
Tucson, AZ  85718
(520) 529-8080
(520) 529-8077 (facsimile)
Email:  joel@joelherz.com
Admitted Pro Hac Vice

Kenneth A. Ehrlich (Bar #150570)
Sean A. McCormick (Bar #295711)
ELKINS KALT WEINTRAUB REUBEN
GARTSIDE LLP
10345 W. Olympic Blvd
Los Angeles, CA  90064
(310) 746-4412
(310) 746-4499 (facsimile)
kehrlich@elkinskalt.com
smccormick@elkinskalt.com
Counsel for NL Industries, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 22, 2022, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF system, which will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

By:  /s/ Joel L. Herz _____

NL INDUSTRIES, INC'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES

CASE NO. 2:20-CV-11293-SVR-JPR