Alexander P. Swanson (State Bar No. 280947)
aswanson@rutan.com
RUTAN & TUCKER, LLP
18575 Jamboree Road, 9th Floor
Irvine, CA  92612
Telephone:   (714) 641-5100
Facsimile:    (714) 546-9035

Patrick W. Dennis (State Bar No. 106796)
pdennis@gibsondunn.com
Thomas F. Cochrane (State Bar No. 318635)
tcochrane@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:   (213) 229-7000
Facsimile:    (213) 229-7520

Attorneys for Defendant and Counterclaimant
QUEMETCO, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL et al., <br><br> Plaintiffs, <br><br> vs. <br><br> NL INDUSTRIES, INC., et al., <br><br> Defendants. | Case No. 2:20-cv-11293-SVW-JPR <br><br> Judge:  Hon. Stephen V. Wilson <br><br> **QUEMETCO, INC.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| QUEMETCO, INC., <br><br> Counterclaimant, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL et al., <br><br> Counterdefendants. | **Hearing:** <br> Date:         March 13, 2023 <br> Time:         1:30 p.m. <br> Courtroom: 10A <br><br> Date Action Filed:  December 14, 2020 <br> Trial Date:           May 30, 2023 |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on March 13, 2023, at 1:30 p.m., or as soon thereafter as may be heard in Courtroom 10A of the above-entitled court, located at 350 West First Street, Los Angeles, California 90012, before the Honorable Stephen V. Wilson, judge presiding, Defendant and Counterclaimant Quemetco, Inc. will and hereby does move under Rule 56 of the Federal Rules of Civil Procedure for an Order in their favor on the claims of Plaintiffs California Department of Toxic Substances Control ("DTSC") and the Toxic Substances Control Account's ("TSCA" and collectively, "Plaintiffs") against Quemetco, namely:  Plaintiffs' First Claim for Relief for Response Costs Pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), Plaintiffs' Second Claim for Relief for Declaratory Relief Pursuant to CERCLA, 42 U.S.C. § 9613(g)(2), Plaintiffs' Third Claim for Relief for Recovery of Costs Pursuant to the Carpenter-Presley-Tanner Hazardous Substance Account Act ("HSAA"), Cal. Health & Safety Code § 25360, and Plaintiffs' Fourth Claim for Relief for Abatement of Release or Threatened Release Pursuant to the HSAA, Cal. Health & Safety Code § 25358.3.

Quemetco seeks partial summary judgment exempting it from any liability under Plaintiffs' CERCLA and HSAA claims for response costs associated with emissions from the Vernon Plant into the atmosphere.  Partial summary judgment is warranted because any such aerial emissions that can be linked to Quemetco's alleged arranging or transporting activities were subject to the Vernon Plant's Title V permit under the federal Clean Air Act of 1970, and are thus federally permitted releases exempt from cost recovery under CERCLA and the HSAA.  42 U.S.C. §§ 9601(10)(H), 9607(j); Cal. Health & Safety Code § 25366(b).

This Motion for Partial Summary Judgment is based on this Notice; the Memorandum of Points and Authorities in support of this Motion; the concurrently

1 lodged Statement of Uncontroverted Facts and Conclusions of Law in support of

2 this Motion; the Declaration of Bruce Murray; the Declaration of Kristina Eckert;

3 the Declaration of Alexander P. Swanson; the concurrently lodged Proposed

4 Judgment; and on such further evidence and argument that may be presented prior to

5 or at the hearing of this Motion.

6    This Motion is made following the conference of counsel pursuant to

7 L.R. 7-3, which took place on December 2, 2022.

8

9 Dated:  December 13, 2022          Respectfully submitted,

10                                   RUTAN & TUCKER, LLP
                                     ALEXANDER P. SWANSON
11

12                                   By:_____*/s/ Alex Swanson*_____

13                                        Alexander P. Swanson
                                          Attorneys for Defendant and
                                          Counterclaimant
14                                        QUEMETCO, INC.

15

16 Dated:  December 13, 2022          GIBSON, DUNN & CRUTCHER LLP
                                     PATRICK W. DENNIS
17                                   THOMAS F. COCHRANE

18                                   By:_____*/s/ Patrick W. Dennis*_____

19                                        Patrick W. Dennis
                                          Attorneys for Defendant and
20                                        Counterclaimant
                                          QUEMETCO, INC.
21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...............................................................................1

II.     FACTUAL BACKGROUND ..............................................................2

        A.      Releases at Issue........................................................................2

        B.      Quemetco's Alleged Connection to the Vernon Plant's Air
                Emissions ...................................................................................3

        C.      The Vernon Plant's Clean Air Act Title V Permit..................4

III.    LEGAL STANDARD ........................................................................6

IV.     ARGUMENT .....................................................................................7

        A.      Emissions subject to a federal Clean Air Act permit are
                exempt from CERCLA and HSAA liability .............................7

        B.      The Vernon Plant's air emissions were subject to a Clean
                Air Act permit as of May 9, 2000 ............................................8

        C.      The only releases that can be linked to Quemetco's
                activities were subject to the Vernon Plant's Title V permit..............10

        D.      Compliance with a Clean Air Act permit is not necessary
                for the federally permitted release defense to apply ..........................11

        E.      The HSAA expressly incorporates CERCLA's exemption
                for federally permitted releases...............................................14

V.      CONCLUSION ...............................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................... 6

*Ass'n of Irritated Residents v. United States E.P.A*,
790 F.3d 934 (9th Cir. 2015) ........................................................ 8

*Burlington Northern and Santa Fe Ry. Co. v. United States*,
556 U.S. 599 (2009) .................................................................... 11

*California v. Ross*,
362 F. Supp. 3d 749 (N.D. Cal. 2018)......................................... 14

*Carson Harbor Village, Ltd. v. Unocal Corp.*,
287 F. Supp. 2d 1118 (C.D. Cal. 2003) *aff'd*, 433 F.3d 1260 (9th Cir. 2006)..... 7

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................................... 6

*Cheneau v. Garland*,
997 F.3d 916 (9th Cir. 2021) ...................................................... 13

*Chevron USA Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) .................................................................... 14

*Clean Air Council v. United States Steel Corp.*,
4 F.4th 204 (3d Cir. 2021) ..................................2, 7, 9, 11, 12, 13, 14

*Pakootas v. Teck Cominco Metals, Ltd.*,
905 F.3d 565 (9th Cir. 2018) ...................................................... 11

*Romoland School Dist. v. Inland Empire Energy Center, LLC*,
548 F. 3d 738 (9th Cir. 2008) ...................................................5, 8

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) .................................................................... 12

*Taylor v. List*,
880 F.2d 1040 (9th Cir. 1989) ...................................................... 6

**Page(s)**

**FEDERAL CASES (CONT.)**

*United States v. EME Homer City Generation, L.P.*,
    727 F.3d 274 (3d Cir. 2013) ................................................................. 8

*United States v. Shell Oil Co.*,
    No. CV 91-0589, 1992 WL 144296 (C.D. Cal. Jan. 16, 1992)........................... 7

**FEDERAL STATUTES**

42 U.S.C. (Public Health and Welfare)
    section 9601(10) ....................................................... 1, 2, 7, 9, 11, 12, 14
    section 9607(j) .................................................................................. 1, 7
    section 7407 ......................................................................................... 8
    section 7410(a) ..................................................................................... 8
    section 7661a ....................................................................................... 8
    section 7661c(a) ................................................................................... 8
    section 9620(a) ................................................................................... 13
    section 9604(k)(10)............................................................................. 13

**CALIFORNIA STATUTES**

Health & Safety Code
    section 25325 ................................................................................. 1, 14
    section 25366 ................................................................................. 1, 14

**FEDERAL RULES**

Federal Rules of Civil Procedure
    rule 56 ................................................................................................. 6

Rutan & Tucker, LLP
*attorneys at law*

3047/037568-0001
18109113.8 a12/13/22

-iii-

QUEMETCO, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Page(s)

**FEDERAL REGULATIONS**

40 Code of Federal Regulations
  section 52.220 ................................................................................................ 8
  section 52.223 ................................................................................................ 8
  section 63 ...................................................................................................... 9
  section 63.541 ............................................................................................... 9
  section 63.544 ............................................................................................... 9
  section 63.545 ........................................................................................ 6, 10
  section 63.548 ............................................................................................... 9
  section 70 ...................................................................................................... 5
  section 70.4 ................................................................................................... 8

61 Federal Register 45330 .......................................................................... 5, 8

65 Federal Register
  32035-36 (May 22, 2000) ......................................................................... 5, 8

66 Federal Register
  53170 ............................................................................................................ 5
  53171 (Oct. 19, 2001) .................................................................................. 5

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The Department of Toxic Substances Control and the Toxic Substances Control Account ("Plaintiffs") contend Quemetco is liable as an "arranger" or "transporter" under CERCLA and the HSAA because it shipped spent lead-acid automotive batteries to the former Exide secondary lead smelter in Vernon (the "Vernon Plant"). The Vernon Plant's recycling operations allegedly released lead within these batteries into the air, which eventually settled on the ground in the area around the plant, causing contamination that Plaintiffs allegedly have incurred or will incur costs to address. The Court has already ruled Plaintiffs failed to prove response costs they incurred beyond a half-mile radius from the Vernon Plant were caused by the Vernon Plant's emissions, but Defendants' liability for costs within the half-mile radius remains in dispute. With this Motion, Quemetco seeks a ruling that it has no liability for cleanup costs associated with *any* contamination *anywhere* caused by air emissions from the Vernon Plant.

Quemetco cannot be liable for these cleanup costs because the cost recovery provisions of neither CERCLA nor the HSAA apply to "federally permitted releases," and any air emissions from the Vernon Plant that could be connected to the spent lead-acid batteries Quemetco allegedly transported were subject to the Vernon Plant's Title V permit under the federal Clean Air Act of 1970. 42 U.S.C. §§ 9601(10)(H), 9607(j); Cal. Health & Safety Code §§ 25325, 25366(b). The Vernon Plant received a Title V permit covering stack and fugitive air emissions on May 9, 2000—meaning *all* of the Vernon Plant's air emissions after that date were subject to its Title V permit (i.e., were "federally permitted")—and there is no evidence that Quemetco shipped *any* hazardous substances to the Vernon Plant before that date. Instead, the only evidence of alleged shipments are a handful of hazardous waste manifests dated between May and June of 2001—a year *after* the Vernon Plant obtained its Title V permit—appearing to indicate Quemetco sent

shipments of spent lead-acid batteries from its own secondary lead smelter in the City of Industry to the Vernon Plant.  These shipments represent a miniscule fraction of the Vernon Plant's overall consumption of lead-bearing scrap over the many decades of its operation.  Indeed, Quemetco itself operates a *different* secondary lead smelter and thus had no reason to regularly, or even intermittently, supply feedstock to a competitor.  Therefore, any air emissions that could possibly be associated with hazardous substances Quemetco allegedly shipped to the Vernon Plant were indisputably subject to a permit under the federal Clean Air Act, and as a matter of law Quemetco cannot be held liable for any associated cleanup costs.

Further, whether such air emissions were in *compliance* with that Title V permit is irrelevant.  The Vernon Plant's air emissions qualify as federally permitted releases as long as they are "subject to" the permit.  42 U.S.C. 9601(10)(H).  As the Third Circuit Court of Appeals recently confirmed, CERCLA's text makes clear that the term "subject to" with respect to Clean Air Act permits in the definition of "federally permitted release" means "governed by," not "in compliance with."  *Clean Air Council v. United States Steel Corp.*, 4 F.4th 204, 207-08, 211-12 (3d Cir. 2021).

For these reasons and as discussed below, the federally-permitted-release defense exempts Quemetco from any CERCLA or HSAA liability for Plaintiffs' response costs caused by the Vernon Plant's air emissions.  Quemetco is therefore entitled to partial summary judgment on Plaintiffs' claims for recovery of response costs incurred to address contamination caused by air emissions from the Vernon Plant.

## II.    FACTUAL BACKGROUND

### A.    Releases at Issue

Plaintiffs are attempting to recover alleged costs of responding to contamination in two different geographic areas caused by different kinds of releases from the Vernon Plant.  *See* Compl. ¶¶ 41-42.  First, Plaintiffs allege that

the former owners and operators disposed of hazardous substances directly at the site of the Vernon Plant (e.g., by dumping furnace slag in a large earthen pit at the Vernon Plant prior to 1973).  *See id.* ¶¶ 50-54.  Second, Plaintiffs claim that air emissions from operations at the Vernon Plant caused deposition of lead particles in the soil outside the boundaries of the Vernon Plant.  *See id.* ¶ 49.  This motion concerns only the second type of release: aerial emissions of material allegedly causing environmental contamination through deposition of lead and other particulate matter.

Most of the Vernon Plant's emissions came from the large vertical stacks that vented exhaust from the Plant's smelting furnaces.  To the extent Plaintiffs seek recovery of response costs associated with fugitive emissions as well—i.e., windborne lead-containing dust exiting the facility other than via the vertical stacks, Dkt. 482 at p. 17, both pathways are air emissions exempt as federally permitted releases from CERCLA's coverage.

## B.   Quemetco's Alleged Connection to the Vernon Plant's Air Emissions

Plaintiffs claim Quemetco is liable for contamination from the Vernon Plant under CERCLA and the HSAA because it transported, or arranged for the transport of, hazardous substances to the Vernon Plant.  Specifically, Plaintiffs allege Quemetco, along with the other arranger and transporter defendants, "has been identified on [Uniform Hazardous Waste Manifests], which documented shipments containing hazardous substances to the Vernon Plant between 1988 to 2015."  Compl. ¶¶ 44-45.  In Quemetco's case, Plaintiffs are referring to just 37 Uniform Hazardous Waste Manifests that appear to show shipments of spent lead-acid batteries from Quemetco's City of Industry facility to the Vernon Plant between May 7, 2001 and June 21, 2001.  Decl. of A. Swanson, Exs. N, O.  In total, the manifests represent shipments of about 880 tons of spent lead-acid batteries, which

1   amount to less than two days' worth of the Vernon Plant's annual consumption.[1]
2   *Id.*, Ex. P at pp. 1-2, 2-6 ("The GNB facility is designed to process up to 215,000
3   tons of material annually"); *id.* at 2-10 ("GNB operates 24-hours per day and its
4   furnaces are operating at full capacity")

5          These 37 manifests from a six-week period in 2001 represent the *only*
6   evidence that Quemetco ever transported or arranged for the transport of hazardous
7   substances to the Vernon Plant.  This should come as no surprise given that
8   Quemetco's smelter was the Vernon Plant's main competitor.  Decl. of B. Murray,
9   ¶ 2.  Quemetco operates its own secondary lead smelter in the City of Industry,
10  about 12 miles from the Vernon Plant.  *Id.*  Both facilities relied primarily on spent
11  lead-acid automotive batteries for feedstock, and they competed for access to that
12  resource.  *Id.*  Quemetco thus had no incentive to regularly, or even intermittently,
13  send spent lead-acid batteries (or any other potentially hazardous scrap that could be
14  recycled in its smelter) to its cross-town rival.  *Id.*

15         Because the evidence shows Quemetco's earliest apparent shipment of
16  hazardous substances to the Vernon Plant occurred on May 7, 2001, any air
17  emissions that could have triggered Quemetco's liability under CERCLA or the
18  HSAA necessarily would have occurred after that date—and, critically, *after* the
19  Vernon Plant obtained its Title V permit on May 9, 2000.

20  **C.     The Vernon Plant's Clean Air Act Title V Permit**

21         California's State Implementation Plan ("SIP") governs administration of the
22  federal Clean Air Act of 1970 in the state's various air quality control regions.  The

23

24  [1]   Plaintiffs will presumably attempt to prove that the Vernon Plant smelter
25  subsequently processed the material mentioned in the manifests, causing emission of
    lead compounds from the stacks and/or fugitive releases that drifted on the wind
26  before being deposited beyond the Vernon Plant's fence line.  Quemetco does not
27  dispute that scenario for the purposes of this motion, because even if true, such
    emissions were federally permitted releases exempt from CERCLA and HSAA
28  liability, for the reasons discussed herein.

1  South Coast Air Quality Management District ("SCAQMD") oversees the South

2  Coast Air Basin, where the Vernon Plant is located.  (Swanson Decl., Ex. T.)

3      Congress amended the Clean Air Act in 1990 to add, among other things, a

4  comprehensive and unified operating permit regime known as "Title V"—also to be

5  administered by the states following the U.S. Environmental Protection Agency

6  ("EPA")'s approval of the state's Title V permit program.  The California Air

7  Resources Board submitted SCAQMD's Title V permit program to EPA for

8  approval on December 27, 1993.  66 Fed. Reg. 53170, 53171 (Oct. 19, 2001);

9  40 C.F.R. § 70, App. A.  EPA granted interim approval on August 29, 1996

10  (effective March 31, 1997).  61 Fed. Reg. 45330, 45330 (Aug. 29, 1996).  The

11  interim approval was originally set to expire on October 29, 1998, *id.*, but EPA

12  extended the deadline to December 1, 2001.  65 Fed. Reg. 32035, 32035-36

13  (May 22, 2000).  EPA granted final approval to SCAQMD's Title V permit program

14  on November 30, 2001.  40 C.F.R. § 70, App. A; *Romoland School Dist. v. Inland*

15  *Empire Energy Center, LLC*, 548 F. 3d 738, 742 n.4 (9th Cir. 2008).

16      SCAQMD issued a Clean Air Act Title V permit for the Vernon Plant on

17  May 9, 2000—almost a year before the earliest of the hazardous waste manifests

18  linking Quemetco to the Vernon Plant.  The permit remained effective for 5 years

19  before renewal.  Eckert Decl., Ex. K at p. 104 of 131 (§ K, p. 1).

20      The Vernon Plant's 2000 Title V permit governed air emissions of all

21  particulate matter, including lead, from the Plant's smelting furnaces.  *Id.* at pp. 25-

22  27 of 131 (§ D, pp. 18-22) (requiring use and maintenance of baghouses and other

23  air pollution controls); *id.* at pp. 127-128 (Appx. B, pp. 14-15) (setting emission

24  limits for particulate matter); *id.* at p. 100 of 131 (§ J, p. 1) ("Gases discharged to

25  the atmosphere from any blast, reverberatory, rotary, or electric smelting furnace

26  shall not contain lead compounds in excess of 2.0 milligrams of lead per dry

27  standard cubic meter (0.00087 grains of lead per dry standard cubic foot)").  The

28  permit also governed fugitive air emissions.  *Id.* at p. 100 of 131 (§ J, p. 1) ("All

1  process fugitive emission sources, excluding all dryer transition emission sources,

2  shall be located in a total enclosure."); *id.* at p. 102 of 131 (§ J, p. 3) ("The control

3  of fugitive dust shall be maintained in accordance with the standard operating

4  procedures . . . manual that was submitted pursuant to the requirements of

5  Section 63.545 and that has been approved by the AQMD.").

6  ## III.   LEGAL STANDARD

7      Summary judgment is "an integral part of the Federal Rules as a whole, which

8  are designed 'to secure the just, speedy and inexpensive determination of every

9  action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ.

10  P. 1).  Summary judgment should be granted when there is "no genuine dispute as to

11  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

12  Civ. P. 56(a).  The court may grant summary judgment on "each claim or defense—

13  or the part of each claim or defense—on which summary judgment is sought."  *Id.*

14      The moving party bears the initial burden to produce evidence showing that

15  no triable issue of fact exists, and the burden then shifts to the opposing party to

16  produce rebutting evidence.  *Celotex*, 477 U.S. at 323 (1986).  "[A] party opposing a

17  properly supported motion for summary judgment may not rest upon mere

18  allegation or denials of his pleading, but must set forth specific facts showing that

19  there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

20  256 (1986).  "The mere existence of a scintilla of evidence in support of the

21  plaintiff's position will be insufficient; there must be evidence on which the jury

22  could reasonably find for the plaintiff."  *Id.* at 252.  "For purposes of summary

23  judgment, '[i]f a party fails to properly support an assertion of fact or fails to

24  properly address another party's assertion of fact as required by Rule 56(c), the

25  court may ... consider the fact undisputed.'"  *Id.*  "[C]onclusory allegations

26  unsupported by factual data" do not defeat summary judgment.  *Taylor v. List*, 880

27  F.2d 1040, 1045 (9th Cir. 1989).

28

1  **IV.   ARGUMENT**

2       **A.      Emissions subject to a federal Clean Air Act permit are exempt**

3                **from CERCLA and HSAA liability**

4       Since its inception in 1980, CERCLA has expressly exempted response costs

5  arising from any "federally permitted release."  *See Carson Harbor Village, Ltd. v.*

6  *Unocal Corp.*, 287 F. Supp. 2d 1118, 1183 (C.D. Cal. 2003) *aff'd*, 433 F.3d 1260

7  (9th Cir. 2006).  Specifically, "[r]ecovery by any person (including the United States

8  or any State or Indian tribe) for response costs or damages resulting from a federally

9  permitted release shall be pursuant to existing law in lieu of this section."  42 U.S.C.

10 § 9607(j).  "A defendant who claims exemption for the release of hazardous

11 substances bears the burden of proving which releases are federally permitted and

12 what portion of the damages are allocable to the federally permitted releases."

13 *U.S. v. Shell Oil Co.*, No. CV 91-0589, 1992 WL 144296, at *6 (C.D. Cal. Jan. 16,

14 1992).

15      CERCLA's definition of "federally permitted release" covers a variety of

16 federal statutes and types of releases, including:

17      "any emission into the air ***subject to*** a permit or control regulation
        under section 111, section 112, title I part C, title I part D, or State
18      implementation plans submitted in accordance with section 110 of ***the***
        ***Clean Air Act*** (and not disapproved by the Administrator of the
19      Environmental Protection Agency), including any schedule or waiver
        granted, promulgated, or approved under these sections."
20

21

22 42 U.S.C. § 9601(10)(H).

23      Accordingly, air emissions governed by a Title V permit issued pursuant to a

24 Clean Air Act state implementation plan, such as the air emissions at issue here, are

25 federally permitted releases exempt from CERCLA liability.  *Clean Air*, 4 F.4th at

26 207-08, 211-12.

27 / / /

28

**B.** **The Vernon Plant's air emissions were subject to a Clean Air Act permit as of May 9, 2000.**

The Clean Air Act establishes "a model of cooperative federalism to achieve the statute's environmental goals." *Ass'n of Irritated Residents v. U.S. E.P.A*, 790 F.3d 934, 937 (9th Cir. 2015). Accordingly, the Clean Air Act requires each state to adopt a state implementation plan ("SIP") governing enforcement of ambient air quality standards in designated air quality control regions. *Id.*; 42 U.S.C. §§ 7407, 7410(a). California's SIP, officially submitted on February 21, 1972, has been approved by the EPA. 40 C.F.R. §§ 52.220, 52.223. The SCAQMD oversees one of California's air quality control regions, the South Coast Air Basin, in which the Vernon Plant is located. *Romoland School Dist. v. Inland Empire Energy Center, LLC*, 548 F.3d 738, 740 (9th Cir. 2008); Swanson Decl., Ex. T.

In 1990, Congress amended the Clean Air Act to include Title V, a comprehensive operating permit program to be administered by the states. 42 U.S.C. §§ 7661a, 7661c(a). "Title V's operating permit program became a required element of SIPs." *U.S. v. EME Homer City Generation, L.P.*, 727 F.3d 274, 280-31 (3d Cir. 2013); *see also*, *Romoland*, 548 F.3d at 742 ("Rather than imposing an additional set of requirements on pollution sources, this permitting scheme was intended to 'incorporate the requirements of the Act (including SIP requirements) that are [already] applicable to the source.'" (quoting S. Rep. No. 101-228, at 350 (1989)).

SCAQMD issued a final Title V permit to GNB Technologies, Inc. for operation of the Vernon Plant on May 9, 2000. Eckert Decl., Ex. [PERMIT]. By then, EPA had granted interim approval to SCAQMD's Title V permit program.[2]

---

[2] "Permits issued under a program with interim approval have full standing with respect to [Title V's implementing regulations]." 61 Fed. Reg. at 45330; *see* 40 C.F.R. § 70.4(d)(2); 65 Fed. Reg. at 32036 ("Permits granted under an interim approval are fully effective and expire at the end of their fixed term, unless renewed under a part 70 program."). Here, the Vernon Plant's May 9, 2000 permit's original

1  *Supra*, § II(C).  The Vernon Plant's May 9, 2000 permit is thus a valid "permit . . .

2  under . . . state implementation plans submitted in accordance with section 110 of

3  the Clean Air Act (and not disapproved by the Administrator of the Environmental

4  Protection Agency)."  42 U.S.C. § 9601(10)(H); *see also*, *Clean Air*, 4 F.4th at 211-

5  12 (holding that air emissions covered in a Title V permit were federally permitted

6  releases).[3]

7        There can be no dispute that after May 9, 2000, the air emissions at issue in

8  this case were subject to the Vernon Plant's Title V permit.  The permit covers

9  emissions of particulate matter, which includes metallic particulates such as lead

10  particles.  Eckert Decl., Ex. K at pp. 127-28 of 131 (Appx. B, "Rule Emissions

11  Limits"); *see also*, Dkt. 351-2 (Decl. of A. Medine) at ¶¶ 23, 35; Dkt. 351-5 (Decl.

12  of L. Chinkin) at ¶ 24.  It also mandates compliance with 40 C.F.R. § 63, Subpart X,

13  generally setting emission standards for secondary lead smelters.  Eckert Decl., Ex.

14  K at p. 100; 40 C.F.R. § 63.541.  These regulations require use and maintenance of

15  baghouses and fugitive dust containment measures, which control all airborne

16  emissions from the Vernon Plant.  *Id.* §§ 63.544, 63.548.  So too does the permit

17  itself.  *See, e.g.*, Eckert Decl., Ex. K at pp. 25-29.  The permit also sets specific

18  standards for lead, mandating that "[g]ases discharged to the atmosphere from any

19  blast, reverberatory, rotary, or electric smelting furnace shall not contain lead

20  compounds in excess of 2.0 milligrams of lead per dry standard cubic meter."  *Id.* at

21  p. 100 of 131 (§ J, p.1).  With respect to fugitive emissions, the permit requires that

22

23  fixed term, before renewals and extensions, ran until May 9, 2005.  Eckert Decl., Ex. K at p. 104 of 131 (§ K, p. 1).

24  [3]   CERCLA's exclusion of federally permitted releases covers more than emissions

25  subject to a Title V permit.  Before the enactment of Title V, the Vernon Plant's air emissions were apparently subject to permits issued by SCAQMD under provisions

26  in California's EPA-approved Clean Air Act SIP.  Because there is no evidence that

27  Quemetco transported or arranged for the transport of hazardous materials to the Vernon Plant before 2001 as discussed below, however, this motion focuses on the

28  Title V permit issued in May 2000.

"[t]he control of fugitive dust shall be maintained in accordance with the standard operating procedures . . . manual that was submitted pursuant to the requirements of Section 63.545 and that has been approved by the AQMD." *Id.* at p. 102 of 131 (§J, p.3). In addition, "[a]ll process fugitive emission sources, excluding all dryer transition emission sources, shall be located in a total enclosure." *Id.* at p. 100 of 131 (§ J, p. 1). Accordingly, the Vernon Plant's Title V permit covers any air emissions that could conceivably have caused Plaintiffs to incur response costs in off-site areas.

## C.   The only releases that can be linked to Quemetco's activities were subject to the Vernon Plant's Title V permit.

Plaintiffs' evidence connecting Quemetco's activities to the Vernon Plant's alleged releases of hazardous substances is extremely limited. Plaintiffs allege only that Quemetco, along with the other arranger and transporter defendants, "has been identified on [Uniform Hazardous Waste Manifests], which documented shipments containing hazardous substances to the Vernon Plant between 1988 to 2015." Compl. ¶¶ 44-45. In fact, Quemetco's search of Plaintiff DTSC's online database of Uniform Hazardous Waste Manifests identified no more than 37 manifests appearing to show transportation of materials from Quemetco to the Vernon Plant. All 37 manifests date to a single six-week period from May 7, 2001 to June 21, 2001. Swanson Decl., Exs. N, O.

Plaintiffs can point to no further evidence that Quemetco shipped any other materials to the Vernon Plant that could possibly have led to the release of hazardous substances. Nor is there any reason to believe such evidence exists. Quemetco was the Vernon Plant's *competitor*, not its supplier. Murray Decl. ¶ 2. Quemetco operates its own secondary lead smelter in the City of Industry, about 10 miles from the Vernon Plant. *Id.* Both facilities relied on the same primary feedstock—spent lead-acid automotive batteries—and competed for that resource. *Id.* Indeed, Quemetco's management actively avoided practices that might have

1  encouraged scrap suppliers to deliver batteries to the Vernon Plant instead of

2  Quemetco.   Swanson Decl., Ex. S.

3      In sum, there is no evidence Quemetco had anything to do with any emissions

4  from the Vernon Plant predating the Vernon Plant's May 2000 Title V permit.  All

5  of Quemetco's shipments of hazardous substances to the Vernon Plant postdate that

6  permit's issuance.  Therefore, Quemetco's potential liability necessarily postdates

7  that permit, too.  Because all of the Vernon Plant's air emissions during the narrow

8  period in which Quemetco shipped batteries to the Vernon Plant were subject to its

9  Title V permit, Quemetco has no liability under CERCLA or the HSAA for

10 Plaintiffs' costs associated with such emissions.  And, plainly, Quemetco cannot be

11 liable for emissions that predate Quemetco's earliest shipment.  *See Burlington*

12 *Northern and Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 616 (2009) (affirming

13 apportionment of liability based on, *inter alia*, "the time period in which defendants'

14 conduct occurred"); *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 595 (9th

15 Cir. 2018) ("[T]he basis for apportionment may rely on the simplest of

16 considerations, most commonly volumetric, chronological, or geographic factors.").

17     **D.    Compliance with a Clean Air Act permit is not necessary for the**

18            **federally permitted release defense to apply.**

19     Whether any air emissions from the Vernon Plant were in *compliance with* a

20 federal Clean Air Act permit is not relevant.  Under the plain language of CERCLA,

21 the only thing that matters is whether the emissions were "*subject to*" such a permit.

22 42 U.S.C. § 9601(10)(H).  Indeed, the only Court of Appeals to analyze the issue

23 has rejected establishing a further requirement that emissions *comply with* the permit

24 to which they are subject.  *Clean Air*, 4 F.4th at 209–11.

25     The statutory text is precise and unambiguous on this point.  CERCLA's

26 definition of "federally permitted release" contains eleven subparts (A through K),

27 each addressing a different federal permitting regime for particular types of releases

28 and discharges.  Six of these subparts expressly require the discharge or release to

be in "compliance with" the federal permit.  42 U.S.C. § 9601(10)(A) (Section 402 of the Federal Water Pollution Control Act); (D) (section 404 of the Federal Water Pollution Control Act); (E) (Solid Waste Disposal Act); (F) (Title 33 [Navigation and Navigable Waters]); (J) (Clean Water Act); (K) (Atomic Energy Act)).

But the terminology under subsection (H) for Clean Air Act permits is different.  To qualify as federally permitted releases, emissions into the air need only be "subject to" permits or control regulations issued under the Clean Air Act. 42 U.S.C. § 9601(10)(H).

In *Clean Air*, the Third Circuit held that the phrase "subject to" in the definition of "federally permitted release" clearly demonstrates Congress's intent to exempt releases *governed by* Clean Air Act permits, regardless whether the release in question exceeds the limits specified in the permit.  *Clean Air*, 4 F.4th at 209–11. If Congress had intended to require "compliance with" Clean Air Act permits, it would have used that phrase instead, just as it did six times in the very same statutory subsection in reference to federal permitting regimes *other than* the Clean Air Act.  *Id.* at 209.  Indeed, under subsection (E) of CERCLA's federally permitted release definition, which concerns section 3005 of the Solid Waste Disposal Act, discharges must be "in compliance with" a permit that specifically identifies a hazardous substance and makes such substances "subject to" a standard practice or control.  42 U.S.C. § 9601(10)(E).  Congress's use of both "in compliance with" and "subject to" in the *same sentence* of a single subsection proves beyond all doubt that Congress did not intend for "subject to" to have the same meaning as "in compliance with."

"When Congress uses a particular phrase in one section of a law but not in another section of the same law, [courts] presume that it included it in one place and excluded it from the other intentionally."  *Clean Air*, 4 F.4th at 209 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)); *see also*, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("'[W]hen the legislature uses certain

language in one part of the statute and different language in another, the court assumes different meanings were intended.'" (quoting N. Singer, Statutes and Statutory Construction § 46:06, p. 194 (6th rev.ed.2000))).  "This presumption applies with even greater force here, where Congress used particular language in one provision and not in another provision of the same subsection of the same statute." *Cheneau v. Garland*, 997 F.3d 916, 920 (9th Cir. 2021).  In accordance with this fundamental canon of statutory construction, the *Clean Air* court correctly concluded that "subject to" and "in compliance with" cannot have the same meaning in the definition of "federally permitted release," and, consequently, that "subject to" means "governed or affected by" rather than "in compliance with." *Clean Air*, 4 F.4th at 209.

Other provisions of CERCLA and the Clean Air Act that distinguish between "subject to" and "in compliance with" further support the Third Circuit's construction of "federally permitted release." *Id.* at 209–10.  For example, CERCLA provides that the federal government "shall be *subject to*, and *comply with*, this chapter."  42 U.S.C. § 9620(a)(1) (emphasis added).  Similarly, grants under CERCLA for brownfield remediation shall "be *subject to* an agreement that requires the recipient to *comply with* all applicable Federal and State laws."  42 U.S.C. § 9604(k)(10)(B) (emphasis added).  Likewise, the Clean Air Act requires "that an owner or operator show that its sources 'are *subject to* emission limitations and are *in compliance . . . with* all applicable emission limitations and standards.'" *Clean Air*, 4 F.4th at 209–10 (citing 42 U.S.C. § 7503(a)(3).)  Each of these provisions would be redundant if "subject to" meant "in compliance with."

The Third Circuit also rejected a prior administrative decision that had interpreted "subject to" to exclude emissions that are not in compliance with Clean Air Act permits.  *Id.* at 211 (citing *In re Mobil Oil Corp.*, Dkt. No. EPCRA-01-0120, 1992 WL 293133, at *8, *17 (EPA Adm'r Sept. 30, 1992), *aff'd*, 1994 WL 544260, at *12 (EPA Env'tl Appeals Bd. Sept. 29, 1994).  Because the meaning of "subject

1  to" is clear from context with application of traditional tools of statutory

2  construction, the agency's decision was not entitled to *Chevron* deference. *Clean*

3  *Air*, 4 F.4th at 211 (citing *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018));

4  *accord*, *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S.

5  837, 843 n.9 (1984); *California v. Ross*, 362 F. Supp. 3d 749, 761 n.7 (N.D. Cal.

6  2018) ("*Chevron* deference is not appropriate here because the canons of

7  construction provide a clear interpretation of the statute.").

8           **E.    The HSAA expressly incorporates CERCLA's exemption for**

9                  **federally permitted releases.**

10          As this Court has explained, "[t]he HSAA is generally interpreted as

11  consistent with the provisions of CERCLA" and "incorporates the same liability

12  standards, defenses, and classes of responsible persons as those set forth in

13  CERCLA." Dkt. 177 at 6 (citing *Coppola v. Smith*, 935 F. Supp. 2d 993, 1011 (E.D.

14  Cal. 2013)). Indeed, the HSAA specifically provides that "[n]othing in this chapter

15  shall be construed as authorizing recovery for response costs or damages resulting

16  from . . . a federally permitted release." Cal. Health & Safety Code § 25366(b).

17  And a "federally permitted release" under the HSAA "has the same meaning as

18  defined in Section 101(a) of the federal act (42 U.S.C. Sec. 9601 (10))." Cal.

19  Health & Safety Code § 25325. Therefore, Quemetco's federally permitted release

20  defense applies to Plaintiffs' HSAA claims as well as their CERCLA claims.

21  **V.    CONCLUSION**

22          It cannot be disputed that Quemetco's only shipments of hazardous

23  substances to the Vernon Plant occurred at least a year after the Vernon Plant

24  received a Title V permit covering any stack or airborne fugitive emissions

25  produced by processing those substances. These air emissions are the sole basis for

26  Quemetco's alleged liability for Plaintiffs' response costs outside the Vernon Plant.

27  But because the emissions were subject to a federal Clean Air Act permit, neither

28

Rutan & Tucker, LLP
*attorneys at law*

CERCLA nor the HSAA allow Plaintiffs to recover such costs from Quemetco. Quemetco is therefore entitled to partial summary judgment of no liability for any of Plaintiffs' response costs caused by air emissions, including, at minimum, any costs incurred to address lead-contaminated soil or surfaces beyond the Vernon Plant's fence line.

Dated:  December 13, 2022

Respectfully submitted,

RUTAN & TUCKER, LLP
ALEXANDER P. SWANSON

By:_____ /s/ Alex Swanson_____
    Alexander P. Swanson
    Attorneys for Defendant and
    Counterclaimant
    QUEMETCO, INC.

GIBSON, DUNN & CRUTCHER LLP
PATRICK W. DENNIS
THOMAS F. COCHRANE

By:_____ /s/ Patrick W. Dennis_____
    Patrick W. Dennis
    Attorneys for Defendant and
    Counterclaimant
    QUEMETCO, INC.