Matthew K. Edling, SBN 250940
matt@sheredling.com
Yumehiko Hoshijima, SBN 331376
yumehiko@sheredling.com
**Sher Edling LLP**
100 Montgomery Street, Ste. 1410
San Francisco, CA 94104
Phone (628) 231-2500
Fax: (628) 231-2929

Christopher T. Nidel, (*pro hac vice*)
Thomas Sims, SBN 264174
**Nidel & Nace, PLLC**
One Church Street, Suite 802
Rockville, MD 20850
Phone: (202) 780-5153
Email: Chris@nidellaw.com

*Attorneys for Plaintiffs California Department of Toxic Substances Control and the Toxic Substances Control Account*

Rob Bonta
**Attorney General of California**
Sarah E. Morrison
Jeremy M. Brown
Supervising Deputy Attorneys General
Maria T. Solomon-Williams, SBN 154040
Kate M. Hammond, SBN 293433
Elizabeth B. Rumsey, SBN 257908
Donald A. Robinson, SBN 72402
Elizabeth Y. Song, SBN 326616
Deputy Attorneys General
300 South Spring Street
Los Angeles, CA 90013
Phone: (213) 269-6531
Fax: (916) 731-2128
E-mail: kate.hammond@doj.ca.gov

*Attorneys for Plaintiffs California Department of Toxic Substances Control and the Toxic Substances Control Account*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL and the TOXIC SUBSTANCES CONTROL ACCOUNT,

Plaintiffs,

v.

NL INDUSTRIES, INC., et al.,

Defendants.

No. 2:20-cv-11293-SVW-JPRx

**PLAINTIFFS' NOTICE OF MOTION AND MOTION *IN LIMINE* TO EXCLUDE OPINIONS OFFERED BY NL INDUSTRIES, INC.'S EXPERTS ANDY DAVIS AND ROBERT S. JOHNSTON**

Judge:            Stephen V. Wilson
Action Filed:     December 14, 2020
Trial Date:       August 1, 2023, at 9 a.m.

1

## NOTICE OF MOTION AND MOTION

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3        PLEASE TAKE NOTICE that on August 1, 2023, at 9 a.m., on the first day of

4 the upcoming Phase III trial, or at such other date and time that may be designated by

5 the above-entitled Court, located at the First Street U.S. Courthouse, 350 West 1st

6 Street, Los Angeles, California 90012, in Courtroom 10A of the Honorable Stephen

7 V. Wilson, Plaintiffs, the California Department of Toxic Substances Control

8 ("DTSC") and the Toxic Substances Control Account, will and hereby do move for

9 an order excluding in part the opinions of Defendant NL Industries, Inc.'s ("NL")

10 expert Dr. Andy Davis, and excluding in whole the opinions of NL's expert Robert S.

11 Johnston.

12        This Motion is based on this Notice of Motion and Motion, the following

13 Memorandum of Points and Authorities, the Declaration of Thomas M. Sims and its

14 exhibits, the concurrently filed and lodged Proposed Order, and on such oral argument

15 and evidence that may be presented at any hearing on this Motion.

16        This Motion is made following a conference of counsel pursuant to L.R. 7-3,

17 which was initiated on Monday, July 17, 2023.

18

19

20 DATED: July 21, 2023                      Respectfully submitted,

21                                */s/ Yumehiko Hoshijima*

22                                Yumehiko Hoshijima
                               Matthew K. Edling

23                                SHER EDLING LLP

24

25                                ROB BONTA
                               Attorney General of California

26                                SARAH E. MORRISON
                               JEREMY M. BROWN

27                                Supervising Deputy Attorneys General

28                                MARIA T. SOLOMON-WILLIAMS

1
2

KATE M. HAMMOND
Deputy Attorneys General

3
4
5

*Attorneys for Plaintiffs California Department of Toxic Substances Control and the Toxic Substances Control Account*

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Introduction

Plaintiffs, the California Department of Toxic Substances Control ("DTSC") and the Toxic Substances Control Account (collectively, "Plaintiffs"), respectfully submit this motion to exclude certain opinions of NL Industries, Inc.'s ("NL") expert Dr. Andy Davis, and all the opinions of NL's expert Robert S. Johnston. Plaintiffs seek an order excluding Dr. Davis's and Mr. Johnston's opinions to the extent they opine about the health risks of the subsurface contamination at the Vernon Plant, and what should be done about those risks; and speculate about the character of DTSC's potential future response actions at the Vernon Plant. Dr. Davis's and Mr. Johnston's opinions are especially improper to the extent they address the *propriety* of the potential future response actions that DTSC may take. Under CERCLA, DTSC is charged with choosing response actions in the first place; those choices are judicially reviewable solely under the framework of the National Contingency Plan ("NCP"), and only after DTSC actually takes future response actions and incurs recoverable costs for them.

Under, neither Dr. Davis nor Mr. Johnston is qualified to render opinions about the health risks posed by the contamination at the Vernon Plant or in the Industrial Area, and what should or should not be done about them. At the Phase II trial, the Court rightly observed that Dr. Davis—a geologist, geochemist, and hydrogeologist whose expertise centers on the subsurface movement of pollutants—went "beyond his realm" in testifying about the risks posed by the Vernon Plant's contamination and "what should or shouldn't be done" about them. *See* Trial Tr. Day 2 (May 31, 2023), at 15:15–17. Despite the Court's statements, NL will reattempt to offer Phase III trial opinions by Dr. Davis that are beyond the scope of his expertise. Namely, Dr. Davis will opine about whether and how the Vernon Plant's contamination poses human health risks, and what should be done about those risks. *See generally* Decl. of Thomas

M. Sims Ex. 1 ("Davis Phase III Report"). But Dr. Davis's qualifications have not changed since the Phase II trial, and he remains unqualified to address such matters.

Likewise, Mr. Johnston, an engineer whom NL newly retained for the purposes of the Phase III trial, lacks expertise to opine about "the potential harm of subsurface contamination" at the Vernon Plant and what should be done about it. *See* Decl. of Thomas M. Sims Ex. 2 ("Johnston Phase III Report"), at 8. Mr. Johnston does not claim or establish any expertise in assessing the health risks that stem from site contamination. His opinions about the potential harm posed by the Plant's subsurface contamination are based only on unsupported *ipse dixit*, rather than a reliable expert assessment of those risks.

<u>Second</u>, these opinions by Dr. Davis and Mr. Johnston should be excluded for another reason: DTSC's potential future response actions that will address the risks posed by contamination are irrelevant to the divisibility issues to be addressed at the Phase III trial. As Plaintiffs explained in a Phase II motion *in limine* that the Court granted, *see* ECF No. 735 at 2 (minute order), Plaintiffs' potential future response actions are irrelevant to the *prima facie* elements of their CERCLA and Hazardous Substances Account Act ("HSAA") cost-recovery claims, *see* ECF No. 663 (motion). Just like the *prima facie* elements, the affirmative defense of divisibility—under controlling Ninth Circuit precedent—does not require or invite the parties or the Court to speculate about DTSC's potential future response actions.

Dr. Davis's and Mr. Johnston's opinions are especially improper to the extent they address the *propriety* of DTSC's potential future response actions. DTSC is charged with selecting response actions in the first instance. The Court may review the propriety of response actions only after Plaintiffs incur costs for those actions and seek recovery of them, and only for consistency with the NCP.

Plaintiffs therefore respectfully request an order excluding Dr. Davis's and Mr. Johnston's opinions to the extent that they: (1) render opinions about the risks posed by contamination; or (2) opine about DTSC's potential future response actions. For

1   Dr. Davis, such a ruling would result in only partial exclusion. For Mr. Johnston, such
2   a ruling would result in complete exclusion.

3   **II.     Legal Standards: FRE 702 and *Daubert***

4            Federal Rule of Evidence 702 codifies the expert opinion doctrines that emanate
5   from *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1] The rule
6   requires an expert to be "qualified . . . by knowledge, skill, experience, training, or
7   education." *See* Fed. R. Evid. 702. It requires a proponent of an expert opinion to
8   establish that it is (1) "based upon sufficient facts or data," (2) "the product of reliable
9   principles and methods," and (3) the result of a reliable application of "the principles
10  and methods . . . to the facts of the case." *See Primiano v. Cook*, 598 F.3d 558, 563–
11  64 (9th Cir. 2010) (quotation omitted).

12  **III.    Argument**

13           **A.     Dr. Davis and Mr. Johnston Are Unqualified To Opine About
14                    Health Risks and Appropriate Responses.**

15                    **1.     Dr. Davis's Testimony Should Be Confined to His Area of
16                             Expertise.**

17           At the Phase II trial, the Court was skeptical about Dr. Davis's attempts to
18  render opinions outside of his area of expertise. NL reprises this practice for the Phase
19  III trial when it asks Dr. Davis to opine about the health risks caused by the Vernon
20  Plant's contamination, and how DTSC should respond to those risks.

21           As the Court heard a few months ago, Dr. Davis is a geologist, hydrogeologist,
22  and geochemist. *See* Trial Tr. Day 1 (May 30, 2023), at 212:3–4. He has no
23  "experience in lead remediation." *Id.* at 235:18–20.  He is "not a risk assessor" who
24  can evaluate whether a contaminated site like the Vernon Plant poses risks to human
25  health. *See id.* at 236:15–16, 238:9–12. He is "not an industrial hygienist" who

---

27  [1] *See* Fed. R. Evid. 702, Committee Notes on Rules—2000 Amendment (explaining
28  that Rule 702 now codifies *Daubert* and "the many cases applying [it]").

assesses how people who occupy a contaminated site may be protected from exposure risks. *Id.* at 236:13–14. He is "not a toxicologist" who understands how hazardous substances may impair human health. *Id.* at 211:21–22. He is not a regulator who understands the myriad regulatory standards that protect people from dangerous hazardous substance exposures. *Id.* at 236:5–6. Unsurprisingly, during cross-examination, Dr. Davis was unable to provide basic facts that are relevant to assessing the risks posed by contamination. For instance, Dr. Davis was unable to identify the regulatory limits for lead on interior and exterior surfaces of a building, *id.* at 216:7–18, or the acute and chronic exposure limits for lead, *id.* at 237:17–23.

During the Phase II trial, the Court rightly recognized that Dr. Davis's testimony is potentially helpful only to the extent he testifies about matters within his domain. *See* Trial Tr. Day 2 (May 31, 2023) at 9:22–25. For example, Dr. Davis might be able to testify about how the Vernon Plant's contamination has migrated and spread in the subsurface. *See id.* at 12:12–17; *accord id.* at 15:11–13. However, the Court observed that Dr. Davis's opinions about the health risks posed by the Vernon Plant's contamination "[we]re not the opinions of [a] geologist." *See* Trial Tr. Day 1 (May 30, 2023) at 240:4–6. Relatedly, the Court also found Dr. Davis unhelpful to the extent he opined about "what he thought should have been done to clean things up" at the Vernon Plant in response to health risks. *See* Trial Tr. Day 2 (May 31, 2023) at 10:1–3; *accord id.* at 13:17–21 (Dr. Davis also was not "in a position to say what ought to be cleaned up."). Put differently, "When [Dr. Davis] started talking or testifying [] about what should or shouldn't be done" about the Vernon Plant's contamination, "[the Court] thought he was beyond his realm." *Id.* at 15:15–17.

Despite the Court's skepticism, NL again asks Dr. Davis to offer opinions that go beyond his expertise. Among others, Dr. Davis will offer the following opinions about the health risks posed by the Vernon Plant's on-site contamination, and what should be done about those risks:

- In the future, DTSC will likely remove only shallow soils—the top 5 feet—in

the North Yard area of the Vernon Plant in response to the risks posed by subsurface contamination, *see* Davis Phase III Report at 17;

- Subsurface contamination at the Vernon Plant does not pose health risks, *see id.* at 37–39 (attempting to describe a different contaminated site to suggest that the Vernon Plant's contaminated subsurface does not pose health or environmental risks); and

- DTSC will likely cap certain parts of the Vernon Plant to address any risks, *see id.* at 33.

Dr. Davis's qualifications have not changed since late May. He remains unqualified to render opinions about the severity of the health risks posed by the contamination at the Vernon Plant, and what should be done in response to those risks. His testimony about those issues should be excluded.[2]

### 2.      Mr. Johnston Is Similarly Unqualified.

Mr. Johnston, an engineer newly retained by NL, is equally unqualified to opine about the health risks posed by contamination and how to address them. Nonetheless, Mr. Johnston will offer the ultimate "opinion . . . that the potential harm of subsurface contamination will most likely be addressed [by DTSC] by enhancement of the existing cap [i.e., the asphalt pavement] on the property." *See* Johnston Phase III Report at 8.

Mr. Johnston's speculative testimony about DTSC's potential future response actions necessarily rests on an antecedent opinion about the risks posed by the Vernon Plant's subsurface contamination. However, Mr. Johnston—just like Dr. Davis—neither possesses nor claims any expertise in risk assessment, toxicology, or industrial hygiene. *See id.* App'x A (curriculum vitae). At most, Mr. Johnston has been involved

---

[2] Dr. Davis will also offer legal opinions that NL "resolved" certain liabilities with co-Defendant Gould Electronics Inc. ("GEI") "many years ago." *E.g.*, Davis Phase III Report at 21, 23. Plainly, Dr. Davis cannot offer such legal opinions, which are in any event irrelevant to the legal relationship between *Plaintiffs* and NL.

1   in engineering projects pertaining to contaminated sites. *See id.* at 2. In simple terms,

2   Mr. Johnston might be qualified to assess whether constructing a cap over the Vernon

3   Plant is feasible as an engineering matter, and he might be qualified to engineer the

4   cap. *See id.* at 7 (assessing "the geotechnical properties of the subsurface soils" and

5   determining that they are strong enough to support the weight of a cap). However, the

6   question of whether the Plant's subsurface contamination should be addressed by

7   capping it, should be left to other experts who are trained to assess risks and determine

8   what remedial measures would suffice to mitigate those risks.

9       Tellingly, Mr. Johnston did not assess the health risks of the Vernon Plant's

10  subsurface contamination, including any potential exposure pathways. *See generally*

11  *id.* For example, Mr. Johnston's report does not even mention the soil gas

12  contamination beneath the Plant that could infiltrate upward and pose exposure risks

13  to future building occupants. Instead, Mr. Johnston's analysis consists of a "review"

14  of three reports that do not involve a health risk assessment, *id.* at 2–5; speculative

15  *ipse dixit* about potential future uses for the Vernon Plant site, *id.* at 6; a limited review

16  of shallow soil boring logs to determine whether the Plant's soils have sufficient

17  integrity to support the weight of a cap, *id.*; and a walk-through of the Plant site, *id.* at

18  7. Nowhere did Mr. Johnston conduct an appropriate analysis of health risks.

19      Mr. Johnston may well be an expert in his field, but he is unqualified to assess

20  the risks posed by the Vernon Plant's contamination.

21      **B.   Dr. Davis's and Mr. Johnston's Views About DTSC's Potential**

22          **Future Response Actions Are Irrelevant to Divisibility.**

23      In any event, Dr. Davis's and Mr. Johnston's views are irrelevant to the extent

24  they address what DTSC might do about the contamination in the future.

25      In advance of the Phase II trial, Plaintiffs explained—and the Court agreed—

26  that DTSC's potential future response actions (and any associated costs) were

27  irrelevant to the *prima facie* elements of CERCLA liability. *See* ECF No. 663

28  (Plaintiffs' motion *in limine*); ECF No. 735 (Court's order granting the motion). The

same is true for Defendants' affirmative defense of divisibility. Divisibility focuses on whether "the relevant 'harm'"—which "is the entirety of *contamination* at a site that has caused or foreseeably could cause a party to incur response costs"—"is theoretically capable of apportionment," and if so, "whether the record provides a 'reasonable basis' on which to apportion liability" for that harm. *See Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 588–89, 592 (9th Cir. 2018) (quotations omitted) (emphasis added). "[P]roving divisibility is a very difficult proposition" because usually, site contamination is "by [its] nature, [] normally incapable of any logical reasonable, or practical division." *See United States v. Hercules*, 247 F.3d 706, 717 (8th Cir. 2001) (quotations omitted). Put differently, a defendant arguing for divisibility must provide "a reasonable basis for determining the contribution of each cause to [the] single harm." *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614 (2009) (quotations omitted).

Here, the Court has already determined what harm, or contamination, is relevant to Plaintiffs' claims. The Court held after the Phase II trial—in the context of CERCLA's *prima facie* release-causation element—that releases from the Vernon Plant had caused Plaintiffs to incur *past* response costs for contamination at the Plant, the topsoil, the subsurface down to the Bellflower Aquiclude (i.e., excluding the Exposition Aquifer), and the Industrial Area. *See* ECF No. 854 at 2. Therefore, NL's burden for the divisibility inquiry is to establish and prove a scientifically sound way to apportion responsibility for the relevant harm—the entirety of the contamination in those areas—among the persons that caused it. DTSC's *potential future response actions* do not bear upon the narrow divisibility inquiry that focuses on different persons' causal contributions to the *contamination*.[3]

---

[3] Because the parties and the Court have already identified the scope of the contamination relevant to the divisibility inquiry, there is no need to consider what might "foreseeably could cause [Plaintiffs] to incur response costs." *See Pakootas*, 905 F.3d at 592.

1    Finally, even if the Court were to determine that DTSC's potential future
2    response actions bear some relationship to the divisibility inquiry, the Court should
3    exclude or disregard any testimony about whether such response actions would be
4    proper or improper. (For instance, the Court should exclude Dr. Davis's anticipated
5    testimony that DTSC *should*—at most—remove only the top 5 feet of contaminated
6    soil beneath the North Yard area of the Vernon Plant.) The NCP charges the "lead
7    agency" responding to the contamination—here, DTSC—with selecting remedial
8    actions for any site. *See* 40 C.F.R. § 300.430(f)(1)(ii) (provisions governing the
9    selection); *id.* § 300.5 (defining "lead agency"). As discussed in prior briefing, a court
10   may evaluate the propriety of a response action only after it is selected and taken. *See*
11   ECF No. 663 at 1–4; ECF No. 684 at 2–8. That is unsurprising because courts are not
12   charged with rendering advisory opinions about what may or may not occur in the
13   future.

14   And even if it were proper for a court to render opinions about the propriety of
15   potential future response actions, the NCP is the only yardstick a court may use to
16   distinguish between proper and improper response actions, because "CERCLA
17   § 107(a)(4)(A) allows the government to recover *all costs* of removal or remedial
18   action 'not inconsistent with the national contingency plan." *United States v.*
19   *Chapman*, 146 F.3d 1166, 1170 (9th Cir. 1998) (emphasis added).[4] The NCP-
20   inconsistency analysis, which presumes that DTSC's response actions are consistent
21   with the NCP, *see Wash. State Dep't of Transp. v. Wash. Natural Gas Co., Pacificorp*,
22   59 F.3d 793, 799–800 (9th Cir. 1995), is limited to DTSC's administrative record and

23

---

24   [4] *See Pakootas v. Teck Cominco Metals, Ltd.,* 632 F. Supp.2d 1029, 1034 (E.D.
25   Wash. 2009) ("The costs associated with response action undertaken by an Indian
     tribe can be avoided by the defendants only if the defendants can show they are not
26   consistent with the national contingency plan . . . ."); *Kelley v. Thomas Solvent Co*,
27   714 F. Supp. 1439, 1451 n.8 (W.D. Mich. 1989) ("[T]he proper way to challenge
     particular response costs is through the means designed by Congress—inconsistency
28   with the NCP.").

conducted using an arbitrary and capricious standard of review, *see California v. Neville Chem. Co.*, 358 F.3d 661, 673 (9th Cir. 2004) (arbitrary and capricious standard of review); *Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.*, 317 F. Supp. 2d 1188, 1193 (C.D. Cal. 2004) (administrative record review).[5] Dr. Davis and Mr. Johnston do not undertake such a review, least of all because no administrative record yet exists for DTSC's potential future response actions.

In summary, even if Dr. Davis and Mr. Johnston were qualified to speculate about DTSC's potential future response actions (which they are not), their speculation bears no relationship to the divisibility inquiry. Their opinions about the propriety of DTSC's potential future response actions are especially improper, as the propriety of such actions may be judicially reviewed only after DTSC chooses a response action and seeks to recover associated costs, and only for inconsistency with the NCP's requirements.

**IV.   Conclusion**

The Court should exclude Dr. Davis's and Mr. Johnston's opinions to the extent they address the risks posed by contamination or speculate about DTSC's potential future response actions. For Dr. Davis, such a ruling would lead to the exclusion of only part of his opinions. For Mr. Johnston, such a ruling would require the exclusion of all of his opinions.

---

[5] *Accord Arizona v. Motorola, Inc.*, 139 F.R.D. 141, 149 (D. Ariz. 1991) (administrative record review).

1    DATED: July 21, 2023                    Respectfully submitted,

2
                                             */s/ Yumehiko Hoshijima*
3                                            Yumehiko Hoshijima
                                             Matthew K. Edling
4                                            SHER EDLING LLP

5
                                             ROB BONTA
6                                            Attorney General of California
                                             SARAH E. MORRISON
7                                            JEREMY M. BROWN
                                             Supervising Deputy Attorneys General
8                                            MARIA T. SOLOMON-WILLIAMS
                                             KATE M. HAMMOND
9                                            Deputy Attorneys General
10

11
                                             *Attorneys for Plaintiffs California*
12                                           *Department of Toxic Substances*
                                             *Control and the Toxic Substances*
13                                           *Control Account*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>WORD-COUNT CERTIFICATION UNDER L.R. 11-6.1</u>

2

      The undersigned, counsel of record for Plaintiffs California Department of

3

Toxic Substances Control and the Toxic Substances Control Account, certifies that

4

this brief contains 2,989 words, which complies with the 7,000-word limit set forth

5

in L.R. 11-6.1.

6

7

DATED: July 21, 2023                /s/ Yumehiko Hoshijima

                                    Yumehiko Hoshijima

8

                                      SHER EDLING LLP

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28