UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | | Date | August 18, 2023 |
|---|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | | |

Present: The Honorable    STEPHEN V. WILSON, U.S. DISTRICT JUDGE

| Paul M. Cruz | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| N/A | N/A |

**Proceedings:** DECISION AND VERDICT FOLLOWING THE MAY 2023 LIABILITY TRIAL; ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT [629]; ORDER GRANTING IN PART AND DENYING IN PART THE MOTION TO STRIKE PORTIONS OF THE DECLARATION OF ANDY DAVIS [818]

## I.    Introduction

Before the Court is an action brought by the California Department of Toxic Substances Control and the Toxic Substances Control Account ("DTSC" or "Plaintiffs") under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq*. Plaintiffs seek recovery of environmental cleanup and response costs from a number of owners and operators and alleged arrangers or transporters of

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

hazardous substances ("Defendants") in connection with a former lead battery recycling plant in Vernon, California (the "Vernon Plant").

The Court held a three-day bench trial beginning on May 30, 2023 (the "Liability Trial") to determine which Defendants are liable under CERCLA. The purpose of this trial, more specifically, was to ascertain whether Plaintiffs have met their burden in establishing a prima facie case of CERCLA and HSAA liability as to each defendant, and then to assess which affirmative defenses to liability apply.

The Court now issues the following verdict, which includes its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

## II. Factual and Procedural Background

The Vernon Plant is a former secondary lead smelter located in Vernon, California. In general, secondary lead smelters receive lead-bearing materials such as spent lead-acid batteries to extract lead. That process entails separating acid, plastic, and lead; treating and disposing of the acid; and melting down the lead in large furnaces. *See* Complaint ("Compl."), ECF No. 1 ¶¶ 41–42, 48.

Lead-acid batteries are commonly used in vehicles such as automobiles and golf carts. They are made up of a series of lead plates and lead oxide paste. The plates and attached paste are submerged in an electrolyte solution of sulfuric acid. The battery also contains battery terminals, made of lead, and have a plastic or rubber exterior. When a battery is used up—or

---

[1] For all findings of fact set forth below, in making any credibility determinations regarding witness testimony, the Court has considered, among other things, the manner in which the witnesses testified, their interest in the outcome of the case, and the reasonableness of their testimony in light of all of the evidence. The Court has also considered the relevant factors in Section 1.14 of the Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit (2017 Edition), located at http://www3.ce9.uscourts.gov/juryinstructions/sites/default/files/WPD/Civil_Instructions_2018_9_0.pdf.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

"spent"—battery makers typically send them to a secondary lead smelter such as the Vernon Plant to recover the lead from the batteries, so that it may be used to make new batteries.

To extract lead from batteries, "[t]he . . . facility starts by "breaking" the batteries into relatively small pieces, separating out the acid, then separating the plastic from the lead in a water bath. In the water bath, the lead sinks, and the plastic floats, allowing separation." Declaration of Joseph Hower, ECF No. 705, at ¶ 7. In general, "The lead components are processed in a secondary smelter to recover the lead. Smelting produces fresh lead by melting and separating the lead from metal and non- metallic contaminants and by reducing oxides to elemental lead. This smelting can be carried out in blast, reverberatory, and/or rotary kiln furnaces. Blast furnaces produce hard or antimonial lead containing about 10 percent antimony. Reverberatory and rotary kiln furnaces are used to produce semisoft lead containing 3 to 4 percent antimony." *Id.* ¶ 8. The Vernon Plant came to have two blast furnaces.

The Vernon Plant also had "baghouses." "Baghouses came into widespread use in the late 1970s after the invention of high-temperature fabrics (for use in the filter media) capable of withstanding exhaust stream temperatures over 350° F. A baghouse, also known as a baghouse filter, bag filter, dust collector, or fabric filter is an air pollution control device that collects particulates or gas released from industrial process exhaust streams. A wide range of industrial facilities, including power plants, lead smelters, steel mills, pharmaceutical producers, food manufacturers, and chemical producers, use baghouses to control emission of air pollutants. Baghouses typically collect 99% or more of the particles in the exhaust stream, even when the particle size is small." *Id.* ¶ 9.

Surrounding the Vernon Plant is a 0.5-mile-across area the parties refer to as the "Industrial Area." On the south side of the Plant is Bandini Boulevard. Several other industrial businesses operate in the Industrial Area, such as Univar and Honeywell.

The Vernon Plant once contained a building in the South Yard used for metal extrusion operations. The parties refer to this as the "Mixed Metals Extrusion Building." There, NL manufactured metal products such as parts used in welding.

As discussed in more detail below, in general terms, there is soil below the Vernon Plant; then a layer of groundwater called the Perched Zone; then a barrier called the Bellflower Aquiclude, then an aquifer deemed the Exposition Aquifer.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

The Vernon Plant has operated as a secondary lead smelter since at least the late 1920s, when Morris P. Kirk established a partnership with his son and a business partner. Declaration of Fredric Quivik, ECF No. 714-6 ("Quivik Decl."), at ¶ 13[2]; Declaration of Andy Davis, ECF No. 699, at ¶¶ 57-58[3] (arguing that operations at the plant would not have begun before 1927). The lead smelter itself was built in 1925. Quivik Decl. at ¶ 13. In 1927, Kirk and his associates formed Morris P. Kirk & Son, Inc., which leased the land comprising the Vernon Plant. *Id.*

---

[2] Paragraph 13 of the Quivik Declaration is objected to as lacking foundation and being inappropriate expert testimony under 702. ECF No. 738 at 4. The entire Quivik Declaration is objected to as being irrelevant, unfairly prejudicial, confusing, causing undue delay, wasting time, or needlessly presenting cumulative evidence under Rules 402 and 403 of the Federal Rules of Evidence, and also on hearsay grounds. ECF No. 750 at 128. However, no party raised substantial objections to the Quivik Declaration's rendition of the Plant's history, nor does any party seem to dispute the basic corporate history of the Plant's operations or provide its own substantially different version of events. Therefore, these objections are overruled. Any factual disputes that are unnecessary to make a conclusive finding at this phase are noted above. If not so noted, the Court adopts the facts as described as its finding of fact. The Court finds the Quivik Declaration admissible and relevant because it describes the general industrial history of the Vernon Plant. The Court relies on the scientific testimony of other experts, as outlined elsewhere in this order, to make findings regarding release causation and other elements of CERCLA.

Dr. Quivik is sufficiently qualified under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) to opine on the industrial history of the Vernon Plant. Dr. Quivik is a professional historian whose area of expertise is industrial history. He was a Professor at the Michigan Technological University and taught the history of technology and the environment there and at several other institutions. Quivik Decl. ¶ 2. He consulted a number of primary sources to compile his report, such as historical documents. Quivik Decl. ¶ 11.

[3] The entire report of Dr. Andy Davis is objected to as hearsay. ECF No 750 at 104. This objection is overruled. Dr. Davis was subject to cross-examination at the trial, ameliorating concerns protected by the rule against hearsay.

---

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

In 1929, Morris P. Kirk & Son formed an agreement with the National Lead Company, which was the largest supplier of lead in the United States at that time, controlling approximately 50% of the lead business in the United States. *Id.* ¶ 14. Morris P. Kirk & Son continued to run the Vernon Plant under the oversight of National Lead. *Id.* In the 1930s, Morris P. Kirk & Son acquired additional property surrounding the lead smelter, which sits on the area the parties refer to as the South Yard. *Id.* ¶ 16.[4] These additional parcels include what the parties here refer to as the West Yard and the North Yard. *Id.*

Sometime in the 1930s, Morris P. Kirk & Son dug a large pit in the West Yard. PX_2-0107.[5] Former employees of the Vernon Plant believe that the pit was 70 to 80 feet deep and 200 feet across. Kirk put slag, battery casings, and drums in the pit. The pit was completely filled by the late 1950s, and Plaintiffs contend that aerial photographs and soil monitoring shows that the West Yard pit crossed the Vernon Plant property line. In total, there were, during the Plant's operation, apparently four pits in the West Yard: the Earthen Disposal Pit (the "Old Slag Landfill"); the Earthen Acid Dump Pit; the Truck Wash Pit; and the Acid Pit. ECF No. 714-1 at 18; *see also* Figure 13, PX_2-0289.

Likewise, at some point, another waste pit was constructed across the street from the Vernon Plant to the south, on Bandini Boulevard. Soil borings have also indicated the presence of another pit in the South Yard, which apparently contained fill material. Plaintiff's Exhibit PX_2-0107 depicts the pit in the upper lefthand corner:

---

[4] Lines 2-6 of this paragraph are objected to as hearsay. ECF No. 738 at 4. This objection is overruled because the court does not rely on these exact lines; rather, the Court relies on this paragraph simply for a recounting of the relevant geographic areas of the Vernon Plant.

[5] PX_2-0107 is objected to as irrelevant under Rule 402; for unfair prejudice, confusing the issues, undue delay, wasting time, or needlessly presenting cumulative evidence under Rule 403; and hearsay under Rule 802. ECF No. 750 at 24. The Rule 402 and 403 objections are overruled. The photograph is relevant because it shows the Vernon Plant at a certain point in time—namely, the time when a pit was constructed, which is at issue in this case. The Court also finds that it is not hearsay because it is a picture, not an assertion.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |



    In 1956, National Lead acquired Morris P. Kirk & Son in its entirety. Quivik Decl. at ¶ 15[6]. In 1971, National Lead changed its name to NL Industries. *Id.* ¶ 18. National Lead operated Morris P. Kirk & Son as its subsidiary until 1973, then merged it into NL's Metals Division in

---

[6] This paragraph is objected to as lacking foundation and being inappropriate under FRE 702. ECF No. 738 at 4. The Court sees no improper legal conclusion offered by Dr. Quivik here; he is simply recounting who owned the Plant and when. To the extent there is a legal conclusion, the Court has not relied on it. The Court also finds there is sufficient foundation. Dr. Quivik relied on correspondence between Morris Kirk and his son and officials at National Lead and other contemporaneous historical documents to make this statement.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

1973. *Id.* ¶ 18.[7] There may have been a pit in the North Yard built sometime in the 1960s according to an aerial photograph.

NL sold the Vernon Plant and its operations to Gould Inc. in 1979. *Id.* Gould was a manufacturer of lead-acid batteries for the automotive market. *Id.* Gould also operated several secondary lead smelters throughout the United States. *Id.* Gould intended to operate the original secondary lead smelter on the South Yard until it could build a new smelter that complied with the environmental regulations that had been enacted in the early 1970s. *Id.* To that end, Gould built a new plant on the North Yard in 1982 and demolished the original plant that sat on the South Yard. *Id.* ¶¶ 18-19.[8]

Gould reorganized its corporate operations in 1983 and then transferred the business at the Vernon Plant to GNB Batteries, Inc., its wholly-owned subsidiary. *Id.* ¶ 19. Gould sold GNB to GNB Acquisition Corp. in 1984, an entity separate from Gould. *Id.* GNB Batteries and GNB Acquisition merged in 1984, forming GNB Incorporated. GNB Incorporated continued to run the Vernon Plant as a secondary lead smelter. *Id.*

In 2000, GNB Incorporated merged with Exide Corporation. *Id.* Exide operated the Plant until 2015, when it ceased operations, partially in response to increasing pressures by regulators to remediate the Vernon Plant and other sites operated by Exide. *In re Exide Holdings, Inc.*, 2021 WL 3145612, at *1 (D. Del. 2021). After selling most of its global businesses, Exide filed for chapter 11 bankruptcy in 2020 due to these "mounting environmental remediation expenses, rising costs, and operational inefficiencies, which were exacerbated by the COVID-19 pandemic." *Id.*

Exide also began negotiating settlements with various environmental regulators, including DTSC, and ultimately reached a global settlement. *Id.* In the bankruptcy proceedings,

---

[7] Lines 12-15 of this paragraph are objected to as lacking foundation and being inappropriate under Rule 702 of the Federal Rules of Evidence. ECF No. 738 at 4. These objections are overruled for the same reasons as stated above.

[8] These objections, regarding paragraph 18, are overruled for the same reasons stated above.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|------------------------|------|------------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

the Vernon Plant was transferred to an environmental trust operated by Plaintiffs after the bankruptcy court allowed Exide to formally abandon the Vernon Plant. *Id.*; ECF No. 727 at 19.

Plaintiffs brought this action against several Defendants in 2020. These defendants fall into two primary categories: former owners and operators of the Vernon Plant, NL Industries ("NL") and Gould Electronics Inc. ("Gould"); and arrangers/and or transporters of hazardous substances: Kinsbursky Bros. Supply Inc. ("Kinsbursky" or "KBI"); Trojan Battery Co., LLC ("Trojan"); Ramcar Batteries Inc. ("Ramcar"); Clarios, LLC ("Clarios"); Quemetco, Inc. ("Quemetco"); International Metals Ekco Ltd. ("Ekco"); and Blount, Inc. (now known, and here referred to as "Oregon Tool").[9]

The Court shall briefly summarize the nature of the arranger/transporter defendants' businesses.

Clarios is a successor to Johnson Controls, Inc. ("JCI") and Johnson Controls Battery Group, Inc. ("JCBGI"). ECF No. 715 ¶ 4. JCI/JCBGI manufactured lead-acid batteries for automotives using recycled lead and plastic from spent lead-acid batteries. *Id.* at ¶¶ 5-6. JCI/JCBGI collected and reused these materials from their automotive industry customers, along with factory lead-bearing scrap from battery manufacturing plants. *Id.* JCI/JCBGI contracted with the Vernon Plant to arrange for recycling of spent lead-acid batteries and other factory materials. *Id.* at ¶ 7.

Oregon Tool, Inc. ("Oregon Tool"), formerly known as Blount, Inc., maintained three operations in Lewiston, Idaho, two of which plaintiffs allege sent lead-bearing materials to the Vernon Plant from 1990 to 2001. ECF No. 696 at ¶ 2-3. The operations manufactured bullets and ammunition primarily using recycled lead purchased from the Vernon Plant and other lead recyclers. ECF No. 697 ¶ at 16-19. Oregon Tool sent dross and other lead-bearing materials produced during the bullet manufacturing process to the Vernon Plant for recycling. *Id.* at 20-22.

---

[9] The Court recognizes that many of these defendants are successors. For simplicity's sake, the Court refers to them by their present names even if the corporate entities were organized or called differently at the time the events described in this order transpired.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Quemetco, Inc., now known as Ecobat Resources California, Inc., operates a secondary lead smelting and recycling facility in City of Industry, California. ECF No. 702 ¶ 2.[10] Quemetco recycles spent lead-acid automotive batteries and lead bearing scrap materials in competition with the Vernon Plant. *Id*. at ¶ 4. Quemetco supplied refined lead produced from its recycling facility to the Vernon Plant and on one occasion also sent lead scrap materials. *Id*. at ¶ 5. It was, however, not customary for Quemetco to deal with the Vernon Plant because Quemetco was the Vernon Plant's main competitor during the relevant time period.

Ramcar Batteries, Inc. ("Ramcar") is a manufacturer of lead acid automotive batteries. ECF No. 711 ¶ 1-2. Ramcar operates one plant in Commerce, California. *Id*. Pursuant to a tolling agreement with GNB/Exide, from 1990 to 2012 Ramcar sent spent batteries and other lead scrap metals to the Vernon Plant and received back refined lead for use in manufacturing new batteries. *Id*. at ¶ 4-9.

Trojan Battery Company, LLC ("Trojan") is a manufacturer of golf cart batteries based in Santa Fe Springs, California. ECF No. 729 at 17. Between 1987 and 2008, Trojan sent spent batteries from its customers and lead bearing scrap to the Vernon Plant for recycling in exchange for refined lead which Trojan would use to manufacture new batteries. *Id*.

Two defendants, International Metals Ekco, Ltd. and Kinsbursky Brothers, have different business models than the other arranger/transporter defendants.

International Metals Ekco, Ltd. ("Ekco") is a metal recycler with facilities in Los Angeles and San Diego, California. ECF No. 700 ¶ 4.[11] Ekco purchases and resells ferrous and non-

---

[10] This entire declaration is objected to the extent it proffers legal opinions concerning the applicability of SREA as lacking foundation, lacking relevance, and failing FRE 702. ECF No. 738 at 19. The Court overrules these objections for the same reasons as to the other declarations; namely, the Court finds this section admissible to convey the general nature of Quemetco's business, which is undisputed.

[11] This entire Declaration of Herb Gelman is objected to the extent it proffers legal opinions concerning applicability of SREA; and as lacking foundation, lacking relevance, and as being inappropriate under Rule 702 of the Federal Rules of Evidence. ECF No. 738 at 14-15. These objections are overruled. As the Court discusses below, it disregards any legal conclusions about

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | | Date | August 18, 2023 |
|---|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | | |

ferrous metals as well as a small number of spent lead-acid batteries. *Id.* at ¶ 7. Ekco does not melt or recycle any materials or manufacture any products. *Id.* Ekco sold spent batteries and metals to the Vernon Plant from 1990 to 2013. *Id.* at ¶ 18-20.[12] In other words, Ekco simply sold metal-bearing products to the Vernon Plant but did not rely on the Plant to get back pure lead for use in any product made by Ekco.

Kinsbursky Bros. Supply, Inc. ("KBI") is a recycler of industrial batteries. ECF No. 729 at 12. KBI sold lead-bearing materials (mainly consisting of lead plates) to the Vernon Plant from 1985 to 2014. ECF No. 693 at ¶ 8.[13] KBI and Exide operated under a tolling agreement whereby Exide would send whole spent industrial lead batteries to KBI, then KBI would recycle the batteries and send the lead scrap back to Exide. *Id.* at ¶ 10.[14] This arrangement, therefore,

---

SREA's application. The Court finds Mr. Gelman's declaration admissible insofar as it reveals Ekco's state of mind about its transactions with the Vernon Plant and is therefore relevant to the issues in this case regarding intent and the nature of certain transactions.

[12] Paragraph 18, lines 24-27 are objected to as speculatory; paragraph 19, lines 1-7 are objected to as lacking personal knowledge and foundation; and paragraph 20, lines 18-19 are objected to as lacking relevance and foundation. ECF No. 738 at 16. These objections are overruled. These statements were made based on Mr. Gelman's experience working at Ekco. They are relevant given that they detail the nature of Ekco's business and transactions with the Vernon Plant.

[13] This entire declaration is objected to the extent is proffers legal opinions concerning the applicability of SREA as lacking foundation and lacking relevance. Paragraph 8 is objected to as lacking foundation and personal knowledge. ECF No. 738 at 17-18. These objections are overruled. The Court has ignored anything it perceives as an improper legal conclusion. The cited sections above are admissible as general statements of the nature of Kinsbursky's business and its dealings with the Vernon Plant.

[14] Paragraph 10 is objected to under the best evidence rule, lacking foundation, and lacking personal knowledge. ECF No. 738 at 18. The Court overrules these objections because it simply cites this section for the undisputed rendition of how KBI's business transactions generally worked with Exide.

---

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

was the opposite of what other defendants did—sending spent batteries to the Vernon Plant and getting back lead.

Defendants also filed a counterclaim against Plaintiffs, contending that Plaintiffs also "operate" the Vernon Plant because they have taken it over after Exide's bankruptcy pursuant to the terms of an environmental trust created in the bankruptcy proceedings.

Defendants moved to dismiss the complaint in 2021. Plaintiffs also moved to dismiss the counterclaim seeking to hold them liable as "operators" of the Vernon Plant. The Court denied these motions, concluding that Plaintiffs had plausibly stated claims against Defendants. The Court also entertained several motions for partial summary judgment. The Court held the first bench trial in this case in May 2022 (the "Scope Trial"), after which it concluded that Plaintiffs failed to meet their burden in showing release-causation as to the Residential Area. The Court held a second bench trial in May 2023 to determine liability of the defendants.

III.    **Legal Standard**

A.  **CERCLA**

Congress enacted CERCLA "to provide for liability, compensation, cleanup, and emergency response for hazardous substances release into the environment and the cleanup of inactive hazardous waste disposal sites." *3550 Stevens Creek Associates v. Barclays Bank,* 915 F.2d 1355, 1357 (9th Cir.1990) (citing Pub.L. No. 96–510, 94 Stat. 2767 (1980)). "CERCLA generally must be construed liberally to accomplish its dual goals of promptly cleaning up hazardous waste sites and making polluters, rather than society as a whole, pay." *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 584 (9th Cir. 2018).

"To establish a *prima facie* right to recovery under § 9607(a), a plaintiff must demonstrate that: (1) the site on which the hazardous substances are contained is a 'facility' as defined in CERCLA; (2) a 'release' or 'threatened release' of a 'hazardous substance' from the facility has occurred; (3) the 'release' or 'threatened release' has caused the plaintiff to incur response costs that were 'necessary' and 'consistent with the national contingency plan;' and (4) defendants are within one of four classes of persons subject to liability under § 9607(a).  *Carson*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
| --- | --- | --- | --- |
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

*Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1152 (C.D. Cal. 2003), *aff'd sub nom. Carson Harbor Vill. v. Cnty. of Los Angeles*, 433 F.3d 1260 (9th Cir. 2006) (citation omitted).[15]

### B. The California Hazardous Substances Account Act ("HSAA")

Plaintiffs have also sued the defendants under the HSAA. "[T]he HSAA adopts CERCLA's standards for determining liability. (Health & Saf. Code, § 25323.5, subd. (a)(1).) A private cause of action under the HSAA therefore has the same elements as a cause of action under CERCLA." *Orange Cnty. Water Dist. v. Sabic Innovative Plastics US, LLC*, 14 Cal. App. 5th 343, 371, 222 Cal. Rptr. 3d 83, 109 (2017), *as modified on denial of reh'g* (Aug. 25, 2017).

## IV. DISCUSSION

### A. Whether the Statute of Limitations Bars the Instant Lawsuit

In their posttrial briefs, several defendants argued that the instant lawsuit is barred by the relevant statute of limitations. The Court concurs with Plaintiffs that the defendants asserting that the statute of limitations bars this case have the burden of showing how and when the limitations periods in CERCLA Section 113(g)(2) began running. *See* 42 U.S.C. § 9613(g)(2).

Though the Court wonders why these defendants did not raise this argument sooner (several years before they incurred what are likely large amounts of attorneys' fees to their clients) and therefore agrees with Plaintiffs that they may have waived these arguments, the Court now addresses this argument as a threshold matter.

In cost recovery actions such as this one, the statute of limitations to bring a suit for a remedial action is within 6 years of starting remedial construction. For a removal action, a suit must be brought within 3 years or within 6 years of a determination to grant a waiver for continued response under 42 U.S.C. § 9604(c)(1)(C):

---

[15] As with the May 2022 Scope Trial, the Court does not, at this phase, consider whether Plaintiffs' response costs were "necessary" and "consistent with the national contingency plan."

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | | Date | August 18, 2023 |
|---|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | | |

An initial action for recovery of the costs referred to in section 9607 of this title must be commenced—

(A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and

(B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2). A § 113(f) contribution action initiated against others by a party who has been found liable in an action for recovery costs must be brought within three years of the date of judgment in the recovery cost action.

Here, Plaintiffs argue their efforts to monitor and respond to environmental contamination at the Vernon Plant qualify as an incomplete and ongoing removal action and so the SOL hasn't started yet. NL argues there have been remedial actions taken at the Vernon Plant since the 1980s, or at least that the cleanup efforts DTSC seeks recovery costs for stem from a 2002 consent order, so they are beyond the six-year statute of limitations which begins at the start of work on a remedial action.

NL also claims that DTSC cannot classify these ongoing efforts as removal actions (as opposed to remedial) because they are not quick emergency management actions designed to prevent imminent harm from a release or threatened release.

The statute defines the terms as follows:

(23) The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act.

(24) The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C.A. § 9601 (West).

NL points to a handful of out-of-circuit cases in its argument that the DTSC's efforts should be classified as remedial, but these cases merely describe removal and remedial efforts generally without drawing bright line rules as to how they should be differentiated under all circumstances. *See, e.g., New York State Elec. & Gas Corp. v. FirstEnergy Corp.,* 766 F.3d 212, 230-31 (2d Cir. 2014) ("Removal actions are generally clean-up measures taken in response to immediate threats to public health and safety . . . Removal actions are also generally designed to

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

address contamination at its endpoint and not to permanently remediate the problem . . . Remedial actions are typically actions designed to permanently remediate hazardous waste." (citations omitted)). In *NYSEG*, the Second Circuit found that an initial cleanup pursuant to a Consent Order put in place shortly after the problem was discovered was a removal action because it was a temporary measure to address the immediate threat of further harmful releases, whereas later work pursuant to a Record of Decision outlining further efforts to remove all contamination at the source was a remedial effort. *Id.* at 233.

Relevant cases generally point to the need for immediacy as the most relevant factor in determining whether an action is remedial or a removal. But in *United States v. W.R. Grace & Co.*, 429 F.3d 1224 (9th Cir. 2005), the Ninth Circuit determined that cleanup efforts could be classified as one extended and successively expanded removal action based on the need for immediate action, the fact that activities were of the same type as examples of removal actions listed in regulations interpreting the statute, and the fact that these actions were taken in sequence to address immediate concerns but then followed by a permanent remedial plan when it became clear that the removal actions would not be sufficient to address the released. *Id.* at 1242-43. While removal actions are often short-term and temporary, the court reasoned that the duration of a cleanup effort did not ultimately determine whether it is a removal or remedial, and removal actions can last several years. *Id.* at 1244. The Ninth Circuit has made clear that there is a low bar to qualify as a "removal" under the statute because the term is broadly defined. *See Pakootas*, 905 F.3d at 579.

The Court agrees with Plaintiffs that the defendants have not met their burden in showing when the statute of limitations began running. The Court also agrees with Plaintiffs that they have engaged in an ongoing removal action and that they have not yet determined a remedial action for the Vernon Plant. As discussed above, several stages of a removal action could be completed but nevertheless be part of one longer removal action which has not yet ended. The Court finds that is the situation here. *Cal. Dep't of Toxic Substances Control v. Alco Pac. Inc.*, 308 F. Supp. 2d 1124, 1131-33 (C.D. Cal. 2004) ("If an action is part of a final and permanent remedy, then it may be remedial . . . However, the final phase of clean-up at the Site has not yet started."); *accord, W.R. Grace & Co.*, 429 F.3d at 1237 ("We refrain from slicing and dicing the EPA's single, cohesive removal action into a myriad of fractured parts. Such atomization would undermine the EPA's scientific and administrative expertise by requiring us to second-guess

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | | Date | August 18, 2023 |
|---|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | | |

whether, for example, the excavation of soil at the local elementary school was a remedial action because 1000 cubic yards of soil was removed when perhaps removal of less soil or less drastic measures could have been employed to counteract the immediate threat. Instead, we take a more comprehensive view of the administrative record in concluding that the EPA's response was a removal action.").

No defendant seems to have explicitly argued that Plaintiffs' claims are time barred under the HSAA. To the extent that they do so argue, this contention fails too. Under the HSAA, the statute of limitations begins when DTSC certifies the completion of a removal or remedial action. Cal. Health and Safety Code section 25360.4. It is undisputed that DTSC has not yet done so. Therefore, Plaintiffs' HSAA claims are also timely.

### B. Motion to Strike Portions of the Declaration of Dr. Andy Davis

As an additional threshold matter, the Court now addresses the admissibility of the testimony of NL's expert witness, Andy Davis, at ECF No. 699. The Court previously denied a motion in limine excluding his testimony about future response costs, which are not at issue in this phase, as it determined that it would like to hear the rest of his testimony in context. However, the Court ultimately agreed that all testimony on future response costs and what steps Plaintiffs should take to clean up the Vernon Plant are irrelevant at this phase of trial. The Court therefore excluded all such testimony from the Liability Trial.[16]

---

[16] In general, the Court finds Dr. Davis qualified under *Daubert* given that he is a professional geologist. Still, despite the Court's order about the propriety of future and present response costs, Dr. Davis nevertheless testified that because he felt perfectly safe at the Plant without wearing personal protective equipment, and that simply hosing down the Plant would be sufficient to clean it up. The Court does find Dr. Davis unqualified to testify as such given that he is not an expert in hazardous substance remediation. Even if he was qualified to so opine, the Court finds his suggestion about the power washer and/or hose and his personal feelings about the vibes of the Vernon Plant totally irrelevant and thus disregards them entirely.

This ruling should come as no surprise to the parties given that, on Day 2, the Court stated: "I mean, [Dr. Davis] was talking about what he thought should have been done to clean things up

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Now, certain defendants move to strike portions of Dr. Davis's declaration, arguing that they improperly raise divisibility arguments. ECF No. 818. More specifically, the moving defendants argue that the following opinions are irrelevant: first, Dr. Davis's testimony that Gould continued contaminating the Vernon Plant through various "legacy operations" with TCE; that Gould contributed to contamination relating to soil and rainwater runoff during Gould's operation of the Plant; third, that Gould excavated all NL-contaminated soil in the North Yard in 1980; and fourth, that Gould installed faulty stormwater pipes that contributed to underground contamination in the North Yard. Motion to Strike, ECF No. 818, at 6-8.

NL objects to the motion to strike. NL argues that they are not improper divisibility opinions, but rather serve to rebut Dr. Cutler's testimony. ECF No. 823, 828. Dr. Cutler is an expert offered by various defendants in support of their third-party defense, which essentially argues that all releases to the subsurface stopped after 1986. *See discussion infra*.[17] The moving defendants argue that this is an improper attempt to exclude Dr. Cutler's testimony. ECF No. 829.

The Court agrees with NL that most of this testimony could be construed as rebutting Dr. Cutler's testimony that all releases to the subsurface ended after the mid-1980s. Even though it is true that the effect of this testimony is to pin some of the blame on Gould, it is also true that these arguments rebut the notion that releases to the subsurface ended in the mid-1980s. The Court therefore declines to strike most of the identified portions.

The Court, however, does agree that Dr. Davis's argument that removing the topsoil at the North Yard meant no more NL-related contamination remained there is an inappropriate divisibility opinion. Unlike the other portions identified in the motion to strike, which go to releases after NL left in the late 1970s, this argument simply tries to say NL should not be responsible for this part of the North Yard. Likewise, for the same reasons, Dr. Davis's argument, at paragraph 354, that "the data demonstrates that the storm water drainage system

---

and how he didn't feel strained going into the factory. And at the end of the testimony, I was saying—'so what'—you know, to myself." Trial Tr. Day 2, at 10:1-5.

[17] As will be later discussed, several defendants use the third-party defense in conjunction with the federally permitted release defense to argue that they are absolved from liability completely.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

built after NL left the property caused all present contamination" is also an improper divisibility opinion.

These parts of Dr. Davis's testimony are stricken, but he can re-raise such arguments at the divisibility phase.[18]

### C. Whether the Vernon Plant is a "Facility" Within the Meaning of CERCLA and the HSAA

CERCLA defines a facility as including "any building, structure, installation, or equipment." 42 U.S.C. section 9601(9)(A). Here, the parties do not dispute that the Vernon Plant is a facility within the meaning of CERCLA. Gould and Quemetco have expressly stipulated with Plaintiffs that it is. ECF Nos. 679, 733. The remaining defendants have not contested this element in their briefs or at trial. In any event, the Vernon Plant is a "facility" because it is a group of buildings, structures, installations and equipment that was formerly operated as a secondary lead smelter.

Therefore, the first element of a prima facie case under CERCLA—and, by extension, the HSAA—is met.[19]

---

[18] The Court notes that it has already cast doubt on Dr. Davis's assertion that, when the North Yard was excavated in 1980, it was fully cleaned. In other words, via a motion for partial summary judgment, the Court declined to hold as a matter of law that removing some soil to make way for a new smelter meant that all contamination from before 1980 had been removed. The Court questions whether this is an apt line of argument because, even according to Dr. Davis, only 2-3 feet of soil was removed. A. Davis Decl. at ¶ 252.The Court also believes the subsequent sampling cited by Dr. Davis may be unreliable given that the data was collected in 1980, over 30 years ago. *Id.* ¶ 288. Still, the Court shall reserve a definitive ruling on this issue for the divisibility phase.

[19] As the court in *Lockheed Martin Corp. v. United States* explained,

Under CERCLA, the term "facility" has two meanings. First, the term "facility" serves as a catch-all for almost any original source from which a disposal might have occurred. *See*

---

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | | Date | August 18, 2023 |
|---|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | | |

---

42 U.S.C. § 9601(9)(A) (defining "facility" as "any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft"). Second, the term "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." *Id.* § 9601(9)(B). Courts have interpreted this second meaning to cover, at a minimum, " 'the bounds of the contamination.'" *See PCS Nitrogen,* 714 F.3d at 178 (quoting *United States v. Twp. of Brighton,* 153 F.3d 307, 313 (6th Cir.1998)). Thus, "[t]here may be several 'facilities' at a site for purposes of CERCLA, including separately owned 'equipment' within a larger facility," *Am. Int'l Specialty Lines Ins. Co. v. United States,* 2010 WL 2635768, at *21 (C.D. Cal. June 30, 2010), as well as the location where the contamination has migrated over time.

*Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 121 (D.D.C. 2014), *aff'd,* 833 F.3d 225 (D.C. Cir. 2016).

To this end, as Plaintiffs point out, it is unnecessary for the Court to determine whether the Industrial Area is part of the "facility" because the Court has already found that Plaintiffs established causation as to the Industrial Area in the Scope Trial verdict. Accordingly, it was a place where a hazardous substance was "deposited," as Plaintiffs met their burden in showing air emissions reached the Industrial Area.

Defendants argue that the Court's February 1, 2023 grant of summary judgment regarding the Residential Areas precludes their liability in the Industrial Area. The Court agrees.

In its February 1, 2023 Order, the Court was required to interpret the Ninth Circuit's *Pakootas III* decision where it held that by emitting chemicals through a smokestack, the defendant had not arranged for the "disposal" of the pollutants at a site farther away from the source of pollution, called the "Upper Columbia River Site." The defendant could not be held liable for contamination at that site. The defendant could, however, be held liable for the smelter site because there had been a disposal there within the meaning of CERCLA. 830 F.3d 975, 978 (9th Cir. 2016). The panel stated:

---

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

### D. Whether the Defendants and/or Plaintiffs are "Covered Persons" Within the Meaning of CERCLA and the HSAA

The four classes of "covered persons" under CERCLA are: the owner and operator of a vessel or a facility; any person who at the time of disposal of any hazardous substance owned or operated a facility at which such hazardous substances were disposed of; any person who by

---

When a smelter emits lead, arsenic, cadmium, and mercury compounds through a smokestack and those compounds contaminate land or water downwind, can the owner-operator of the smelter be held liable for cleanup costs and natural resource damages under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(3)? All parties agree the answer turns on whether the smelter owner-operator can be said to have arranged for the "disposal" of those hazardous substances within the meaning of CERCLA. Bound by a previous en banc case's interpretation of "deposit"—the only theory of "disposal" urged by Plaintiffs in this interlocutory appeal—as not including the gradual spread of contaminants without human intervention, we must answer no.

*Id.*

Applying the facts of *Pakootas III* to the instant case, the Court concluded that the defendants here could not be liable here in the Residential Areas as a matter of law because there had been no disposal in the Residential Areas. The Court's February 1, 2023 Order was somewhat redundant, given that the Court had already made factual findings in the Scope Trial, finding that Plaintiffs failed to meet their burden as to release causation in the Residential Areas.

But *Pakootas III* applies here too. Here, there was no disposal in the Industrial Area aside from the discrete portion where the waste pits were located. The only pathway beyond the pits was air emissions, which *Pakootas III* says are not disposals. Therefore, the Plaintiffs can only collect response costs in the Industrial Area in the places where the pits are, plus any release of contamination from those pits.

---

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:20-cv-11293-SVW-JPR | | Date | August 18, 2023 |
|---|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | | |

contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances; or any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person . . . ."  42 U.S.C. section 9607.

### 1. Owner/Operators: NL, Gould, and Plaintiffs

An "operator" "manage[s], direct[s], or conduct[s] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations. *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998) ("The phrase 'owner or operator' is defined only by tautology . . . ."). Whether an entity is an operator is a fact-intensive inquiry reviewed for clear error. *United States v. Sterling Centrecorp Inc.*, 977 F.3d 750, 757 (9th Cir. 2020).

"In contrast with a past operator, in the case of a *current* operator of a facility, "the [opposing party] is not even required to show that the party was an operator when an active 'disposal' of hazardous waste occurred." *Orange Cty. Water Dist.*, 14 Cal. App. 5th at 377 (quoting *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 382 (3d Cir. 2013)).

Gould is an owner/operator because it has stipulated with Plaintiffs as such: namely, it agrees that, during its ownership and operation of the Vernon Plant, it managed, directed, and conducted operations related to hazardous substances, and that in so doing it made a disposal.

NL is also an owner/operator. Though NL has filed no stipulation with Plaintiffs, NL concedes that it is an owner/operator and that it is the successor to Morris & Kirk because it did not contest these points in its pretrial brief. *See* ECF No. 724. It is also largely undisputed in the record that NL ran the plant as a lead smelter in the course of its business.

The Court finds that NL's business had to do with the leakage or disposal of hazardous waste and that it is therefore an owner/operator under *Bestfoods*. For example, NL does not dispute that it disposed of hazardous substances in various pits.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|----------------------|------|-----------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Defendants, however, contend that Plaintiffs also "operate" the Vernon Plant because they have taken over the Plant to conduct remediation activities and to ensure that the Plant remains compliant with its environmental permits. The Court, however, finds that Plaintiffs are not operators within the meaning of CERCLA. This is so for the following reasons.

First, Plaintiffs did not become operators of the Plant before Exide abandoned it pursuant to the order of the bankruptcy court. Like in *Sterling Centrecorp*, where the United States "instructed [the operator defendant] to shut down its mining operations" and "had general regulatory authority over the mining industry [during the relevant time period]," here, prior to Exide's 2015 closure of lead smelting activities at the Vernon Plant, Plaintiffs oversaw Exide's activities at the Vernon Plant in its capacity as a regulator. *See* PX 2-0332. For example, Plaintiffs induced Exide to enter into a 2002 Corrective Active Consent Order and conducted regulatory activities related to Exide's RCRA violations. *See also Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 150 (D.D.C. 2014), *aff'd*, 833 F.3d 225 (D.C. Cir. 2016) (finding that, even though the United States had stipulated to CERCLA liability, "[c]onsidering the totality of the circumstances, the Court concludes that the government was not an operator of the Sites. To be sure, all of LPC's operations at the Sites were in performance of government contracts or subcontracts and the government had a pervasive influence over general activities at the Sites, whether through process specifications, safety manuals, inspections, or technical direction. However, the government did not manage, direct, or otherwise control on a frequent basis the day-to-day hazardous waste disposal activities at the Sites.").

In short, the Court finds that, during the time Exide operated the Plant, Plaintiffs did not have a "day to day" role in the Plant's hazardous waste-related activities, but instead acted in a regulatory capacity. This role is insufficient under the totality of the circumstances to conclude that Plaintiffs were operators during this period.

Nor did Plaintiffs, in the Court's view, come to operate the Vernon Plant after Exide officially abandoned it following Exide's 2020 bankruptcy, for similar reasons as above: namely, under the totality of the circumstances, they did not conduct activities specifically related to the leakage or disposal of waste, but rather acted to safely shut down, monitor, and clean up the plant. But the Court need not elaborate on these reasons, because it agrees with Plaintiffs that CERCLA section 101(20)(D) would shield Plaintiffs from liability. It provides that

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|------------------------|------|------------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

> The term "owner or operator" does not include a unit of State or local government which acquired ownership or control through seizure or otherwise in connection with law enforcement activity, or through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government acquires title by virtue of its function as sovereign. The exclusion provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility, and such a State or local government shall be subject to the provisions of this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title.

42 U.S.C. § 9601(20)(D). It is undisputed in the record that Plaintiffs acquired control of the Vernon Plant in connection with the Exide bankruptcy pursuant to the terms of the environmental trust.

The Court holds that this provision does not require that Plaintiffs acquired "title" to the Vernon Plant. The Court agrees with Plaintiffs that because no comma precedes the modifier "in which the government acquired title," it modifies only the antecedent phrase "other circumstances." The statute, moreover, references "ownership or control" in reference to the relevant situation here—bankruptcy. Congress would not have included the words "ownership or control" "through bankruptcy" if it intended that such ownership or control come through "title."

Plaintiffs' activities at the Vernon Plant have probably caused some pollution. Plaintiffs do not contest that they hose down the Plant three times per day.[20] Plaintiffs themselves have also contended that the asphalt cap at the Plant is permeable and allows pollutants to be washed

---

[20] Though the Court found his testimony generally irrelevant or worthy of little weight, the Court recalls NL's expert witness, Andy Davis, testifying at trial that, in his view, simply hosing down the Vernon Plant would be sufficient to clean it up. By this reasoning, Plaintiffs' actions would be viewed as beneficial instead of harmful, further reinforcing the Court's finding that they are not operators within the meaning of the statute.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

into the subsurface. An appreciation for this irony is insufficient to render Plaintiffs operators within the meaning of the statute and under *Bestfoods*.

Again, Plaintiffs have not caused such pollution through operations "specifically related to pollution." *Sterling Centrecorp*, 977 F.3d at 758. The Court construes this phrase to result in the conclusion Plaintiffs have not undertaken to recycle batteries at the Plant for profit or to otherwise run an industrial business at the Plant. Plaintiffs only control the Plant to facilitate its eventual remediation. Their activities—closing the plant after Exide's bankruptcy, asking for additional funds, and hosing down the Plant—are related to regulation, not pollution. The Court finds that this regulatory purpose is insufficient to render Plaintiffs liable as operators within the meaning of CERCLA.

The Court declines to adopt a general regulatory exemption articulated in cases such as *California Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.,* 298 F. Supp. 2d 930, 955 (E.D. Cal. 2003), where the court concluded that a "[g]overnmental regulatory action taken to clean up a contaminated site does not subject the government to liability under CERCLA." Nevertheless, looking to the totality of the circumstances, Plaintiffs did not cause or contribute to the release of the hazardous substances because they did not operate the Plant as a smelter, which is generally what caused the releases at issue in this case. Defendants also have not highlighted evidence in the record showing what specific releases Plaintiffs are supposedly causing by washing down the Vernon Plant each day. Therefore, Defendants have failed to meet their burden in showing that Plaintiffs are potentially responsible parties for the purposes of their counterclaim against Plaintiffs.

Because Plaintiffs are not owner/operators of the Vernon Plant, they are not potentially responsible parties or covered persons within the meaning of CERCLA, and thereby the HSAA, so Defendants' counterclaim against Plaintiffs fails.[21]

---

[21] Even if they were, in the alternative, the Court holds that a CERCLA exception from operator liability would likely apply. See 42 U.S.C. 107(d)(2) (exemption for liability "result[ing] [from] actions taken in response to an emergency created by the release or threatened release of a hazardous substance generated by or from a facility owned by another person"). Plaintiffs are the beneficiaries of the environmental trust that owns title to the Vernon Plant, so they would be

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

### 2.  Arranger/Transporters: Clarios, Ecko Metals, Kinsbursky, Quemetco, Oregon Tool, Ramcar, and Trojan Battery

Plaintiffs allege that all seven arranger/transporter defendants are liable under CERCLA as arrangers. Plaintiffs allege that four of these defendants—Clarios, Ecko, Kinsbursky, and Quemetco[22]—are liable as both transporters and arrangers. The rest are being sued only as arrangers.

An arranger is a person or entity who by contract or agreement "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3). A transporter is a person or entity any person who "accepted any hazardous substances for transport to disposal or treatment facilities, incineration

---

exempted under this section. It is also undisputed that Plaintiffs determined there were potentially harmful environmental problems at the Plant. Section 107(d)(1) would probably also apply, but the Court has not yet determined whether any of Plaintiffs' actions comported with the NCP 42 U.S.C. section 107(d)(1) (exemption for all persons including government entities from CERCLA liability for actions taken "in the course of rendering care, assistance, or advice" regarding an "incident creating danger to public health or welfare or the environment as a result of any releases of a hazardous substance or the threat thereof" if they are in compliance with the NCP.

[22] Plaintiffs allege that Quemetco sent hazardous substances to the Vernon Plant during a six-week period in 2001 and one time in January 1995. The Court finds that Quemetco did not ship hazardous materials to the Vernon Plant in 1995. The Court credits the testimony of Bruce Davis, at ECF No. 702, ¶ 21. Though it is true that the 1995 Manifest bears the EPA ID number of the Vernon Plant, the address on the manifest is not the Vernon Plant's. The Court agrees with Mr. Davis that the truck driver would not know the EPA ID number's meaning. Rather, as Mr. Davis points out, the driver would look to the address. Discussion in this section regarding Quemetco is therefore limited to the 2001 shipments only.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

vessels or sites selected by such person, from which there is a release, or a threatened release . . . ." *See* 42 U.S.C. § 9607(a)(4).

Treatment is defined as "any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume." 42 U.S.C. § 6903(34).

The Supreme Court has articulated an intent requirement with regards to arranger liability for "disposal." In *Burlington Northern*, the Supreme Court stated that

> While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity "planned for" the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product .... In order to qualify as an arranger, [the defendant] must have entered into the sale of [its product] with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in § 6903(3).

*Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 612 (2009).

"Congress did not, to say the least, leave the floodlights on to illuminate the trail to the intended meaning of arranger status and liability." *United States v. Aceto Agricultural Chemicals Corp.,* 872 F.2d 1373, 1380 & n. 8 (8th Cir.1989).

\*\*\*

The parties dispute whether CERCLA exempts recycling from the definition of "treatment" under the Superfund Equity Recycling Act ("SREA"). Plaintiffs contend that the word "treatment" encompasses recycling, so Defendants cannot avoid liability simply by asserting that they intended to recycle batteries when they sent the batteries to the Vernon Plant. Defendants contend that recycling is exempted from CERCLA's definition of treatment, so, by

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

intending only to recycle and not treat (or dispose), they are not covered persons within the meaning of CERCLA. Even if "recycling" is embodied in the term "treatment," the parties further dispute whether the arranger defendants meet all the requirements under SREA and whether this exemption is incorporated into the HSAA.

The Court holds that recycling is encompassed in the term "treatment." Part of CERCLA's definition of treatment is "to make amenable for recovery." The point of recycling is to make various products amenable for recovery, in other words, so that they may be used again. The dictionary definition of "recycling" accords with this interpretation.

The defendants assert that they intended to recycle by sending various lead-bearing materials to the Vernon Plant. Court accordingly turns to whether any of the seven arranger/transporter defendants are exempted from liability under SREA's recycling exemption.

   **i.**  **Useful Product Doctrine**

First, the Court must determine whether any of the products sent by the defendants here were useful products. If they are, then CERCLA does not apply to these shipments. If they are not, the Court must then consider whether these shipments are exempted from CERCLA liability under SREA.

In determining whether a product is waste, and therefore potentially subject to CERCLA liability, or a useful product, courts, in broad terms, look to whether the "substance had the characteristic of waste . . . at the point at which it was delivered to another party." *Catellus Development Corp. v. United States*, 34 F.3d 748 (9th Cir. 1994).

The Ninth Circuit later stated

In light of the intent requirement, we have long recognized the so-called useful product defense to CERCLA claims.... The defense prevents a seller of a useful product from being subject to arranger liability, even when the product itself is a hazardous substance that requires future disposal. In other words, a person may be subject to arranger liability "only if the material in question constitutes 'waste' rather than a useful product."

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

> The useful product doctrine serves as a convenient proxy for the intent element because of the general presumption that persons selling useful products do so for legitimate business purposes. It would be odd, for example, to say that an auto parts store sells motor oil to car owners *for the purpose* of disposing of hazardous waste. Conversely, persons selling or otherwise arranging for the transfer of hazardous waste (which no longer serves any useful purpose) are more likely trying to avoid incurring liability that might attach were they to dispose of the hazardous waste themselves. In other words, the probable *purpose* for entering into such a transaction is to dispose of hazardous waste.

*Team Enterprises, LLC v. W. Inv. Real Est. Tr.*, 647 F.3d 901, 908 (9th Cir. 2011) (emphasis in original) (citations and footnotes omitted).

The Ninth Circuit has stated that whether a product is a useful product or is waste is a fact-intensive inquiry, and has thus far frequently declined to hold that certain products are waste as a matter of law. *Alco Pac.*, 508 F.3d at 938. The Ninth Circuit has cited with approval a district court's consideration of the following factors: (1) "the 'commercial reality' and value of the product in question"; (2) "a factual inquiry into the actions of the seller in order to determine the intent underlying the transaction"; and (3) "whether the material in question was a principal product or by-product of the seller," are among the factors appropriate to consider in determining "whether in light of all the circumstances the transaction involved an arrangement for disposal or treatment of a hazardous waste." *Cadillac Fairview/California, Inc. v. United States,* 41 F.3d 562, 566 (9th Cir. 1994).

In *Alco Pacific*, the court reiterated and identified six factors to aid in its assessment of the material's status in the transaction under consideration: (1) whether the material was a principal business product or a by-product or the arranger's principal business in need of disposal, (2) whether the material had more than a nominal commercial value, (3) the commercial reality and value of the product, (4) the actions of the seller and any inferred intent underlying the transaction, (5) whether the material would be useless unless contamination was removed, and (6) whether the material could continue to be used in its identical state after the transaction. *Alco Pac.*, 508 F.3d at 938. In *Burlington Northern*, the court also considered whether the product in dispute was unused at the time it was sold, as this may indicate that it was

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|------------------------|------|------------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

a legitimately useful product being sold, rather than an arrangement for the disposal of incidental waste. *Burlington N.,* 556 U.S. at 612.

The following defendants allegedly sent the following products:

- **Batteries (all arranger/transporter defendants) and/or Parts: Clarios, Ecko, Kinsbursky, and Ramcar**

The only Ninth Circuit authority on the question of whether spend lead-acid batteries are useful products is *Catellus,* 34 F.3d at 748. The "sole question before [the court was] whether, viewing the facts in the light most favorable to Catellus, General arranged for treatment or disposal of a hazardous substance within the meaning of section 107(a)(3) of CERCLA." *Id.* at 750. There, the defendant, which "receive[d] used automotive batteries from customers as trade-ins," argued that spent batteries were not waste because "they were being recycled and the lead extracted from them would be put to future productive use." *Id.* at 750-751.

In concluding that the defendant could be held liable as an arranger, the Ninth Circuit wrote that the "spent batteries would clearly be defined as waste" because they were "reclaimed." According to Solid Waste Disposal Act, under regulations interpreting section 107(3) of CERCLA, "[m]aterials are not solid wastes when they can be shown to be recycled by being: (i) Used or reused as ingredients in an industrial process to make a product, provided the materials are not being reclaimed." 40 C.F.R. § 261.2(e) (1993). The panel noted that the regulations define reclamation: "A material is 'reclaimed' if it is processed to recover a usable product, or if it is regenerated. Examples are recovery of lead values from spent batteries and regeneration of spent solvents." 40 C.F.R. § 261.1(c)(4) (1993).

Defendants ask the Court to find that this conclusion is dicta because it was not necessary in reaching the Ninth Circuit's ultimate holding. The Court agrees that it was unnecessary for the Ninth Circuit to classify batteries as waste because its holding rested on the fact that the hazardous substances at issue were not treated at the plaintiff's facility. 34 F.3d at 753. The discussion in *Catellus* therefore could be classified as dicta.

But whether or not it is dicta, the Court agrees with the Ninth Circuit's analysis in light of the factors articulated in Ninth Circuit decisions that came after *Catellus*. Though lead-acid batteries were the principal business product of the defendants here, and had more than nominal

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

commercial value, they could not be used in their present form as batteries because they could not "supply an electric current" and "only had value because of the lead" inside the spent batteries. *United States v. Mountain Metal Co.,* 137 F. Supp. 2d 1267, 1275-76 (N.D. Ala. 2001), *aff'd*, 91 F. App'x 654 (11th Cir. 2004).

The fact that SREA was passed after *Catellus* does not change the Court's conclusion here. SREA could even be read to reify *Catellus*'s suggestion that spent lead-acid batteries are waste. In other words, if these batteries were categorically useful, and therefore exempt from CERCLA liability, SREA's explicit reference to lead-acid battery recycling, and the numerous elements required to prove that the SREA safe harbor applies, would be superfluous. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews,* 534 U.S. 19 (2001) (quoting *Duncan v. Walker,* 533 U.S. 167, 174 (2001)).

Nor does the Court find that battery parts other than plates, to the extent that any defendants sent those types of parts, are useful products. For the same reasons as articulated above, the battery parts are not useful because they would be useless unless recycled into a new battery and could not continue to be used unless transformed in some way.

- **Battery Plates: Ramcar, Kinsbursky, Ekco**

Battery plates present a different question from whole spent batteries themselves and non-plate battery parts. Courts, even having found spent batteries to be waste and not useful products, have found that battery plates are useful where they are sold separately from battery casings. For instance, in *Mountain Metal Co.,* 137 F. Supp. 2d at 1267, the Eleventh Circuit affirmed the district court's holding that lead plates were a useful product where they could be put directly into a furnace for smelting. More specifically, "[w]hile the batteries themselves were no longer useful for their original intended purpose, the lead plates were in a form that allowed [the operator defendant] to place them directly in the furnace for smelting." *Id.*

The same is true here. The parties do not appear to controvert the fact that battery plates could be placed directly into the Vernon Plant's lead smelter. Additionally, the plates here could be characterized as "raw materials ready for processing." *Id.* at 1276.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
| --- | --- | --- | --- |
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

The Court's inquiry does not end here. In *Interstate Non-Ferrous Corp.*, in denying a motion for summary judgment, rejected the argument that non-plate battery components were scrap metal, one of the bases for potential SREA protection, as discussed at greater length below. There, the court concluded that

> Barstow's oral argument that the battery parts were "scrap metal" conflicts with the actual wording of § 127 [SREA]. Section 127 separates battery recycling and imposes separate eligibility requirements. If the legislature intended battery parts to be treated the same as "scrap metal," the battery recycling exemption under 127(e) would be superfluous. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews,* 534 U.S. 19, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) *quoting Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001); *see United States v. Menasche,* 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' ") (quoting *Inhabitants of Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883)). Barstow's interpretation would read the battery recycling clause out of Section 127.

298 F. Supp. 2d at 965.

Though the procedural posture is different in this case—namely, here, the Court may act as factfinder—these considerations are relevant to the issue of whether battery plates are useful products in the face of the fact that SREA expressly provides for transactions involving spent lead-acid batteries. If plates, but not the whole battery itself, were potentially useful products, then that would render SREA partially superfluous. In other words, it would seem inconsistent to exempt some battery parts from CERCLA entirely, but make an express statutory provision for transactions involving batteries which, as the Court discussed above, suggests that Congress did not intend for whole spent lead-acid batteries to be entirely exempt from CERCLA liability.

Faced with the potential clash between the useful product doctrine and an imperfectly written statutory provision, the Court holds that the battery plates are useful as to Ekco. Ekco, as the Court finds in more detail below, did not send battery plates separate from batteries they themselves had taken from their own spent batteries. Rather, the Court finds Ekco only sent

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

battery plates if they were attached to a shipment of whole spent batteries it received from its own customers.

The plates KBI returned to Exide were also useful products. More specifically, some of KBI's tolling agreements with Exide involved Exide sending KBI batteries, who then broke them apart and returned to Exide lead plates. Declaration of Paul Johnson, ECF No. 693 ("Johnson Decl.") at ¶ 10[23]. This situation is analogous to the situation in *RSR Corp.*, where the court there found lead plates useful products in the context of similar agreements. *RSR Corp. v. Avanti Dev., Inc.*, 68 F. Supp. 2d 1037, 1045 (S.D. Ind. 1999) ("[Evidence of the worth of the plates] is also found in the fact that not only are the lead plates not a by-product of Ace's business operation, Ace exists to break batteries and to sell the lead components within."). Accordingly, for these types of KBI's transactions, the plates—and other metal products returned to Exide—are useful and therefore do not subject KBI to CERCLA liability. These transactions made up 20-50% of all Kinsbursky's dealings with Exide. Johnson Decl. at ¶ 10.[24]

As to both Ecko and KBI, it is additionally relevant to the Court's analysis that it is uncontroverted in the record that the lead plates were placed directly into the smelter, a fact other courts have found suggests that the product is useful and not waste. And moreover, because both Ecko and KBI, in these transactions, did not get the recycled lead back from Exide, they essentially both seemed to have no more say over what Exide did with it. As an additional basis for finding them not liable under CERCLA for these types of shipments, it seems to the Court that these are not transactions "arranging for treatment" because once they sold the lead, they had

---

[23] NL objects to entire declaration to the extent is proffers legal opinions concerning the applicability of SREA as lacking foundation and lacking relevance. As discussed above, this objection is overruled as the Court has disregarded any improper legal conclusion. Paragraph 10 is objected to as violating the best evidence rule, lacking foundation, and for lacking personal knowledge. ECF No. 738 at 18. The Court overrules these objections, finding sufficient personal knowledge and foundation because Mr. Johnson was employed by KBI and appears to rely on the business records produced in this case.

[24] NL makes the same objections as detailed in the previous footnote. For the same reasons, these objections are overruled.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|------------------------|------|------------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

no more stake in what became of it, unlike other defendants who received smelted lead back from the plant.

Because the other defendants who sent plates needed them to be recycled at the Plant for them to be remade into new products, they are not useful as to those defendants. Accordingly, as to Ekco and KBI only, its shipments of battery plates do not confer CERCLA liability upon them because those were useful products.

- **Dross: Clarios, Kinsbursky, Oregon Tool, Quemetco, and Ramcar**

Plaintiffs contend that Clarios, KBI, Oregon Tool, Quemetco, and Ramcar all shipped dross to the Vernon Plant. ECF No. 727. In *Alco Pacific*, the Ninth Circuit held that dross could not be characterized as waste as a matter of law but would need to be evaluated based on the facts at hand. 508 F.3d at 939.

Defendants contend that dross is a useful product because of its relatively high lead content. Declaration of Terry Wussow ("Wussow Decl."), ECF No. 716 at ¶ 69; Declaration of Mark Von Lindern ("Von Lindern Decl."), ECF No. 697 at ¶ 21. However, Plaintiffs contend that dross is a by-product of the recycling process that was disposed of as waste. ECF No. 727 at 6.

The Court finds that dross is not a useful product. Unlike lead plates, there is no evidence in the record that it was placed directly into the Vernon Plant's smelter. Even if there was, the dross itself could not be used for any productive purpose except extracting more lead from the dross. The Court finds that dross is not useful and therefore does not exempt its sellers from liability.

- **Remelted Lead Scrap: Trojan Battery**

There was little or no argument or description of what this material might be in the record, either at trial or in the parties' briefing. The Court assumes it is a byproduct. In the absence of any evidence about what productive use it might have without undergoing additional treatment or transformation, the Court declines to find that remelted lead scrap is a useful product.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

- **Lead Dust; Lead Oxide Mud; Wood with Acid, Used Belts, Soda Ash, Trash, Sump Mud, and Trash Sump: and Floor Sweepings: Clarios, Ramcar, and Trojan Battery**

The Ninth Circuit has not yet definitively opined on whether any of these materials are useful products as a matter of law. Various Defendants shipped lead dust, lead oxide mud, air filters, floor sweepings, wood with acid, used belts, soda ash, trash, sump mud, and trash sump to the Plant for recycling.  Dust is a "source of recoverable lead" that accumulates in battery manufacturing facilities such as those operated by the Defendants. Wussow Decl. at ¶ 70.  Most of these materials were required to contain a certain minimum percentage of recoverable lead to be accepted by Exide.  Declaration of Frederick Ganster ("Ganster Decl."), ECF No. 707 at ¶ 23.[25]  *See also* Declaration of Clifford Crowe ("Crowe Decl."), ECF No. 711 at ¶ 9-10[26] (stating that Ramcar would only send materials to the Vernon Plant with lead contents between 25% and 85%).

However, the relative lead contents in these materials is not enough on its own to characterize them as useful products.  The commercial reality of the products is that they were waste by-products that had reached the end of their productive life.  The only remaining value attached to these materials was held in the lead they contained, but the materials themselves were no longer useful. Like the spent car batteries in *Mountain Metal* that were deemed waste because they could no longer be used for their intended purpose of powering vehicles, none of these items could continue to be used in their identical states for any productive purpose.  *See*

[25] NL objects to the Ganster Declaration at paragraph 23 as hearsay, lacking foundation, and being speculative. The Court overrules the hearsay objection because Mr. Ganster was available for cross-examination at trial. The Court also finds sufficient foundation for the statement cited given Mr. Ganster's position at Trojan Battery during the relevant time period. It is also not speculative; Mr. Ganster adequately conveyed that in his experience Exide would only accept materials containing a certain amount of lead.

[26] Plaintiffs to the Crowe Declaration at paragraph 10 as lacking foundation and being speculative. This objection is overruled. The Court finds sufficient foundation and that this paragraph is not speculative given Mr. Crowe's experience as a Ramcar employee.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

*Mountain Metal*, 137 F. Supp. 2d at 1275–76. For instance, Oregon Tool shipped used air filters to the plant that had captured residual lead, but these filters could no longer be used to filter air in the machines they were designed for. Von Lindern Decl. at ¶ 23, 29-30.[27]

Additionally, part of the useful product inquiry considers whether the material would be useless unless contamination was removed. In *Cadillac Fairview*, the Ninth Circuit determined that contaminated styrene which was purified and then could be reused could reasonably be considered a waste product. 41 F.3d at 566. However, the materials used in this case are not only useless for their original intended purpose without treatment (by removing the residual lead contained in them), but useless even after treatment. Once their lead contents are removed, the materials shipped to the Plant no longer held any productive potential or commercial value. *See* ECF No. 727 at 7. Without the lead particles they contained, the materials had no inherent value.

Factors relating to price and commercial reality also indicate that the materials sent to the Plant were waste. Prices of all lead-bearing materials sent to the Vernon Plant were based on the value associated with the lead contained in them and a fee for extracting it, rather than any estimation of the value of the materials themselves. *See* Declaration of Anthony Saldaña ("Saldaña Decl.") at ¶ 23; Von Lindern Decl. at ¶ 23;[28] Crowe Decl. at ¶ 5-6. The fact that the materials themselves were considered waste apart from the residual lead they held is evident from the plant owner's policy to reject materials "unless the materials contained a lead content that was sufficiently high to allow GNB or Exide to benefit commercially from the recycling of the lead contained in those materials." Saldaña Decl. at ¶ 24. GNB/Exide even termed the initial assessment of the lead content in spent batteries received at the Plant "junk sampling," indicating

---

[27] Plaintiffs object to the Von Lindern Declaration at paragraph 23 for being an improper legal conclusion to the extent lay witness purports to opine about "disposal" and "treatment." This objection is overruled; the Court has not credited any legal conclusions offered in this declaration. Plaintiffs also object to paragraph 29 as lacking foundation and being speculative. These objections are also overruled.

[28] Plaintiffs object to paragraph 23 as an improper legal conclusion to the extent the lay witness purports to opine about "disposal" and "treatment." The Court overrules this objection because it has not relied on any legal conclusions offered by this witness, to the extent there are any.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

the parties' views that the materials sent to the Vernon Plant were indeed waste. Wussow Decl. at ¶ 44-45.

The Court accordingly finds that these are not useful materials and therefore do not exempt these defendants from liability under CERCLA or the HSAA.

- **Unidentifiable Materials: Clarios, Ecko, Kinsbursky, and Trojan Battery**

The Court cannot determine what these materials were according to the hazardous waste manifests. Because it is unknown, Plaintiffs cannot meet their burden in showing that the materials were hazardous substances within the meaning of CERCLA. The mere likelihood or probability that they were is insufficient to meet Plaintiffs' burden in establishing the prima facie case. Therefore, the Court need not address whether these materials were useful or not.

In the alternative, the Court finds that it is probable that these unidentified materials were of the same types of materials that these defendants typically sent and shall treat them the same as the identified shipments for the purposes of determining liability. Therefore, the Court concludes that Ecko's unidentified shipments were scrap metal and spent batteries, since Ecko, unlike other defendants, is a scrap metal dealer who buys and sells ferrous and non-ferrous metals.[29]

The Court likewise concludes that Clarios, Kinsbursky, and Trojan Battery sent spent batteries and the other materials detailed above in these shipments.

ii.    **SREA Generally**

---

[29] The Court agrees with Ekco that there is no admissible evidence in the record showing that it sent anything else. Plaintiffs point to PX_2-0100, a document titled "Settlement for Materials," that references battery plates and "ind. groups." But as Ekco argues in its posttrial brief, this exhibit does not aid Plaintiffs because there is no address of where the material was sent or received and it is not signed by Ekco.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | | Date | August 18, 2023 |
|---|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | | |

Congress enacted SREA in 1999, approximately 20 years after CERCLA was passed. SREA is a defense to arranger and transporter liability. Congress passed SREA for the following reasons:

> 1) to promote the reuse and recycling of scrap material in furtherance of the goals of waste minimization and natural resource conservation while protecting human health and the environment,
>
> (2) to create greater equity in the statutory treatment of recycled versus virgin materials," and
>
> (3) to remove the disincentives and impediments to recycling created as an unintended consequence of the 1980 Superfund liability provisions.

Act of Nov. 29, 1999, Pub.L. No. 106–113, § 6001, 1999 U.S.C.C.A.N. (113 Stat.) 1501A–598. It provides that

> For purposes of this section, the term "recyclable material" means scrap paper, scrap plastic, scrap glass, scrap textiles, scrap rubber (other than whole tires), scrap metal, or spent lead-acid, spent nickel-cadmium, and other spent batteries, as well as minor amounts of material incident to or adhering to the scrap material as a result of its normal and customary use prior to becoming scrap.

42 U.S.C. section 9627(b).

To meet this statutory exemption, the defendant bears the burden of showing that (1) the recyclable material met a commercial specification grade; (2) a market existed for the recyclable material; (3) a substantial portion of the recyclable material was made available for use as feedstock for the manufacture of a new saleable product; and (4) the recyclable material could have been a replacement or substitute for a virgin raw material.

In the context of lead-acid batteries, the defendant must additionally show that (1) the entity arranging for the recycling "did not recover the valuable components of such batteries;" and (2) it was in compliance with applicable federal environmental regulations regarding the

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

storage, transport, management, or other activities associated with the recycling of spent lead-acid batteries.

In the context of scrap metal transactions, the defendant must show that it did not (1) melt the scrap metal prior to the transaction and (2) was in compliance with applicable regulations under the Solid Waste disposal Act regarding activities associated with the recycling of scrap metal.

Even if a defendant meets its burden in establishing these requirements, if it does so, the burden shifts to Plaintiffs[30] to demonstrate that the defendant is ineligible for SREA protection under the following circumstances:

1) The defendant "had an objectively reasonable basis to believe at the time of the recycling transaction—

    (i)    that the recyclable material would not be recycled;

    (ii)    that the recyclable material would be burned as fuel, or for energy recovery or incineration; or

    (iii)    for transactions occurring before 90 days after November 29, 1999, that the consuming facility was not in compliance with a substantive (not procedural or administrative) provision of any Federal, State, or local environmental law or regulation, or compliance order or decree issued pursuant thereto, applicable to the handling, processing, reclamation, or other management activities associated with the recyclable material"

---

[30] *Gould, Inc. v. A&M Battery & Tire Service*, 176 F. Supp. 2d 324 (M.D. Pa. 2001); *Interstate Non-Ferrous Corp.*, 298 F. Supp. 2d at 967. The Court recognizes that no binding authority that reiterates the burden-shifting approach adopted in these cases. However, the Court agrees that such a framework is appropriate.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

2) "had reason to believe that hazardous substances had been added to the recyclable material for purposes other than processing for recycling," or

3) "failed to exercise reasonable care with respect to the management and handling of the recyclable material (including adhering to customary industry practices current at the time of the recycling transaction designed to minimize, through source control, contamination of the recyclable material by hazardous substances)."

42 U.S.C. § 9627(f)(1).

Under SREA,

the objectively reasonable basis for belief shall be determined using criteria that include (but are not limited to) the size of the person's business, customary industry practices (including customary industry practices current at the time of the recycling transaction designed to minimize, through source control, contamination of the recyclable material by hazardous substances), the price paid in the recycling transaction, and the ability of the person to detect the nature of the consuming facility's operations concerning its handling, processing, reclamation, or other management activities associated with the recyclable material.

42 U.S.C. § 9627(f)(2).

Courts have held that SREA is a clarification, not an amendment. *See, e.g.*, *Interstate Non-Ferrous Corp.*, 298 F. Supp. 2d at 1129, 1151-52 ("When Congress clarifies a statute, it adds language to show how the law was originally intended to operate."). The Court also agrees that SREA is a clarification. It is labeled as such. The Court also agrees with the Eastern District of California court's reasoning in *Interstate Non-Ferrous Corp.*, which held that the "totality of the circumstances underlying [SREA's] passage" looking to SREA's language, context, and legislative history demonstrated that "Congress meant to clarify not change, eliminate ambiguity and conflict, and bring uniformity and certainty to recycler liability under CERCLA." *Id.* at 1151-52.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Because it is a clarification, it therefore applies to the HSAA. Though the HSAA does not expressly adopt SREA as an affirmative defense, because it only expressly incorporates the affirmative defenses to CERCLA enumerated in a code section that does not include SREA, it does so because it provides that "Responsible party, or liable person, for the purposes of this chapter, means those persons described in Section 107(a) of [CERCLA] as amended." Cal. Health & Safety Code section 25323.5(a)(1). SREA states that defendants shall not be liable under section 107(a)(3) or (4) of CERCLA, in other words, as arrangers or transporters, if its requirements are met. Accordingly, because SREA modifies who is a person described in Section 107(a), and the HSAA expressly adopts the definition of who is a liable person under this section, SREA accordingly applies to the HSAA.

Plaintiffs point to one case from the Fifth Circuit, *Del-Ray Battery Co. v. Douglas Battery Co.*, where the court held that SREA did not apply to Texas's version of CERCLA. 635 F.3d 725 (5th Cir. 2011). The Court agrees with Defendants that this case is distinguishable because the HSAA and the Texas statute in that case are not the same. More specifically, Texas's version of CERCLA did not expressly incorporate CERCLA's liability provisions like the HSAA does. But even if the two state statutes were not distinguishable, there is no binding precedent upon this Court dictating an opposite conclusion to the Court's holding today, which comports with a plain reading of both statutes.

SREA is therefore also a defense to HSAA liability.

### iii.    Whether Any of the Non-Battery Materials Sent By the Defendants Were Scrap Metal Within the Meaning of SREA

It is undisputed in the record that the defendants largely sent lead-acid batteries to the Vernon Plant, which are potentially covered under SREA. The Court has also concluded above that battery plates were useful products and therefore not subject to CERCLA liability at all. Therefore, the Court must determine whether any defendant sent scrap metal.

Under SREA, "scrap metal" is defined as "bits and pieces of metal parts (e.g., bars, turnings, rods, sheets, wire) or metal pieces that may be combined together with bolts or soldering (e.g., radiators, scrap automobiles, railroad box cars), which when superfluous or worn

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

can be recycled, except for scrap metals that the Administrator excludes from this definition by regulation." 42 U.S.C. § 9627(d)(3).

For instance, in *Evansville Greenway*, the court determined that the defendants sent scrap metal for recycling when they sent bulldozers, shovels, trucks, piping, stainless steel, and other pieces of mining equipment. *Evansville Greenway & Remediation Tr. v. S. Indiana Gas & Elec. Co., Inc.*, No. 3:07-CV-66-SEB-WGH, 2011 WL 13237784, at *4 (S.D. Ind. Feb. 25, 2011).

Here, the Court concludes that only Ekco sent scrap metal (aside from battery plates) within the meaning of CERCLA, namely, the few shipments that relate to ferrous and non-ferrous metals. As for battery plates, the Court finds in the alternative that, even if they are not useful products and therefore do not open defendants to CERCLA liability at all, the plates would be scrap metal because they are "sheets" of lead that could be combined with other parts to make a new battery.

The rest of the materials defendants argue are scrap metal do not fall under SREA's definition. Materials like dross, ash, dust, air filters, sump mud, lead oxide paste, floor sweepings, and the other materials the Court concluded are not useful products also are not scrap metal. The plainest reading of SREA indicates that scrap metal is a solid material, not a particulate such as lead dust or particles of lead stuck to air filters. A "bit" or "piece" suggests that it is more tangible than a mere particle. Paste is also not able to be soldered to some other metal part. And as for the remelted lead scrap, it is unclear to the Court that it could be soldered to some other metal to create a new product. In short, these materials are not akin to the statutory examples such as rods or wires or akin to something like a railroad box car or piece of a bulldozer. Dross also is not scrap metal because it does not appear to be able to be combined to make a new product. It is simply a byproduct.

Accordingly, this section of SREA is applicable only to Ecko. The Court will not address the other defendants' shipments of battery plates in this section, having already concluded that battery plates were useful here and are exempted from CERCLA liability.[31]

---

[31] The Court, in the alternative, finds that the relevant defendants have met their burden in showing that the SREA scrap metal defense would apply to their shipments of battery plates for the same reasons as already articulated in the forthcoming section. More specifically, lead plates

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
| --- | --- | --- | --- |
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

iv.      **Analysis of the SREA Requirements**[32]

*Commercial Specification Grade*[33] *-- Spent Batteries and Scrap Metal*

are made of lead, and are a "bit or piece" of a larger whole, and could theoretically be combined with bolts or soldering to make a new product, a battery.

[32] The Court includes discussion of Oregon Tool's evidence and arguments in this section. Oregon Tool, however, did not send whole spent lead-acid batteries like the other defendants. Rather, the record only shows that Oregon Tool sent dross and air filters with lead particles attached. As the Court's foregoing analysis shows, these materials are not useful products; they are not whole batteries; and they are not scrap metal. Accordingly, they are not exempt from CERCLA liability. They also are irrelevant to the SREA analysis. Accordingly, at this point, the Plaintiffs have established that Oregon Tool is liable as an arranger within the meaning of CERCLA. Nevertheless, the Court includes discussion of Oregon Tool in this section in the alternative, in the event that Oregon Tool did send any SREA eligible materials.

[33] The Court understands that, in *California Department of Toxic Substances Control v. Alco Pacific, Inc.*, the Ninth Circuit noted in a footnote that

> The district court properly concluded that Defendants failed to offer evidence establishing at least one such requirement, that the recyclable material met a commercial specification grade at the time of the transaction, *see* 42 U.S.C. § 9627(c)(1), and thus properly denied Defendants' motion for summary judgment under the recycling exemption. Defendants point to a 2003 publication of the Institute of Scrap Recycling Industries, Inc., entitled "Scrap Specifications Circular 2003," but fail to explain how this 2003 language established a specification grade for materials sold to Alco in the 1970s and 1980s. Defendants also point to the testimony of Alco's designee, who stated that Alco preferred to purchase lead slag with at least thirty percent lead content, but fail to explain why Alco's preference constituted a "commercial specification grade" within the meaning of the statute.

508 F.3d at 940.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | | Date | August 18, 2023 |
|----------|----------------------|--|------|-----------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | | |

      As other courts have pointed out, Congress did not define "commercial specification grade," so they have looked instead to SREA's legislative history to conclude that a commercial specification grade could include specifications as those published by industry trade associations, or other historically or widely utilized specifications are acceptable." 145 Cong. Rec. S14986-03; *Evansville Greenway*, 2011 WL 13237784 at \*5.

      Plaintiffs urge the Court to adopt a high standard as to what counts as a "commercial specification grade." According to Plaintiffs, such a grade must be objective and essentially come from on high, for instance, via publication by an industrial association or regulator.

      The Ninth Circuit has not yet conclusively opined on this issue. But other courts have used a more flexible standard. For instance, in *Evansville Greenway*, the court concluded that the scrap metal shipped by the alleged arranger/transporter defendant met a commercial specification grade where it was "cut down to size so that a steel mill or foundry would accept it." *Id*. The defendant proffered an expert who stated that, in his experience, recycling facilities set standards for what types of recyclable materials they would accept from customers. *Id.*

      Here, the defendants have presented declarations describing the standards set by the Vernon Plant operator regarding acceptable shipments of lead-bearing materials. *See, e.g.*, Declaration of Brian Wycklendt, ECF No. 715 ("Wycklendt Decl."), Ex. 1 (specifying in Clarios's tolling agreement with Exide that lead alloys had to conform to "Exide specification NA-MS 100-02 Rev 1" or a "mutually upon [] specification"); Declaration of Herb Gelman, ECF

---

The Court does not construe this footnote as conclusively stating that a "commercial specification grade" must be either an objective industry standard or whether it may entail more subjective evidence based on the defendants' course of dealing. In any event, this case is distinguishable. The defendants here have provided declarations stating why the Vernon Plant's preferences constituted a commercial specification grade within the meaning of the statute.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

No. 700 ("Gelman Decl."),[34] at ¶¶ 10-12;[35] 28-29; Exs. 1, 2 (describing how Ecko maintained a list of the types and grades of materials it accepted from its customers and how Exide, in its dealings with Ecko, also provided Ecko with specifications of the types of batteries it found acceptable for purchase); Johnson Decl. at ¶¶ 9-10[36] (discussing how Kinsbursky's dealings with Exide—whereby Exide would send Kinsbursky industrial batteries, which Exide could not recycle, and Kinsbursky would send Exide back lead plates—involved Exide paying Kinsbursky at market rates set by the London Metals Exchange); Declaration of Mark Von Lindern, ECF No. 697 ("Von Lindern Decl."), at ¶ 39(a) (describing the Vernon Plant's acceptance criteria for materials sent by Oregon Tool and other customers); Declaration of Frederick Ganster, ECF No. 707 ("Ganster Decl."), at ¶ 23[37] ("When I worked for Exide, Exide had the authority to reject

---

[34] NL objects to the entire declaration to the extent it proffers legal opinions concerning applicability of SREA. It also objects for lacking foundation, relevance, and being inappropriate expert testimony under Rule 702, as well as makes specific objections to Gelman's testimony about SREA. *See* ECF 738. These objections are overruled. The Court disregards any legal opinions and does not view the declaration as improper expert testimony; rather, the declaration concerns Mr. Gelman's personal experiences working for Ekco, providing sufficient foundation for his statements.

[35] Plaintiffs object to the Gelman Declaration at paragraph 10 as being an improper legal conclusion to the extent lay witness purports to opine about the meaning of "commercial specification grade." The Court has disregarded any legal opinions, to the extent there are any. Plaintiffs also contend that it lacks foundation, but the Court finds adequate foundation, as Mr. Gelman is testifying in his capacity as having worked for Ekco.

[36] NL objects to entire declaration to the extent it proffers legal opinions concerning applicability of SREA. The Court has disregarded any legal opinions, to the extent there are any.

[37] NL objects to paragraph 23 as hearsay, lacking foundation, and being speculative. Mr. Ganster was available for cross examination at the trial. Also, to the extent NL claims the Uniform Hazardous Waste manifests are hearsay, those are business records, so the hearsay objection is overruled.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

shipments of materials that had insufficient lead content or that did not comply with the terms of the contract with Exide's customers."); Declaration of Clifford J. Crowe, ECF No. 711 ("Crowe Decl."), at ¶ 10[38] ("The type of materials sent by Ramcar to the Vernon Plant remained consistent over time because Ramcar's manufacturing operations remained consistent over time. [Gould]/Exide would test the materials that were being sent to Exide to confirm the lead content of those materials").

Though it is true that in *Evansville Greenway*, there was a published industry specification regarding the quality of the recyclable material, the fact that there is none here does not doom the defendants' case. The fact that the Vernon Plant operators had specifications for its customers is sufficient for the Court to find that the shipments met a commercial specification grade. The Court further credits testimony that the lead delivered was valued according to a particular market exchange, for instance, the London Metals Exchange. Johnson Decl. at ¶¶ 9-10.[39] The fact that the lead-bearing products could be valued according to a published exchange price suggests that these products met a widely utilized specification according to industry standards and practices.

Applying the above-described standard, all seven arranger/transporters have met their burden in showing that their shipments met a commercial specification grade because the Vernon Plant's operators told its customers, the defendants here, what types of products it would accept. There is no evidence on the record before the Court that any shipments were non-conforming to these standards or that the plant operator did not follow its own policies.

---

[38] Plaintiff objects to paragraph 10 on the grounds that it lacks foundation and is speculative. This objection is overruled. The portion of the declaration cited to is admissible because it reflects Mr. Crowe's experiences as Ramcar president, so he can permissibly testify what materials were sent by Ramcar. Additionally, even if it is speculative, the Court has relied on other evidence reflecting what Ramcar sent, namely, hazardous waste manifests.

[39] NL objects to the entire declaration to the extent it proffers legal opinions concerning applicability of SREA. The Court has disregarded any legal conclusions, to the extent there are any.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

This element of SREA is therefore met by all seven defendants.

> *Whether a Market Existed for the Recyclable Material – Spent Batteries and Scrap Metal*

The parties do not dispute that a market existed for the recyclable materials at issue here. Indeed, the Vernon Plant's existence was premised on the notion that it could make money off smelting lead acid batteries and that others could purchase these batteries, have them smelted, and then resell them to customers. *See* Ganster Decl. at ¶ 11; Johnson Decl. at ¶¶ 9-10[40]. The Court accordingly finds that a market existed for the recyclable materials here, which is true for all seven defendants.

> *Whether a substantial portion of the recyclable material was made available for use as feedstock for the manufacture of a new saleable product*

The parties also do not seem to dispute that this element is met. No testimony regarding this factor was presented at trial. It seems undisputed that the lead gleaned from the lead-bearing materials was used to make new lead-acid batteries and that this lead was a substantial portion of the recyclable material. *See generally* Ganster Decl.[41] Courts have also declined to set a bright-line rule as to how much of the material was "substantially" made available as feedstock. *See, e.g., Evansville Greenway*, 2011 WL 13237784, at *5 (noting that there is "no single benchmark

---

[40] NL objects to the entire declaration to the extent it proffers legal opinions concerning applicability of SREA. The Court has disregarded any legal conclusions, to the extent there are any.

[41] NL objects to the Ganster Declaration at various lines in paragraphs 21-24 (hearsay, lacks foundation, speculation). Plaintiffs object to the Ganster Declaration at paragraph 10 (improper legal conclusion to the extent lay witness purports to opine about the meaning of "disposal"), 13 (improper legal opinion testimony), paragraph 22 (lacks foundation, speculative), paragraph 24 (improper legal conclusion to the extent lay witness purports to opine about the meaning of "disposal"). For the same reasons as stated elsewhere, these objections are overruled.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

or recovery rate" and that a "common sense evaluation" can be used to determine whether the amount of feedstock gleaned was "substantial").

Here, common sense yields the conclusion that a substantial portion was made available as feedstock, as virgin lead is apparently quite rare and there is undisputed testimony in the record that the defendants here sent every last speck of potential lead to be recycled at the Vernon Plant. And, for instance, Ramcar provided undisputed evidence that recycling materials that had only 25% lead resulted in a recycling rate of 96% for that lead. Crowe Decl. ¶ 29. Accordingly, it was undisputed in the record that the Vernon Plant had a high rate of lead recovery even for the materials that had small amounts of lead in them. The Court accordingly finds this element is met as to all defendants.

> *Whether the recyclable material could have been a replacement or substitute for a virgin raw material*

Last, the parties also seemingly do not dispute that the recycled lead is a substitute for virgin lead. Indeed, there is evidence in the record that lead is in short supply around the world and those who use lead in their products heavily rely upon recycled lead. Ganster Decl. at ¶ 5; Saldaña Decl. at ¶ 4; Declaration of Timothy Lafond ("Lafond Decl."), ECF No. 713 at ¶ 44.

Absent any evidence to the contrary and in light of the apparent consensus between the parties, Court therefore finds that this element is met as to all defendants.

**v.   Additional SREA Requirements and SREA Exclusions**

All seven arranger/transporter defendants have met their initial burden under SREA as to spent batteries and/or scrap metal regarding that the material met a commercial specification grade, a market existed for the material, a substantial portion was made available for feedstock, and that the recyclable material could have been a substitute for raw virgin lead. They also established that they took reasonable care. The Court next will assess whether Plaintiffs have shown that these defendants are nevertheless not entitled to SREA protection.

The statute provides, in relevant part,

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

(f) Exclusions

    (1) The exemptions set forth in subsections (c), (d), and (e) shall not apply if--

        (A) the person had an objectively reasonable basis to believe at the time of the recycling transaction—

            (i)    that the recyclable material would not be recycled;

            (ii)    that the recyclable material would be burned as fuel, or for energy recovery or incineration; or

            (iii) for transactions occurring before 90 days after November 29, 1999, that the consuming facility was not in compliance with a substantive (not procedural or administrative) provision of any Federal, State, or local environmental law or regulation, or compliance order or decree issued pursuant thereto, applicable to the handling, processing, reclamation, or other management activities associated with the recyclable material;

        (B) the person had reason to believe that hazardous substances had been added to the recyclable material for purposes other than processing for recycling; or

        (C) the person failed to exercise reasonable care with respect to the management and handling of the recyclable material (including adhering to customary industry practices current at the time of the recycling transaction designed to minimize, through source control, contamination of the recyclable material by hazardous substances).

    (2) For purposes of this subsection, an objectively reasonable basis for belief shall be determined using criteria that include (but are not limited to) the size of the person's business, customary industry practices (including customary industry practices current at the time of the recycling transaction designed to minimize,

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

through source control, contamination of the recyclable material by hazardous substances), the price paid in the recycling transaction, and the ability of the person to detect the nature of the consuming facility's operations concerning its handling, processing, reclamation, or other management activities associated with the recyclable material.

The Court shall also, in this section, address SREA's requirement that those seeking the affirmative defense "did not recover the valuable components of [spent lead-acid] batteries." *See* 42 U.S.C. § 9627(e)(1).

> *Objectively Reasonable Belief that the Vernon Plant was in Environmental Compliance After February 27, 2000[42]*

At trial, Plaintiffs argued that the defendants did not have an objectively reasonable basis for which to believe that the Vernon Plant was environmentally compliant. Plaintiffs also argued that certain arranger/transporter defendants were deficient in their waste handling practices. Last, Plaintiffs contend that SREA does not apply to some defendants because they broke the batteries and thus "recovered the useful components," removing them from SREA protection. The Court shall address each in turn.

Unlike in establishing that the five basic elements of SREA are met, it appears that a different standard applies here in determining what "an objectively reasonable belief" is. In *Gould v. A&M Tire & Battery Service*, the court also considered whether the simple negligence standard can be used in determining whether the defendants' conduct rendered them ineligible for SREA's safe harbor under this exception. Looking to the legislative history, the court concluded that it was "clear that the objectively reasonable basis for belief standard is not equivalent to the ordinarily prudent person standard.

---

[42] There were objections to the trial declaration testimony of several of the arranger/transporter defendants' executives on the basis of foundation, relevance, hearsay, and improper legal foundation. These objections are overruled as to any testimony relied on in this section. The testimony goes to the companies' state of mind during the relevant time period; the Court has additionally disregarded any evidence it views as conclusory.

---

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|----------------------|------|-----------------|
| Title    | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

The parties here have not argued for a specific reasonable care standard. The Court agrees with the *Gould* court that the standard is higher than the ordinarily prudent person standard.

Here, Plaintiffs have not met their burden as to any of the seven arranger/transporter defendants in showing that they did not exercise reasonable care.

Again, SREA section 127(c)(5) requires that for "transactions [on or after February 27, 2000]," the arranger or transporter must have "exercised reasonable care to determine that the facility . . . was in compliance with substantive (not procedural or administrative) provisions of any Federal, State, or local environmental law or regulation, . . . applicable to the handling, processing, reclamation, storage, or other management activities associated with recyclable material." 42 U.S.C. § 9627(c)(5).

"Reasonable care" is "determined using criteria that include (but are not limited to)" the price paid for the materials, the defendant's "ability . . . to detect the nature of the consuming facility's operations concerning its handling, processing, reclamation, or other management activities associated with recyclable material," and "the result of inquiries made to the appropriate Federal, State, or local environmental agency (or agencies)." *Id.* § 9627(c)(6).

Plaintiffs argue that the defendants here did not exercise reasonable care in ensuring that the Vernon Plant was environmentally compliant. Plaintiffs contend that the defendants ought to have taken more substantial affirmative measures to ensure compliance, for instance, by checking an online database launched in 2004 where customers such as the arranger/transporter defendants could have looked up the Vernon Plant to see whether it had violated any environmental laws.

Few courts seem to have opined on what precisely constitutes "reasonable care" in the context of this portion of SREA. The Court therefore must first define the contours of what "reasonable care" might mean, and then ascertain whether the defendants here took reasonable care.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

The Court looks to tort law to determine a basic definition of "reasonable care" subject to the factors enumerated in the statute. Though CERCLA is not exactly a tort, several principles of tort law and related concepts of strict liability animate CERCLA analyses. The 2022 Ninth Circuit Model Jury Instructions, in the section on the Federal Employer's Liability Act, defines "reasonable care" as "the degree of care that a reasonably prudent person would use under like circumstances." This definition accords with Black's Law Dictionary's definition of "reasonable care," which is "the degree of care that a prudent and competent person engaged in the same line of business or endeavor would exercise under similar circumstances . . . the application of whatever intelligence and attention one possesses for the satisfaction of one's needs."

Thus, looking to what an ordinarily prudent and competent executive of the defendant companies would do in order to ensure environmental compliance, the Court finds that all seven arranger/transporter defendants did so.

Clarios meets its burden in showing that it exercised reasonable care with respect to its shipments of SREA-qualifying materials. The testimony of its predecessors' executives provided uncontroverted evidence that Clarios was incentivized to only work with plants that were environmentally compliant, evidenced through the testimony that compliance was a factor in negotiating the tolling agreements. Wycklendt Decl. ¶ 88; Declaration of Jeramy LeMieux ("LeMieux Decl."), ECF No. 712 at ¶ 36; Wussow Decl. ¶¶ 91-95.  Clarios also regularly visited the plant, used the online database contacted the Vernon Plant to ask about any issues learned of in the media and asked about regulatory activities; and was in regular communication with Exide, which gave Clarios assurances that it was or would become compliant. Lafond Decl. at ¶¶ 49-57; LeMieux Decl. at ¶¶ 37-40; Wycklendt Decl. at ¶¶ 79-85.

Ekco meets its burden in showing it exercised reasonable care. It was paid market price for the materials it sent to the Plant. Gelman Decl. at ¶ 18.[43] It received information regularly from the plant operator that the plant was compliant. Declaration of David Cobb ("Cobb Decl."),

---

[43] NL objects to the declarations of the arranger transporter defendants on the to the extent it proffers legal opinions concerning applicability of SREA. For the same reasons as above, this objection is overruled.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

ECF No. 701 at ¶ 4[44]; Gelman Decl. ¶ 19.[45] Ekco even received an explicit warrant from Exide that it was SREA compliant. DX 2-3503. The state never told Ekco that there were any environmental violations. Gelman Decl. ¶ 36;[46] Acharya Depo. 559:6-16 (May 1, 2023). Taking into account the small size of this company, the Court finds that Ekco exercised reasonable care during the relevant period.

Kinsbursky meets its burden in showing it exercised reasonable care during the relevant period. Like executives of several other defendants who toured the Plant at regular intervals, Paul Johnson conducted several plant tours and inspections. Saldaña Decl. ¶ 28. Kinsbursky also reasonably ensured environmental compliance given its knowledge that the Plant had a valid RCRA permit. Johnson Decl. at ¶¶ 12-14.[47]

Oregon Tool meets its burden. Mark Von Lindern testified that, as compliance officer, he never had any reason to believe that the Vernon Plant was in violation of its RCRA permit, never

---

[44] NL objects to the declarations of the arranger transporter defendants on the to the extent it proffers legal opinions concerning applicability of SREA. For the same reasons as above, this objection is overruled. The Court finds sufficient foundation, as the declarant is testifying based on his personal experience.

[45] NL objects to the declarations of the arranger transporter defendants on the to the extent it proffers legal opinions concerning applicability of SREA. For the same reasons as above, this objection is overruled.

[46] NL objects to the declarations of the arranger transporter defendants on the to the extent it proffers legal opinions concerning applicability of SREA. For the same reasons as above, this objection is overruled.

[47] NL objects to the declarations of the arranger transporter defendants on the to the extent it proffers legal opinions concerning applicability of SREA. For the same reasons as above, this objection is overruled.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

heard from DTSC that the plant was not compliant, and visited the plant in the 1990s and was satisfied. Von Lindern Decl. at ¶¶ 36-41.

Quemetco meets its burden as to this element. There was undisputed testimony that Quemetco knew that the Vernon Plant had a valid DTSC interim permit, that DTSC was overseeing the site, and that the Plant had a SCAQMD permit. Declaration of Bruce Davis ("B. Davis Decl."), ECF No. 702 at ¶¶16-18.[48] It was also undisputed that Quemetco, being a competitor of the Vernon Plant, kept close tabs on the compliance activities of its competition. *Id.*[49] Last, Quemetco's care was reasonable given that it knew DTSC cited the facility for not keeping adequate training records, so it was reasonable for it to believe that DTSC would have also cited the Plant for any more serious environmental regulations. PX 2-0009.1013-1014.

Ramcar meets its burden as to this element. It also received periodic assurances from Exide that the plant was environmentally compliant. Crowe Decl. ¶¶ 27-28. Additionally, the Court also considers that Ramcar is a small business and was reasonable in its reliance on these representations. Last, like the other defendants, there is no evidence in the record showing that Ramcar received any notice from DTSC that the Plant was not in compliance. *See also* Declaration of Ronald Hayes, ECF No. 710 at ¶¶ 48-58.[50]

---

[48] Plaintiffs object to the Declaration of Bruce Davis at paragraphs 17-18 on the basis that it lacks foundation, as declarant was hired by Quemetco in August 2007. The Court holds that there is sufficient foundation for this testimony as Quemetco's corporate witness. NL objects to entire declaration to the extent it proffers legal opinions concerning applicability of SREA. NL also objects to paragraph 18. The objections are overruled for the same reasons as above.
[49] For the same reasons as in the above footnote, the objections are overruled.

[50] Plaintiffs object to the Hayes Declaration at paragraphs 48 and 58 on the basis of improper legal conclusion to the extent lay witness purports to opine about the meaning of "commercial specification grade." NL objects to Entire Declaration to the extent it proffers legal opinions concerning applicability of SREA. NL also objects to paragraphs 48-58 as lacking foundation, relevance, improper expert opinion, and hearsay). Both Plaintiffs' and NL's objections are overruled for the same reasons as articulated above.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|----------------------|------|-----------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Last, Trojan Battery also meets its burden. Like the other defendants, former Exide employee Tony Saldaña testified that he gave tours to Trojan Batteries personnel. Saldaña Decl. ¶ 29. And like the others, there is no evidence in the record showing that DTSC ever informed Trojan Battery of any Exide violations, nor that Trojan Battery was aware of any.

As to all defendants, the Court does not find it unreasonable that several defendants did not actively check the regulatory violation database online. Many defendants operated in early 2000s, when computer use was not widespread. But in any event, the assurances given to each defendant indicate that their behavior was reasonable, because these assurances would mean that each defendant had no reason to check the database at all. This is especially true given that each defendants' general testimony was that they had longstanding and productive business relationships with the Vernon Plant (with the potential exception of Quemetco, who was a competitor, not a customer).

In conclusion, each defendant was reasonable in relying on Exide's representations and in trusting that the state would inform them of any compliance issues.

*Deficient Waste Handling Practices*

If a defendant "failed to exercise reasonable care with respect to the management and handling of the recyclable material (including adhering to customary industry practices current at the time of the recycling transaction designed to minimize, through source control, contamination of the recyclable material by hazardous substances)," then they are also ineligible for SREA's safe harbor. As for scrap metal, the defendant must show that it was "in compliance with applicable Federal environmental regulations or standards." 42 U.S.C. section 9627(d)(1)(B).

Plaintiffs argue that Kinsbursky and Quemetco do not qualify for the SREA exception because they had deficient waste handling practices. Plaintiffs argue that Kinsbursky's facility was cited for violations of its RCRA hazardous waste facility permit and that Quemetco's wastewater treatment system, which Quemetco used to recycle its own spent batteries, was also out of compliance with its relevant permit. ECF No. 727 at 43.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|------------------------|------|------------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

The Court finds that Kinsbursky was not "in compliance with applicable Federal environmental regulations or standards." Plaintiffs have adduced evidence showing that KBI sent an unauthorized hazardous waste transporter to send shipments to facilities including the Vernon Plant. PX 2-0374; PX 2-0004.840; PX 2-0004.845; PX 2-0004.6432.[51] Plaintiffs also adduced evidence that KBI entered into consent orders with DTSC for hazardous waste violations that occurred at its facility in 2004 and in 2013-2014. PX 2-0375; PX 2-0374.

In response, KBI does not really contest that it incurred these violations, only that they were "promptly corrected." KBI's Posttrial Brief, ECF No. 846, at 6. But the statute says nothing about how promptly a violation must be remedied—only that the defendant must have been compliant. In the absence of any case law to the contrary, the Court finds that KBI's violations remove it from the ambit of SREA protection.

The Court finds otherwise as to Quemetco. Plaintiffs, more specifically, argue that "when Quemetco sent spent lead-acid batteries from its City of Industry facility to the Vernon Plant between May and June 2001, its wastewater treatment system—which was integral to Quemetco's handling of spent batteries—was likely out of compliance with applicable regulations" and that "September and October 2000 inspections of Quemetco's City of Industry facility revealed "numerous violations," including "major corrosion," "overflowing" and spilling sumps, and possibly compromised leak containment infrastructure in the facility's wastewater treatment system. *See* PX 2-0189.6. Quemetco has not introduced any evidence showing that these substantive violations had been corrected by the time it sent hazardous waste to the Vernon Plant in May or June 2001." Plaintiffs' Posttrial Brief, ECF No. 840, at 54. The Court finds this insufficient for Plaintiffs to meet their burden. As Quemetco points out, there is no evidence of any follow-up after the violation notice. The Court therefore finds that Quemetco remedied the violation, otherwise, the regulator would have kept asking it to correct the problem. Also, Plaintiffs have not sufficiently demonstrated how the wastewater system connected to the specific shipments Quemetco sent to the Plant.

---

[51] KBI objects to these exhibits discussed here on the basis of hearsay, relevancy, for not being valid business records, and lack of foundation. These objections are overruled because the Court finds them admissible as valid business records and being relevant to the SREA defense.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

*Battery Components Derived from Battery Breaking*

As Plaintiffs point out, again, SREA extends its affirmative defense only to those that "did not recover the valuable components of [spent lead-acid] batteries." *See* 42 U.S.C. § 9627(e)(1). Plaintiffs contend that Ekco and Kinsbursky both recovered the valuable components of the batteries before sending the battery parts to the Vernon Plant.

Plaintiffs' argument fails as to Ekco. The Court has already determined that battery plates, the parts Plaintiffs argue that these defendants obtained through breaking batteries, are useful products as to Ekco, are therefore not subject to CERCLA liability and therefore also not subject to the SREA defense. In the alternative, even if they are not useful products, the Court previously determined that they are scrap metal.

If they are scrap metal or encompassed in the spent battery transactions[52] and subject to SREA, the Court finds Plaintiffs' argument still fails. Though it is true that Ekco's corporate witness mentioned that battery plates would be "generated" from batteries in a deposition, Gelman Depo. at 79:8-23, there is also evidence from another Ekco witness that it actually would not have broken the batteries and would only have sent battery plates (the "tops") if Ekco's customer had incidentally included the plates along with a shipment of batteries. Cobb Decl. at ¶ 8[53]. The Court credits this testimony, which is not inconsistent with Mr. Gelman's testimony that

---

[52] The Court understands that the Eastern District of California, in *Interstate Non-Ferrous Corp.*, held that battery plates are not scrap metal. 298 F. Supp. 2d 930 at 965. The Court disagrees that that court's reading of SREA dictated such a result as to Ekco, as discussed above.

[53] Plaintiffs object to the Cobb Declaration at ¶ 8 (Improper legal conclusion to the extent lay witness purports to opine about the meaning of "commercial specification grade"; lacks foundation.). These objections are overruled, as Mr. Cobb properly testified as to what the Vernon Plant's specifications were. To the extent Mr. Cobb offered a legal conclusion, the Court has disregarded it. NL objects to Entire Declaration to the extent it proffers legal opinions concerning applicability of SREA. For the same reasons, these objections are overruled. NL also objects to paragraph 8 on the basis of speculation and lacking foundation. These objections are

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

they bought only whole batteries from customers. Gelman Depo. at 19:24-20:7. Ekco is also somewhat differently situated than the other defendants in that they simply sold materials to the Vernon Plant; there were no tolling agreements between Ekco and Exide. Therefore, Ekco is not disqualified from the SREA safe harbor on this basis.

As for Kinsbursky, the Court finds it persuasive that it did "recover the valuable components" of the batteries within the meaning of SREA, as to the 20-50% of shipments to Exide where it simply sold Exide materials gleaned from Exide's spent batteries and then had nothing else to do with the lead.

To support their contention that KBI did so, Plaintiffs cite to *Interstate Non-Ferrous Corp.*, where the court held that

It is undisputed that Barstow recovered the battery's valuable components by taking posts, terminals, and cables to Mobile for smelting, retaining ownership of those components, and acquiring the valuable lead from those components once smelted. The only reason Barstow sent the parts to Mobile Smelting was to complete its recovery by treatment of the "valuable components." Barstow's battery related transactions do not qualify for § 127 exemption.

298 F. Supp. 2d at 965. First, though that case dealt with posts, terminals, and cables, not plates, the defendant there did break apart the battery first before sending those parts to the plant.

Paul Johnson's declaration states that

KBI's operations processes includes receiving batteries from its various customers, depackaging and segregating the batteries by size and type, and removing the cells from the large, steel-cased batteries. The electrolyte is pumped through a filter press to remove lead, which goes into a waste-water treatment system, where KBI treats the acid and the electrolytes. The lead is then placed onto a pallet and put onto a pan where it dries for

---

also overruled, as the Court finds there was a sufficient basis for this testimony and that it was based on Mr. Cobb's experiences.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

between 3-60 days. KBI then packages it into a UN-certified wheeler box and ships the material for recycling to a secondary lead smelter based on the market price."

Johnson Decl. at ¶ 11[54]; *see also* Trial Tr. Day 2, 180:12-15. Accordingly, the Court is persuaded that Kinsbursky broke apart the batteries, rendering it SREA-ineligible for the relevant shipments—those other than the 20-50% of its transactions with Exide where the tolling agreement simply sent lead back to Exide.

### vi. Whether Any Arranger/Transporter Defendant Intended to Make a "Disposal"

Thus far, the Court's analysis has focused on "treatment." Plaintiffs also assert that some defendants are liable as arrangers and/or transporters because they made a "disposal."

Again, in *Burlington Northern*, the Supreme Court clarified the scope of arranger liability regarding alleged disposals. It held that "[w]hile it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity "planned for" the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product." *Burlington N.*, 556 U.S. at 612.

Thus, in that case, the defendant was not liable as an arranger for the disposal of a hazardous material when it had no specific intent that the waste should be disposed, but knew that it possibly or even probably would need to eventually be disposed of. The defendant also was not liable on this basis even though it knew that the entity it gave the waste to sometimes accidentally spilled the waste.

Here, the Court finds this to be so as to all arranger defendants. The uncontroverted testimony from each defendant's relevant witness was that they all intended for the waste to be recycled. Even if they knew that certain parts of the batteries had to be disposed, under

---

[54] NL objects to the entire declaration to the extent it proffers legal opinions concerning the applicability of SREA. The Court has disregarded any legal conclusions.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

*Burlington Northern*, this knowledge is insufficient to render them liable as arrangers under CERCLA.

Plaintiffs seem to suggest that "disposal" is somehow encompassed in "treatment," arguing in its posttrial brief that sending lead-bearing materials to the plant for recycling means that it must have entailed "plac[ing] the materials in or on the Plant's fixtures and buildings," citing various district court cases adopting this potential means of disposal. Plaintiffs' Posttrial Brief, ECF No. 840 at 30. The Court rejects this attempt to conflate "disposal" and "treatment." The record shows that each defendant intended to recycle, which the Court previously determined is a form of "treatment." The Court does not extend this reasoning to view recycling as a "disposal." The placing of material on the ground at the Plant is more akin to the incidental spills or mere awareness that parts may be disposed of that were insufficient to confer liability in *Burlington Northern*.

The Court therefore holds that no arranger defendant intended to make a disposal within the meaning of CERCLA or the HSAA.

### vii.    **Transporter Liability**

There is an open question as to whether the intent requirement in *Burlington Northern* applies to transporter liability, as it only involved arranger liability. No case that the Court is aware of has applied the intent requirement to transporters. There is also an open question in the case law of what it means for a site to have been "selected by such person."

Though interesting from an academic standpoint, neither grey area in the case law is important here. In general, as Plaintiffs point out, the transporter defendants do not appear to have really contested that they accepted for transport hazardous substances to be taken to the Vernon Plant. No transporter defendant seems to contend that they did not select the Vernon Plant. No transporter defendant argued explicitly that *Burlington Northern*'s intent requirement should apply to transporters, but even if it did, the Court has already found that intent to recycle is part of the statutory definition of "treatment."

Clarios and KBI are therefore also liable as transporters under CERCLA and the HSAA for the shipments of materials not covered by the useful product doctrine and/or SREA defense.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

\*\*\*

In conclusion, the Court finds as to the following arranger/transporter defendants:

Quemetco is not liable under CERCLA or the HSAA as an arranger or a transporter. Quemetco's only shipments occurred between May and June 2001. The manifests all say the shipment involved "WASTE BATTERIES, WET, FILLED WITH ACID 8." B. Davis Decl. ¶ 13.[55] There is no evidence in the record of any other kind of material being shipped to the Vernon Plant by Quemetco. As discussed above, these lead-acid batteries are eligible for SREA protection, and Quemetco met its burden in showing that it met SREA's requirements. Plaintiffs did not meet their burden in showing that Quemetco was deficient in its waste handling practices.

Ekco is not liable under CERCLA or the HSAA as an arranger or a transporter. It only sent batteries or plates that were incidentally sent from customers. There is no evidence the Court finds admissible or credible that it sent any other type of material. All these shipments are SREA-qualifying.

The remaining arranger/transporter defendants are liable. As for KBI, the Court held above that it broke apart the batteries itself before sending hazardous materials to the Plant and that it had deficient waste handling practices. As to the other defendants, even though their shipments of batteries qualified for the SREA defense, they sent materials that were not either useful products or covered by SREA. Clarios and KBI are liable not only as arrangers, but also as transporters.

There is no "de minimis" defense to CERCLA liability. *See United States v. Kramer*, 757 F. Supp. 397, 423 (D.N.J. 1991). Thus, even though the Court may agree with the various defendants that it seems unfair to hold them liable under CERCLA and the HSAA for the small amounts of non-battery materials they sent that are not included in SREA and are not useful, yet

---

[55] NL objects to the entire declaration to the extent it proffers legal opinions concerning applicability of SREA. Again, the Court has disregarded any legal opinions, so the objection is overruled.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

that they intended to recycle, that unfairness alone is insufficient to deem them not liable. It is also true that, while one court in this circuit has suggested that a defendant could still be eligible for SREA's safe harbor even if it sent materials not explicitly included in SREA. *Interstate Non-Ferrous Corp.*, 298 F. Supp. 2d at 966. That court, however, did not explain why this could be so. It is not clear from the plain wording of the statute why it would be, and the Ninth Circuit has not yet conclusively said whether materials other than scrap metal or batteries are SREA-eligible. The Court therefore declines to hold that the non-battery and/or scrap metal materials sent by the defendants here are SREA-eligible.

The Court, however, shall keep such considerations in mind during future proceedings, such as at the divisibility and equitable allocation phases.[56]

### E. Whether a Release from the Vernon Plant Caused Plaintiffs to Incur Response Costs

The Court previously articulated the release-causation standard in its Scope Trial verdict. As the Court previously held, CERCLA's plain language does not require a showing of actual contamination. Plaintiffs must, however, show that contamination plausibly caused them to incur response costs in remediating the relevant area.

The parties generally agree that releases from the Vernon Plant caused Plaintiffs to incur response costs. There is no dispute among the parties, for instance, that the Vernon Plant released air emissions through its stacks that contaminated the topsoil at the Plant with hazardous substances. Nor is there any dispute that the Plant's operations also caused hazardous substances to leach further into the soil, reaching the upper layers of soil and groundwater, the "perched zone." There is similarly no dispute that, to date, Plaintiffs have spent money remediating and monitoring the Vernon Plant and surrounding areas.

The parties do dispute the geographic extent of the contamination. At this phase, the gravamen of the parties' dispute is how far into the earth trichlorethylene ("TCE") leached from

---

[56] The Court also notes that there *is* a "de micromis exemption" at 42 U.S.C. 9607(o). If relevant, the Court would entertain argument regarding this section at a future proceeding.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

the mixed-metals extrusion building. Defendants contend that it only reached the perched zone, at which point it was stopped by a geological feature known as an aquiclude—essentially, a barrier made of silt and clay. The parties refer to this aquiclude as the "Bellflower Aquiclude." The Bellflower Aquiclude is roughly 70 to 90 feet below ground surface. Declaration of Kristin Robrock, ECF No. 719 ("Robrock Decl.") at ¶ 20. Below the Bellflower Aquiclude is about 40 feet of soil, and below that is an aquifer approximately 140 feet below surface (what the parties call the "Exposition Aquifer").

Plaintiffs contend that TCE traveled further into the earth, all the way into the Exposition Aquifer. The Exposition Aquifer is roughly ¾ of a mile in diameter, exceeding the geographic scope of the Vernon Plant and extending into the Industrial Area. Plaintiffs contend that TCE went from the Vernon Plant into the Exposition Aquifer, spread throughout the aquifer, and now threatens a deeper aquifer that is used for drinking water.

The parties also dispute the extent to which the paving of the Vernon Plant stopped all releases to the subsurface. The Court shall address each disputed aspect of the release-causation inquiry in turn.

### 1. Scope of Contamination to the Topsoils

The parties do not seem to dispute the general proposition that the topsoils at the Vernon Plant are contaminated. The Scope Trial verdict also found that the Industrial Area and Plant were contaminated via air emissions. Though there is some contradictory testimony, for instance, in Dr. William Cutler's trial declaration. where he asserts that the evidence does not support that, in general, the Court accepts this general consensus[57] and finds that the topsoils are contaminated at the Plant.

---

[57] For example, the Declaration of Kristen Robrock states that there were unlined disposal pits in the West Yard from the 1940s to 1970s, Robrock Decl. at ¶ 11. At various points, her testimony is also that there is soil contamination throughout the Vernon Plant.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|----------------------|------|-----------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

There is, more specifically, ample evidence in the record showing that the topsoils and ground at the Plant are contaminated not only through air emissions, but also through other pathways.[58] The Declaration of Richard Laton discusses numerous non-airborne releases onto the top level of soil and just beneath the Plant in the South Yard such as: contamination stemming from hard rubber chip storage that apparently contains lead, arsenic, and antimony; releases of sulfuric acid and lead from the "Old Battery Separation Building"; TCE from the Mixed Metals Extrusion Building; arsenic, cadmium, lead, and zinc from the "Zinc Alloy Operations Area"; contamination of lead, arsenic, antimony, and sulfate from spills and leaking of smelting pots. ECF No. 714-1 at 60-64.

As for the West Yard, the Laton Declaration describes leaking and contamination in an "Earthen Disposal Pit," the "Old Slag landfill"; the "old battery storage area"; the Acid Sump Pit, the Acid Pit, and the Old Fill Area, which obviously involved putting acid and fill materials into a pit in the ground; the Slag Storage Pile; the Crushed Drum Storage Pile; contamination from the use of fuel tanks; contamination from the breaking of the batteries themselves, namely, resulting in leaked lead and sulfuric acid, because they were broken on bare soil with axes, cranes, skip loaders, and guillotines; and from rubber chip and other storage piles. ECF No. 714-1 at 64-68.

In the North Yard, Dr. Laton describes other types of contamination, such as contamination stemming from a loading dock that was used to load polypropylene onto trucks; the placing of soda ash, a material used in the desulfurization process to convert lead sulfate to

---

[58] Plaintiffs also offered the testimony of Dr. Frederic Quivik to show that various releases occurred throughout the Plant's history. The Court finds his declaration somewhat helpful in compiling evidence given his background as an industrial historian. But the Court relies most heavily on Dr. Laton's declaration regarding contamination given that Dr. Laton is a scientist, not a historian.

NL objects to much of Dr. Quivik's declaration; as discussed above, these objections are overruled as to the cited sections.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|----------------------|------|-----------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

lead carbonate, onto the ground; and contamination stemming from other battery breaking sites and storage piles. ECF No. 714-1 at 69-70.[59]

Defense expert Dr. Cutler rebuts some of these releases. However, most of his arguments in rebuttal to Dr. Laton involve the timing of these alleged releases, in support of the defendants' third-party defense arguments, as discussed below, as opposed to actually controverting that such releases ever occurred or threatened to occur. Additionally, there was little argument regarding these releases in detail either at trial or in the parties' trial briefing. Considering the weight of this evidence of contamination at the Plant, the Court finds Plaintiffs' evidence stablishes more convincingly that, by a preponderance of the evidence, there was plausibly a release of hazardous substances on the surface at the Vernon Plant. Even if it is true that some of these contaminants did not actually leach into the ground, the Court finds it more than plausible that the industrial activities at the Vernon Plant threatened to release hazardous substances onto the ground.

### 2. Whether TCE Reached the Exposition Aquifer

The parties do not dispute that contamination reached the Perched Zone. It also does not seem disputed that the Perched Zone groundwater is not flowing offsite given that water in this zone has historically flowed south-southeast, but wells to the southeast have dried up since 2015. Declaration of Andy Davis ("A. Davis Decl."), ECF No. 699 ("A. Davis Decl.') at ¶ 214-215[60]

---

[59] NL objects to paragraph 69 as lacking foundation and being improper expert testimony. These objections are overruled. As discussed below, the Court finds Dr. Laton sufficiently qualified to provide the opinions in his declaration.

[60] Plaintiffs object that paragraphs 142-215 are inadmissible pursuant to the Court's May 22, 2023 order granting Plaintiffs' motion in Limine No. 1: to exclude evidence of Plaintiff's potential future response costs (ECF 745 at 6); Plaintiff object that declaration should be filed, not placed in exhibit list. Gould objects under hearsay as to the entire Declaration of Andy Davis. (ECF 750 at 104). The Court finds that the cited paragraphs above do not run afoul of the Court's order granting the motion in limine; it has not considered the propriety of future response costs here. And because Dr. Davis was available for cross-examination, the hearsay objection is overruled.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

(contamination cannot migrate south because the Perched Zone "pinches out" such that "the saturated thickness becomes 0 feet south of Bandini Boulevard, nor can it migrate north, east, or west because it would be against the groundwater flow direction).

In general, the parties seem to agree that in order for TCE to have plausibly reached the Exposition Aquifer, TCE must either be present in its dense nonaqueous phase liquid ("DNAPL") form or there must be discontinuity in the Bellflower Aquiclude to allow for the passage of contamination. Robrock Decl. at. ¶¶ 32, 63, 74. Defendants contend that groundwater recharge is also necessary for TCE to have reached the Exposition Aquifer, of which, they argue, there is no evidence.

The parties do dispute whether the Exposition Aquifer was contaminated; this aquifer does extend offsite. The parties offered testimony of several experts to assess whether TCE reached the Exposition Aquifer.

### a. Dr. Kristin Robrock

Defendants primarily rely on the testimony of Dr. Kristin Robrock. Dr. Robrock is a Managing Engineer in Exponent's Environmental & Earth Sciences Practice in Oakland, California. Robrock Decl. ¶ 5. She has a B.S. in Earth and Environmental Engineering from Columbia University and a M.S. and Ph.D in Environmental Engineering from the University of California, Berkeley. *Id.* She is a Professional Engineer in the State of California and has practiced for approximately 15 years. *Id.* ¶ 6. Her areas of experience include "the fate and transport of chemicals; environmental forensic investigations of the sources of contaminants found at various types of contaminated sites; and assessment and review of environmental cleanups in both soils and groundwater." *Id.*

To form her opinions, Dr. Robrock relied on "soil, soil vapor, and groundwater sampling data; investigation reports, maps, photographs, textbooks and published studies; deposition transcripts; expert reports and supporting documents; and legal documents," plus her experience in the field and based upon a visit to the Vernon Plant. *Id.* ¶ 7.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Dr. Robrock testified that several data points suggest that TCE did not flow from the Vernon Plant into the Exposition Aquifer. First, Dr. Robrock points to the fact that, since 1985, the Perched Zone has decreased in thickness due to a decrease in groundwater, and some monitoring wells there have gone dry. *Id.* ¶ 25. Therefore, there is less pressure that can push water through the Bellflower Aquiclude towards the Exposition Aquifer. *Id.* ¶ 27.

Second, Dr. Robrock discusses the character of TCE, as well as PCE, another chemical detected at the Vernon Plant. Dr. Robrock asserts that it tends to migrate vertically until it reaches groundwater, then dissolve into and migrate with the groundwater. *Id.* ¶ 32. TCE, however, does not travel through substances with lower hydraulic conductivity, such as clay, particularly if the clay layer is impermeable. *Id.* PCE is slightly denser, less soluble, and less volatile than TCE. *Id.* ¶ 36.

Dr. Robrock looked to site data to conclude that TCE is present in the highest concentrations in the soil, soil vapor, and Perched Zone groundwater immediately below the Vernon Plant and "immediately off-site." *Id.* ¶ 37. At trial, Dr. Robrock also testified that, more specifically, TCE levels were highest below the Mixed Metals Extrusion Building. PCE was also detected in the soil vapor at the Vernon Plant at levels 10 to 100 times lower than the TCE concentrations. *Id.* at ¶ 47. PCE was detected below the Mixed Metals Extrusion Building, "likely due to biodegradation of the TCE" in this area. *Id.* ¶ 48. While TCE was found in the Perched Zone, there was either no detection of PCE, or, if there was, at a level below acceptable levels. *Id.* ¶ 56. Last, TCE has been found in the Exposition Aquifer, as well as PCE, but at low concentrations. *Id.* ¶¶ 58-62. Also found in the Exposition Aquifer was carbon tetrachloride, which was not used at the Vernon Plant. Id. ¶ 79.

In Dr. Robrock's opinion, several other sites near the Vernon Plant are responsible for the TCE and PCE found in the Exposition Aquifer, such as the Univar Plant and the Baker site. The Univar Plant used carbon tetrachloride in its operations. *Id.* ¶¶ 78-79. Because carbon tetrachloride was used there and not at the Vernon Plant, Dr. Robrock concludes that the Univar Plant's stream of chemicals (what the parties term the "Univar Plume") is impacting the Exposition Aquifer.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Dr. Robrock further points out that there are 40 feet of unsaturated soils between the Perched Zone and the top of the Exposition Aquifer. *Id.* ¶ 82. That 40 feet, according to Dr. Robrock presents an additional barrier aside from the Bellflower Aquiclude itself to the flow of TCE from the Vernon Plant.

Dr. Robrock emphasizes that "[n]o samples have been collected between the bottom of the Bellflower Aquiclude and the top of the Exposition Aquifer in the areas where the highest concentrations of TCE are present to indicate whether TCE from the Perched Zone is reaching the Exposition Aquifer. The only available data are field measurements collected using a photoionization detector during the installation of Wells MW-11D and MW-12D. These field measurements detected no organic vapors, suggesting that there is no significant migration of TCE from the Perched Zone to the Exposition Aquifer." *Id.* ¶ 87.

Last, Dr. Robrock opines that there is no threat to drinking water sources, namely, the "Gage-Gardena Aquifer" that lies about 190 to 210 feet below the surface, and which lies below the Exposition Aquifer and another aquiclude, but which is not itself used for drinking water, as well as the drinking water sources themselves, 500-1000 feet below ground level. *Id.* ¶ 88. Because of the low concentrations of TCE in the Exposition Aquifer and low groundwater recharge above it, Dr. Robrock concludes that there is no viable migration pathway for the TCE to reach either the Gage-Gardena Aquifer or the drinking water sources. *Id.* ¶¶ 89-90. Dr. Robrock included the following image showing her conception of what the ground under the Plant looks like:

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |



DX 2-1027.

### b. Dr. Andy Davis

Defendant NL called Dr. Andy Davis, who also opined on whether releases from the Vernon Plant reached the Exposition Aquifer.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Dr. Davis has over 50 years of experience investigating chemical transportation through the environment. Declaration of Andy Davis ("A. Davis Decl."), ECF No. 699 at ¶¶ 15-26. Dr. Davis has been an adjunct professor at the University of Colorado, an editor or reviewer for five environmental science journals, and an author of more than 80 peer-reviewed publications in scientific literature. *Id.* Dr. Davis has managed numerous environmental project sites globally and regularly consults for the EPA and private sector organizations in their interactions with the EPA and other state environmental agencies (including the DTSC). *Id.* Dr. Davis founded an environmental engineering, design, and consulting firm called Geomega after working as a geochemist at various private firms. *Id.* Dr. Davis holds a Ph.D. in Geology from the University of Colorado, a Master of Science degree in Environmental Sciences from the University of Virginia, and a Bachelor of Science degree in Applied Biology from Liverpool Polytechnic. *Id.*

Dr. Davis contends that because soils contaminated with lead, a heavy and largely immobile metal, are sealed under an asphalt cap, there is no pathway for lead to come into contact with drinking water. A. Davis Decl. at ¶¶ 182-91. Similarly, Dr. Davis argues that the former slag disposal area cannot contaminate the aquifers below the West Yard because it is also encased in asphalt. *Id.* at ¶¶ 199-206.

Dr. Davis contends that contamination in the perched zone is contained by groundwater flow direction. *Id.* at ¶ 214. The perched zone is discontinuous, meaning that water is found in pockets throughout the silty clay. *Id.* at ¶¶ 624-33. According to Dr. Davis, these pockets have dried up significantly over the past six years because operators of the Vernon Plant stopped allowed process water to run into groundwater below the West Yard in 1983 and then paved over the area, sealing in the subsurface. *Id.* Dr. Davis contends that this cap has proven to effectively prevent water from leaking from the Vernon Plant to the perched zone as shown by the fact that saturated thickness in the perched zone has not increased despite frequent water applications to the asphalt over the past eight years. *Id.* at 639.

According to Dr. Davis, TCE contamination in the Exposition Aquifer shows levels too high to be consistent with a release from the Vernon Plant and can only be explained by TCE contamination carried by the Univar and Honeywell plumes. *Id.* at ¶¶ 800-21.

    c.  **Dr. William Richard Laton**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Plaintiffs offered the testimony of Dr. Richard Laton. Dr. Laton is a Registered Professional Geologist and Hydrogeologist in the State of California, as well as other states. Declaration of William Richard Laton, ECF No. 714-1 ("Laton Decl.") at ¶ 2. He holds several professional certifications in this field. *Id.* ¶ 3. He is currently an Associate Professor of Hydrogeology at California State University, Fullerton, and the owner of his own environmental consulting business. *Id.* ¶¶ 4-5. His areas of expertise include issues concerning fate and transport hydrogeology, hydrology, geology, soil, soil vapor, aquifer contamination, and the quality of groundwater, including drinking water. *Id.* ¶ 7.

To form his opinions, Dr. Laton looked at documents relating to the Vernon Plant, RCRA documents, aerial photographs and maps, contaminant sampling data, and technical literature relevant to his analysis. *Id.* ¶ 10. He also considered the reports of other experts retained in this litigation. *Id.* ¶ 12.

Regarding mechanisms of groundwater contamination, Dr. Laton opines that, for COCs and other metals introduced at the soil surface to be able to move down the soil column and into groundwater, the soil must be overloaded with metal or mobility must be enhanced by interaction with the associated waste matrix. *Id.* ¶ 84. According to Dr. Laton, metal mobility at the Vernon Plant was enhanced by the presence of spent battery acid, which facilitated the movement of lead and COCs from the soil surface or waste pits into groundwater below the Plant. *Id.* at ¶ 85.

Dr. Laton also described the general nature of TCE, the chemical the parties allege went from the Mixed Metals Extrusion Building into the ground:

> TCE is moderately soluble in water and soil. TCE is not expected to bind with soil particles or bioaccumulate and will migrate downward through the soil column. TCE has a relatively high Henry's Constant and will form a vapor plume in the vadose zone. Once it migrates to the water table, since TCE is denser than water, free-phase TCE will sink to the bottom of an aquifer as a dense nonaqueous phase liquid (DNAPL). TCE can destroy the structure of clayey minerals, making them more permeable to dissolved contaminants. Further, TCE is not readily degraded in groundwater, although some TCE may naturally degrade under anaerobic conditions.

*Id.* ¶ 86.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

    Regarding the site's general character, Dr. Laton contends that the Vernon Plant sits on a layer of fill material atop the Central Basin of the Coastal Plain of Los Angeles County, a depositional basin composed of 4,100 feet of sediments and aquifers. *Id*. at ¶¶ 87-89. The Central Basin is divided into three upper layers of sediment. *Id*. The Bellflower Aquiclude, below which sits the Exposition and Gage-Gardena Aquifers, is located in the middle layer, called the Lakewood Formation, which is found at 25 feet bgs to 170 feet bgs. *Id*.

    In Dr. Laton's view, the Bellflower Aquiclude is a section of coarse sand that contains perched groundwater in places around 75-80 feet deep. *Id*. According to Dr. Laton, the Exposition Aquifer sits just below the Bellflower Aquiclude at 85-90 feet; water can be reached in the Aquifer at 150 feet deep. *Id*. He notes that some wells in the perched zone have run dry since 2012 as water levels have decreased. *Id*. at ¶ 90. Groundwater in the perched zone historically flows to the southeast, though it has been observed flowing to the south, southwest and west directions beneath the West Yard; groundwater in the Exposition Aquifer flows predominantly to the southwest. *Id*. This movement, Dr. Laton argues, has spread contamination throughout the entire perched zone below the Vernon Plant. *Id*.

    Dr. Laton contends that contamination did reach the Exposition Aquifer. In his view, the Vernon Plant presents a significant drinking water quality concern because lead and other contaminants can travel in groundwater from the Plant through the forebay (the permeable layers of sediment and groundwater on which the Vernon Plant sits) and into the aquifers below. *Id*. at ¶¶ 91-92. Pathways interspersed through artificial fill and discontinuous fine-grained portions of the Bellflower Aquiclude allow contaminants to penetrate the deeper layers of the Exposition Aquifer from the perched zone. *Id*.

    Dr. Laton argues that boring data published by Advanced Geoservices and Avocet Environmental show that the layers of clay above the Exposition Aquifer may be inconsistent in thickness and permeability such that contaminants can still seep through in certain areas from the perched groundwater to the Aquifer below. *Id*. at ¶¶ 93-96. The presence of clay layers varies across the area beneath the Plant and in some places, water was found inside the clay, indicating that the clay does not always function as an impermeable barrier between water in the perched zone and the Aquifer. *Id*. Some cross-sections of the area beneath the Plant created from these borehole logs show contours enclosing high pH levels deep in the soil, which Dr. Laton interprets as a residual effect of acidic water moving downward from the acid disposal pits to the west. *Id*.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Dr. Laton asserts that, contrary to the Defendants' expert Dr. Davis' opinion, the depth of water measured at the Exposition Aquifer wells indicate that there is a downward hydraulic gradient between perched zone, the Exposition Aquifer below, and the deeper Gage Aquifer, which could have induced water to flow downward from the old production well on-site at the Plant to the Exposition Aquifer. *Id.* at ¶¶ 98-99. Dr. Davis references an upward hydraulic gradient, but this gradient is located in deeper aquifers to the south of the forebay area. *Id.*

In Dr. Laton's view, TCE concentrations in groundwater below the Vernon Plant are tied to groundwater levels in the perched zone, indicating that the Vernon Plant is a significant source of TCE contamination. *Id.* at ¶ 100. Other off-site sources, such as the Univar plume, may also contribute to TCE contamination, but according to Dr. Laton, they do not have as great an impact as the Defendants' experts suggest. *Id.* at ¶ 101-106.

Looking to data collected from monitoring wells both on- and off-site at the Plant, Dr. Laton believes that the plume moves slower than groundwater under the Plant and the concentration of TCE is much higher in wells found on-site below the Mixed Metals building than in off-site wells closer to Univar, suggesting that the operations in the Mixed Metals building more heavily contributed to TCE contamination below the Plant than the plume. *Id.* In addition, the TCE levels in the Exposition Aquifer measured below the Plant were much higher than any of the nearby locations. *Id.* This colocation data indicates that the Vernon Plant's TCE-producing operations were a significant cause of TCE contamination in the Exposition Aquifer. *Id.*

Last, Dr. Laton rebuts Dr. Davis's declaration, stating that, contrary to Dr. Davis's assertion, rainfall and leaked stormwater can seep through cracks in the ground and contribute to groundwater contamination below the Vernon Plant in addition to acknowledged downward percolation from on-site activities, pipe, leaks, and other sources. *Id.* at ¶ 107. "The long-term effects of infiltration are also known to cause the aquifer waters to maintain a less-than-desirable acidity, which Dr. Laton believes will move Site COCs through the vadose zone." *Id.*

### d. Dr. Vandana Mistry

Plaintiffs witness Vandana Mistry also offered some testimony about contaminants in the subsurface. Vandana Mistry is a Senior Hazardous Substances Engineer with the California DTSC responsible for project management, contract management, and technical reviews for the

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Exide Facility Corrective Action and Closure programs. Declaration of Vandana Mistry ("Mistry Decl."), ECF No. 714-5 at ¶¶ 2-4. Prior to joining DTSC, Mistry worked for over 20 years at several environmental consulting firms in project management, soil and groundwater assessment, remedial design and engineering, and regulatory compliance in the environmental industry. *Id.* Mistry holds a Bachelor of Science and Master of Science degree in civil engineering from California State University, Fullerton. *Id.*

Based on data drawn from several investigations conducted at the Vernon Plant between 2006 and 2019, Mistry states that concentrations of antimony, cadmium, arsenic, and lead did not exceed California EPA maximum contaminant levels ("MCLs") for drinking water in any groundwater samples taken from the South Yard Exposition Aquifer. *Id.* at ¶¶ 15, 17, 19, 21.[61] TCE levels exceeded the MCL (5 μg/L) in groundwater samples collected from the perched zone and Exposition Aquifer near the Old Mixed Metals Extrusion Building, Metals Warehouse, and Storm Water Retention Pond. *Id.* at ¶ 24.

Mistry contends that antimony, cadmium, arsenic, and lead did not exceed MCLs in any Exposition Aquifer groundwater sample in the North or West Yards. *Id.* at ¶¶ 32, 34, 36, 38, 44, 46, 48, 50. TCE and PCE concentrations exceeded MCLs in groundwater samples collected from the perched zone and Exposition Aquifer near the former Earthen Disposal Pit and Earthen Acid Dump Pit. *Id.* at ¶¶ 53-55.

### e. Discussion

The Court, overall, found Dr. Robrock more credible than Dr. Davis after observing them both testify at the May 2023 Trial. More specifically, the Court observed their manner of testifying and the reasonableness of their scientific positions vis-à-vis the record before the Court. The Court therefore affords less weight to Dr. Davis's testimony, but finds his assertion that the aquiclude prevented Vernon Plant TCE from traveling into the Exposition Aquifer persuasive. The Court shall accordingly focus its discussion in this section on Dr. Robrock's analysis for the defense experts.

---

[61] NL objects to paragraphs 14-74 as hearsay (ECF 738). The Court disagrees that this testimony is hearsay; the objection is overruled.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

To summarize, Dr. Robrock asserts that the Bellflower Aquiclude is impermeable, so no TCE could get through. Dr. Laton asserts that the Bellflower Aquiclude *is* permeable and therefore let TCE through from the Vernon Plant. Thus, like in the Scope Trial, "[s]ince this was a bench trial involving primarily battling experts, it is up to the Court to weigh the evidence presented and attempt to ascertain the truth." *Couer D'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094, 1103 (D. Idaho 2003).[62]

The Court finds that TCE did not reach the Exposition Aquifer for the following reasons.

First, the Court credits the testimony of Dr. Robrock that the Bellflower Aquiclude is impervious. The Court, more specifically, credits Dr. Robrock's testimony that the Bellflower Aquiclude is continuous. First, her testimony was that the aquiclude must be "sufficiently thick, impervious, and continuous at the Vernon Plant to support accumulation of groundwater[,]" which for decades was about 20 feet of groundwater. Robrock Decl. at ¶¶ 21,73; Trial Tr. May 30, 2023, 159:15- 160:10. The fact that the Perched Zone sustained groundwater for so long credibly demonstrates that the aquiclude is continuous and would have prevented TCE from seeping through into the aquifer. The fact that there seems to be little or no groundwater recharge also persuades the Court that TCE from the Vernon Plant did not reach the aquifer. As Dr. Robrock argues, this fact means that there would be little movement from the surface downwards. If there was, the Court finds that there would be observable groundwater recharge in the Perched Zone.

The Court also does not credit Dr. Laton's declaration testimony that MW 23D and 24D support the proposition that the Bellflower Aquiclude is discontinuous. Laton Decl. at ¶ 96. There was some argument between the parties about whether Monitoring Well 23D and 24D

---

[62] Like with the Scope Trial, the Court finds all expert testimony discussed here admissible under the standard articulated in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). The Court, rather, credits the testimony of Dr. Robrock, and not Plaintiffs' experts, for the reasons outlined in this section, and therefore finds that Plaintiffs did not meet their burden in showing a plausible TCE migration pathway into the Exposition Aquifer. The Court also notes that no *Daubert* motions were filed. To the extent that any party objected to any testimony relied on in this section, those objections are overruled.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

both show that there is very little clay at this point in the aquiclude. The Court credits Dr. Robrock's interpretation of the geological data. Indeed, Dr. Laton even stated at trial that, unlike his prior opinion that Monitoring Well 24-D showed very little clay, he thought it could show up to 25 feet of clay. Trial Tr. Day 1, 86:21-25; 88:5-9. The Court finds that this well showed a thick layer of clay. Thus, because the Court finds that the aquiclude is impermeable, there was not only no "release," but there also no "threatened release."

Second, the Court agrees with Defendants that there are several flaws in Dr. Laton's reasoning. Dr. Robrock's assertion that there is no significant groundwater recharge in the perched zone was not refuted by Dr. Laton. Rather, in his deposition, he stated that while "certainly there could be recharge through [paved] asphalt" through cracks and poor conditions, Laton Depo. 82:22-23[63], Laton did not perform any quantitative analysis to determine how much groundwater recharge is coming from the Vernon Plant. Laton Depo. 83:13-17.

Nor does Dr. Laton's report adequately refute Dr. Robrock's conclusion that the TCE in the Exposition Aquifer originated from offsite sources, such as Univar and Honeywell. Dr. Laton did not consider offsite sources in forming his opinions, though he was aware that other sites around the Vernon Plant had released TCE into the ground. Laton Tr. 77:20-25; 88:11-22; 92:14-93:10. The Court finds it unpersuasive that that Dr. Laton states that just because Univar contaminated the Exposition Aquifer, that "[t]here is no reason to suspect TCE to act differently at the Vernon Plant." Laton Decl. at ¶ 41. As Dr. Robrock pointed out, the TCE at the Univar site was DNAPL TCE, which is TCE in its pure state. Robrock Decl. at ¶ 33. The TCE at the Vernon Plant is dissolved phase TCE, not DNAPL. *Id.* ¶¶ 33, 44, 55, 63, 74. These two types of TCE apparently move differently in water, which Dr. Laton apparently did not account for. *Id.* ¶¶ 31-32.

Third, relatedly, though this is not the primary basis of the Court's finding here, the Court notes that Dr. Laton did no analysis of background levels of TCE in the Exposition Aquifer. Dr. Laton stated at trial that one "would want to look at background[,]" but he did not do so. Tr. Transcript Day 1, 82:6-18.

---

[63] Plaintiffs object on grounds that deposition transcript should be designated, not submitted as trial exhibits. ECF 750 at 164. The Court nevertheless opts to rely on this deposition section.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Last, the Court emphasizes the lack of evidence in the record that, even if molecules of TCE did reach the Exposition Aquifer, which Dr. Robrock stated at trial could be true, this reality would still be insufficient for Plaintiffs to meet their burden. There is a marked lack of evidence in the record before the Court how this TCE would have propagated throughout the entire Exposition Aquifer, which is apparently almost a mile wide. There was some general testimony by Dr. Robrock that TCE would move with the water but more slowly. But there was no evidence discussing in detail how the water in the Exposition Aquifer is moving or how much more slowly the TCE would go with it. Indeed, there is even little or no evidence in the record showing how much TCE was in the aquifer even if it did travel that far. Dr. Laton stated at trial that he "did not make an analysis of how much" "TCE contamination in the groundwater came from the Vernon Plant." Tr. Transcript, Day 1, at 82:19-24.

It is true that there were low levels of another chemical, PCE, found in the Perched Zone directly below the Vernon Plant. But as Dr. Robrock points out, first, there is simply a lack of evidence in the record showing that PCE was an impurity present in the TCE used at the Vernon Plant. Robrock Decl. at ¶ 42. The PCE, therefore, cannot necessarily be traced to the Mixed Metals Building at all. Additionally, PCE was also used at other plants in the area, such as the Univar Plant. *Id.* ¶ 64. Last, PCE was found in lower concentrations in the Perched Zone than the quantities found in the Exposition Aquifer, not only suggesting that the PCE could have come from somewhere else, but also that even if it did travel with the TCE from the Vernon Plant, it would have waned in concentration the further down it went, making it implausible that it went through the Bellflower Aquiclude. *Id.* ¶ 78.

It is also true that Monitoring Well 12D had a lesser concentration of TCE than Monitoring Well 11D. 12D is generally upgradient of 11D, and TCE generally moves downgradient. Trial TR 144:12-24. Therefore, Plaintiffs argued, the TCE must have come from the Vernon Plant because levels of TCE increased when they should have decreased as they got farther away from the offsite sources. But this data point came from one instance when it was installed in 2015. The Court therefore affords little weight to this data point and does not find that it credibly supports Plaintiffs' position.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

The same is true for Monitoring Well 11D: the data Plaintiffs rely on came from one year, 2015, and is therefore not helpful to the Court. Even if the Court did find this data point credible, there was evidence that 2015 monitoring data did not show any TCE in the soils between the Perched Zone and the Exposition Aquifer. Robrock Decl. at ¶ 87. This lack of TCE in 2015 above the aquifer further suggests that TCE was not moving downward from the Plant.

And even if the Court did find this single data point persuasive, the Court also credits the defendants' explanation that any TCE found in this well came from upgradient, namely, the Univar site. This explanation is particularly true given the evidence presented at trial that other monitoring wells, such as data obtained from monitoring well HMW-2 in 2021, which monitors the Exposition Aquifer, showed that there were high levels of TCE. Trial Tr. Day 1, 94:11-23; 95:10; *see also* DX 2-1046. As defendants argue, this evidence from 2021 shows that it is entirely possible that Univar is responsible for all contamination. Though Plaintiffs contend that both Univar and the Vernon Plant also contributed to TCE contamination there, the fact that the Court found the Bellflower Aquiclude impervious forecloses this possibility, and the fact that the amount of TCE in the aquifer could have come from entirely from Univar is also persuasive.[64]

---

[64] Plaintiffs point to the following exchange at trial as showing that Dr. Robrock admitted the TCE reached the Exposition Aquifer:

Q: Dr. Robrock, a moment ago I believe you agreed with me that it is possible that that groundwater that now is memorialized as dry could have migrated vertically down. You said we just don't know how much; is that correct?

A: That is correct, yes. Some small amount will get through. Clay is not a sheet of glass, so some will get through, some small amount. We don't have studies to indicate what that amount is. The information -- the little bit of information we do have suggests it's very little. And one of the sources of information we have is if we look at how much groundwater there has been in that upper zone and the lower zone over time, both have been drying out. So the level of groundwater has been dropping and dropping over time in both groundwater zones, but the lower groundwater zone has been dropping more quickly than the upper zone, and so from that I think we could infer that there is very limited amount of water from the upper zone that is getting down to that lower zone. Had

---

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

there been a significant amount of water from the upper zone getting down to the lower
zone, I think it would have helped refill that lower groundwater zone, but we don't see
that. We see that the lower groundwater zone is drying up more quickly than the upper
zone, so it would suggest to me there is not an appreciable amount of water getting from
the upper zone to the lower zone that would help refill that lower zone. That is Laton's --
Dr. Laton's Figure 6(A), I believe shows that.

Trial Tr. Day 1 at 151:9-152:13.

Plaintiffs additionally point to the Robrock Declaration at paragraph 23 as making a similar
alleged admission. This paragraph states:

The Exposition Aquifer is located beneath the Bellflower Aquiclude at a
depth of approximately 140 to 150 ft bgs. There are approximately 40 ft of unsaturated
sediments between the bottom of the Bellflower Aquiclude and the top of the Exposition
Aquifer water table. These unsaturated sediments indicate that there is limited hydraulic
connection between the Perched Zone and Exposition Aquifer due to the lack of water to
saturate the intervening soils. Beneath the Exposition Aquifer lies a 35-foot thick
aquiclude, and beneath the aquiclude is the underlying Gage-Gardena Aquifer.

Robrock Decl. at ¶ 23.

The Court disagrees with Plaintiffs that these statements constitute an admission that TCE from
the Vernon Plant reached the aquifer. The Court simply disagrees that paragraph 23 can be
construed to mean that TCE reached the aquifer. Read in context, this paragraph suggests that no
water went through the clay because it is so dry in the Perched Zone.

As for her testimony on cross examination, the Court understands this response as answering
Plaintiffs' counsel's question about the possibility of water getting through if there was enough
water in the Perched Zone. Dr. Robrock's response was responding to a hypothetical situation:
"some small amount will get through." But as discussed in this section, the Court finds the

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | | Date | August 18, 2023 |
|---|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | | |

*See also* Trial Tr. Day 1, 178:2-10 (testifying that there is no evidence that the TCE at MW 11D came from the Vernon Plant).

*** 

For the foregoing reasons, the Court finds that Plaintiffs have met their burden as to release causation at the Vernon Plant itself, and more specifically in its topsoils, as well as in the subsurface. The Court previously found that Plaintiffs had established release causation via air emissions into the Industrial Area, and have also alleged a "disposal" there through the out on Bandini Boulevard.

Plaintiffs, however, did not meet their burden in showing contamination went past the Bellflower Aquiclude into the Exposition Aquifer. The Court did not find that there was either a release or a threatened release of TCE into the Exposition Aquifer. It was not plausible to the Court that the TCE traveled through the Perched Zone scores of feet and then through the clay barrier the Court found to be impenetrable under the Plant. The Court also relies upon the relative lack of evidence—namely, on the facts that TCE dissolves over time, and that Plaintiffs rely on discrete data points that the Court does not find sufficiently robust.

**F. Defenses to and Exemptions From CERCLA Liability**

There are few defenses to CERCLA strict liability. The three statutory defenses enumerated in § 9607(b), including defenses for "an act of God," "an act of war," or "an act or

---

aquiclude was impermeable based on the fact that it supported groundwater for so long, which was also Dr. Robrock's testimony at trial.

To summarize, the Court construes this testimony as regarding a possibility—a general observation that clay thickness varies throughout the aquiclude. But there is definite evidence in the record that the Court relies on. Namely, the Perched Zone under the Plant was, at one time, 20 feet thick, and was supported by the Bellflower Aquiclude. This evidence is persuasive evidence that under the Mixed Metals Building, the clay layer was thick enough to be considered impenetrable. Trial Tr. Day 1 at 179:4-8.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

omission of a third party other than an employee or agent of the defendant," are "the only [defenses] available, and ... the traditional equitable defenses are not." *Pakootas v. Teck Cominco Metals, Ltd.,* 452 F.3d 1066, 1078 (9th Cir.2006) (quoting *California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.,* 358 F.3d 661, 672 (9th Cir.2004)) (citation omitted) (alteration in original)

Two defenses, relating to releases relating to acts of war and acts of God, are not at issue here. Defendants here have asserted the third-party defense, arguing that it, in conjunction with the recycling exemption and federally permitted release defense, absolve them of liability.

The Court has reserved divisibility,[65] a defense to joint and several liability, for a future proceeding. The Court shall address each remaining relevant defense in turn. However, and as discussed above, in finding contamination to the surface, the Court agrees with Plaintiffs that the foregoing evidence shows releases to the surface and contamination in the buildings, even after 1986, so those releases would be neither federally permitted nor as a result of conduct attributable wholly to a third party. *See, e.g.,* Mistry Decl. at ¶¶ 69-71[66] (showing contamination at the North Yard smelter, constructed in 1982, to the concrete at the Plant).

> 1. **Third Party Defense -- Whether the Paving of the Vernon Plant Prevented Further Releases of Hazardous Substances into the Ground and Whether There Were Releases After 1986**

Several parties assert the third-party defense here: Ekco, Trojan, Quemetco, Kinsbursky, Oregon Tool, and Ramcar. Their basic argument is that they did not ship hazardous materials to the Vernon Plant before 1986. Therefore, they argue that all releases to the subsurface stopped

---

[65] The Court notes that here, the defendants' third-party defense argument is something akin to a temporal divisibility argument. But because they are trying to use it, in combination with the federally permitted release defense, to completely absolve themselves of CERCLA liability in the first instance, not to stave off joint and several liability, the Court shall now consider this evidence. The Court's reasoning in this section shall also apply to any divisibility argument the parties might want to make in the future, however.

[66] NL objects to this section as hearsay. The objection is overruled.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

after that date, meaning all subsurface contamination is entirely attributable to someone other than these defendants. Additionally, they all argue that any surface-level emissions were federally permitted, they should be exempt from CERCLA liability. The federally permitted release defense is discussed in the next section.

To establish the third-party defense, a defendant must prove by a preponderance of the evidence, that (1) the release or threat of release of hazardous substances was caused solely by the acts of a third party and (2) the defendant exercised due care with respect to the hazardous substances and took precautions against foreseeable third-party acts or omissions. 42 U.S.C. § 9607(b)(3); *see Castaic Lake Water Agency v. Whittaker Corp.,* 272 F.Supp.2d 1053, 1079-80 (C.D. Cal. 2003); *see also Adobe Lumber, Inc. v. Hellman*, 658 F. Supp. 2d 1188, 1204 (E.D. Cal. 2009).

"In order to successfully raise this defense, [the defendants] must establish by a preponderance of the evidence that a third party who was not [the defendants'] employee or agent, and with whom [the defendant] had no direct or indirect contractual relationship, was the *sole* cause of the relevant damages. 42 U.S.C. § 9607(b)(3)." *United States v. Honeywell Int'l, Inc.*, 542 F. Supp. 2d 1188, 1199 (E.D. Cal. 2008).

The Court shall address each element in turn. But as a threshold matter, the Court finds that several defendants shipped materials before 1986. Kinsbursky's witness, Paul Johnson, stated that shipments had started by at least 1985. Johnson Decl. at ¶ 8.[67] Plaintiffs also adduced evidence that Trojan Battery likewise shipped hazardous substances to the Vernon Plant beginning in the 1970s. DX 2-0080 at 53-61.[68] Therefore, these defendants cannot use the third-party defense to prove that they are "wholly innocent" of releases to the subsurface before 1986. *Honeywell*, 542 F. Supp. 2d at 1201. Additionally, Plaintiffs are correct that these defendants' contractual relationship with the Plant would, therefore, seem to preclude them from asserting the third-party defense too. 42 U.S.C. section 9607(b)(3) (defense inapplicable if the third party,

---

[67] NL objects to entire declaration to the extent it proffers legal opinions concerning applicability of SREA. For the same reasons as stated elsewhere, the objection is overruled.

[68] Plaintiffs also made this argument as to Ekco; however, the Court determined *ante* that Ekco is not liable per SREA.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

here, the Vernon Plant operator, is "one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant.").

*Release or Threatened Release Solely Caused by Third Parties*

The relevant defendants argue that, first, the paving of the plant in the 1980s meant that all releases to the subsurface stopped after that point. Additionally, defendants point to the 1994 lining of a stormwater pipe as additional evidence that this was the case.

In *Lincoln Properties*, the court examined what "caused solely by" meant in the context of CERCLA. *Lincoln Properties, Ltd. v. Higgins*, 823 F. Supp. 1528 (E.D. Cal. 1992). After echoing the frequent refrain in CERCLA cases that the statute is unclear, the court articulated the following standard:

> [T]he court holds that "caused solely by," as used in CERCLA, incorporates the concept of proximate or legal cause. If the defendant's release was not foreseeable, and if its conduct—including acts as well as omissions—was "so indirect and insubstantial" in the chain of events leading to the release, then the defendant's conduct was not the proximate cause of the release and the third party defense may be available.

*Id.* at 1540-42.

The Ninth Circuit has cited this case with approval generally, *see, e.g.*, *Fireman's Fund Ins. Co. v. City of Lodi, California*, 302 F.3d 928 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Oct. 8, 2002), it has never formally adopted the causation standard articulated in *Lincoln Properties*. Other courts in the Ninth Circuit, however, have adopted this standard. *See, e.g.*, *Adobe Lumber*, 658 F. Supp. 2d at 1188; *Castaic Lake*, 272 F.Supp.2d at 1081.

**<u>Paving of the Vernon Plant</u>**

Here, certain defendants argue that the paving of the Vernon Plant around 1986 acted as a barrier that prevented further contamination from leaking into the ground. The Court disagrees.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

First, the Court credits the testimony of Dr. Laton, who provided evidence of cracks and damage to the paving of the Vernon Plant. Laton Decl. at ¶¶ 45, 121-37.[69] The Court also agrees with Plaintiffs that the fact that there was a "regulatory determination in 1987 that the Vernon Plant's surface was not impermeable" is sufficient to show that, at some point after being paved, it is more likely than not that hazardous substances passed through it.

The Court more fundamentally finds that there is simply a lack of evidence in the record that asphalt paving, once installed, acts as an impermeable shield to anything that lands on top of the asphalt—even assuming that the asphalt remained pristine. But there is ample evidence in the record from which the Court concludes that the asphalt did not remain pristine after 1987 or that it would have stopped all releases anyway. As Dr. Laton discusses in his declaration, "[w]eather and climate conditions, traffic loads, drainage problems, utility holes, poor-quality materials, and highly corrosive materials can cause asphalt or cement to crack/crumble and fail." Laton Decl. at ¶ 122. Additionally, and more specific to the Plant, the heavy truck traffic persuades the Court that cracks and wear would invariably develop on the asphalt. Last, several earthquakes occurred in California during this time, further crediting Dr. Laton's testimony that earthquakes would have rendered the asphalt here permeable. And further, Plaintiffs adduced evidence that the chemicals used at the plant, such as spilled acid from the lead-acid batteries and sulfuric acid, which was known to be released at the Vernon Plant, would have been able to deteriorate the asphalt, particularly after rain or other water landed on the asphalt too. *Id.* ¶¶ 125-26.[70]

The Court additionally credits the photographic evidence, showing cracks and damage to the asphalt, and testimony from former Vernon Plant employees that they saw cracks in the

---

[69] Clarios objects to paragraph 128 for lack of foundation, personal knowledge, and authentication. ECF 172 at 1. The Court overrules the objections.

[70] For this reason, the Court likewise finds Dr. Davis's opinions that the current paving of the Vernon Plant means it is no longer harmful to the community to be similarly unavailing. In short, the Court finds that a layer of asphalt, no matter when or how it was installed at the Vernon Plant, would not prevent all contamination from passing through this pavement.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

cement. *Id.* ¶¶ 127-136[71] (citing to interviews with employees stating that they saw damage to the pavement).

Last, even though the defendants' expert on this point, Dr. Cutler, may have disagreed about exactly which substances leaked into the ground after 1986 and how, at trial, he did not contest that there had been releases after 1986.

Q. . . . You are not disputing that after 1986, there were, in fact, releases of lead and other heavy metals to the surface, right?

A. I don't dispute that.

Trial Tr. Day 2 at 79:19–22. As Plaintiffs argue in their briefing, "[t]his concession is critical because Plaintiffs presented considerable evidence of post-1986 non-airborne releases to the surface of the Plant. *See, e.g.*, Dkt. 741-1 (Laton Decl.) at 10:8-12 (discussing post-1986 releases); Dkt. 714-6 (Quivik Decl.) ¶¶ 84–86 (same); PX002.28–29, 80–81, 107–08[72] (Phase I trial exhibit that documented post-1986 releases to the surface, including from crushed drum storage pile, battery storage area, and polypropylene loading dock)."

In light of this evidence, and considering the fact that defendants have the burden here, Court accordingly finds that the relevant defendants have not met their burden in showing that the pavement at the Vernon Plant is an impenetrable barrier that totally prevented releases of hazardous substances into the ground.

---

[71] Clarios objects to paragraph 128 for lacking foundation, personal knowledge, and for improper authentication (ECF 172 at 1). This objection is overruled, as the Court finds Dr. Laton relied on his experience examining the Plant and as a scientist. The Court also finds the photographs sufficiently authenticated; and additionally relies on the statements of former Vernon Plant employees, which are admissible as statements of a party opponent, given that they were employees of the plant's former owner/operator.

[72] In the joint exhibit list, this evidence is objected to on hearsay, unfair prejudice, relevance. ECF 392. The Court disagrees, and the objections are overruled.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|------------------------|------|------------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

**The Stormwater Pipe and the Drainage System at the Vernon Plant**

The parties dispute the latest date that lead went into the soil and Perched Zone through stormwater pipes and the drainage system at the Vernon Plant. Defendants contend that the latest date it did was in 1994, when the stormwater pipes were lined. Plaintiffs contend that this lining did not prevent leaks.

NL relies on the testimony of Dr. Andy Davis to assert that there were releases to the subsurface after the early to mid-1980s. Dr. Davis asserts that the pipe had missing segments and was otherwise in poor condition according to a 1994 Insituform Southwest Storm Water System Analysis Report. A. Davis Decl. at ¶ 328-337[73]; see also NL-DX 2-048.

Dr. Davis further points to a 2013 California Environmental Quality Act Notice of Exemption (NOE) issued by DTSC stating that the stormwater drainage system included "(a) 3,460 feet of underground piping, (b) 80 feet of aboveground piping, (c) 140 feet of inactive underground piping and trench drain, (d) 36 manholes/inlets and catch basins; and (e) one pumping sump," and concluded that the existing stormwater system was "an imminent and substantial endangerment to public health and the environment." Davis Decl. at ¶¶ 352-53.[74] A 2014 Advanced GeoServices Report also showed lead concentrations in the surface soils, but as

---

[73] Gould objects generally to ¶ 324-432 on grounds that it is irrelevant in light of GEI's phase II stipulation, and specifically irrelevant divisibility testimony, hearsay, lacks foundation, improper expert testimony (ECF 748). The Court deems the evidence admissible and overrules the objections.

[74] Gould objects that it is irrelevant, lacks foundation, and is improper expert testimony (ECF 748). The Court deems the cited-to sections admissible for the purposes of determining whether releases to the subsurface stopped after a certain point.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Dr. Davis points out, the top few feet of soil had been removed in 1980, suggesting that the stormwater drainage system leaked after the early 1980s. *Id.* at ¶¶ 354-56.[75]

The other defendants primarily rely upon the Declaration of William Cutler, ECF No. 708 ("Cutler Decl.").[76] Dr. Cutler opines that all piping was lined in 1994 following a stormwater system analysis. Cutler Decl. at ¶ 18(a)(v); DX_2-1559; DX_2-1528.[77] Dr. Cutler opines that the stormwater pipe was lined, which "likely happened after a 1994 stormwater system analysis." Tr. Ex. DX_2-1559 (Advanced GeoServices Storm Sewer Inspection Report (Mar. 5, 2013)); Tr. Ex. DX_2-1528 (InSituForm Storm Water System Analysis Report (Feb. 25, 1994)). Dr. Cutler's testimony is that there is no evidence in the record that the pipe leaked, or, if it did, that any contamination breached the lining.

Plaintiffs rely on the Laton Declaration. Dr. Laton stated, regarding the pipe, that

A Storm Water System Analysis conducted in 1994 found that 1,341 feet of 3,194 feet (42 percent) of the stormwater pipe at the Vernon Plant Site were categorized as Category 1, which includes the following defects: segments of missing pipe; pipe peeling and splitting; excessive radial cracks; holes in the pipe; extreme ovality; heavy deterioration;

---

[75] Gould objects that it is irrelevant, lacks foundation, and is improper expert testimony (ECF 748). For the same reasons as stated above, the objections are overruled.

[76] The Court agrees with various Defendants and with Plaintiffs that some of Dr. Davis's expert opinions improperly makes divisibility arguments. For instance, as is relevant to the discussion in this section, Dr. Davis seems to be blaming certain releases on Gould, which operated the plant in 1994 when the alleged stormwater leak occurred. The Court nevertheless, for the purposes of this phase of the litigation, simply uses his opinions to determine whether this release occurred at all, which Plaintiffs bear the burden of proving at this phase. This finding is necessary at this phase of the trial because certain Defendants rely on this argument to contend that all contamination occurred as a result of a third party.

[77] NL objects to paragraph 18 (lacking foundation and as improper expert testimony) and DX_2-1528 (lacks foundation). These objections are overruled.

---

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

rust; and chemical damage, all leading to excessive infiltration and exfiltration. Another
1,444 feet (45 percent) of pipe were categorized as Category 2, which includes the
following defects: joint separation; large debris deposits; medium deterioration due to
rust; and medium ovality, all leading to infiltration and exfiltration. Sometime in the
1990s, the stormwater system was lined (AGS, 2013). Presumably, this occurred
sometime after the 1994 inspection, as there is no discussion of lining in the report.

Laton Decl., ECF No. 714-1, at 37, ¶ 113.

The Court finds persuasive the testimony of Dr. Laton. It is true that, as Dr. Cutler points
out, Dr. Laton's deposition revealed a general belief that "[m]y experience over the past 30+
years has led me to accept the fact that sewers leak." Laton Depo. at 204:21-209:18. [78] Dr. Cutler
may also be correct that Dr. Laton's analysis of the 1994 stormwater system report was flawed. It
may be true that Dr. Laton "incorrectly characterize[ed] one feature that could be applicable to
certain categories of pipes (infiltration and exfiltration) as necessarily applicable to all pipes in
those categories." Cutler Decl., ECF No. 708, at 19, ¶ 24; Tr. Ex. DX_2-1528 (InSituForm Storm
Water System Analysis Report (Feb. 25, 1994)).[79] The Court nevertheless finds Dr. Laton more
credible on this point. Dr. Laton provided considerable evidence, not squarely contradicted by
any defense witness, that at one point the pipe was severely damaged and corroded. This
evidence is sufficient to find that it is more likely than not that the pipe did not totally stop all
releases after 1987.

The Court also credits Dr. Davis's testimony regarding the pipes in determining that they
never leaked after they were lined. The Court finds persuasive his argument that an Advanced
GeoServices' Emergency Response Interim Measures Work Plan Stormwater Management
System from 2013 showed the contamination as "up to 10 feet below ground surface level"

---

[78] Plaintiffs object on the basis that deposition transcripts should be designated, not submitted as
trial exhibits. The Court nevertheless considers the deposition testimony cited above.

[79] NL objects to DX_2-1528 on the basis that it lacks foundation. The Court finds that there is a
sufficient foundation for this exhibit.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

existed levels of lead in excess of industrial soil standards, which were "reasonably attributable to the stormwater system." A. Davis Decl. at ¶ 378-380;[80] NL-DX_2-068; *see also* NL-DX_2-078. Again, 2014 report showed a similar conclusion. NL-DX_2-071.[81] The fact that lead contamination remained in the surface soils persuades the Court that the pipe leaked, because it is uncontroverted that this area previously had the first few feet of soil removed in 1980.

Accordingly, the Court finds that the stormwater pipe's lining did not stop the release hazardous substances into the environment after being lined in 1994.

*Due Care and Precautions Against Foreseeable Third-Party Acts or Omissions*

Though the Ninth Circuit has also not yet determined what this prong of the third-party defense requires precisely, other courts have found that it is the defendant's burden to establish that it "took all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken in light of all relevant facts and circumstances." *State of New York v. Lashins Arcade Co.,* 91 F.3d 353, 360-61 (2d Cir.1996) (quoting H.R.Rep. No. 1016, 96th Cong., 2d Sess., pt. 1, at 34 (1984)).

Here, the parties make no argument as to this element. Because the defendants did not address this element either in their briefs or at trial, the Court cannot conclude that they have met their burden as to this element.

### 2. **Federally Permitted Release Defense**[82]

---

[80] Gould objects that it is irrelevant, lacks foundation, and is improper expert testimony. ECF 748. For the reasons discussed in the section regarding the motion to strike, the Court disagrees, and the objections are overruled.

[81] Plaintiffs object that it is inadmissible pursuant to May 22, 2023 order granting motion in limine. ECF 745 at 11. The above-cited section, however, does not run afoul of the Court's grant of the motion in limine, as this rebuts the other defendants' third-party defense arguments.

[82] Technically, the Court need not address this defense as to contamination in the Industrial Area as a result of its foregoing holding that these emissions are not recoverable under Pakootas III.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|------------------------|------|-----------------|

| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* |
|-------|------------------------------------------------------------------------------------------|

Several defendants assert the federally permitted release defense, which is really a statutory exemption: Gould, Oregon Tool, Kinsbursky, Ramcar, and Trojan, as well as Ekco and Quemetco.

CERCLA Section 107(j) provides an exemption from CERCLA liability for response costs that result from a "federally permitted release." *See* 42 U.S.C. § 9607(j) ("Recovery by any person . . . for response costs or damages resulting from a federally permitted release shall be pursuant to existing law in lieu of this section."). Federally permitted releases include:

> any emission into the air subject to a permit or control regulation under section 111, section 112, title I part C, title I part D, or State implementation plans submitted in accordance with section 110 of the Clean Air Act (and not disapproved by the Administrator of the Environmental Protection Agency), including any schedule or waiver granted, promulgated, or approved under these sections . . . .

42 U.S.C. § 9601(10)(H). The same exemption exists under the HSAA. *See* Cal. Health & Safety Code § 25366(b) (barring recovery for response costs resulting from federally permitted releases); *id.* § 25325 (adopting the definition of "federally permitted release" set forth in 42 U.S.C. § 9601(10)).

To prevail on this defense, as the defendants state, they need to show that (1) the metal particulate emissions at issue in this case were subject to regulation by the South Coast Air Quality Management District ("South Coast AQMD"), and (2) the relevant South Coast AQMD regulations were part of California's EPA-approved State implementation plan. 42 U.S.C section 9601(1)(H).

**Whether "Subject To" Means "Compliant With"**

The parties initially dispute whether a defendant must comply with the relevant environmental permit in order to qualify for the defense. On one hand, the EPA has interpreted the words "subject to" to mean that a defendant must be compliant with its Clean Air Act permit

---

The Court nevertheless addresses these arguments as to the Industrial Area too as an alternative basis for concluding that these defendants are not liable for airborne contamination, including dust, in the Industrial Area.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|----------------------|------|-----------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

for the defense to be available to that defendant. Plaintiffs' Pretrial Brief, ECF No. #, at #. Plaintiffs urge the Court to defer to this interpretation under *Chevron*.

Defendants point the Court to the recent Third Circuit decision in *Clean Air Council v. United States Steel Corp.*, 4 F.4th 204 (3d Cir. 2021). There, the panel concluded that the words "subject to" to be unambiguous, thereby avoiding *Chevron* deference. Looking to both the plain meaning of the words "subject to" and the structure of the statute, the Court determined that a defendant need not be "compliant with its permit for its releases to be "subject to" a Clean Air Act permit. 4 F.4th at 211.

The Court agrees with the Third Circuit that the words "subject to" are not ambiguous; therefore, the Court need not defer to the EPA's interpretation of those words. The ordinary dictionary definition of the words "subject to" is "affected by or possibly affected by;" "likely to do, have, or suffer from; "dependent on something else to happen or be true." Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/subject%20to. Being affected by something is unambiguously broader than complying with something.

Even the definition offered by Plaintiffs (and rejected by the Third Circuit) is unambiguous and does not run contrary to the Court's interpretation: "falling under . . . the power or dominion of," and "obedient to." Plaintiffs' Pretrial Brief at 727. Falling under the power or dominion of another does not preclude someone from disobeying that authority. Nor does the dictionary definition of "obedient to" actually mean "compliant with." "Obedient" is defined as "submissive to the restraint or command of authority; willing to obey." https://www.merriam-webster.com/dictionary/obedient. Even if someone is willing to submit to the authority of another or is willing to comply with certain demands, it is possible that they could nevertheless end up non-compliant with those demands.

The statute's structure further supports the Court's interpretation. In the surrounding sections, dealing with other types of permits for other hazardous substances, Congress elected to include both the words "subject to" and "compliant with." Congress could have chosen to do so here. But it didn't do that here. Here, the words "compliant with" are absent. The Court therefore "presume[s] that it included it in one place and excluded it from another intentionally." *Rusello v. United States*, 464 U.S. 16, 23 (1983).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|----------------------|------|-----------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

It is true that, as Plaintiffs point out, that CERCLA is "a hastily passed statute" that was "poorly drafted." Plaintiffs' Pretrial Brief at 48. The Court also agrees that it might be strange that Congress would require compliance with some regulations and not others in order to be exempt from CERCLA liability. Last, the Court recognizes that its interpretation could, theoretically, reduce incentives to comply with Clean Air Act permits. But CERCLA's imprecise wording, the uncertain motives of a hasty Congress, and the remote possibility that incentives for environmental compliance may be realigned by the Court's decision are no basis for this Court to decline to comply with an unambiguous statute.

Accordingly, the defendants here need not have complied with their Clean Air Act permits avail themselves of the federally permitted release defense. The Court shall therefore turn to the question of whether the releases here were federally permitted.

**Whether the Permits Covered Particulate Matter**

The Court finds that they were federally permitted. First, as a threshold matter, the parties apparently do not dispute that the Vernon Plant was regulated by the South Coast Air Quality Management District ("SCAQMD") from 1979 to 2014. *See* ECF No. 733 at ¶¶ 1-2 (Plaintiffs' stipulation with defendant Quemetco that between 1995 and 2001, the Vernon Plant had a facility-wide permit); *see generally* Muehlbacher Decl.; Hower Decl. SCAQMD was created in 1976 and is responsible for air pollution control in Southern California. *See* ECF No. 728 at 5 (describing how air emissions are regulated in California at the state and local levels).

From 1979 to 2000, SCAQMD did not issue facility-wide permits. SCAQMD rather operated individual pieces of equipment, such as those at the Vernon Plant, according to its internal rules and regulations. SCAQMD's Regulation II "establish[ed] a system for permitting the construction and operation of equipment" that could release air emissions. ECF No. 728 at 7. Under Rule 201, a facility such as the Vernon Plant had to apply for a permit to construct new equipment, or, under Rule 203, to operate existing equipment. *Id.*; *see also* Hower Decl. Ex. 5 (DX_2-0506) at GEI0011766.

**Fugitive Dust Emissions, Emissions of Particles of Lead, and Whether These Emissions Are "Particulate Matter"**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|----------------------|------|-----------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Between 1979 and 2000, when the Vernon Plant obtained a Title V permit from SCAQMD, which "consolidate[d] the terms of all individual equipment-based permits in a single facility-wide permit." Muehlbacher Decl. ¶ 19. After 2000, because the Vernon Plant had a facility-wide permit, in general, air releases after 2000 were federally permitted.

The parties do dispute whether these permits applied to fugitive air emissions. Fugitive air emissions are "non-stack lead emissions caused by things other than the Plant's industrial processes." Plaintiffs' Pretrial Brief at 48. Plaintiffs contend that these emissions do not constitute "particulate matter," which is covered by the permit. Plaintiffs also contend that SCAQMD Rule 403 did not apply to particulate matter.

Defendants contend that any fugitive air emissions *were* particulate matter. Defendants, to this end, argue that (1) the experts who opine on this issue have testified that during the years South Coast wrote, issued, and enforced these permits, South Coast itself interpreted particulate to include lead; and (2) under Clean Air Act, it was ultimately the EPA's responsibility to promulgate ambient air standards, which South Coast had to enforce. The EPA specifically said that lead is a form of particulate.

SCAQMD rules "are divided into functional groups called regulations." 43 Fed. Reg. 25684. The Court shall first survey the relevant rules and regulations these permits entailed.

Regulation IV rules "impose restrictions or prohibitions on various types of emissions," including particulate matter and component metals including lead and fugitive dust. Hower Decl. ¶ 21. For particulates, the rules limit the amount of particulate matter "discharge[d] into the atmosphere from any source" by weight, per Rule 405, and concentration, per Los Angeles County Rule 52 and Rule 404. Rule 405 limits the amount of "solid particulate matter including lead and lead compounds" that can be discharged into the atmosphere. DX_2-0508 at GEI0011837. Los Angeles County Rule 52 and Rule 404 prohibit "discharge into the atmosphere" of particulate matter in excess of a set concentration. DX_2-0509 at GEI0011948, DX_2-0510. Rule 401 also limits visible emissions of air contaminants, including particulate matter, from any "single source of emission." DX_2-4341.

Regulation IV also "addresses fugitive dust[,]" which is any solid particulate matter

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

that becomes airborne, other than that emitted from an exhaust stack, directly or indirectly as a result of the activities of man. Hower Decl. ¶ 22. Rule 403 prohibits "the emissions of fugitive dust from any transport, handling, construction or storage activity so that the presence of such dust remains visible in the atmosphere beyond the property line of the emission source." Hower Decl. Ex. 8 (DX_2-0508) at GEI0011832.

"The Regulation II rules establish a permitting system for the construction and operation of equipment that may emit air contaminants and equipment that will be used to eliminate, reduce or control such emissions. To install or operate equipment under the South Coast AQMD rules, a facility must first apply for a permit to construct new equipment (Rule 201, DX_2-0504) or operate existing equipment (Rule 203, DX_2-505)." ECF No. 851 at 4.

It is additionally uncontroverted in the record that "[i]n 1993, South Coast AQMD established the RECLAIM (Regional Clean Air Incentives Market) program. *Id.* ¶ 17. RECLAIM Facility Permits, which consolidated all equipment-specific permits requirements in a single facility-wide permit, were issued to the Vernon Plant beginning in 1994. Separately, Title V of the Clean Air Act established a universal federal permit program to standardize air quality permits and the permitting process for facilities like the Vernon Plant. Muehlbacher Decl. ¶ 19. Beginning in 2000, the Vernon Plant operated under Title V permits that, as with the RECLAIM permits, consolidated all of South Coast AQMD's equipment-based requirements." *Id.* at 4-5.

The Court is sufficiently persuaded that these SCAQMD regulations were part of California's EPA approved state implementation plan. The parties do not dispute that the EPA approved SCAQMD Rules 201, 202, 203, and 212 in October 1978 and were federally enforceable through at least 1982. 43 Fed. Reg. 52237. EPA approved the inclusion of Rules 403 and 405 in the California's State implementation plan on June 7, 1978 (43 Fed. Reg. 25684) and approved the inclusion of LA County APCD Rule 52 on September 15, 1972. 37 Fed. Reg. 19812. LA County APCD Rule 52 remained federally enforceable until U.S. EPA approved Rule 404 to take its place in the California SIP on September 21, 1981. 43 Fed. Reg. 40011 ("Rule 52 in Los Angeles [County,] as approved in 37 FR 19812, remains federally enforceable as part of the California SIP."); 43 Fed. Reg. 25684; 46 FR 47451. The parties also do not dispute that the regulations and rules discussed in this section were part of California's implementation plan

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
| --- | --- | --- | --- |
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

from 1979-1982 and 1990-2001. Hower Decl. at ¶ 23; Muehlbacher Decl. ¶¶ 3, 10-26; *see also* Hower Decl. at ¶ 24.

As to whether lead particles are regulated by these permits, the Court credits the testimony of Joseph Hower and Edward Muehlbacher to conclude that they are. Mr. Hower has over 40 years of experience "addressing Clean Air Act issues applicable to industrial facilities in the Los Angeles area, including air quality management, permitting, regulatory compliance, risk management, pollution control engineering, litigation support, and expert witness work." Hower Decl. at ¶ 3. He also served on the SCAQMD Advisory Council for approximately five years and is a certified SCAQMD Permitting Professional. *Id.* He has "used [his] expertise and experience to negotiate complex technical agreements and permits with SCAQMD and other regulatory agencies, and to assist facilities with air quality compliance programs." *Id.* He is also a licensed professional engineer in several states, including California. *Id.* ¶ 6.

Mr. Muehlbacher worked as an Engineer for SCAQMD for over 35 years, from 1984 to 2020. His roles at SCAQMD included supervising air quality permitting for secondary lead smelters, including the Vernon Plant. Muehlbacher Decl. ¶¶ 6-7.

The Court, first, agrees with the defendants that Plaintiffs appear to have failed to conclusively identify any contamination attributable to "fugitive dust." There was no testimony on this subject at trial. And though Dr. Laton's declaration does state that there was fugitive dust generated at the Plant through 1998, he does not provide any kind of definitive quantitative analysis of the dust. Laton Decl. at ¶¶ 28, 115-120.[83] But even if he had, SCAQMD Rule 403(a) expressly prohibits "the emissions of fugitive dust from any transport, handling, construction or storage activity so that the presence of such dust remains visible in the atmosphere beyond the property line of the emission source." Rule 403(c), at the time, also prohibited fugitive emissions that increase the concentration of particulate matter at certain levels. Hower Decl. at ¶ 53. The Court concludes that the relevant rules therefore regulated fugitive dust emissions.

The aforementioned rules and regulations also covered particles of lead and metal emitted from the Plant into the air. Though Plaintiffs argue that lead was supposed to be treated

---

[83] NL objects on grounds of speculation, lacking foundation, and inappropriate expert testimony. ECF 738. These objections are overruled; the Court deems the evidence admissible, it simply does not find it persuasive.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

somehow differently, as the defendants show, the EPA has included lead in its conception of particulate matter. *See* DX_2-0500 at xiii. SCAQMD adopted the above rules and regulations that were intended to implement the EPA's regulatory scheme. Accordingly, their conception of particulate matter is apparently broad, noting that it "consists of atmospheric particles resulting from many kinds of dust and fume-producing" operations. DX_2-0503 at V-36. The Court finds credible the testimony of Mr. Hower and through a plain reading of the rules. Rules 401, 403, 404, and 405 all limit emissions of particulate matter. This limitation would necessarily encompass all the particles in those emissions including lead. Indeed, as defendants note, "Rule 405, which limits solid particulate matter emissions by weight specifically identifies "lead and lead compounds" as a component of particulate matter subject to regulation. DX_2-0508 at GEI0011837-38." ECF No. 851 at 8; Hower Decl. at ¶ 12.

As an additional basis, the Court also finds helpful the perspectives of Mr. Hower and Mr. Muehlbacher. Mr. Hower stated that, in planning a new smelter at the Vernon Plant in the 1980s, compliance with regulations was partially determined through lead emissions calculations. Hower Decl. at ¶ 44. Similarly, Mr. Muehlbacher testified that "[a]t SCAQMD, we understood that particulate matter emissions from the Vernon Plant included lead particles . . . ." Muehlbacher Decl. at ¶ 11. Plaintiffs did not cross examine these witnesses or challenge these contentions at trial.

Accordingly, airborne emissions at the Vernon Plant—including fugitive dust emissions and emissions of other lead particulates—were federally permitted between 1979 and 2014. Still, as with the third-party defense, Plaintiffs have pointed to evidence showing that Kinsbursky, Trojan, and Ramcar all made shipments during periods where there was no permit in place, so this defense would not totally absolve them of liability either. Johnson Decl. at ¶ 8[84]; Crowe Decl. at ¶¶ 4, 24; Ganster Decl. at ¶ 18.

Practically speaking, however, a combination of the federally permitted release and the Court's application of *Pakootas III* lead the Court to hold that airborne contamination in the Industrial Area is not recoverable as to any defendant; nor can those who successfully asserted the federally permitted release defense be liable for these emissions. Airborne contamination was the only contamination pathway in the Industrial Area aside from the pits close to the Plant

---

[84] NL objects to entire declaration to the extent it proffers legal opinions concerning applicability of SREA. The Court has disregarded any legal conclusions, to the extent there are any.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

property. Therefore, the Court can now conclude that the Industrial Area airborne contamination is different than that at the Plant.

The Court, however, declines to hold that the defendants asserting the defense cannot be held liable for airborne contamination at the Vernon Plant site itself. This is so because, as the Court's concurrently-filed divisibility verdict will find, the contamination at the Plant is commingled such that the airborne contamination cannot be separated from non-airborne contamination. Also, again, some defendants made shipments during periods when no permit was in place.

### 3. HSAA Retroactivity Defense

NL argues in its posttrial brief that it should not be liable under the HSAA because it only operated the Vernon Plant before 1982.

The HSAA provides that:

This chapter shall not be construed as imposing any new liability associated with acts that occurred on or before January 1, 1982, if the acts were not in violation of existing state or federal laws at the time they occurred.

Cal. Health & Safety Code § 25366(a) (West). Under a plain reading of the statute, for the HSAA to apply retroactively, the defendant needs to have done something that could incur liability under environmental laws enacted before 1982.

As a threshold matter, the Court struck NL's thirty-fourth affirmative defense after Plaintiffs moved to strike under Federal Rule of Civil Procedure 12(f). ECF No. 212 at 9, 17-18. NL's thirty-fourth affirmative defense argued that it was not liable under the HSAA because the HSAA is not retroactive. The Court granted the motion and held that

CERCLA and the HSAA impose liability retroactively. *See Anderson Bros. v. St. Paul Fire & Marine Ins. Co.*, 729 F.3d 923, 926 (9th Cir. 2013). Though NL raises Constitutional questions as to the validity of this statutory framework, the Court considered this question extensively in its prior [order denying NL's motion to dismiss]. Thus, these affirmative defenses are stricken.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

ECF No. 260 at 7. Even though the Court struck this affirmative defense, the Court nevertheless addresses NL's arguments regarding retroactivity.

The Court's prior orders never definitively concluded whether or not the HSAA retroactivity provision—or CERCLA's retroactivity provision—was constitutional, an argument NL has raised in the past and which it mentioned briefly in its posttrial papers. The Court now holds that these provisions are constitutional.

In the Court's prior order, at ECF No. 103, the Court noted that the substantial weight of authority suggested that CERCLA's retroactivity provisions were constitutional. The Court also noted that in *Eastern Enters. v. Apfel*, 524 U.S. 498 (1998), no majority of the Supreme Court could agree on a constitutional rationale for invalidating retroactive legislation. *see Alcan*, 315 F.3d at 188. ("Although a majority in *Eastern Enterprises* was willing to declare the retroactive liability scheme of the Coal Act unconstitutional, no single rationale commanded a majority.").

In *Eastern Enterprises v. Apfel*, the Court invalidated a portion of the Coal Act which required a former employer to contribute a large sum into an employee benefits pool to cover benefits which were not guaranteed at the time the company employed miners in the coal industry. 524 U.S. 498 (1998). A plurality found the Act to be an unconstitutional taking because it imposed a significant economic burden on the company, interfered with reasonable investment-backed expectations, and operated to arbitrarily deprive certain companies of funds with no correlation to their past actions. *Id.* at 523-24. A single company in *Eastern Enterprises* was required to pay between $50 and $100 million, which the plurality viewed as too substantial an economic burden under the circumstances. *Id.* at 529.

The plurality also took issue with the Coal Act's disruption of settled expectations because the company had no notice that the government might retroactively impose a severe and disproportionate burden "not calibrated either to Eastern's past actions or to any agreement—implicit or otherwise—by the company." *Id.* at 536.

Finally, the plurality commented that legislative solutions are often needed to solve complex national problems, but those solutions may violate the Takings Clause where they "single[] out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused . . ." *Id.* at 537.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

Justice Kennedy, along with the four dissenters, disagreed with the plurality's Takings analysis and concluded that the scheme at issue does not implicate property interests, but rather "imposes an obligation to perform an act" in the same way as many other regulatory schemes which do not implicate the Takings Clause. *Id.* at 540. In Justice Kennedy's view, the Coal Act was one of the "rare instances" of a retroactive economic regulation which was not "remedial" or "just and reasonable, and conducive to the general welfare . . ." *Id.* at 549.

Writing for the dissent, Justice Breyer did not find the Coal Act to violate due process where the company was aware of the potential problems inherent in collective benefits schemes, and it would have been more fundamentally unfair to impose the ongoing costs of its former employees' benefits claims on current industry operators who did not employ the same people or profit from their labor. *Id.* at 566. Justice Breyer also pointed to CERCLA as an example of a regulatory scheme which imposes retroactive liability in accordance with due process because it is "designed to prevent degradation of a natural resource, upon those who have used and benefitted from it." *Id.* at 560.

The concerns raised by the opinions in Eastern Enterprises are inapposite here. CERCLA is a regulatory scheme of a different kind that is designed to create a broadly remedial solution to address a threat to the general welfare. It cannot be said to violate the "permissive" due process standard for any of the same reasons as the Coal Act, especially considering that, as Justice Kennedy states, "[s]tatutes may be invalidated on due process grounds only under the most egregious of circumstances." *Id.* at 549. Under CERCLA, moreover, does not necessarily impose liability disproportionately because courts have equitable powers to adjust the share each party must ultimately pay. Third, potentially responsible parties should have been on notice of potential CERCLA because "[i]t is likely . . . that it was never legally permissible to release hazardous substances to the environment." *Otay Land Co., LLC v. U.E. Ltd., L.P.*, 15 Cal. App. 5th 806, 844-45 (2017). CERCLA's strict liability and contribution scheme ensures that no one party is forced to bear the burden of paying for others' harmful actions since all parties who might be responsible face liability under the statute and the costs are then allocated to those actors who contributed most heavily to the injury. None of the reasons for which the plurality in *Eastern Enterprises* found the Coal Act to be an unconstitutional taking apply to CERCLA's retroactivity provision.

As other courts have pointed out, CERCLA's retroactive application accords with Congress's apparent intent. "Congress's twin goals of cleaning up pollution that occurred prior to

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|----------|------------------------|------|------------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

December 11, 1980, and of assigning responsibility to culpable parties can be achieved only through retroactive application of CERCLA's response cost liability provisions; this fact provides additional evidence of clear congressional intent favoring retroactivity." *United States v. Olin Corp.*, 107 F.3d 1506, 1514 (11th Cir. 1997). *Olin* also looked to CERCLA's legislative history to conclude that Congress intended it to apply to parties who operated before 1980. *Id.*

The HSAA's regulatory scheme and remedial goals largely mirrors CERCLA's. The Court therefore, for the same reasons, declines to hold the HSAA's retroactivity scheme unconstitutional—particularly because a party would have been on notice of any environmental violation given the HSAA's language about complying with then-existing environmental regulations. In fact, while CERCLA is silent regarding retroactivity, the HSAA has an explicit retroactivity provision that contemplates some parties being exempt from retroactive application.

Having concluded that these retroactivity provisions are constitutional, as the Court noted in its previous order denying NL's motion for summary judgment on HSAA retroactivity, one California appellate court has elaborated on the burdens regarding retroactivity. In *Sabic Innovative Plastics*, the court held:

> Marotta and the District dispute the elements of the HSAA's nonretroactivity defense. Marotta argues it satisfied its initial burden by showing that its ownership of the property (and therefore any conduct that would violate the HSAA) ceased prior to 1982. The District argues Marotta was also required to show that its conduct did not violate any then-existing state and federal laws. We agree with the District [the plaintiff].

> The HSAA's nonretroactivity provision states that a defendant will not be liable under the HSAA if (1) the alleged wrongful acts occurred before on or before January 1, 1982 and (2) the alleged wrongful acts did not violate any existing state or federal laws at the time they occurred. (Health & Saf. Code, § 25366, subd. (a).) Unless both conditions are satisfied, the defense cannot overcome a prima facie showing of HSAA liability. Given the text of the statute, and the broadly remedial nature of the HSAA, it is appropriate to place the burden on the otherwise-liable defendant to prove compliance with then-existing environmental laws, e.g., through compliance records or the testimony of knowledgeable individuals. Marotta is required to establish both elements to prevail on this affirmative defense.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

*Orange Cty. Water Dist.,* 14 Cal. App. 5th at 389.

There, the court relied on the fact that the parties had stipulated that HSAA retroactivity was an affirmative defense. The court did articulate other reasons, however. The Court reaches the same conclusion here as in *Sabic*. Though the Court disagrees that the simple assertion that a statute's purpose "broadly remedial" is sufficient to place the burden of proof on a potentially responsible party, the Court agrees on the *Sabic* court's additional reasoning that the HSAA's text suggests that the burden of proof should be placed on the defendant. The HSAA's text of this provision includes the words "shall not" and "if" which, as Plaintiffs have noted, frequently denotes an exception to a statutory provision, and the person seeking the exception typically has the burden of proof. *See Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 91 (2009) (echoing "the familiar principle that when a proviso . . . carves an exception out of the body of a statute or contract those who set up such exception must prove it") (quotations and citations omitted).

Plaintiffs provide the following evidence to support its contention that NL was not always in environmental compliance during its tenure as Vernon Plant operator: a 1973 citation for failing to properly control lead pollution; a series of smoke violations, including lead oxide emissions, from the 1940s; a 1977 request by SCAQMD asking the Los Angeles District Attorney for a complaint against NL relating to air contaminant emissions; and other violations in the 1970s where NL pleaded no contest, including for emitting excessive baghouse dust, smoke, and contaminants from its furnaces.[85]

Plaintiffs have also adduced evidence of several admissions by NL that it violated environmental regulations. For example, an internal NL memorandum describes a Southern California Air Pollution Control District misdemeanor violation as having been caused by "improper feed procedures" and lamenting that an inspector was present during this episode.

NL has not met its burden here. Though it contends that there is no evidence in the record that it ever violated a law, the Court finds this to be simply argument with no evidence attached. Evidence of having a permit is insufficient to prove compliance with that permit (indeed, as the Court has discussed *ante*, having a permit and complying with it are different). And even if the

---

[85] The Court deems this evidence admissible as ancient documents. Fed. R. Evid. 803(16). The Court also concludes that these documents have been properly authenticated by Plaintiffs.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | | Date | August 18, 2023 |
|----------|----------------------|--|------|-----------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | | |

*Sabic* court is incorrect that the burden of proof is on the defendant to prove that it complied with then-existing laws, the evidence adduced by Plaintiffs would be sufficient to meet any burden placed on them to show non-compliance.

\*\*\*

In light of the foregoing analysis, the HSAA's retroactivity provision is constitutional, as is CERCLA's. Asserting that the HSAA should be non-retroactive is an affirmative defense for which NL had the burden of proof. NL did not meet this burden. But even if Plaintiffs had the burden, they met it. NL accordingly can be liable under the HSAA for acts committed before 1982.

**V.    CONCLUSION**

In conclusion, the Court's findings of fact and conclusions of law are as follows:

Plaintiffs have met their burden in making a prima facie case against the following defendants under CERCLA and the HSAA:

- Clarios – arranger and transporter
- Gould – owner/operator
- KBI – arranger and transporter
- NL Industries – owner/operator
- Oregon Tool – arranger
- Ramcar – arranger
- Trojan Battery – arranger

Because it is true that "if a plaintiff successfully establishes liability for the response costs sought in the initial cost-recovery action, it is entitled to a declaratory judgment on present liability that will be binding on future cost-recovery actions," *City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998, 1007 (9th Cir. 2010), Plaintiffs prevail on their claim for a declaratory judgment as to these defendants.

The following parties are not liable under CERCLA or the HSAA, as the Court holds that the SREA defense applies to the HSAA:

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | | Date | August 18, 2023 |
|----------|----------------------|---|------|-----------------|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | | |

- Ekco Metals
- Quemetco
- Plaintiffs (in other words, they are not owner/operators within the meaning of CERCLA)

Plaintiffs have met their burden in establishing release causation and/or whether or not the defendant is a covered person in the following areas:

- The Vernon Plant itself
- The topsoil
- The subsurface, including the perched zone but only until the Bellflower Aquiclude
- The Industrial Area – Plaintiffs can recover response costs in the discrete parts of the Industrial Area where the pits are located. Plaintiffs cannot recover for air-emissions-related response costs—i.e., stack emissions and dust—that fall under the federally permitted release defense asserted by all defendants except NL as to the Industrial Area beyond the Plant. But nor is NL liable for air emission contamination in the Industrial Area because these emissions are barred from recovery under *Pakootas III*.

Plaintiffs did not establish release causation as to:

- The Exposition Aquifer

Defendants did not meet their burden in showing that all releases to the subsurface stopped after 1986.

All defendants asserting the federally permitted release defense met their burden in showing that the releases were federally permitted.[86]

---

[86] [86] The Court generally agrees with Plaintiffs that the federally permitted release defense is part of the divisibility analysis. But, even were they not barred under *Pakootas III*, the Court holds

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | | Date | August 18, 2023 |
| --- | --- | --- | --- | --- |
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | | |

Defendants did not establish that the applicable statute of limitations bars the instant lawsuit.

CERCLA and the HSAA have retroactive effect. This retroactive effect is not unlawful either under the federal or California constitutions. NL did not establish that it is not liable under the HSAA's relevant provisions.

The Court, again, agrees with Defendants that this result may seem unfair in some instances. This is particularly so given the fact that Plaintiffs waited so long to bring the instant suit and seem to have brought it knowing that small-business recyclers may be run out of business as a result.

Trojan Battery's motion for partial summary judgment, at ECF No. 679, is denied. Plaintiffs did not bring this case on the theory that air emissions are not "treatment" within the meaning of CERCLA. Accordingly, the Court holds that it is unnecessary to make such a holding in this case given that it was not actually at issue. In other words, even if air emissions are not treatment, the defendants joining in this motion would still be liable anyway for the reasons discussed above.

In conclusion, because the Court is subject to, obedient to, *and* must comply with as best it can Congress's chosen language and probable intent in applying the aforementioned statutory schemes, for all the foregoing reasons, liability is established as to the foregoing parties.

---

that air emissions are not recoverable in the Industrial Area because there is no other contamination pathway to the 0.5-mile radius aside from the pits. The Court therefore can conclude at this stage that they are divisible from other contamination in the Industrial Area. As a result, Plaintiffs can only clean up the parts of the Industrial Area where the pits were.

Extending this logic, however, the Court concludes that air emissions, even if covered as to some defendants by the federally permitted release defense, are recoverable at the Vernon Plant. This is so because the contaminants there are commingled physically, making it impossible on the record before the Court for it to say which harm is caused by air pollution and which by other pathways.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11293-SVW-JPR | Date | August 18, 2023 |
|---|---|---|---|
| Title | *California Department of Toxic Substances Control et al. v. NL Industries, Inc. et al.* | | |

**IT IS SO ORDERED.**